# ORIGINAL

④
6/25/01
sc

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL A. SHAFFER, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION NO. 01-CV-1065 |
| | : Judge Sylvia H. Rambo |
| SUSAN GRAYBILL AS AN INDIVIDUAL AND | : |
| AS ADMINISTRATRIX OF THE ESTATE OF | : |
| DENNIS M. GRAYBILL, | : |
| MINUTEMAN PRESS INTERNATIONAL, INC., | : |
| and ROBERT EMMETT, | : |
| Defendants. | : |

**FILED**
**HARRISBURG, PA**

JUN 2 2 2001

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS OF DEFENDANTS MINUTEMAN PRESS INTERNATIONAL, INC. AND ROBERT EMMETT

Pursuant to Fed. R. Civ. P. 12(b)(6) and the Federal Arbitration Act ("FAA"), 9 U.S.C. §1, *et seq.*, Defendants Minuteman Press International, Inc. and Robert Emmett (collectively, "Moving Defendants") move the Court to dismiss the above-captioned civil action filed by plaintiff Michael Shaffer ("Plaintiff") for Plaintiff's violation of a binding arbitration agreement between the parties. In the alternative, Moving Defendants also move the Court to dismiss Plaintiff's Complaint and First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(3) and 12(b)(6), move to strike Plaintiff's jury demand, and for an award of their attorney's fees and costs associated with filing this Motion.

## I.   PROCEDURAL HISTORY

Moving Defendants are defendants in a civil action that was originally filed in the Court of Common Pleas of Cumberland County, Pennsylvania captioned *Michael A. Shaffer v. Susan Graybill as an individual and as Administratrix of the Estate of Dennis M. Graybill; Minuteman Press International, a New York corporation; and Robert Emmett*, Docket No. 2001-2664. Moving Defendants received a copy of the Complaint in Law with Action for Declaratory Judgment ("Complaint") via certified mail on or shortly after May 3, 2001. A copy of the Complaint is attached hereto as Exhibit "A." On or shortly after May 19, 2001, and before any defendant answered, moved or otherwise pled to the Complaint, Plaintiff filed his First Amended Compliant with Action for Declaratory Judgment ("First Amended Complaint"). A copy of the First Amended Complaint is attached hereto as Exhibit "B." Moving Defendants filed their Notice of Removal of the case to this Court on June 15, 2001.

In the Complaint, Plaintiff allegedly asserts the following claims:

a.   Count I - fraud in the inducement, fraudulent misrepresentation;
b.   Count II - breach of contract;
c.   Count III - negligence and infliction of emotional distress; and
d.   Count IV - punitive damages.

In the First Amended Complaint, Plaintiff incorporates by reference the Complaint and adds Count VI[sic][1] attempting to allege misrepresentation, omissions, false statements and conspiracy in violation of various unspecified "blue sky laws, federal FTC rules, federal securities laws, the criminal law of the Commonwealth of Pennsylvania, and federal criminal law," and Count VII [sic] attempts to allege that a clause in the Franchise Agreement requiring non-binding arbitration of Plaintiff's claims against Minuteman Press is a contract of adhesion.

---

[1]   It should be noted that the Complaint and First Amended Complaint are missing paragraphs 24 through 31 and there is no Count V. Count VI of the First Amended Complaint should be Count V and Count VII should be Count VI.

## II.  STATEMENT OF FACTS

Plaintiff and Minuteman Press entered into a Franchise Agreement on or about September 1, 2000 ("Franchise Agreement").  A copy of the Franchise Agreement is attached hereto as Exhibit "C".  Subject to certain terms and conditions, the Franchise Agreement granted Plaintiff the right to operate a franchised Minuteman Press Full Service Printing Center pursuant to the Minuteman Press System.  *See* Exhibit A at ¶ 1(a).  Plaintiff operated a franchised Minuteman Press Full Service Printing Center at 855 Market Street, Lemonye, Pennsylvania.  *See* Exhibit A at ¶ 1(c).

The Franchise Agreement contains an express arbitration provision.  Specifically, § 23 of the Franchise Agreement states in pertinent part that:

### 23.    Arbitration and Litigation

The **parties hereby agree** that the Federal Arbitration Act shall apply to all claims arising out of or relating to this Agreement or the breach thereof and that the business, which is the subject of this Agreement, is engaged in Interstate Commerce.  *Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by arbitration* in accordance with commercial arbitration rules of the Center for Dispute Resolution at a hearing to be held **in the State of New York** in the county where Minuteman maintains its home office.  …

Each party will be responsible for its own costs, including attorneys fees, in conjunction with the arbitration proceeding.  **If the franchisee commences action in any court prior to the arbitrator's final decision on the controversy or claim, then the franchisee will be responsible for all expenses incurred by Minuteman and the franchisee in the arbitration proceeding.**  …

The commencement of arbitration proceedings by an aggrieved party to settle disputes arising out of or relating to this Agreement is **a condition precedent** to the commencement of legal action by either party.

Exhibit "A", § 23 (emphasis added).

## III.    STATEMENT OF QUESTIONS PRESENTED

1.    Should Plaintiff's Complaint and First Amended Complaint be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and the Federal Arbitration Act, 9 U.S.C. § 3, because of the mandatory arbitration provision contained in the Franchise Agreement?

2.      Should Plaintiff's Complaint and First Amended Complaint be dismissed for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure?

3.      Should Counts I, III and IV of the Complaint and Counts VI and VII of the First Amended Complaint be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(6)?

4.      Should the parties' contractual jury waiver contained in the Franchise Agreement be enforced and should Plaintiff's jury demand be stricken?

## IV.    STANDARDS OF REVIEW UNDER FED. R. CIV. P. 12(b)(3) AND 12(b)(6).

Under Fed. R. Civ. P. 12(b)(6), a district court is permitted to dismiss claims that fail to state a legal basis upon which relief can be granted. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). Where a court concludes that the factual allegations in a plaintiff's complaint, even if true, do not state grounds for relief, then dismissal is warranted. *See Bell v. Hood*, 327 U.S. 678 (1946) and *Kronmuller v. West End Fire Co. No. 3*, 123 F.R.D. 170 (E.D. Pa. 1988).

On a Rule 12(b)(6) motion, a court is required to accept only well-pleaded facts as true; however, it is not required to accept as true any legal conclusions, deductions or opinions alleged in or inferred from the allegations contained in the complaint. *See Interfaith Community Organization v. Allied-Signal, Inc.*, 928 F. Supp. 1339, 1346 (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986) and *Briscoe v. LaHue*, 663 F.2d 713 (7th Cir. 1981), *aff'd*, 460 U.S. 325 (1983)).[2] Moreover, where the allegations of a complaint are contradicted by documents made a part thereof, the court may consider the documents and the court need not accept as true the allegations of the complaint. *Chester County Intermediate Unit v. Pennsylvania Blue Shield*, 896 F.2d 808, 812 (3d Cir. 1990). *See also Olpin v. Ideal National Insurance Company*, 419 F.2d 1250, 1251 (10th Cir. 1969). If the acceptable facts pleaded in the complaint, and reasonable inferences drawn from such allegations, are legally deficient to state a claim, a motion to dismiss should be granted. *McCoy v. United States*, 758 F.Supp. 299 (E.D. Pa. 1991). Dismissal is also appropriate where facts sufficient to support an affirmative defense, such as futility, appear on the face of the complaint. *Kahn v.*

---

[2]      *See also Zappala v. Burruano*, 1990 WL 79403 *1 (E.D. Pa. 1990) and *Wilson v. Rackmill*, 1990 WL 63504 *1 (E.D. Pa. 1990).



*Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992); *La Porte Constr. Co. v. Bayshore Nat'l Bank*, 805 F.2d 1254, 1255 (5th Cir. 1986) (citations omitted).

Before a case can be dismissed or transferred pursuant to Fed. R. Civ. P. 12(b)(3), there must be an evidentiary showing that venue is improper. *See Simon v. Ward*, 80 F.Supp.2d 464, 466-468 (E.D. Pa. 2000).

## V.   ARGUMENT

### A.   Plaintiff's Claims Are Subject to Arbitration.

Every contract or agreement involving interstate commerce that contains an arbitration clause is governed by FAA, 9 U.S.C. § 1, *et seq.* The FAA provides that arbitration agreements in contracts "shall be valid, irrevocable and enforceable," 9 U.S.C. § 2, and establishes a "federal policy favoring arbitration." *Moses H. Cane Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983). Congress' "principal purpose" in passing the FAA was to "ensur[e] that private arbitration agreements are enforced according to their terms." *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 478 (1989).

The FAA requires federal courts to "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cane*, 460 U.S. at 24-25; *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986); and *United Steelworkers of America v. Warrier and Gulf Navigation Co.*, 363 U.S. 574, 582-583 (1960). The Court should resolve all doubts in favor of arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of America v. Warrier and Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960).

There can be no such "positive assurance" here. On the contrary, every word of the Franchise Agreement makes clear that Plaintiff's claims are subject to arbitration, and thus not properly before the Court. The broad language of the Franchise Agreement clearly covers Plaintiff's claims requiring arbitration for *any* controversy or claim arising out of or relating to the Franchise Agreement. It cannot be credibly argued that Plaintiff's claims against Moving Defendants in this action do not "arise out of or relate to" the Franchise Agreement, as there would *be* no business relationship between the parties, but for the Franchise Agreement and the transaction at issue.

Moving Defendants are entitled to enforce the arbitration clause of the Franchise Agreement. The Complaint alleges that Defendant Emmett is a representative of Defendant Minuteman Press International, Inc. The Complaint asserts that "Defendant Robert Emmett is an individual and representative of MMPI…" and that "Defendant Emmett was the regional representative of Defendant MMPI and had authority to speak for and to bind the corporation." *See* Exhibit A, ¶¶ 5 and 10. Defendant Emmett, as Minuteman Press' representative, is an employee and agent of Minuteman Press and thus, the claims relating to him are arbitrable as all of the alleged claims relate to or arise out of the Franchise Agreement. *See* Exhibits "A" and "B". *See Doctor's Associates, Inc. v. Hollingsworth*, 949 F. Supp. 77, 83 (D. Conn. 1996) ("The acts of employees of a party to an arbitration agreement are arbitrable as long as the challenged acts fall within the scope of the customer agreement.") (citations omitted); *see also Okcuoglu v. Hess, Grant & Co., Inc.*, 580 F. Supp. 749, 752-53 (E.D. Pa. 1984) (where broker was agent to clearing broker and where agreement between customer and clearing broker called for arbitration was applicable to dispute between customer and broker). Moreover, Defendant Emmett is a third party beneficiary of the Franchise Agreement, and therefore is entitled to invoke the arbitration clause. *See Tillery v. Raffone*, 1991 WL 185158 , *5 (E.D. Tenn. 1991) (a third party beneficiary of an arbitration agreement are entitled to enforce the arbitration agreement); *see also Stone v. Pennsylvania Merchant Group, Ltd.*, 949 F.

Supp. 316 (E.D. Pa. 1996). In *Tillery*, franchisees sued their franchisor and three of its representatives. The defendants moved to enforce the arbitration clause contained in the franchise agreements. *See Tillery*, 1991 WL 185158. The franchisees argued that the arbitration clause could not be enforced because the three representatives of the franchisor were not signatories to the franchise agreement. *See id.* at \*5. In rejecting the plaintiffs' argument, the court held that the three representatives were third party beneficiaries and as such they "are entitled to invoke the arbitration clause of the franchise agreements... ." Here, as in *Tillery*, Defendant Emmett, as Minuteman Press' representative, is a third party beneficiary and is entitled to invoke the arbitration clause.

Plaintiff alleges that the arbitration "clause is a contract of adhesion, since Plaintiff simply had no bargaining power when he entered into the Agreement." *See* Exhibit B, ¶ 40. Pursuant to Pennsylvania law, a contract of adhesion is "a standardized contract form offered to consumers of goods and services on [an] essentially 'take it or leave it' basis without affording [the] consumer a realistic opportunity to bargain and under such conditions that [the] consumer cannot obtain [the] desired product or services except by acquiescing [to the] form contract." *See Todd Heller, Inc.*, 754 A.2d 689, 700 (Pa. Super. Ct. 2000) (citations omitted). "However, merely because a contract is a contract of adhesion does not automatically render it unconscionable and unenforceable." *See id.* For a contract of adhesion to be unenforceable, it must be found to be unconscionable. *See Rudolph v. Pennsylvania*, 553, Pa. 9, 17, 717 A.2d 508, 511 (1998). In order to show that the contract is unconscionable, a party must prove that (1) the party signing the contract lacked a meaningful choice in accepting the challenged provision, and (2) the challenged provision must "unreasonably favor" the party asserting it. *See Denlinger, Inc. v. Dendler*, 415 Pa. Super. 164, 177, 608 A.2d 1061, 1068 (Pa. Super. Ct. 1992). Moreover, "[u]nequal bargaining power is not alone enough to make an agreement to arbitrate a contract of adhesion." *See Seus v. John Nuveen & Co., Inc.*, 146 F.3d 175, 184 (3rd Cir. 1998).

Here, the arbitration clause is not a contract of adhesion because there is no evidence that Plaintiff lacked the power to change the conditions of the Franchise Agreement. *See e.g., Dabney v. Option One Mortgage Corp.*, 2001 WL 410543 (E.D. Pa. 2001) (held that no contract of adhesion existed where there was no evidence that the plaintiff attempted to negotiate over the arbitration clause or did not have the opportunity to gain the same services from another entity). Moreover, there is no evidence that Plaintiff would have been unable to obtain the same services or products through other avenues (*i.e.*, competitors or an independent business), or that he was in any way forced to sign the Franchise Agreement. *See id.; see also Brown v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 664 F. Supp. 969, 974 (E.D. Pa. 1987) (upheld validity of arbitration clause and determined that there was no contract of adhesion where the record was devoid of evidence that the challenging party was coerced into signing an agreement).

Assuming *arguendo* that the "arbitration clause is a contract of adhesion", it is still enforceable because Plaintiff has not alleged or shown that the arbitration clause is inherently favorable to Defendant Minuteman Press and unconscionable. *See e.g., Trott v. Paciolla*, 748 F. Supp. 305, 309 (E.D. Pa. 1990). In *Trott*, the plaintiffs argued that the arbitration clauses contained in their agreements were contracts of adhesion. *See id.* However, the court concluded that the clauses were enforceable because "such a proposition flies in the face of strong public policies favoring arbitration," and the plaintiffs "cited no authority to support the notion that an arbitration clause is a contractual term that plaintiffs should have opposed or one that is inherently favorable to Merrill Lynch." *See id.* Similarly here, Plaintiff has failed allege any facts that the arbitration clause is in any manner favorable to Defendant Minuteman Press or otherwise unconscionable.

**B.      The Complaint and First Amended Complaint Must Be Dismissed Or, In
The Alternative, the Action Must Be Stayed Pending Arbitration.**

It being clear that Plaintiff's claims are subject to arbitration, Plaintiff's Complaint and First

Amended Complaint must be dismissed or in the alternative stayed pending arbitration.  The FAA

provides in pertinent part that:

> If any suit or proceeding be brought in any of the courts of the United
> States upon any issue referable to arbitration under an agreement in
> writing for such arbitration, the court in which such suit is pending,
> upon being satisfied that the issue involved in such suit or proceeding
> is referable to arbitration under such an agreement, shall on
> application of one of the parties stay the trial of the action until such
> arbitration has been had in accordance with the terms of the
> agreement, providing the applicant for the stay is not in default in
> proceeding with such arbitration.

9 U.S.C. § 3.

While the FAA authorizes the stay of actions pending the outcome of an arbitration,

subsequent decisions have made clear that the courts are authorized to dismiss a Complaint in its

entirety where, as here, all of the claims in the Complaint are subject to a valid arbitration clause.

*See, e.g., Pennsylvania Data Entry, Inc. v. Nixdorf Computer Corp.,* 762 F. Supp. 96, 101 (E.D.

Pa. 1990) (granting motion to dismiss rather than stay on finding entire controversy subject to

arbitration).  Plaintiff raises the following claims relating to the Franchise Agreement:  fraud in

the inducement, conspiracy, misrepresentation, breach of contract, negligence, omissions and

false statements.  Once those claims are resolved in arbitration, as they must be, there will be no

causes of action remaining in this case for the Court to adjudicate.  Thus, the proper remedy in

this case is to dismiss, rather than to stay, Plaintiff's claims.

**C.      The Complaint and First Amended Complaint Must Be Dismissed or, in the
Alternative, Transferred for Improper Venue.**

In ¶ 23 of the Franchise Agreement, Plaintiff agreed that:

…any litigation shall be brought in the Supreme Court, of the State of New York
in the county where Minuteman has its home office, or in the United States
District Court for the Eastern District of New York.

*See* Exhibit "C" at p. 20, ¶ 23.  Where, as here, a party contracts to a forum selection clause, that party is bound by that clause and has an obligation to institute his action in the agreed upon forum.  *See e.g., Lipcon v. Underwriters at Lloyd's of London*, 148 F.3d 1285 (11th Cir. 1998); *see also Dickerson v. Signs Now, Inc.*, 1994 WL 184442 (E.D. Pa. 1994) (dismissed case for improper venue where franchise agreement forum selection clause identified was Mobile County, Alabama as the proper venue).  This Court has the authority to enforce the forum selection clause through dismissal of the Complaint and the Amended Complaint.  *See Salovaara v. Jackson National Life Insurance Co.*, 246 F.3d 289 (3rd Cir. 2001).

Even allegations of fraud in the inducement with respect to a franchise agreement as a whole are insufficient to invalidate forum selection clauses because "forum selection clauses are presumptively valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances."  *See, e.g., Provident Mutual Life Insurance Company of Philadelphia v. Bickerstaff*, 818 F.Supp. 116, 118 (E.D. Pa. 1993) (citations omitted) ("a forum selection clause is unjust and unreasonable when obtained fraudulently or where enforcement would violate a strong public policy of the forum or effectively deprive the other party of his day in court").  In other words, a plaintiff must allege fraud related to the forum selection clause itself before consideration may be given as to whether it can be invalidated.  *Id.* *See also BABN Technologies Corp. v. Bruno*, 25 F. Supp.2d 593, 595-96 (E.D. Pa. 1998) (enforced forum selection clause where evidence of coercion was lacking and there was no contention that *the clause* was a product of fraud).  The party opposing the forum selection clause has the burden of showing that enforcement of the clause itself is unreasonable.  *Provident Mutual, supra.*

Plaintiff does not allege that the forum selection clause is in any manner unreasonable or the by-product of any fraud.  Plaintiff is contractually bound to comply with the agreed upon

clause and obligated himself to have brought this action in the State of New York.  The

Complaint and First Amended Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1)

or, in the alternative, transferred for improper venue pursuant to Fed. R. Civ. P. 12(b)(3).

> **D.    Counts I And VI [Sic] For Fraud And Fraudulent Misrepresentation Must
> Be Dismissed Because They Lack Specificity.**

Counts I and VI [sic] for fraud and fraudulent misrepresentation must be dismissed for

failure to assert with particularity the necessary elements of fraud required by Fed. R. Civ. P.

9(c).  To assert a claim for fraud, a plaintiff must plead facts demonstrating that there was:  "(1)

[a] representation; (2) which is material to the transaction at hand; (3) made falsely, with

knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of

misleading another into relying on it; (5) justifiable reliance on the misrepresentation and (6) the

resulting injury was proximately caused by the reliance".  *See Huddleston v. Infertility Center of

America*, 700 A.2d 453 (Pa. Super. Ct. 1997); *see also*, *Tyler v. O'Neill*, 994 F. Supp. 603 (E.D.

Pa. 1998) (*citing Michael v. Shiley, Inc.*, 46 F.3d 1316, 1333 (3d Cir.1995) and *Sowell v. Butcher

& Singer, Inc.*, 926 F.2d 289 (3d Cir. 1991)).  The who, what, where and when of each incident

of fraud must also be stated.  *See Rosen v. Communication Services Group, Inc.* 2001 WL

474421, *2 (E.D. Pa. 2001).  Thus, the plaintiff must identify "(1) precisely what statements

were made in what documents or oral representations. . ., and (2) the time and place of each

statement and the person responsible for making . . ., (3) the content of such statements and the

manner in which they misled the plaintiff, and (4) what defendants 'obtained as a consequence of

the fraud'."  *See Fitch v. Radnor Industries, Ltd.*, 1990 WL 150110, *2 (E.D. Pa. 1990).

The Complaint and First Amended Complaint fail to state the "who, what, where and

when" of any alleged fraud with particularity.  Nowhere in the Complaint or First Amended

Complaint does Plaintiff state *when* or *where* the alleged fraudulent misrepresentations occurred.

The Complaint and First Amended Complaint are also devoid of any precise statements which

allegedly constitute misrepresentations, the manner in which any statement purportedly mislead

Plaintiff, or what any defendants gained or obtained as a result of the alleged fraudulent

statements.  Thus, Counts I and VI[sic] must be dismissed as to fraud and fraudulent

misrepresentation for failure to meet the particularity requirement of Fed.R.Civ.P. 9(c) and Fed.

R. Civ. P. 12(b)(6).

### E.     Counts I And VI [Sic] For Civil Conspiracy Must Be Dismissed.

The tort of conspiracy requires a plaintiff to plead facts demonstrating:

(1)     a combination of two or more persons acting with a common purpose to do an
unlawful act or to do a lawful act by unlawful means or for an unlawful purpose;

(2)     an overt act done in pursuance of the common purpose; and

(3)     actual legal damage.

*Landau v. Western Pennsylvania Nat. Bank*, 445 Pa. 217, 282 A.2d 335 (1971) and *Fife v. Great*

*Atlantic & Pacific Tea Co.*, 356 Pa. 265, 52 A.2d 24 (1947), *cert. denied*, 332 U.S. 778 (1947).

Malice, *i.e.*, intent to injure and a lack of justification, are essential parts of a civil conspiracy

cause of action.  *Barmasters Bartending School v. Authentic Bartending School*, 931 F.Supp.

377, 386 *613 (E.D. Pa. 1996) (*citing Rutherfoord v. Presbyterian-University Hospital*, 417 Pa.

Super. 316, 333 612 A.2d 500, 508-509 (1992)).  "Additionally, absent a civil cause of action for

a particular act, there can be no cause of action for civil conspiracy to commit that act."

*McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000) (*citing Pelagatti v.*

*Cohen*, 703 Pa. Super. 422, 536 A.2d 1337, 1342 (1987)).

Because the Complaint and First Amended Complaint fail to state claims for fraud in the

inducement, fraudulent misrepresentation, and infliction of emotional distress for the reasons

stated herein, there can be no cause of action for conspiring to commit such acts.  Moreover, the

Complaint and First Amended Complaint are devoid of any allegation of malice on behalf of any

Moving Defendant.  Accordingly, Counts I and VI[sic] of the Complaint fails to state the

essential elements of civil conspiracy and must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

**F.    Count III's Claim For Negligence Must Be Dismissed.**

Count III's claim for negligence must be dismissed.  Plaintiff alleged that "As the superior

bargaining party, MMPI was under a duty to disclose to Plaintiff that he had insufficient income

and assets with which to purchase the Lemoyne franchise." *See* Exhibit "A" at ¶ 20.  To

adequately state a claim for negligence, "the pleader must aver in his complaint the following

elements:  (1) a duty or obligation recognized by the law, requiring the actor to conform to a

certain standard of conduct for the protection of others against unreasonable risks; (2) a failure

on the person's part to conform to the standard required; (3) a breach of the duty; (4) a reasonably

close causal connection between the conduct and the resulting injury; (5) actual loss or damage

resulting to the interest of another" *See Reformed Church of Ascension v. Theodore Hooven &

Sons, Inc.*, 764 A.2d 1006, 1109-1110 (Pa. Super. Ct. 2000).

Plaintiffs allegations in ¶ 20 of the Complaint are insufficient and illogical.  Plaintiff

complains that Defendant Minuteman Press allegedly had a duty to disclose that Plaintiff did not

have sufficient income to purchase the franchise, however, in ¶ 8 of the Complaint states that he

did purchase the franchise on September 6, 2000.  Thus, it is impossible that Defendant

Minuteman Press had a duty to inform Plaintiff that he did not have enough money to purchase

the franchise when in fact he did purchase the franchise.  Accordingly, Count III must be

dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to allege any duty owed by any Moving

Defendant.

**G.    Count III's Claim For Emotional Distress Must Be Dismissed.**

The claim for infliction of emotional distress alleged in Count III of the Complaint must

be dismissed because Plaintiff has failed to allege physical injury or acts of outrageous conduct

committed by any Moving Defendant sufficient to support such claims.

Pennsylvania law establishes that, except in limited, compelling circumstances not herein

applicable, a claimant may not recover damages for negligent infliction of emotional distress in

the absence of attendant physical injury or where the contract or its breach is of a kind such that

serious emotional disturbance was a particularly likely result. *Houston v. Texaco, Inc.*, 371 Pa.

Super. 399, 538 A.2d 502, *alloc. denied*, 520 Pa. 575, 549 A.2d 136 (1988); and *Price v. Blyth*

*Eastman Paine Webber, Inc.*, 576 F. Supp. 431, 435 (W.D. Pa. 1983) (*citing* Restatement

(*Second*) of Contracts § 353, at 149 (1981)).

Plaintiff alleges that he was unable to profitably operate his franchise because Defendant

Minuteman Press did not inform him that he had insufficient income to purchase the Lemoyne

franchise and that as a result, he suffered emotional distress. Here, Plaintiff does not state that he

suffered any physical injury arising from any alleged actions by any Moving Defendant. *See*

Exhibit "A" at ¶ 20. Further, Plaintiff does not describe any purported outrageous conduct or

breach of the subject contract of a kind particularly likely to evoke serious emotional

disturbance. Accordingly, Count III must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

**H.    Count IV Must Be Dismissed Because Punitive Damages Are Not A Recognized Independent Cause Of Action And No Outrageous Or Malicious Conduct Is Alleged.**

Under Pennsylvania law, punitive damages are not an independent cause of action and

are only awarded to deter outrageous and malicious conduct. *See In re Benson*, 180 B.R. 796

(Bankr. W.D. Pa. 1995) and *Garden Sate Tire Realty Corp. v. R.K.R. Hess Associates, Inc.*, 762

F. Supp. 776 (M.D. Pa. 1990). Where, as here, no outrageous or malicious conduct is alleged to

have been committed by any defendant, and because there is no independent cause of action for

punitive damages, Count IV of the Complaint must be dismissed pursuant to Fed. R. Civ. P.

12(b)(6).

**I.    Count VII [sic] Must Be Dismissed Because The Arbitration Clause Is Enforceable and Declaratory Relief Is Inappropriate.**

As explained above, Plaintiff's claim that the arbitration clause is a contract of adhesion

lacks merit because there is no allegation or showing that the arbitration clause is inherently



favorable to Defendant Minuteman Press. Count VII [sic] should be dismissed pursuant to Fed.

R. Civ. P. 12(b)(6) as the arbitration clause is enforceable and declaratory relief is inappropriate.

### J.    Plaintiff's Jury Trial Demand Must Be Stricken Because Plaintiff Contractually Waived Any Right to a Jury Trial.

In ¶ 23 of the Franchise Agreement, Plaintiff agreed that "The parties waive their rights

to trial by jury except where prohibited by Federal or State law. *See* Exhibit "C".  If a plaintiff

contractually waives his right to a jury trial, a court may strike the plaintiff's demand for a jury

trial.  *See e.g., Phoenix Four Grant Trust #1 v. 642 North Broad Street Associates*, 2000 WL

1717261, *2 - *3 (E.D. Pa. 2000).  Plaintiff's demand for a jury trial must be stricken pursuant to

Fed.R.Civ.P. 12(f) because he contractually waived his right to a jury trial.

## VI.    CONCLUSION

For the foregoing reasons, defendants Minuteman Press International, Inc. and Robert

Emmett, respectfully request that this Court grant their Motion to Dismiss in the form of order

attached; dismissing plaintiff's claims with prejudice and granting such other alternative relief as

requested by Moving Defendants and as the Court deems just and proper.

Respectfully submitted,

Harris J. Chernow
John J. Jacko III
Pearlette V. Toussant
P.A. I.D. Nos. 52577/67477/85756
**BUCHANAN INGERSOLL**
**PROFESSIONAL CORPORATION**
Eleven Penn Center, 14th Floor
1835 Market Street
Philadelphia, PA  19103
(215) 665-3854

Attorneys for Defendants,
Minuteman Press International, Inc. and
Robert Emmett

Dated:  June _____, 2001

JUN 21 2001 23:03 FR BUCHANAN INGERSOLL 215 665 8760 TO 17172330852    P.03

In the Court of Common Pleas of Cumberland County, Pennsylvania
Civil Division

Michael A. Shaffer,
      Plaintiff,

      v.

Susan Graybill as an individual
and as Administratrix of the
Estate of Dennis M. Graybill;
Minuteman Press
International, a New York corpor-
ation; and Robert Emmett
      Defendants.

) No. 01-2664 Civil Team
)
)
)
)
) Judge _____
)
)
)
)
)
)
)
) Jury Trial Demanded

## NOTICE TO DEFEND

### Notice

You have been sued in court. If you wish to defend against these claims, you must take action within twenty (20) days after this complaint and notice are served by entering an appearance personally or by an attorney and filing in writing with the Court your defenses or objections. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice. A judgment may also be entered against you for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Cumberland County Lawyer Referral Service
Cumberland County Bar Association
2 Liberty Avenue
Carlisle, PA 17013
(717) 249-3166
1-800-990-9108

TRUE COPY FROM RECORD
In Testimony whereof, I here unto set my hand
and the seal of said Court at Carlisle, Pa.
This _____ day of _____ _____
_____
Prothonotary

## AVISO

Usted ha sido domandado en corte. Si usted quiere defenderse en contra de estas demandas, usted debe tomar accion dentro de viente (20) dias despues que esta queja y aviso sean servidos, registrando una comparacencia personalmente o por su abogad y llenando en escerito en la corte su defensa u objectiones con la corte. Usted esta advertido que si fallah de hacerlo, el casa puede seguir sin usted y un desicion pued ser registrado en contra suya por la corte sin ningun otra aviso. Ademas, la corte pued decidir a favor del demandante y requiere que usted cumpia con todas las provisiones de esta demanda. Usted puede perder dinero o sus propriedades u otros derechos importante para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO NO PUEDE PAGAR UNO VAYA O LLAME POR TELEFONO A LA OFFICINA ESCRITA ABAJO PARA AVERIGULAR DONDE USTED PUED CONSEQUIRE ASSISTANCIA LEGAL.

Cumberland County Lawyer Referral Service
Cumberland County Bar Association
2 Liberty Avenue
Carlisle, PA 17013
(717) 249-3166
1-800-990-9108

JUN 21 2001 23:03 FR BUCHANAN INGERSOLL 215 665 8760 TO 17172330852

In the Court of Common Pleas of Cumberland County, Pennsylvania

Civil Division

| | |
|---|---|
| Michael Shaffer, | ) No. _____ |
| Plaintiff. | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Judge _____ |
| Susan Graybill as an individual | ) |
| and as Administratrix of the | ) |
| Estate of Dennis M. Graybill, | ) |
| Minuteman Press International, | ) |
| Inc., and Robert Emmett | ) |
| Defendants. | ) Jury Trial Demanded |

Complaint in Law with Action for Declaratory Judgment

Comes now Plaintiff and complains of each Defendant as follows:

Parties, Jurisdiction and Venue

1. Plaintiff is Michael Shaffer who resides at 88 Bentz Mill Road, East Berlin, PA 17316.

2. Defendant Susan Graybill is an individual who operated a Minuteman Press franchise in Lemoyne, PA, and may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

3. Defendant Susan Graybill as Administratrix of the Estate of Dennis M. Graybill, deceased, may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

4. Defendant Minuteman Press International, Inc. (hereafter MMPI) is a New York corporation with its home office in Farmingdale, New York. It may be served by certified mail addressed to its registered agent, Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735.

5. Defendant Robert Emmett is an individual and representative of MMPI and maintains

an office in Wayne, PA. I. .nay be served in person at 489 Devo. .ark Drive, Suite 307.

Wayne, PA 19087.

6. The court has jurisdiction over these proceedings because the Minuteman Press

franchise sold to Plaintiff by Defendants Graybill is located in Cumberland County and the

amount in controversy exceeds the minimum jurisdictional amounts of the court.

7. The court has venue over these proceedings because all or part of the cause of action

arose in Cumberland County and Defendants Graybill maintained a place of business in

Lemoyne, Cumberland County, PA, and reside in Cumberland County, PA.

### Facts Common to All Counts

8. On or about August, 2000, Defendants Graybill were operating a Minuteman

Press franchise in Lemoyne under contract with Defendant MMPI. Defendants Graybill were

desirous of selling the franchise to Plaintiff and did so on September 6, 2000. Plaintiff entered

into various contracts with Defendants Graybill, Defendant MMPI in pursuance of the purchase

of the franchise.

### Count I

9. This count sounds in tort.

10. Throughout the relevant time frame alleged in Paragraph 9, all Defendants entered

into a conspiracy with one another to unload a failing business on Plaintiff by agreeing to

materially defraud Plaintiff by falsely inducing him to enter into a contract to purchase and to

purchase the Minuteman Press franchise located in Lemoyne, PA. Defendant Emmett was the

regional representative of Defendant MMPI and had authority speak for and to bind the

corporation.

11. Defendants Graybill were the owners of the franchise. Defendants Graybill made material misrepresentations as to the financial viability of the franchise and these were made to falsely induce Plaintiff to purchase the Minuteman Press franchise of Lemoyne as an ongoing and viable enterprise with sufficient income to pay expenses and support the store owner and two employees.

12. Defendants Graybill conspired with one another, MMPI and Emmett to represent the Lemoyne franchise as a viable entity that would make a profit and that Plaintiff would start seeing those profits within three months. Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise. Defendants MMPI and Emmett materially assisted Defendants Graybill to do so. Defendants MMPI and Emmett also made material misrepresentations to induce Plaintiff to purchase the franchise and materially assisted Defendants Graybill in unloading an unprofitable franchise on Plaintiff; these misrepresentations were made by Defendant Emmett, MMPI's regional representative.

13. The following misrepresentations were made by one or more of the Defendants:

a. Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise by representing that monthly operating expenses were in the range of $7,000.00 when in fact monthly operating expenses were in the range of $12,000.00. Plaintiff expressly obtained copies of the checks written for expenses by the franchise and refused to purchase the franchise because the operating expenses were too high at $12,000.00 per month. Defendant Emmett represented to Plaintiff in response that many of the checks were for personal expenditures and that the operating expenses for the franchise were only $7,000.00 per month. Defendants Graybill confirmed Emmett's misrepresentation. This was a very material factor to Plaintiff because the franchise's monthly income was only in the $5,000.00

because he was devoting full time to operation of the franchise instead of his former employment as well as amounts he owes to his landlord and Textron Financial Corporation from contracts that were necessitated by his purchase of the franchise. Further consequential damages stemmed from the inevitable loss of credit reputation when he was unable to repay the money he borrowed to keep the franchise operating from month to month.

### Count II

15. On or about September 1, 2000, Plaintiff entered into a written contract with Defendant MMPI which was labeled as the Franchise Agreement. Immediately upon entering the Agreement, Plaintiff was sent to New York for an explanation of what to do to make the franchise viable. He was promised in writing all needed technical assistance and advice. This assistance and advice was based on the express corporate formula that if the franchisee did what MMPI told him to do, he would meet expenses and make a profit. Plaintiff was expressly told by MMPI that all he would have to do was manage the franchise, make twenty cold calls a day, leave all work to the employees, and, by doing so, he would make significant profits. These promises were made in order to induce Plaintiff to enter into the franchise agreement and were again made in the training school in New York. These promises were made in the Franchise Agreement or were made in supplementation of the written agreement or were made in order to induce Plaintiff to enter into the written agreement. In other words, follow our program and you will realize a pretax profit of one third of your gross sales.

16. These promises were breached by MMPI. At no time was the income from the franchise sufficient to even meet expenses and within six months of purchasing the franchise, Plaintiff was forced to close his doors due to excessive expenses.

18. Damages that flow from these breaches of contract and false promises include the

loss of the money that w... paid to MMPI to transfer the franchis... Pla...f and send him to training school in New York. Consequential damages include the loss of what was paid by Plaintiff to the franchise owners to purchase the franchise, the loss of operating capital, the waste of the assets of Plaintiff's franchise, and the various contractual payments needed to pay the landlord and the equipment lessor. Further direct damages resulted from the extreme mental anguish suffered by Plaintiff which were intentionally inflicted as the result of the torts alleged in this Complaint. These damages are in an amount in excess of the minimum jurisdictional limits of the court.

## Count III

19. Defendant MMPI would not transfer the franchise to Plaintiff without first receiving a financial application from the Plaintiff calling for a disclosure of all assets. After reviewing Plaintiff's financial statements, MMPI caused the sale of the franchise in Lemoyne to Plaintiff and transferred the franchise to Plaintiff and caused him to expend significant amounts for training and for anticipated losses from operation of the franchise within the first three months.

20. Having required Plaintiff to submit a financial application listing all assets of Plaintiff, Defendant MMPI at all times material to this Complaint, knew or should have known that Plaintiff had insufficient income and assets to operate the franchise for even the three months at the end of which Plaintiff was promised that he would be making profits. As the superior bargaining party, MMPI was under a duty to disclose to Plaintiff that he had insufficient income and assets with which to purchase the Lemoyne franchise. This negligence on the part of MMPI caused Plaintiff to suffer not only monetary damages but also an entitlement to damages for extreme emotional distress in amounts in excess of the minimum jurisdictional limits of the court.

In the Court of Common Pleas of Cumberland County, Pennsylvania
Civil Division

Michael A. Shaffer              ) No. 2001-2664 Civil Term
            Plaintiff,          )
                                )
                                )
        v.                      )
                                )
Susan Graybill                  )
et al.,                         )
            Defendants          ) Jury Trial Demanded

Plaintiff's First Amended Complaint with Action for Declaratory Judgment

Comes now Plaintiff and amends his Complaint with Action for

Declaratory Judgment and states the following additional causes of action:

## Count VI

32. Plaintiff's Complaint is incorporated herein by reference, the same

as if fully set forth herein.

33. In the Disclosure Document of Minuteman Press International, Inc. which

which was required by FTC rules and is dated August, 1999, the following disclosure is made on

page 12 about an FTC action against Defendant MMPI and others:

Federal Trade Commission, Plaintiff, v. Minuteman Press International, Inc., Speedy
Sign-A-Arama, USA, Inc., Rov W. Titus and Jeffrey Haber, Defendants (CV 93-2496)
Filed on June 4, 1993, in the United States District Court, Eastern District of New York.
On December 18, 1998, an injunction was filed prohibiting the Defendant's excluding
Haber from doing the following: A. Making, or assisting in the making of, expressly or
by implication, orally or in writing, to any prospective franchisee any statement of past,
present or future sales, income, or gross or net profits of any existing or prospective
franchisee or group of franchisees, unless at the time of making such representation the
defendant possesses written material that provides a reasonable basis for the
representation. B. Violating any provision of the Rule 16 C.F.R. Part 436 or the rule as it
may later be amended and the disclosure requirements of the UFOC in effect at the time.

Respectfully Submitted.

*Robert White*

Robert J. White
Counsel for Plaintiff
PO Box 3005
York, PA 17402
(717) 699-4534
FAX (717) 699-2895

## Certificate of Service

The undersigned certifies that he has mailed a copy of this First Amended Complaint with Action for Declaratory Judgment to each Defendant on May 19, 2001 by first class mail addressed as follows:

MMPI by serving Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735

Defendant Robert Emmett at 489 Devon Park Drive. Suite 307, Wayne, PA 19087

*Robert White*

Robert J. White

## Verification

I verify that the facts contained in this First Amended Complaint with Action for Declaratory Judgment are true and correct to the best of my knowledge, information and belief. I understand that any false statements are made subject to the penalties of 18 Pa.C.S.A. Sec. 4904 relating to unsworn falsification.

Michael Shaffer



# AGREEMENT

# BETWEEN

# MINUTEMAN PRESS INTERNATIONAL, INC. and

Michael A. Shaffer

DATE: 9/1/00

AGREEMENT made as of the 1st day of Sept 2000 2000 by and between MINUTEMAN

PRESS INTERNATIONAL, INC., a New York corporation having its principal place of business at 1640 New

Highway, Farmingdale, New York 11735 (hereinafter called "Franchisor") and   Michael A. Shaffer

_____ _____, (hereinafter called "Franchisee").

### WITNESSETH

WHEREAS, Franchisor is the owner of the service mark and logo, "MINUTEMAN PRESS" (the

"Mark"), and other service marks and trade names (hereinafter collectively "Marks"), trade secrets, and

know-how for use in connection with the unique system for full service quick offset printing, reproduction and

copying, to meet the printing requirements for letterheads, bills, forms, cards, etc. (the "Minuteman Press

System") and is the owner of the entire right, title and interest in and to U.S. Trademark, Principal Register,

Registration No. 2,314,083, "Minuteman Press"; Registration No. 1,109,656, "Man With Clock Head;

Registration No. 1,107,498 "For The Job You Needed Yesterday"; Registration No. 1,667,927 "International

Minute Press"; Serial No. 153,653, "International MinuteFax & Design"; Registration No. 1312789 "Put a Little

Color in Your Printing" and Registration No. 1,341,716 "Stripe Design" (Window Graphics); "Printing with

Minute to Minute Results" Registration #1,755,929, "Color Combo Days" Registration No. 75/135,933, "Color

Combo Days (Stylized) & Design", Registration No. 75/135,934 together with all of the good will symbolized

by the Marks which Marks are used in identifying, advertising, promoting and marketing the Minuteman Press

System; and

WHEREAS, Franchisee hereby acknowledges that by reason of Franchisor's high standards of

quality and service in connection with the development of the Minuteman Press System, that the Minuteman

Press System is unique and Franchisor has created over a period of time a clear identification and consumer

demand therefor, which requires appropriate and adequate safeguards for the maintenance and future

promotion of the Minuteman Press System; and

WHEREAS, Franchisee hereby acknowledges the exclusive right of Franchisor in and to the

Minuteman Press System, as presently developed or as same may be improved and expanded during the

term of this Agreement, including practices, know-how, trade secrets, designs, marks, logos, window

MMP00E3

1

graphics, signs and slogans presently in use and to be hereafter developed, all of which may be used thereunder; and

WHEREAS, Franchisee desires, upon the terms and conditions herein set forth, to obtain and enter into the business of owning and operating a Minuteman Press System at and from the location agreed upon, under the Marks, subject to the supervision of Franchisor and in accordance with the standards of Franchisor.

NOW THEREFORE, in consideration of the mutual promises and undertakings set forth below, the parties hereto agree as follows:

1. **Grant of License**

(a) Franchisor hereby grants to Franchisee a non-exclusive license to use and practice the Minuteman Press System in a location as hereinafter specified (the "Premises"), (the Minuteman Press System at the Premises being referred to as the "Minuteman Press Full Service Printing Center") solely in connection with the operation of a Minuteman Press Full Service Printing Center and to employ therein the Marks.

(b) Franchisee shall, under no circumstances, be authorized to use the Marks hereunder as part of any corporate name. If Franchisee is required to register under any statute for the registration of fictitious business name, Franchisee shall register in a form approved, in advance, by the attorneys for Franchisor.

(c) Franchisor agrees that so long as Franchisee faithfully performs and observes each and all of the obligations and conditions to be performed and observed by the Franchisee under or in connection with this Agreement, Franchisor, during the continuance of this Agreement, will not authorize any person or company, including itself, to operate a Minuteman Press Full Service Printing Center or any other store engaged in the quick offset printing business at _____ 855 Market ST _____

Lemoyne, PA 17043 _____

2. **Trade Secrets and Confidential Relationship**

MMP00E3

2

(a) Franchisor grants to Franchisee the right to use the Marks at the Premises, and will impart to Franchisee much of the know-how and trade secrets accumulated by Franchisor, in the operation of a Minuteman Press Full Service Printing Center.

(b) Franchisee acknowledges that Franchisor will disclose and impart to Franchisee, in confidence, some or all of its established trade secrets, production and sales methods and other techniques and know-how relating to the Minuteman Press Full Service Printing Center. Franchisee agrees that all such confidential information shall at all times be maintained in strictest confidence and used by Franchisee only in the regular operation of the duly authorized Minuteman Press Full Service Printing Center during the period of such authorization and not in any other business or other activity whatsoever. Franchisee further acknowledges that such trade secrets and confidential information are valuable, unique and special assets of Franchisor, and that it will not disclose any of same to any person, firm, corporation or other entity whatsoever, for any reason or purpose, without the prior written authorization or consent of Franchisor.

### 3. The Premises

The Premises at which the facility is to be located will be mutually agreed upon and will be leased directly by Franchisee pursuant to a lease to be executed by Franchisee (the "Lease").

Prior to Franchisee's executing the Lease, Franchisor shall have the right to review same. Franchisee shall not execute the Lease without the prior written consent of the Franchisor. The Lease will contain a provision permitting the Franchisor to assume the obligations of Franchisee and/or its designee, upon any default of Franchisee and/or its designee, or upon any adjudication, whether voluntary or involuntary, that Franchisee is bankrupt, or upon the execution of a deed of trust to the benefit of creditors of Franchisee. The Franchisor shall have no liability with respect to the selection of a location for the Franchisee, nor liability with respect to any recommendation regarding the site's suitability.

Franchisee must deliver to Franchisor a fully executed copy of the lease to the Premises, prior to execution of the license agreement.

Franchisee cannot amend, renew or cancel lease or move the business without the express written consent of the Franchisor.

MMP00E3

3

4.    **Duties of Franchisor**

(a) In order to assist Franchisee in the establishment and operation of the Minuteman Press Full Service Printing Center, Franchisor shall be obligated to perform the following duties on behalf of the Franchisee.

(i)    to provide Franchisee with a suggested bookkeeping system and invoice system;

(ii)    to provide Franchisee with periodic Minuteman Press system bulletins;

(iii)    to provide Franchisee with an Official Manual of Operations, which includes statements of policies and procedures, together with instruction and advice in the operation of a Minuteman Press Full Service Printing Center;

(iv)    to provide Franchisee with a starter supply of printed material consisting of letterhead, envelopes, flyers, invoices, business cards;

(v)    to provide Franchisee with sample copies of "Yellow Pages" advertising approved for Franchisee's use; and

(vi)    to provide Franchisee with reproduction proofs of newspaper advertising approved for Franchisee's use.

(vii)    to provide telephonic consultation and advisory assistance.

(viii)    assist Franchisee in planning the layout of the Minuteman Press Full Service Printing Center, which will essentially comply in appearance with all other Minuteman Press Full Service Printing Centers. If the Franchisee purchases an existing Minuteman Press, License from an existing Franchisee, Franchisor shall have no obligation with respect to planning any layout as described herein above;

(ix)    aid in obtaining financing of the equipment selected for the Minuteman Press Full Service Printing Center;

(x)    a field representative to assist Franchisee for forty hours during the initial set up and operational phases of the Minuteman Press Full Service Printing Center.    Franchisor will make available, from time to time, "on location" assistance after the opening of the Minuteman Press Full Service Printing Center's operation, subject to Franchisee compliance with the Franchise Agreement.

(b) The parties agree that the assistance to be rendered to Franchisee by Franchisor hereunder shall in no way impose any obligation upon Franchisor to make any payment or incur any expense or assume any obligation therefor.

MMP00E3

4

**6. Training Program**

Franchisor shall conduct a Minuteman Press System training program at a time designated and to be held at the Minuteman Press Training Center. Franchisee agrees that at least one (1) owner will attend such training session. Franchisor shall pay the cost of such training, including the transportation and the cost of lodging for one (1) owner during the training period. The training period is for 14 days over 2 1/2 weeks. Franchisor will pay no compensation for any service performed by the Franchisee during such training period. Franchisee may thereafter, at its request, receive, at its own expense, additional training or have an immediate family member receive training at a location as may be designated by Franchisor, provided a regularly scheduled training program is then scheduled or in session. Franchisor also agrees to provide training to a full time employee of Franchisee at Franchisee's cost and expense. Franchisor will have no obligation to pay for transportation and lodging expenses for the additional training period and will pay no compensation for any service performed by Franchisee or its representatives during such additional training period. .

**6. Payments by Franchisee**

In consideration of the grant of the license contained herein, Franchisee shall pay to Franchisor the following:

(a) Upon the execution hereof, a franchise fee of ~~Forty-Four Thousand Five Hundred ($44,500)~~ One Dollar ($1.00) ~~Dollars~~ is due and payable. Receipt of which Franchisor hereby acknowledges. An initial $5,500. deposit ("binder"), is payable after you submit your application, but before Minuteman Press commences investigation on potential site locations. The balance due and owing at the time of execution of this agreement.

(b) A royalty fee equal to six percent (6%) of Franchisee's total monthly gross billings as hereinafter defined. "Gross Billings" shall mean the total of all sales and/or fees charged for product and/or services furnished in, or upon orders placed at, or completed by delivery in, through or from the Minuteman Press Full Service Printing Center at the Premises, whether or not collected by Franchisee, less state and local sales taxes, if any. Within ten (10) days after the end of each month, Franchisee shall send to Franchisor, a statement in a form approved by Franchisor, signed by Franchisee showing all orders placed at the Minuteman Press Full Service Printing Center, all merchandise sold, and all billings therefor during the month, accompanied by a royalty check in the appropriate amount. All royalty fees are to be sent to the Franchisor's corporate headquarters in Farmingdale, New York or to such location as Franchisor may

MMP00E3

6

designate from time to time. In the event Licensee fails to deliver to Licensor, and/or deposit in the U.S. Postal System the royalty statement by the 10th day of the month for which the continuing royalty is due and payable, then such royalty statement shall be deemed late, and Franchisor, at its discretion, may charge a penalty of up to $10 per day, or not to exceed the maximum permitted by State law, for each day such royalty statement is late. In the event Licensee fails to deliver to Licensor, and/or deposit in the U.S. Postal System the Royalty Fee by the 10th day of the month following the close of the month for which the continuing royalty is due and payable, then such royalty fee shall be deemed late, and Franchisor, at its discretion, may charge a penalty of up to $10 per day, or not to exceed the maximum permitted by State law, for each day such royalty fee is late.

Royalty fees shall be waived for the first sixty (60) days after the opening of a new Minuteman Press Full Service Printing Center. If the Franchisee is the purchaser of an existing franchised center, the royalty is 6% commencing the first month of operation and continuing thereafter. It is expressly agreed that the payment of the royalty fee is not contingent upon Minuteman providing a level of service perceived by the Franchisee to be adequate.

Royalty Incentive Program:

Minuteman has instituted a royalty incentive program for qualified franchisees. Minuteman's current royalty incentive program is based on a set gross sales maximum. A qualified franchisee's royalty payments are currently capped at six percent of the maximum amount. Minuteman evaluates the gross sales maximum on a yearly basis, and at it's sole discretion may change the level or discontinue the program without prior notice to the franchisee at the end of the current program year.

In order for a franchisee to become eligible for participation under the program, the franchisee must be in full compliance with the terms, covenants and conditions of this Agreement. Specifically the franchisee must submit monthly royalty statements and monthly royalty payments by the 10th day of the following month.

## 7. Term

This Agreement shall be for an initial Term of thirty five (35) years (the "Initial Term") commencing as of the date hereof, unless sooner terminated as hereinafter provided. Franchisee shall have the option to renew this Agreement on the prevailing terms and conditions then available to new Franchisees of Franchisor for an additional period of thirty five (35) years, provided that Franchisee is not in default under this Agreement at the date upon which Franchisor receives notice of the exercise of the option

MMP00E3

6

and upon the expiration of the Initial Term of this Agreement. Such option to extend shall be exercisable by the sending of written notice to Franchisor not later than six (6) months prior to the expiration of the Initial Term hereof and provided Franchisee shall agree to the then prevailing terms and conditions available to new Franchisees of Franchisor.

Franchisee shall execute a general release, in a form prescribed by the Franchisor, of any and all claims against the Franchisor and its subsidiaries and affiliates, and their respective officers, directors, agents and employees, provided that all rights enjoyed by the Franchisee and any causes of action arising in its favor from the provisions of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of GBL 687.4 and 687.5 be satisfied.

### 8. Duties of Franchisee

Franchisee understands and acknowledges that every detail of the system is important to Franchisee, the Franchisor and other Franchisees in order to develop and maintain high operating standards, system wide uniformity, and to increase the demand for services rendered by all of the licensed businesses under the System, and to protect the Franchisor's reputation and good will.

Franchisee agrees that it will:

(a) Use the subject matter of the license granted hereunder solely for the purposes of operating a Minuteman Press System at the Premises. Franchisee shall not use the Premises for any other purpose without the prior written consent of Franchisor.

(b) Maintain the Premises (exterior and interior), and all related equipment, furnishings, materials and supplies in first-class condition and operate the Minuteman Press Full Service Printing Center in a manner which will enhance, and not detract from, the value of the Franchisor's marks, trade names, reputation and good will.

(c) Prominently display on and in the Minuteman Press Full Service Printing Center advertising signs of such nature, form, color, number, location and size and containing such material as Franchisor shall direct, in writing, and shall not display therein or thereon any sign or advertisement to which Franchisor objects.

(d) Comply with all laws, ordinances, regulations and requirements of local, state and federal governmental authorities and pay any and all city, county, state and/or federal sales and/or use taxes.

MMP00E3

excise taxes, occupation taxes, license fees and other taxes, assessments and levies arising out of or in connection with all or any part of this Agreement.

(e) Obtain public liability, workmen's compensation and property damage insurance in amounts and through insurance carriers approved by Franchisor and shall name Franchisor as an additional insured as its interest may appear. Franchisee shall indemnify and save Franchisor harmless from and against any claims or expenses (including but not limited to reasonable attorney's fees) of whatever kind or character, on account of any actual or alleged loss, injury or damage to any person, firm or corporation, or to any property or claim arising out of or in connection with Franchisee's business, or the exercise or purported exercise by Franchisee of its license hereunder. This covenant shall survive the expiration or other termination of this Agreement.

(f) Join and participate in a minimum of two local business and civic organizations.

(g) Commence operation of the Minuteman Press System at the Premises not later than sixty (60) days following selection of the location and execution of the Lease thereof.

(h) Furnish to the Franchisor at Franchisor's request, sampling of Franchisee's finished work product.

(i) Franchisee is obligated and agrees to answer the telephone at the store premises with the name "Minuteman Press." Franchisee shall not answer the telephone under any other name without the written consent of Franchisor.

(j) Franchisee shall conduct its business in accordance with Franchisor's Operations Manual, one copy of which Franchisee will have on loan from Franchisor for the term of the License Agreement. Franchisee agrees to comply with all the policies , procedures and standards set forth in the manual and as it may be modified from time to time by the Franchisor.

(k) Franchisee acknowledges that Franchisor has explained the importance of the creation and maintenance of a full-time marketing program. Franchisee further acknowledges that a vital element of success of any Minuteman Press Full Service Printing Center lies in the creation and maintenance of a full-time marketing program. Franchisee agrees to initiate and maintain a regular, ongoing marketing program, spending a minimum of three hours per day, or a minimum of fifteen hours per week either personally or through an employee pursuing a marketing program. Franchisee further agrees to create a marketing file

MMP00E3

6

and record all marketing activities therein. This file shall remain on the premises and be available to the Franchisor to review upon reasonable notice.

## 9. Equipment and Supplies

Franchisee acknowledges that the equipment, or equivalent equipment and supplies listed in Schedule A attached hereto and made a part hereof are required to open a Minuteman Press Full Service Printing Center. All furniture, fixtures, equipment and supplies listed in Schedule A are available from Franchisor. Franchisee has no express obligation to purchase or lease these items from Franchisor and Franchisor agrees to furnish specifications therefor upon request of Franchisee. Franchisee acknowledges that all items, or their equivalents, set forth in Schedule A must be purchased or leased prior to the date the Minuteman Press Full Service Printing Center opens for business and failure to purchase or lease the equipment within the time periods provided in Paragraph 8 (g) hereof shall be deemed a default hereunder.

## 10. Operation of Premises

(a) Franchisee agrees to continuously (during regular business hours and days) operate the Minuteman Press System in the Premises unless prohibited from so doing by an act of God, a religious holiday, a personal tragedy or conditions beyond Franchisee's control; and further agrees to exercise Franchisee's best efforts, skills and diligence in the conduct of such operations. In this connection, Franchisee agrees to so select and regulate its employees that they will be knowledgeable, presentable, courteous and helpful to customers, in compliance with the standards of Franchisor.

(b) During the term of this Agreement, Franchisee shall only sell products in the Premises approved by the Franchisor.

## 11. Regulation of Premises by Franchisor

(a) Throughout the term of this Agreement, Franchisor may regulate the services and performance rendered at the Premises in connection with the operation of the Minuteman Press System; Franchisor further may determine and regulate the standards of repair and maintenance of the Minuteman Press premises. Franchisee agrees to conform to the standards established by Franchisor as herein provided and maintain the Premises in the manner best calculated by the Franchisor to sustain the good will, consumer demand and prestige enjoyed by the Franchisor.

MMP00E3

9

(b) If Franchisor advises Franchisee that the premises are not neat or clean, Franchisee has fifteen (15) days after written notification to clean up the premises.  If said cleaning is not performed, Franchisor has the right to have the premises cleaned at the expense of Franchisee.

(c)  Franchisee hereby agrees to rent from Franchisor the logo type and name to be displayed on the exterior of the Premises and to pay Franchisor therefor a rental fee of Ten Dollars ($10.00) per annum, in advance. At the expiration or sooner termination of this Agreement, Franchisee agrees to return all such rented logo type, sign and name, if practicable.

(d)  Franchisee agrees to permit Franchisor to take interior and exterior photographs of the Premises and use in any of Franchisor's publicity, advertising, or in such manner as Franchisor deems appropriate, all at Franchisor's expense.

## 12.  Inspection of Books and Records

(a) Franchisee agrees that Franchisor's duly authorized representatives shall have the right at all times during regular business hours without notice to enter upon the Premises for the purpose of examining them to insure the proper exercise of quality control hereunder, testing the work product and conferring with Franchisee and Franchisee's employees, inspecting and checking merchandise, equipment and supplies and reviewing sales and operations procedures and obtaining samples of work produced by Franchisee.

(b)  Franchisee will submit to Franchisor, annually during the term of this Agreement, a balance sheet and income statement and such other financial statements and schedules as Franchisor may reasonably require.  In addition, Franchisee will submit to Franchisor, together with each payment made pursuant to Paragraph 6, a complete, itemized and detailed statement setting forth the total amount of gross billings of Franchisee during the preceding months. All statements submitted to Franchisor hereunder shall be sworn to by Franchisee and (if Franchisee is also a corporation) by its chief executive, directors and chief financial officers.

(c)  Franchisee agrees to maintain at the Premises and available for inspection by Franchisor, at Franchisor's discretion during normal business hours, adequate records of its business operations. Franchisee agrees to permit Franchisor's duly authorized representatives to examine and/or audit and make copies thereof. Such records shall include, but not be limited to, invoices, W2's, 1099's, all tax returns and their supporting documents, profit and loss statements, cash register records, all bank statements and

MMP00E3

10

canceled checks as well as deposit slips, whether corporate or personal, and all other pertinent information deemed necessary in an examination or audit.

(d) Franchisor has the right to verify all of Franchisee's sales, directly with their customers, as well as all purchases and other expenses, directly with Franchisee's suppliers or employees.

(e) Franchisee will maintain true and correct books of account, in accordance with generally accepted accounting principals, consistently applied. Franchisor has the right under the agreement to have its authorized representatives examine and make copies of Franchisee's records of its business operations. Such records shall include, but not limited to cash register records, profit and loss statements, balance sheets, income tax work sheets and returns and any other records normally maintained by a business similar to that conducted at a Minuteman Press Full Service Printing Center. Franchisor may examine any such other reports or information pertaining to the business as Franchisor may reasonable request, from time to time.

(f) If the Franchisee fails to timely submit either the Franchisee's monthly gross sales report or financial statements, then Franchisor may conduct an audit and be reimbursed for all costs and expenses incurred without regard to the percentage of any discrepancy found. Franchisor estimates the audit charge to be between $150 and $300 per day, plus all expenses.

## 13. The Marks

Franchisor hereby acknowledges and warrants that the Marks are valid and subsisting, as hereinbefore recited. In this connection, Franchisee covenants and agrees never to object to or contest the validity or renewal rights of Franchisor thereof; and further agrees to refrain from any act seeking to infringe upon Franchisor's rights in and to the Marks. Franchisee agrees that its rights to use the Marks shall at all times be limited to the terms of this Agreement. At the expiration of the Agreement or sooner termination of the Agreement pursuant to its terms, Franchisee agrees to execute such documents and take such further actions as Franchisor shall reasonably deem necessary or advisable to the end that Franchisor shall be convinced that Franchisee has ceased the use of the Marks in every way and has no further interest or right therein whatsoever. Franchisee further covenants and agrees that it will not utilize the Marks, as shall be registered with the United States Patent Office, in any manner whatsoever either directly or indirectly, in any certificate or charter of incorporation. The Franchisor shall have the right to change the Marks and name at

such time as the Franchisor shall deem appropriate. Any such change shall be at the Franchisee's cost and expense.

Whereas, it may be in the best interest of the Franchisor to have the Franchisee conduct business in a name other than Minuteman Press it is, therefore, agreed between the parties that when or if Franchisor advises the Franchisee that the name Minuteman Press be discontinued and business conducted under a different trade name, the Franchisee will immediately remove the various signs from the Minuteman Press Full Service Printing Center and replace the same substituting in its place appropriate signs with the changed name.

In the event that Franchisee removes, defaces or improperly uses any Minuteman Press trademark, service mark, copyright or sign at the Licensed location, and fails to remedy default within twenty (20) days of written notice to correct same then in that event it is acknowledged that such action shall have caused severe damage to Franchisor.

## 14. Events of Default

Upon the occurrence of any of the following events, Franchisor, at its option, shall have the right, pursuant to applicable state law, to terminate this Agreement and all of the Franchisee's rights hereunder, provided Franchisee shall fail to remedy any of the following to Franchisor's satisfaction:

If Franchisee shall:

(a) become in default under any lease covering the Premises or equipment of its Minuteman Press Full Service Printing Center, and such default remains unremedied for ten (10) days after notice thereof; or

(b) closes the Minuteman Press Full Service Printing Center for a period of fifteen (15) successive days without Franchisor's prior written consent; or

(c) defaults in the performance of any of the covenants, terms or conditions of this Agreement, and such default remains unremedied for more than five (5) days after written notice thereof to Franchisee of such default; or

(d) becomes insolvent, be adjudicated bankrupt, have a voluntary or involuntary petition in bankruptcy or any other arrangement under the bankruptcy laws filed by or against it, make an assignment for the benefit of creditors, or if a receiver or trustee in bankruptcy appointed to take charge of Franchisee's affairs or property; or

MMP00E3

12

(e) commences dissolution proceedings or have such proceedings commenced against the Franchisee; or

(f) permits a judgment against the Franchisee to remain unsatisfied or unbonded of record for fifteen (15) days.

(g) removes, defaces, or improperly uses any Minuteman Press trademark, service mark, copyright or sign at the licensed location.

(h) state laws may exist which govern default, nonrenewal, termination and time to cure. If any of the terms of this agreement are inconsistent or determined void because of public policy of State Franchise Law, then any inconsistency shall be governed by State law to the extent it is void.

## 15. Termination or Expiration of Agreement

In the event of termination of this Agreement as provided herein:

(a) Franchisee agrees to immediately discontinue the employment or use of all marks (and to file notice of discontinuance or termination thereof), signs, structures and forms of advertising incorporating the Marks and further agrees to make, or cause to be made, such changes in signs, buildings and structures, equipment, supplies, furnishings and fixtures, and otherwise in order to distinguish the Premises from its former appearance and from other Minuteman Press System establishments. Thereafter, Franchisee shall not use in any manner any trademark, service mark, or trade name which is the same as Franchisor or its Franchisees. Upon termination of this Agreement for any reason, Franchisee may not refer to itself or any of its officers, directors, or employees as "formerly Minuteman Press", "formerly of Minuteman Press" or other words to that effect. Franchisee hereby authorizes the Franchisor to have the use and ownership of the telephone numbers used by the Franchisee in the Minuteman Press Full Service Printing Center and hereby authorizes the appropriate telephone company to change said ownership of said lines. Franchisee further agrees to execute those papers necessary to effect change in ownership. After said transfer, the cost of said number or numbers shall be borne by the Franchisor.

(b) All amounts due and owing from Franchisee to Franchisor shall immediately become due and payable.

(c) Franchisee shall pay to Franchisor all damages, costs and expenses, including reasonable attorney's fees, incurred by Franchisor in obtaining injunctive relief for the enforcement of any portion of the License Agreement.

MMP00E3

13



(d) Franchisee agrees that upon termination of the License, they will immediately return to the Franchisor all copies of the Confidential Operations Manual which have been loaned to them by the Franchisor and all updates, if any, which Franchisee may have thereafter.

(e) At the time of termination of the License Agreement, for any reason, Franchisee agrees to do the following:

1. Change any listed telephone numbers relating to the franchised business and;

2. Agrees not to provide a call forwarding telephone number referral with respect to any disconnected telephone number and;

3. Agrees not to indicate in any manner that it was previously affiliated with the Franchisor.

Franchisee further agrees to execute any and all necessary documentation to transfer any telephone numbers for the franchised business to the Franchisor.

(f) Franchisee shall immediately cease to use whatsoever the licensed software, and shall immediately return to Franchisor all originals, copies and updates thereto.

(g) Franchisor shall have the right, at its option, to purchase from Franchisee all of, or any part of any equipment, furnishings, supplies, or other material then in the possession of Franchisee that bears any of the Marks or trade names of Franchisor. Such right shall be exercisable by the giving of written notice to Franchisee, and all of the equipment, furnishings, supplies and materials designated or referred to in said notice shall immediately be delivered to Franchisor and Franchisor shall thereafter, after setting off against the amounts payable any monies owed by Franchisee to Franchisor under Paragraph 15 (b) above, promptly pay to Franchisee the amount due. Franchisor shall purchase the foregoing at the cost thereof to Franchisee less the depreciation therefore taken by Franchisee, if applicable, for such items for federal income tax purposes.

(h) THE LICENSE AGREEMENT MAY BE TERMINATED ONLY BY THE FRANCHISOR AND NO PROVISION IS MADE IN THIS AGREEMENT FOR THE UNILATERAL TERMINATION OF THIS AGREEMENT BY THE FRANCHISEE, EXCEPT FOR VIOLATION OF PROVISIONS SET FORTH IN PARAGRAPH FOUR (4) OF THE FRANCHISE AGREEMENT. IN THAT EVENT THE FRANCHISEE MUST PROVIDE FRANCHISOR WITH NOTICE OF DEFAULT AND OPPORTUNITY TO CURE.

MMP00E3

(i)  Franchisee's lease to the Premises heretofore referred to in Paragraph 3 of this Agreement shall be at the option of Franchisor deemed assigned to the Franchisor. The Franchisor shall advise the Franchisee of the exercise of said option at the time the termination notice is given.

(j)  Upon termination of Franchisee by Franchisor, Franchisee irrevocably grants to Franchisor all customer lists, customer business, including customer art work, presently in the possession of Franchisee.

## 16. Assignment

(a)  This Agreement shall not be assigned by Franchisee, whether voluntary, involuntary, by operation of law, or otherwise, without the prior written consent of Franchisor, which consent shall not be unreasonably withheld.

(b)  If Franchisee is an individual or two or more individuals or a partnership, Franchisee may upon the written consent of the Franchisor assign this Agreement to a corporation formed by Franchisee at its sole cost and expense for the sole purpose of operating a Minuteman Press Full Service Printing Center at the Premises, provided that Franchisee shall be and remain on the License Agreement jointly and severally liable for the performance of all the obligations of Franchisee under and in connection with this Agreement. Franchisee shall own not less than eighty percent (80%) of the issued and outstanding shares of such corporation; and provided, further that in the event of such assignment, the assignee corporation shall, in writing, assume all of the obligations of the Franchisee hereunder.  A change in the ownership (voluntary, involuntary, by operation of law or otherwise) of twenty percent (20%) or more of the capital stock of Franchisee corporation shall be deemed an assignment requiring Franchisor's consent.

(c)  In the event of a total assignment of all Franchisee's rights and interest in this agreement, the assignor will execute a general release in favor of Franchisor, in a form prescribed by Franchisor, provided, however, that all rights enjoyed by Franchisee and any causes of action arising in its favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of GBL 687.4 and 687.5 be satisfied.

(d)  In the event that Franchisee wishes to assign this Agreement to a party other than Franchisee corporation, Franchisee agrees to first offer to assign this Agreement to Franchisor or its

MMP00E3

15



nominee, on the same terms and conditions as offered to a bona fide prospective assignee, and Franchisor shall have a period of thirty (30) days in which to accept said offer.

(e) In the event of the death or incapacity of the Franchisee, and Franchisee is not a corporation, this Agreement will be transferable to the heirs of the deceased or incapacitated Franchisee, provided the active management of the Minuteman Press Full Service Printing Center continues satisfactorily to Franchisor. If Franchisee is a corporation then, upon the death or incapacity of the shareholder holding the greatest number of shares of stock of the Corporation this Agreement will continue in effect, provided the active management of the Minuteman Press Full Service Printing Center continues satisfactorily to Franchisor. If, in either of said events, the active management of the Minuteman Press Full Service Printing Center does not continue satisfactorily to Franchisor as reasonably determined by Franchisor within sixty (60) days after the death or incapacity of the Franchisee or Largest Shareholder or in the event the heirs of said deceased or incapacitated Franchisee or Largest Shareholder do not wish to continue the operation of the Minuteman Press Full Service Printing Center, then Franchisor or its nominee shall have the first right to acquire all of Franchisee's rights in and to this Agreement before the same be offered for assignment.

(f) Franchisor, as a condition of any Transfer, will require the payment to it of a training fee by the new Franchisee in order to reimburse Franchisor for any expenses which may be incurred, the actual technical and mechanical training as well as the backup and support provided to the incoming Franchisee. The training fee shall be Seventeen Thousand Five Hundred Dollars ($17,500), or the then current training fee charged by Minuteman Press International, Inc. The training fee will be payable by the new franchisee.

(g) Franchisor's consent to any proposed assignment hereunder shall not be deemed unreasonably withheld if the current Franchisee is in default of his obligation under the license agreement. Franchisor's consent to any proposed assignment hereunder shall not be deemed unreasonably withheld if the proposed assignee, in Franchisor's opinion, does not have the proper qualifications, capital, training and experience (or within a reasonable time cannot acquire such training and experience) and does not meet other standards that are reasonably required by Franchisor.

(h) Upon Franchisor's approval of a proposed assignment, the franchise agreement currently in force shall be surrendered to the Franchisor, and the Franchisee shall execute the then current form of License Agreement as Franchisor may reasonably require. The new Franchisee shall be required to attend the Minuteman Press Training Center Program

MMP00E3

16



### 17. Agency and Indemnity

This Agreement does not create the relationship of principal and agent between Franchisee and Franchisor. Neither Franchisee nor Franchisor will under any circumstances, act or hold itself out as an agent or representative of the other nor incur any liability or create any obligation whatsoever in the name of the other. Franchisee will indemnify Franchisor and hold it harmless from any claims, demands, liabilities, actions, suits or proceedings asserted by third parties and arising out of the operation by Franchisee of the Premises. In the event any such claims, demands, actions, suits or proceedings relating to the Premises are commenced against Franchisor, Franchisee shall be solely responsible for the defense thereof, utilizing counsel reasonably satisfactory to Franchisor, and will promptly pay and discharge the expenses of such defense and all judgments and liens arising therefrom.

### 18. Actions Against Franchisee

In the event any claim, demand, action or proceeding is brought against Franchisee, or if Franchisee is notified of any violation of an applicable rule or statute, Franchisee will immediately notify Franchisor thereof, giving full particulars, and will diligently and expeditiously defend, compromise, cure or satisfy such claim, action, demand, proceeding or violation in Franchisee's sole discretion. Franchisee shall, in all respects, strive to uphold the standards and good will created in the Marks.

### 19. Restrictive Covenant

During the term of this Agreement, Franchisee will not directly or indirectly, as owner, employee, or otherwise, have any interest in or control over any type of business substantially similar to that of a Minuteman Press System establishment. Additionally, Franchisee will not divert or attempt to divert any business of or any customer of, the business licensed hereunder to any competitor, by direct or indirect means.

Unless specifically prohibited by state law Franchisee shall not for a period of two (2) years after termination of this Agreement, directly or indirectly, as owner, employee, or otherwise, have any interest in or control over any type of business substantially similar to that of a Minuteman Press System establishment within a radius of five (5) miles from the Minuteman Press Full Service Printing Center with which he had been formerly associated or within an area of five (5) miles from any existing Minuteman Press Full Service Printing Center. Franchisor acknowledges that Franchisee has previously made his living in other fields and



that this paragraph in no way prevents him from earning his living in other fields of endeavor. The provisions of this paragraph will survive the termination of this Agreement, and will continue to be binding upon Franchisee individually and its individual shareholders, officers and directors notwithstanding any assignment pursuant to Paragraph 16.

## 20. Additional Remedies of Franchisor

Franchisee acknowledges that the restrictions contained in Paragraphs 2 and 19 of this Agreement are a reasonable and necessary protection of the legitimate interests of Franchisor, that any violation of them would cause substantial and irreparable injury to Franchisor, and that Franchisor would not have entered into this Agreement with Franchisee without receiving the additional consideration of Franchisee's binding itself to said restrictions. In the event of any violation of the said restrictions, Franchisor shall be entitled, in addition to any other remedy at law, to seek preliminary and permanent injunctive relief.

## 21. Notices

All notices which the Franchisor is required or may desire to give to the Franchisee under this Agreement may be delivered personally or may be sent by certified mail or registered mail, postage prepaid, addressed to Franchisee at either store address __855 Market ST, Lemoyne, PA 17043__, or home address, __4101 Fawn Square, Harrisburg, PA 17112__. All notices which Franchisee may be required or desires to give to Franchisor shall be sent by certified mail or registered mail, postage prepaid, addressed to: Minuteman Press International, Inc. 1640 New Highway, Farmingdale, NY 11735.

The addresses herein given for notices may be changed at any time by either party by written notice given to the other party as herein provided. Notices shall be deemed given upon personal delivery or two (2) business days after deposit in the U. S. Mails.

The Franchisee must give the Franchisor immediate written notice of any alleged breach or violation of this Agreement after the Franchisee has knowledge of, believes, determines or is of opinion that there has been an alleged breach of this Agreement by the Franchisor including any acts of misfeasance to nonfeasance. If the Franchisee fails to give written notice within one (1) year from the date that the Franchisee has knowledge of, believes, determines or is of the opinion that there has been an alleged breach by the Franchisor, then the alleged breach by the Franchisor will be deemed to be condoned, approved and waived by the Franchisee, the alleged breach by the Franchisor will not be deemed to be a breach of the

MMP00E3

agreement by the Franchisor, and the Franchisee will be permanently barred from commencing any action against the Franchisor for that alleged breach or violation.

## 22. Entire Agreement

THIS AGREEMENT AND SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF CONTAIN THE ENTIRE AGREEMENT OF THE PARTIES. NO OTHER AGREEMENTS, WRITTEN OR ORAL, SHALL BE DEEMED TO EXIST, AND ALL PRIOR AGREEMENTS AND UNDERSTANDINGS ARE SUPERSEDED HEREBY. NO OFFICER, EMPLOYEE OR AGENT OF FRANCHISOR HAS ANY AUTHORITY TO MAKE ANY REPRESENTATION OR PROMISE NOT CONTAINED IN THIS AGREEMENT, AND FRANCHISOR AGREES THAT IT HAS EXECUTED THIS AGREEMENT WITHOUT RELIANCE UPON ANY SUCH REPRESENTATION OR PROMISE. THIS AGREEMENT SHALL NOT BE BINDING UPON FRANCHISOR UNTIL EXECUTED BY AN AUTHORIZED OFFICER THEREOF. THIS AGREEMENT CANNOT BE MODIFIED OR CHANGED EXCEPT BY A WRITTEN INSTRUMENT SIGNED BY ALL OF THE PARTIES HERETO.

## 23. Arbitration and Litigation

The parties hereby agree that the Federal Arbitration Act shall apply to all claims arising out of or relating to this Agreement or the breach thereof and that the business, which is the subject of this Agreement, is engaged in Interstate Commerce. Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by arbitration in accordance with commercial arbitration rules of the Center for Dispute Resolution at a hearing to be held in the State of New York in the county where Minuteman maintains its home office. Any arbitration award shall be non-binding, but if the losing party consents, (such consent shall be in writing ) a judgment upon the arbitration award may be entered in any court having competent jurisdiction and then become binding and final. Minuteman and the franchisee (and their respective owners) waive to the fullest extent permitted by law, and right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

Each party will be responsible for its own costs, including attorneys fees, in conjunction with the arbitration proceeding. If the franchisee commences action in any court prior to the arbitrator's final decision on the controversy or claim, then the franchisee will be responsible for all expenses incurred by Minuteman and the franchisee in the arbitration proceeding. The Franchisee acknowledges and agrees that it is the

MMP00E3

intent of the parties that arbitration between Minuteman and the Franchisee shall be of Minuteman's and the Franchisee's individual claims only. No consolidated or multiple party claims may be brought by either Minuteman or the Franchisee.

The commencement of arbitration proceedings by an aggrieved party to settle disputes arising out of or relating to this Agreement is a condition precedent to the commencement of legal action by either party. If the parties cannot resolve their differences through the arbitration program or if the Arbitration clause in this agreement is found to be unenforceable, then either party may bring their individual action after thirty (30) days have expired from the final decision of the arbitrator or court. In either event, any litigation shall be brought in the Supreme Court, of the State of New York located in the county where Minuteman has its home office, or in the United States District Court for the Eastern District of New York. The parties waive their rights to trial by jury except where prohibited by Federal or State law.

This Arbitration Clause shall not be construed to limit the right of Minuteman to apply to any court of competent jurisdiction for injunctive relief for infringement on any of Minuteman's service marks, trademarks, or copyrighted items, unauthorized decimation of Minuteman's confidential information or trade secrets or violations of covenant not to compete. The Franchisee recognizes that violation of these provisions may cause irreparable harm to Minuteman, other franchisees and the franchise system as a whole.

## 24. Franchisee's Acknowledgment

Franchisor has made a strong effort to familiarize Franchisee with its franchise concepts, location criteria, and the duties and responsibilities of a Minuteman Press Franchisee. Minuteman Press Full Service Printing Centers differ depending on geographic location, length of time in business, the attitude and effort of Franchisee. Franchisee acknowledges the business and economic risks associated with the purchase of a franchise.

FRANCHISOR SPECIFICALLY STATES THAT THERE IS NO MINUTEMAN PRESS FULL SERVICE PRINTING CENTER THAT MAY BE CONSIDERED TO BE A "TYPICAL" OR "AVERAGE" CENTER. FRANCHISOR MAKES NO REPRESENTATIONS OR GUARANTEES AS TO GROSS SALES, NET PROFITS, GROSS PROFITS, REVENUES OR OTHER EARNINGS ANY FRANCHISEE CAN EXPECT. FRANCHISEE IS NOT ENTITLED TO ANY COMPENSATION OR REIMBURSEMENT FOR LOSS OF PROSPECTIVE PROFITS, ANTICIPATED SALES OR OTHER LOSSES.

MMP00E3

No person is authorized to give any representation other than those contained in or incorporated in this Franchise Agreement; and if given or made, such information or representation should not be relied upon as having been authorized.

### 25. Miscellaneous Provisions

(a) This Agreement shall be binding upon the parties hereto, their successors and assigns.

(b) As to any provision in this Agreement wherein approval is required, or modification desired, such approval or modification must be in writing and signed by the party to be charged.

(c) If any portion of this Agreement is declared to be invalid by any court, such determination shall not affect the balance of this Agreement and the same will remain in full force and effect.

(d) THIS AGREEMENT SHALL BE GOVERNED AS TO VALIDITY, CONSTRUCTION AND IN ALL OTHER RESPECTS, BY THE LAW OF THE STATE OF NEW YORK.

(e) The failure of Franchisor to enforce at any time or for any period of time any one or more of the terms or conditions of this Agreement shall not be a waiver of such terms or conditions or of Franchisor's right thereafter to enforce each and every term of this Agreement.

(f) Franchisor may sell or assign its interest in the license, in whole or in part, at any time.

(g) The captions herein are inserted for convenience only, and will not be deemed or construed to be a part of this Agreement or to define or limit the contents of the paragraph thereof.

(h) Franchisee acknowledges receipt from Franchisor of offering prospectus covering the terms of this Agreement.

(i) Franchisee acknowledges that State and Federal law may require the Franchisor to list the home address of the Franchisee in particular circumstances. Franchisee agrees and gives their consent to use the same.

MMP00E3

IN WITNESS WHEREOF the parties hereto have signed and sealed this instrument the day and year first above written.

Witness:                                    MINUTEMAN PRESS INTERNATIONAL, INC.

_____                     BY: _____ Vice Pres
                                            Franchisor   — Robert G. Emmett, V.P.

_____                     BY: _____
                                            Franchisee   — Michael A. Shaffer

                                            BY: _____
                                            Franchisee


                                            _____

_____                     BY: _____
                                                Title
                                            A corporation organized under the laws
                                                of the State of _____

I have read the foregoing Agreement and understand and consent to the terms and provisions thereof, having affixed my initials to each respective page.


                                            _____
                                            Franchisee Signature — Michael A. Shaffer


                                            _____
                                            Franchisee Signature


MMP00E3

22

# FRANCHISEE'S RATIFICATION

In consideration of the execution of the foregoing License Agreement with Minuteman Press International, Inc., the Franchisee hereby acknowledges that:

I have read and understand the foregoing License Agreement and understand that if I do not understand any terms of the License Agreement or if I do not understand any terms of this Acknowledgement of Receipt that I have the right to have my own attorney explain any terms of this Agreement to me; Minuteman encourages you to seek the advice of an attorney prior to signing the Franchise Agreement.

I understand that although Minuteman Press International, Inc., will provide assistance and advice, as outlined in the License Agreement, Minuteman Press cannot guarantee my success as a Minuteman Press Franchisee, and that my earnings as a Minuteman Press Franchisee will be primarily dependent upon my individual efforts in operating my Minuteman Press center.

I ACKNOWLEDGE THAT NEITHER MINUTEMAN PRESS INTERNATIONAL, INC., NOR ANY OF ITS DIRECTORS, OFFICERS, AGENTS OR EMPLOYEES HAS MADE ANY CLAIMS OR REPRESENTATIONS WHATSOEVER REGARDING POTENTIAL REVENUES, EARNINGS OR PROFITS, THAT A FRANCHISEE WILL ACHIEVE AS THE OWNER OF A MINUTEMAN PRESS FULL SERVICE PRINTING CENTER. I REPRESENT THAT I HAVE ENTERED INTO THE LICENSE AGREEMENT WITHOUT RELYING UPON ANY CLAIM OR REPRESENTATION NOT CONTAINED IN THE OFFERING CIRCULAR AND TO DO SO WOULD BE UNREASONABLE. I UNDERSTAND THAT THE FRANCHISOR IS RELYING UPON MY REPRESENTATION IN MAKING ITS DECISION TO GRANT THE FRANCHISE.

While Minuteman Press International, Inc., has offered assistance, I UNDERSTAND THAT I AM ASSUMING FULL RESPONSIBILITY FOR, AND HAVE HAD THE FINAL, ULTIMATE APPROVAL OF THE SITE SELECTED AND THE LEASE EXECUTED FOR THAT SITE, I further understand that I have the right to have my own attorney review the lease and explain to me any provisions of the lease.

Executed this _1st_ day of _Sept_, ~~19~~ 2000

Witness

_____

BY:X _Michael A. Shaffer_
   Franchisee – Michael A. Shaffer

_____

BY:X _____
   Franchisee

_____

BY:X _____
   Franchisee

   _____
   Corporate Name

_____

BY:X _____
Name & Title

A corporation organized under the laws of the State of _____.

MMP99F3









SCHEDULE A

LEMOYNE, PENNSYLVANIA
DENNIS M. & SUSAN D. GRAYBILL
TO: MICHAEL A. SHAFFER

EQUIPMENT DESCRIPTION LIST

COMPUTER WORKSTATION

COLOR COMPUTER MONITOR

LASERJET PRINTER

SOFTWARE

ONE MODEL 1650 XE-CD AM INTERNATIONAL OFFSET PRESS

ONE 1650 MODEL SWING-AWAY SECOND COLOR HEAD

MULTI-INSTALLED KOMPAC AUTOMATIC DAMPENER SYSTEM

ONE SP 990 PHOTO-DIRECT SILVER PLATEMAKER SYSTEM

METAL PLATEMAKER/MERCURY PRINTER

PLATE PUNCH

LIGHT TABLE

PRECISION PAPER CUTTER

AUTOMATIC AIR/SUCTION FEED FOLDER

PAPER DRILL

ELECTRIC SADDLE STAPLER

PADDER

THREE STEEL WORK TABLES

NEON SIGN PACKAGE

WINDOW GRAPHICS PACKAGE

FRONT LOBBY SERVICE COUNTER

FILE CABINET

TWO SIX FOOT FOLDING TABLES

LOBBY FURNITURE

DESK

SECRETARIAL CHAIR

STEEL SHELVING

IT IS UNDERSTOOD AND AGREED THAT THE ABOVE EQUIPMENT HAS BEEN PREVIOUSLY USED.

_Dennis M Graybill_          _Susan D Graybill_          11/24/98

AGREED - DENNIS M. GRAYBILL & SUSAN D. GRAYBILL          DATED