# ORIGINAL

> to 4

**In the United States District Court for the Middle District of Pennsylvania**

| | |
|---|---|
| Michael A. Shaffer, | } Civil Action No. 01-CV-1065 |
| Plaintiff, | } |
| | } |
| v. | } (Judge Rambo) |
| | } |
| Susan Graybill, et al. | } |
| Defendants. | } Oral Argument Requested |

FILED
HARRISBURG, PA

JUL 1 0 2001

MARIE D'ANDREA, CLE
Deputy Clerk

### Memorandum of Law of Plaintiff Michael A. Shaffer

### In Opposition to

### Defendants MMPI and Emmett's Motion to Dismiss

Comes now Plaintiff and opposes Defendants' Motion to Dismiss.

### Procedural Matters

1.  Plaintiff filed suit against four Defendants in the Court of Common Pleas of Cumberland County on May 3, 2001, and amended the Complaint on May 19, 2001.  See Exh. A and B.

2.  Plaintiff's case was removed to federal court on June 15, 2001.  Defendant Emmett's removal was frivolous, alleging that Plaintiff had stated federal causes of action for a factual pleading in state court that Defendants had violated state blue sky laws, federal security laws, the FTC Act, and state criminal and federal criminal law.  Defendant MMPI and Emmett also cited the Federal Arbitration Act, 9 U.S.C. Sec. 1 et seq. as grounds for removal.  Defendant Emmett is not entitled to invoke the Act because of an express contractual provision in the Franchise Agreement that arbitration shall be solely between the franchisor and the franchisee.  Franchise

1

*ORIGINAL*

Agreement, Exh. G, at p. 20.

3.  Only Defendants MMPI and Emmett filed a Motion to Dismiss on June 22, 2001, and served it on counsel by mail. Defendants MMPI and Emmett were served with state law Interrogatories and Requests for Production on June 7, 2001, which sought to discover most of the matters that Defendants now raise in their Brief.  Both Defendants are now in default in that discovery, Rules 33 and 34, and are therefore estopped from prosecuting their motion to dismiss since the discovery is relevant to the matters raised in their motion. Scarano v. Central R. Co. of New Jersey, 203 F.2d 510, 512 (3d Cir. 1953); Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982).

### The Federal Arbitration Act

4.  Plaintiff starts with the proposition that the great weight of the case law enforces agreements to arbitrate, notwithstanding such matters as piecemeal litigation or the joinder of parties who cannot be forced to arbitrate.  However, under all the facts and circumstances of this case ( many of which have not been plead yet because to do so would require a pleading of evidentiary matters rather than facts to support a complaint) as outlined in Plaintiff's Response to Defendants' Motion to Dismiss, enforcement of the arbitration clause in this case would be inequitable and unjust and lead to oppression and unconscionableness..

5.  9 U.S.C. Sec. 2 provides that arbitration agreements shall be enforceable, " save on such grounds as exist at law or in equity for the revocation of any contract." The facts set forth in Plaintiff's Response brings this arbitration clause well within this express statutory exception to the enforceability of the arbitration clause in this case.  Defendants are past masters of fraud in this respect.  See Para 22-25.

2

6.  Plaintiff has pled for rescission of the contract on the grounds that it is a contract of adhesion, Exh. B, Count VII, and further pleads that its enforcement would be oppressive and unconscionable in this case.

7.  Plaintiff was a small, unsophisticated businessman at the time he entered into the Franchise Agreement.  He had assets of less than $50,000.00 in savings and IRA accounts, disclosed that fact to Defendants in writing, Exh. D, and trusted Defendants MMPI, Emmett and the Graybills to part with that money on the blandishment that he would control his own destiny and make a lot of money if he purchased the existing franchise in Lemoyne, PA.  He was falsely told by Defendant Emmett that, while the franchise was losing money,  by following the MMPI marketing program, Plaintiff would turn the business around within three months.

7.1.  Plaintiff invested $17,500.00 of his money to go to a training school in New York and began to operate with the remainder of his money. Defendant Emmett knew that Plaintiff then would have only $20,000.000 with which to operate the franchise, Plaintiff's Aff., Exh. C, but falsely told Plaintiff prior to his entry into the Franchise Agreement that that amount would be enough to turn the franchise around in three months time, after which Plaintiff would be making a profit.  He was expressly lied to by all Defendants before he entered into the Franchise Agreement or the Purchase Agreement with the Graybills that the franchise expenses were thousands of dollars less than what they actually were.  Only after he got into operation of the franchise did he discover that those expenses were over $11,000.00 per month instead of the $7,000.00 per month represented to him.  Since the franchise only brought in  an average of $5,000.00 per month, these matters were highly relevant to Plaintiff and he was literally forced into destitution in trying to cover those extra expenses.  Exh. A, Para.14; Plaintiff's Aff., Exh. C

3

as to all facts.   He started operating the franchise in September of 2000 and was forced out of

business by February 28, 2001.

8. Each Defendant therefore participated in a scam to defraud Plaintiff. Defendant MMPI

required that Plaintiff submit a financial statement, Exh. D, before it would allow Plaintiff to

purchase the franchise. Defendant MMPI in particular knew or should have known that Plaintiff

had insufficient income and assets with which to purchase and operate the franchise for a time

period long enough to turn the franchise around and realize a profit for the Plaintiff.

Notwithstanding that knowledge, Defendant MMPI deliberately and maliciously sold the

franchise to Plaintiff and required  him to sign a form contract that waived his right to a jury trial,

waived his right to punitive damages, contained disclaimer clauses that the precise

misrepresentations made on its behalf by Defendant Emmett were not made, contained a non-

binding arbitration clause making it very expensive if not impossible for a small franchise owner

with limited income to obtain a meaningful remedy as a condition precedent to the lawful resort

to the courts for redress. MMPI cannot at one and the same time cause Plaintiff to part with

nearly all his money and still require him to arbitrate in expensive New York arbitration  This is

sufficient fraud so as to vitiate the entire contract.   That the arbitration clause is itself

unconscionable, oppressive and fraudulent is beyond question.   The case law indicates that this

issue must be tried by a jury before the court can refer the matter to arbitration.  Paine Webber,

Inc. v.Hartmann, 921 F.2d 507 (3d Cir. 1990) - the court must decide if the issue is arbitrable

before compelling an unwilling party to arbitrate. The issue of rescission of the contract must be

decided before the court can compel arbitration.  Southland Corp. v. Keating, 79 L.Ed.2d 1, at

18, Justice Stevens, concurring in part and dissenting in part (1984). Defendant MMPI knew

that Plaintiff did not have sufficient assets to operate the franchise for a sufficient time period to realize a profit and knew that Plaintiff would be bled dry when it enticed him to enter into the contract, affirmatively and materially misrepresented the expenses that would be incurred in the operation of the franchise, knew that Plaintiff would be unable to turn the operation of the franchise around before he ran out of investment money, and thereby made it impossible for him to obtain a remedy by its inclusion of an expensive arbitration clause in the Franchise Agreement in lieu of his court remedies. This is fraud sufficient to vitiate the entire contract. This is oppression. This is unconscionable. This is a contract of adhesion. This is a provision that unreasonably favors MMPI. By Defendant's own standards as set forth in its Brief at p. 7, the court cannot refer this matter to arbitration.

8.1. Under Third Circuit law, whether a particular issue is subject to arbitration is a matter of contract interpretation because a party cannot be required to submit to arbitration any dispute which he has not agreed to submit; whether a dispute is covered by arbitration is for the court to decide Laborers' International Union of N.A., afl-cio v. Foster Wheel Corp., 868 F.2d 573 (3rd Cir. 1989) ... 26 F.3rd 375, cert. denied 130 L.Ed.2d 311, cert. denied 130 L.Ed.2d 311.

8.2. The position with which Defendants have barged into court is untenable and frivolous.

### Dismissal or Stay Pending Arbitration

9. Defendants cases that the case should be dismissed pending arbitration are not on point. Not all of the claims in Plaintiff's Complaint are subject to a valid arbitration clause. Assuming that the court gives any effect to the arbitration clause, the clause does not apply to Defendants Emmett or the Graybills. See Para 2. Plaintiff is willing to pursue his claims against

them, whether or not MMPI is a party to the suit.  Since arbitration is designed to be swift, there

should be no problem in rejoining Defendant MMPI later in this case. The evidence developed

against Emmett will be the evidence to be used against MMPI when it is joined basck in the suit.

10.  Defendants' contention that there will be no causes of action remaining for the court

to adjudicate after Plaintiff's claims are resolved by arbitration has no merit.  The arbitration

clause in the Franchise Agreement is non-binding, although it does give the "losing party" the

right to have judgment entered on the arbitrators' decision without specifying whom the losing

party may be.  This attempt to make the arbitration binding is so loose as to be unenforceable. If

Plaintiff asks the arbitrators for an award of $1,000,000.00, Defendants ask for a take nothing

award, and the arbitrators award Plaintiff only $150,000.00, who has won or lost?  What about an

award of $1.00?  For that matter, what about an award of $500,000.00?  The clause  also ignores

Plaintiff's well plead cause of action for rescission of the contract. Exh. B, Count VII. An

arbitration panel apparently can not award this relief.  Can it award any equitable relief at all?

10.1.  In addition, this case needs to remain open as to the other three Defendants if for

no other reason than that Plaintiff needs the subpoena power of the court over Pennsylvania

witnesses.  A New York arbitration panel does not have subpoena powers over Pennsylvania

witnesses.  It is limited in that power to the same extent that the federal court in the E.D.N.Y. is.

**Venue**

11.  Defendants' alternative motion to transfer venue likewise does not withstand simple

analysis.  Defendant MMPI frequently resorts to this tactic.  In Hoffman v. Minuteman Press

International, Inc., 747 F.Supp. 552 (W.D.Mo. 1990), the court made short shrift of such an

attempt.  First, the party seeking transfer bears the burden of proving that the balance of relevant

6

statutory interests weigh in favor of the transfer. Defendants have not met that burden. In fact, Defendant Emmett is a Pennsylvania resident. Second, the court went on to hold that even though the choice of law clause specified New York as the governing law and the forum, other factors such as hardship to Plaintiff, convenience of the witnesses, availability of judicial process to compel attendance of unwilling witnesses, ease of access to proof, possibility of delay or prejudice if a transfer is granted, and practical considerations indicating where the case can be tried more expeditiously and inexpensively, also had to be considered. Where a case involves allegations of small, unsophisticated business people who were fraudulently induced to enter franchise agreements they never would have entered but for the fraud, "the forum selection clause is not worth the paper it is printed on."

12. Plaintiff's Aff., Exh. C, establishes that these factors militate against transfer of this case to the Eastern District of New York. He is a small, unsophisticated business man with extremely limited income who cannot afford the additional expense of litigating in New York. In addition, a transfer to New York would not allow the entire case to be litigated since three of the Defendants are not susceptible to New York jurisdiction. Complete relief can be obtained only in a Pennsylvania venue.

13. Finally, "Forum selection clauses that are drafted so broadly so as to encompass even tort litigation that may arise between the contracting parties are themselves prima facie evidence of fraud and overwhelming bargaining power." Hoffman, supra.

### Specificity of Fraud Claims

14. The who, what, when and where of the fraud and misrepresentation claims have been plead with sufficient particularity. Count I of the Complaint, Exh. A, contains the details. The

7

dates are within the knowledge of the Defendants.  Plaintiff specifically requested these dates from Defendants MMPI and Emmett in discovery propounded under state law that was due to be answered on July 7, 2001.  Neither Defendant has answered and cannot now complain that the allegations of fraud are not specific enough as to the who, what, when and where of the offenses. Plaintiff's Aff., Exh. C, establishes them beyond reasonable objection.  In addition, MMPI required Defendant Emmett to keep logs of all contacts with the Plaintiff.  See Plaintiff's Aff., Exh. C. The fraud that Plaintiff alleged was committed prior to his entry into the Franchise Agreement or the Purchase Agreement and occurred in July and August of 2000 in Lemoyne. Pa, or by telephone calls from Defendant Emmett to him at his home in Harrisburg, PA.

15.  The cases on the particularity required for allegations of fraud are across the board. The Complaint as amended certainly gives Defendants fair notice of Plaintiff's claims and it has been held that this is all that is required.  <u>Lessard v. Jersey Shore State Bank</u>, 702 F.Supp. 96 (M.D.Pa. 1988).  There are even cases holding that Plaintiffs need state no legal theories in their complaints, only sufficient facts to put Defendants on notice of the contemplated relief.  Rule 8.

16.  In addition, there is nothing raised by the Defendants that cannot be cured by an amended pleading if the court so orders. However, the pleading appears to be frivolous.

### The Conspiracy Claim

17.  While Defendants claim that Plaintiff has not averred malice (if required - it isn't since none of Defendant's own cases but one, which is wrongly decided, require it) for civil conspiracy, Defendants also move to dismiss Plaintiff's pleadings for punitive damages.  Those pleadings are in Count IV, Exh. A, and aver deliberate and willful actions on the part of the Defendants.  The malice is inferred from those actions, especially where the Defendants are

8

alleged to have led Plaintiff down the path to destruction by falsely inducing him to purchase a franchise when the Defendants knew that he could not turn the franchise around with his limited assets.

18. Again, there is nothing here that cannot be cured by an amended pleading if the court so orders. However, the pleading appears to be frivolous. This Complaint is not a first degree murder indictment. Still, the new tort of first degree fraud has been committed since Defendants lay in wait for the next chump who would purchase a failing enterprise based on the representation that he could turn it around in three months with only $20,000.00 to invest.

### The Negligence Claim

19. Plaintiff has plead that Defendant MMPI owed him a duty as the superior bargaining power to adequately analyze his financial application to MMPI and to inform him that he did not have enough money to purchase the franchise and operate it for sufficient length of time to make it turn a profit for him. While Plaintiff did unfortunately limit his pleadings in one sentence of many in Count III of Exh. A to an allegation regarding only insufficient money to purchase the franchise, he also pleads in the preceding Para.19, Exh. A, that Defendants caused him to expend significant amounts of money for training and for anticipated losses from operation of the franchise within the first three months and that Defendants knew that Plaintiff had insufficient income and assets to operate the franchise for even the three months at the end of which Plaintiff was promised that he would be making profits. Exh. A, Para 20 - the same Para from which Defendants allege that Plaintiff was complaining only about having enough money to purchase the franchise.

9

20.  Plaintiff's highly selective choice of what Plaintiff actually plead crosses the line of frivolity.

### Emotional Distress

21. Even the cases cited by Defendants in their Brief recognize that even breach of contract can give rise to the tort of negligent or intentional infliction of emotional distress where the breach is of such a kind that serious emotional disturbance was a particularly likely result. Defendants actions in this case were wicked, egregious and even criminal and they were designed to destroy Plaintiff's life.  In addition, physical "injury" is not required, only physical manifestation.

21.1.  Plaintiff suffered serious emotional disturbance as demonstrated by his Aff. At Exh. C.

### Punitive Damages

22.  Plaintiff concedes that punitive damage pleadings do not give rise to an independent cause of action. Nonetheless, the pleadings must stand, although not as a separate count, because under all the facts and circumstances of this case, Defendants' actions were wicked, egregious and criminal as well as outrageous.

23.  There is a certain class of small franchise owners with insufficient investment money to make a go of a smaller Minuteman franchise upon whom Defendants prey.  Defendants represent to these small franchise purchasers that they would achieve specific gross sales, that one third of their gross sales would be profits, and make earnings and expense claims without documentation to back them up and then turn around and disclaim each representation in contract disclaimers.  FTC v. Minuteman Press International, Inc. 53 F.Supp. 248 (E.D.N.Y. 1998).

10

Plaintiff was among this class.  These are small, unsophisticated business people with a little bit, but not a whole lot, of money.  MMPI takes that money under false pretenses and leaves them high and dry with insufficient assets to make a go of the smaller Minuteman franchises.  This is what Defendants did to Plaintiff in this case.  It is wrong.  It is wicked.  It is outrageous.  It is criminal.  Defendants deserve to be punished in this case.  They deserve to be deterred from continuing to do this.  See Pa. Standard Jury Instructions, Sec. 1400.

24. Defendant MMPI started out in its fraudulent ways as far back as the 1970's. Beardshall v. Minuteman Press International, Inc., 664 F.2d 23 (3rd Cir. 1981).  Defendant also did this again to many small business purchasers as held in the FTC case, supra, before it did it to Plaintiff.  Defendants did it again to John Schlaline in 1996.  See First and Second Amended Complaints, Exh. E.  Then, notwithstanding injunctive relief in the FTC case barring them from doing so again, Defendants MMPI and Emmett did it again to George Steedle, who purchased the Akron, PA, franchise in January of 2000 and was left high and dry.  See Draft Complaint attached hereto as Exh. F.  Not satisfied with that, Defendants did it again to Plaintiff who purchased the Lemoyne, PA, franchise in September of 2000.  Shaffer was left with so little money that he could keep his store open for only six months.

25. Defendants MMPI and Emmett know that in certain cases, they will be ruining people's lives by selling those people franchises that they can barely afford to purchase let alone operate for sufficiently long periods to turn a profit and they do it anyway.  They need to be deterred and punished.

### Declaratory Relief

26.  Plaintiff's pleadings for declaratory relief are missing from the First Amended

Complaint, Exh. B, at what was supposed to be Count V. Plaintiff will move to plead them. That relief is requested because Defendants simply try to take away too much from small franchise purchasers who are enamored of Defendants' claims that they will control their own destiny and make a lot of money by operating a Minuteman franchise. Small franchise purchasers in this situation simply pay no heed to what they may be giving away. MMPI as the superior bargaining entity has them sign standard form contracts in which they waive their rights to a jury trial, to sue for punitive damages, to sue for misrepresentations and also contain onerous disclaimer provisions that nothing has been represented other than in the Franchise Agreement while at the same time Defendants' actual practices in marketing to small franchise purchasers are to make many and significant misrepresentations. This was done to Plaintiff in this case and his contract needs to be reformed.

27. Count VII of his First Amended Complaint, Exh. B, attacks the arbitration clause and seeks not only a declaratory judgment to reform the contract but also a claim to actually rescind the contract. Under the facts and circumstances as set forth in Para 4 through 8 hereof, this contract needs to be reformed at the least as it relates to the arbitration clause. In addition, the fraud that Plaintiff is pleading vitiates the entire contract and the contract needs to be rescinded.

27.1. Since Plaintiff has plead fraud vitiating the contract and has plead for rescission, it is probably not necessary that Plaintiff continue to plead for declaratory relief as to specific clauses of the contract. Nonetheless, the issue appears to be free from doubt. 28 U.S.C. 2201 indicates that a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." In addition, declaratory relief is a remedy and does not create an additional cause of action. Richards v.

12

Select Ins. Co., 40 F.Supp.3d 163 (S.D.N.Y. 1999).

### Jury Trial

28.  Defendants have good reason to be frightened of a jury trial in this case. For that matter, Defendants also have good reason to be frightened of a bench trial in this case. Judge Hurley of the E.D.N.Y. hit them with an injunction in the FTC case and Defendants were forced to agree to pay $3 million in damages to the small franchise purchasers whom the FTC was representing in that case. But the contractual waiver of a jury trial is part and parcel of the fraud being perpetrated on the Plaintiff. As with the forum selection clause in the contract, the court's analysis with respect to forum selection clauses set forth in Para 11 through 13 applies to jury waiver clauses that the mere existence of these types of clauses is prima facie evidence of fraud and gross disparity in bargaining positions.

29.  In addition, the clause is unenforceable in this case since Plaintiff is entitled to a jury trial against Defendant Emmett and Defendants Graybill. The Graybill purchase agreement contains no similar clause. The Complaint alleges conspiracy and joint fraud against Defendants and the Graybill Defendants. Defendant MMPI's waiver clause is not broad enough to deprive Plaintiff of his right to a jury trial as to these other Defendants and Plaintiff cannot split his cause of action against the four Defendants since he alleges that each conspired with the others to defraud him and jointly as well as severally defrauded him.

### Issues Conceded by Defendants

30.  Defendants removed this case to federal court on the alleged grounds of the Federal Arbitration Act. However, there is nothing in these grounds that is not cognizable in a state court and the federal abstention doctrine applies. Tafflin v. Levitt, 493 US 455, 107 L.Ed.2d 887

13

(1990).

31.  Defendants only other ground for removal was a factual pleading in the state action that Defendants had violated state blue sky laws, federal securities laws, state criminal laws, the FTC Act, and federal criminal laws.  These factual matters are highly relevant to the pleading of punitive damages.  Interestingly, Defendants make no mention in their Brief of the existence of these causes of action nor do they move to dismiss on any of these grounds.  Defendants totally ignore Para 37 a through k of the Amended Complaint, Exh. B, which details in what significant respects the Disclosure Statement required by the FTC failed to disclose material facts necessary to make the written disclosure of the FTC action as quoted in Para 33 true:  Defendant MMPI still hasn't disclosed that the FTC proved to the satisfaction of a federal judge that its actual practices in marketing small franchises to unsophisticated purchasers are fraudulent.  Plaintiff intended to take the issue up with the state court to see if the state court would fashion a remedy under state law since no federal court to date has recognized a private cause of action for violation of FTC rules.  This may be the case that calls for a federal court to do so.  At any rate, Plaintiff will ask this court to fashion such a state law remedy under existing franchise common law in Pennsylvania and to issue an appropriate injunction under the state corrupt organization criminal statute, which provides for a civil remedy of injunctive relief.  18 Pa.C.S.A. 901.  This relief cannot be awarded by an arbitration panel.

32.  In order to salvage a federal cause of action for Defendants, Plaintiff will have to move the court to amend his pleadings to aver a RICO action against Defendants MMPI and Emmett.  Plaintiff will also move for protective relief under 18 U.S.C. 1964 and to enforce the FTC injunction.  This protective and injunctive relief cannot be awarded by an arbitration panel..

14

33.  The issues that must be tried before the court can refer this matter to arbitration constitutes good ground cause for Plaintiff to file this suit before proceeding to arbitration. Therefore, the contractual clause that Plaintiff must pay for all arbitration fees, including MMPI's fees, if he first files suit in court is unenforceable.

34.  Enforcement of the arbitration clause in this case is void as against the public policy that every citizen should have his day in court, even if he cannot afford arbitration. declaratory judgment on this issue.  There appears to be no case law.

35.  Plaintiff offered Defendant reasonable arbitration of the case before it was removed to federal court and before a response was due.  Exh. H.  Defendants are therefore estopped from even claiming enforcement of the unreasonable, oppressive and unconscionable clause.  See cases at Para 3.

36.  In Plaintiff's own words when he first consulted me about possible claims against the Defendants, **"They set me up to fail."**

Wherefore, Plaintiff prays that the court postpone ruling on Defendants' Motion until such time as Plaintiff moves the court to amend his Complaint and deny Defendants' Motion to Dismiss or Transfer Venue or to Stay these proceedings and grant Plaintiff such other and further relief at law or in equity to which Plaintiff is justly entitled.

Respectfully Submitted,

Robert J. White
Counsel for Plaintiff
PO Box 3005
York, PA 17402
(717) 699-4534

15

In the Court of Common Pleas of Cumberland County, Pennsylvania
Civil Division

Michael A. Shaffer,                    } No. 01-2664 Civil Term
        Plaintiff,              }
                                       }
    v.                                 }
                                       } Judge _____
Susan Graybill as an individual        }
and as Administratrix of the           }
Estate of Dennis M. Graybill;          }
Minuteman Press                        }
International, a New York corpor-       }
ation; and Robert Emmett               }
        Defendants.             } Jury Trial Demanded

## NOTICE TO DEFEND

### Notice

You have been sued in court. If you wish to defend against these claims, you must take action within twenty (20) days after this complaint and notice are served by entering an appearance personally or by an attorney and filing in writing with the Court your defenses or objections. **You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice. A judgment may also be entered against you for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.**
**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

**Cumberland County Lawyer Referral Service**
**Cumberland County Bar Association**
**2 Liberty Avenue**
**Carlisle, PA 17013**
**(717) 249-3166**
**1-800-990-9108**

## AVISO

Usted ha sido domandado en corte. Si usted quiere defenderse en contra de estas demandas, usted debe tomar accion dentro de viente (20) dias despues que esta queja y aviso sean servidos, registrando una comparacencia personalmente o por su abogad y llenando en esccrito en la corte su defensa u objectiones con la corte.  **Usted esta advertido que si fallah de hacerlo, el casa puede seguir sin usted y un desicion pued ser registrado en contra suya por la corte sin ningun otra aviso. Ademas, la corte pued decidir a favor del demandante y requiere que usted cumpia con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propriedades u otros derechos importante para usted.**
**USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO NO PUEDE PAGAR UNO VAYA O LLAME POR TELEFONO A LA OFFICINA ESCRITA ABAJO PARA AVERIGULAR DONDE USTED PUED CONSEQUIRE ASSISTANCIA LEGAL.**

Cumberland County Lawyer Referral Service
Cumberland County Bar Association
2 Liberty Avenue
Carlisle, PA 17013
(717) 249-3166
1-800-990-9108

In the Court of Common Pleas of Cumberland County, Pennsylvania
Civil Division

| | |
|---|---|
| Michael Shaffer,<br>    **Plaintiff,**<br><br>  **v.**<br><br>Susan Graybill as an individual<br>and as Administratrix of the<br>Estate of Dennis M. Graybill,<br>Minuteman Press International,<br>Inc., and Robert Emmett<br>    **Defendants.** | } No. _____<br>}<br>}<br>}<br>}<br>} Judge _____<br>}<br>}<br>}<br>}<br>} Jury Trial Demanded |

**Complaint in Law with Action for Declaratory Judgment**

Comes now Plaintiff and complains of each Defendant as follows.

**Parties, Jurisdiction and Venue**

1. Plaintiff is Michael Shaffer who resides at 88 Bentz Mill Road, East Berlin, PA 17316.

2. Defendant Susan Graybill is an individual who operated a Minuteman Press franchise in Lemoyne, PA, and may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

3. Defendant Susan Graybill as Administratrix of the Estate of Dennis M. Graybill, deceased, may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

4. Defendant Minuteman Press International, Inc. (hereafter MMPI) is a New York corporation with its home office in Farmingdale, New York. It may be served by certified mail addressed to its registered agent, Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735.

5. Defendant Robert Emmett is an individual and representative of MMPI and maintains

11. Defendants Graybill were the owners of the franchise. Defendants Graybill made material misrepresentations as to the financial viability of the franchise and these were made to falsely induce Plaintiff to purchase the Minuteman Press franchise of Lemoyne as an ongoing and viable enterprise with sufficient income to pay expenses and support the store owner and two employees.

12. Defendants Graybill conspired with one another, MMPI and Emmett to represent the Lemoyne franchise as a viable entity that would make a profit and that Plaintiff would start seeing those profits within three months. Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise. Defendants MMPI and Emmett materially assisted Defendants Graybill to do so. Defendants MMPI and Emmett also made material misrepresentations to induce Plaintiff to purchase the franchise and materially assisted Defendants Graybill in unloading an unprofitable franchise on Plaintiff; these misrepresentations were made by Defendant Emmett, MMPI's regional representative.

13. The following misrepresentations were made by one or more of the Defendants:

a. Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise by representing that monthly operating expenses were in the range of $7,000.00 when in fact monthly operating expenses were in the range of $12,000.00. Plaintiff expressly obtained copies of the checks written for expenses by the franchise and refused to purchase the franchise because the operating expenses were too high at $12,000.00 per month. Defendant Emmett represented to Plaintiff in response that many of the checks were for personal expenditures and that the operating expenses for the franchise were only $7,000.00 per month. Defendants Graybill confirmed Emmett's misrepresentation. This was a very material factor to Plaintiff because the franchise's monthly income was only in the $5,000.00

range.

b. Defendant Emmett materially misrepresented the financial viability of the Lemoyne franchise by representing that Plaintiff need earn only $2,000.00 per month over and above what the franchise was bringing in in order to make a profit when in fact Plaintiff needed more than $7,000.00 more per month in gross sales just to break even.

c. Defendants MMPI and Emmett materially misrepresented to Plaintiff the financial viability of the Lemoyne franchise by making the same representations as set forth in Paragraphs 13a and 13b. Said Defendants conspired with Defendants Graybill to make these misrepresentations.

d. Defendants MMPI and Emmett materially misrepresented to Plaintiff that he would not only be able to meet expenses within a very short period of time but that he would also realize a gross profit of 30% of gross sales within that same time merely by following MMPI's marketing program, which was to make twenty new contacts per day. Plaintiff did so but was unable to make a profit on the franchise.

e. Defendants MMPI and Emmett materially misrepresented to Plaintiff that the only reason why the Lemoyne franchise was not already making a profit was because Defendant Dennis M. Graybill, now deceased, was not able due to his poor health to make enough marketing calls to generate additional sales.

14. Plaintiff was damaged by these misrepresentations in the loss of the amounts that he paid to Defendants Graybill to purchase the franchise, in the amounts that he paid Defendant MMPI for the transfer of the franchise and to attend its school for new owners, and in the loss of working capital and the amounts that had to be borrowed to operate the franchise from month to month. Consequential damages were suffered by Plaintiff in the amounts that he could not earn

because he was devoting his full time to operation of the franchise instead of his former employment as well as amounts he owes to his landlord and Textron Financial Corporation from contracts that were necessitated by his purchase of the franchise. Further consequential damages stemmed from the inevitable loss of credit reputation when he was unable to repay the money he borrowed to keep the franchise operating from month to month.

### Count II

15. On or about September 1, 2000, Plaintiff entered into a written contract with Defendant MMPI which was labeled as the Franchise Agreement. Immediately upon entering the Agreement, Plaintiff was sent to New York for an explanation of what to do to make the franchise viable. He was promised in writing all needed technical assistance and advice. This assistance and advice was based on the express corporate formula that if the franchisee did what MMPI told him to do, he would meet expenses and make a profit. Plaintiff was expressly told by MMPI that all he would have to do was manage the franchise, make twenty cold calls a day, leave all work to the employees, and, by doing so, he would make significant profits. These promises were made in order to induce Plaintiff to enter into the franchise agreement and were again made in the training school in New York. These promises were made in the Franchise Agreement or were made in supplementation of the written agreement or were made in order to induce Plaintiff to enter into the written agreement. In other words, follow our program and you will realize a pretax profit of one third of your gross sales.

16. These promises were breached by MMPI. At no time was the income from the franchise sufficient to even meet expenses and within six months of purchasing the franchise, Plaintiff was forced to close his doors due to excessive expenses.

18. Damages that flow from these breaches of contract and false promises include the

loss of the money that was paid to MMPI to transfer the franchise to Plaintiff and send him to training school in New York. Consequential damages include the loss of what was paid by Plaintiff to the franchise owners to purchase the franchise, the loss of operating capital, the waste of the assets of Plaintiff's franchise, and the various contractual payments needed to pay the landlord and the equipment lessor. Further direct damages resulted from the extreme mental anguish suffered by Plaintiff which were intentionally inflicted as the result of the torts alleged in this Complaint. These damages are in an amount in excess of the minimum jurisdictional limits of the court.

### Count III

19. Defendant MMPI would not transfer the franchise to Plaintiff without first receiving a financial application from the Plaintiff calling for a disclosure of all assets.. After reviewing Plaintiff's financial statements, MMPI caused the sale of the franchise in Lemoyne to Plaintiff and transferred the franchise to Plaintiff and caused him to expend significant amounts for training and for anticipated losses from operation of the franchise within the first three months.

20. Having required Plaintiff to submit a financial application listing all assets of Plaintiff, Defendant MMPI at all times material to this Complaint, knew or should have known that Plaintiff had insufficient income and assets to operate the franchise for even the three months at the end of which Plaintiff was promised that he would be making profits. As the superior bargaining party, MMPI was under a duty to disclose to Plaintiff that he had insufficient income and assets with which to purchase the Lemoyne franchise. This negligence on the part of MMPI caused Plaintiff to suffer not only monetary damages but also an entitlement to damages for extreme emotional distress in amounts in excess of the minimum jurisdictional limits of the court.

20.1.  Plaintiff has further been consequentially damaged by these defendants in an amount in excess of the minimum jurisdictional amount of the court for extreme mental anguish intentionally inflicted upon him as the result of the loss of his life savings.

## Count IV

22.  Each of the torts complained about were committed with such deliberateness and willfulness and in such reckless disregard of the rights of Plaintiff so as to entitle him to punitive damages in an amount in excess of the minimum jurisdictional amounts of the court.

## Incorporation by Reference

23.  Each Count hereof is incorporated in each other Count by reference.  Each Paragraph hereof is incorporated in each other Paragraph by reference.

Wherefore, Plaintiff prays that after trial hereof, he be awarded actual and consequential and punitive damages, each in an amount in excess of the minimum jurisdictional limits of the court against each defendant and against all defendants jointly and severally for their joint misconduct and for such other and further relief in law and in equity to which Plaintiff may be justly entitled.

Respectfully Submitted,

Robert J. White
Counsel for Plaintiff
PBN 32487
PO Box 3005
York, PA 17402
(717) 699-4534
FAX (717) 699-2895

## Verification

In the Court of Common Pleas of Cumberland County, Pennsylvania
Civil Division

| | |
|---|---|
| Michael A. Shaffer,<br>　　　　Plaintiff, | } No. 01-2664 Civil Term<br>}<br>} |
| 　　v. | }<br>} Judge _____ |
| Susan Graybill as an individual<br>and as Administratrix of the<br>Estate of Dennis M. Graybill;<br>Minuteman Press<br>International, a New York corpor-<br>ation; and Robert Emmett<br>　　　　Defendants. | }<br>}<br>}<br>}<br>}<br>}<br>} Jury Trial Demanded |

## NOTICE TO DEFEND

### Notice

You have been sued in court. If you wish to defend against these claims, you must take action within twenty (20) days after this complaint and notice are served by entering an appearance personally or by an attorney and filing in writing with the Court your defenses or objections. **You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice. A judgment may also be entered against you for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.**
**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

**Cumberland County Lawyer Referral Service**
**Cumberland County Bar Association**
**2 Liberty Avenue**
**Carlisle, PA 17013**
**(717) 249-3166**
**1-800-990-9108**

I verify that the facts contained in the Complaint are true and correct to the best of my knowledge, information and belief.  I understand that any false statements are made subject to the penalties of 18 Pa.C.S.A. Sec. 4904  relating to unsworn falsification.

May 1, 2001.

Michael Shaffer

**In the Court of Common Pleas of Cumberland County, Pennsylvania**
**Civil Division**

| | |
|---|---|
| Michael A. Shaffer | } No. 2001-2664 Civil Term |
|       Plaintiff, | } |
| | } |
|   v. | } |
| | } |
| Susan Graybill | } |
| et al., | } |
|      Defendants | } Jury Trial Demanded |

**Plaintiff's First Amended Complaint with Action for Declaratory Judgment**

Comes now Plaintiff and amends his Complaint with Action for

Declaratory Judgment and states the following additional causes of action:

**Count VI**

32. Plaintiff's Complaint is incorporated herein by reference, the same

as if fully set forth herein.

33. In the Disclosure Document of Minuteman Press International, Inc. which

which was required by FTC rules and is dated August, 1999, the following disclosure is made on

page 12 about an FTC action against Defendant MMPI and others:

> <u>Federal Trade Commission, Plaintiff, v. Minuteman Press International, Inc., Speedy Sign-A-Arama, USA, Inc., Roy W. Titus and Jeffrey Haber, Defendants</u> (CV 93-2496) Filed on June 4, 1993, in the United States District Court, Eastern District of New York. On December 18, 1998, an injunction was filed prohibiting the Defendant's excluding Haber from doing the following: A. Making, or assisting in the making of, expressly or by implication, orally or in writing, to any prospective franchisee any statement of past, present or future sales, income, or gross or net profits of any existing or prospective franchisee or group of franchisees, unless at the time of making such representation the defendant possesses written material that provides a reasonable basis for the representation. B. Violating any provision of the Rule 16 C.F.R. Part 436 or the rule as it may later be amended and the disclosure requirements of the UFOC in effect at the time.

C. Assessing or collecting a transfer/training fee from any franchisee who sells or assigns its franchise unless the selling franchisee received a copy of a disclosure statement indicating that such fee would be charged. D. Failing to monitor and investigate any complaints about compliance with the rule or the injunction. E. To cooperate with the Commission in the enforcement of this injunction.

Section A of this disclosure relates to precisely the same marketing methods and misrepresentations that are set forth in Counts I through IV of the Plaintiff's Complaint, which are incorporated herein by reference. The disclosure omits material facts and is affirmatively misleading.

34.  Defendant MMPI's misrepresentations, omissions, false statements, actions and inactions violate state blue sky laws, federal FTC rules, federal securities laws, the criminal law of the Commonwealth of Pennsylvania, and federal criminal law. Not only has MMPI violated civil law but also criminal law in the manner in which it falsely induced Plaintiff to purchase the existing Minuteman franchise in Lemoyne.

35.  Defendant Emmett materially assisted MMPI to do or fail to do those actions set forth in Paragraph 34.

36.  Defendants Graybill may or may not have assisted MMPI and Emmett to do or fail to do those actions set forth in Paragraph 34. Defendants Graybill materially assisted Defendants MMPI and Emmett to market by unlawful methods as set forth in Counts I through IV of the Plaintiff's Complaint and has therefore assisted the latter Defendants to violate state blue sky laws, federal FTC rules, and federal securities laws and state and federal criminal laws..

37. In particular, the following written misrepresentations or omissions to state material facts needed to make the misrepresentation true have been made or not made with respect to the Disclosure Statement disclosure of then existing litigation as set forth in Paragraph 33:

a. MMPI and Emmett failed to disclose that the FTC was complaining about the precise marketing methods that MMPI and Emmett used in the marketing of existing franchises to particular franchisees, all as more fully set forth in Counts I through IV, which are incorporated herein by reference.

b. MMPI failed to disclose the full nature and extent of the relief sought by the FTC by omitting all those disclosures set forth in Paragraph 34, in particular the fact that the FTC was attempting to prohibit it from marketing any existing franchise in the manner in which the Lemoyne  franchise was marketed to Plaintiff as more fully set forth in Counts I through IV, which are incorporated herein by reference.

c. Defendants Graybill, MMPI and Emmett failed to disclose to Plaintiff material financial information as required by the FTC request for injunctive relief when Emmettt falsely told Plaintiff that the Graybill expenses to operate the franchise were about $7,000.00 per month and made the other misrepresentations set forth in Counts I through IV.

d. MMPI failed to disclose to Plaintiff that the FTC was alleging that MMPI and others were liable for false and misleading claims about earnings, gross sales and profitability levels. Emmett and unnamed co-conspirators in the home office of MMPI were making those same false and misleading claims to Plaintiff.  Defendants Graybill were materially assisting Emmett to do so.

e. MMPI failed to disclose that the litigation involved FTC claims that it and its officers violated federal consumer protection and franchise disclosure laws

f. MMPI failed to disclose that the FTC was complaining about sales pitches made by MMPI to prospective franchisees about gross earnings and profits they could expect to see by buying and operating MMPI's quick print and sign shops.

g. MMPI failed to disclose that the FTC was seeking hefty monetary damages to those prospective franchisees who suffered monetary damage from the violation of the federal consumer protection and franchise disclosure laws.

h. MMPI failed to disclose that the FTC accused MMPI and its sales force of an unlawful pattern of providing false and unsubstantiated information about earnings to people interested in buying one of MMPI's franchises.

i. MMPI failed to disclose that the FTC was attacking its written disclaimer statement that no earnings claims were made or authorized by MMPI as being unenforceable in the FTC action.

j. MMPI failed to disclose that the contradiction between its written disclaimers and a franchisor's actual practices was a violation of the FTC Act. The actual practices in this case were committed by Defendants Graybill, MMPI and Emmett.and certain unnamed co-conspiratorss in MMPI's home office.

k. MMPI failed to disclose that the FTC was complaining about the common-sense net impression from its actions in marketing its franchises that the purchaser was being furnished important specific earnings claims information to assist in the decision making process, notwithstanding the general disclaimers about earnings..

38. Defendants are therefore estopped from relying on their disclaimer clauses in their contracts with Plaintiff as a defense made to the claims of Plaintiff by collateral estoppel and their own misrepresentations made as part of a common scheme to defraud purchasers of MMPI franchises that the purchaser was being furnished important specific earnings claims information to assist in his decision making process and then forcing the purchaser to sign a bald faced lie that the precise information had not been provided. Plaintiff. The conspiracy between

Defendants Graybill, Emmett and MPI was so specific that all

Defendants are liable for all misrepresentations and the actions and inactions of one another, the

same as if they had performed the misrepresentations, actions and inactions as an individual.

### Count VII

39.  This Count sounds in equity.

40. Plaintiff was presented with a written Franchise Agreement which affirmatively

requires him to seek non-binding arbitration of his claims against MMPI.  This clause is a

contract of adhesion, since Plaintiff simply had no bargaining power when he entered into the

Agreement.  The contract was dictated by MMPI on a take it or leave it basis; no input from

Plaintiff was permitted; this clause is required of all who wish to purchase a franchise from

MMPI.  In addition, under all the circumstances of this case, it would be inequitable to enforce

this provision of the contract because this clause was designed by MMPI to further its unlawful

schemes and activities as set forth in the other Counts of this action

41.  Plaintiff aks the court for a declaratory judgment canceling that clause of the contract

and for rescission of the contract.

Wherefore, in addition to the relief requested in Plaintiff's  Complaint

with Action for Declaratory Judgment, Plaintiff requests such other and further relief at law and

in equity as arise from these  additional Counts together with a declaratory judgment that the

arbitration clause of the  MMPI contract with Plaintiff be rescinded.

### Notice to Plead

**Plead to the First Amended Complaint within 20 days of service or default judgment may**

**be entered against you.**

Respectfully Submitted,


Robert J. White
Counsel for Plaintiff
PO Box 3005
York, PA 17402
(717) 699-4534
FAX (717) 699-2895

## Certificate of Service


The undersigned certifies that he has mailed a copy of this First Amended Complaint with Action for Declaratory Judgment to each Defendant on May 19, 2001 by first class mail addressed as follows:

MMPI by serving Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735

Defendant Robert Emmett at 489 Devon Park Drive, Suite 307, Wayne, PA 19087

/s/
Robert J. White

## Verification


I verify that the facts contained in this First Amended Complaint with Action for Declaratory Judgment are true and correct to the best of my knowledge, information and belief. I understand that any false statements are made subject to the penalties of 18 Pa.C.S.A. Sec. 4904 relating to unsworn falsification.

/s/
Michael Shaffer

**In the United States District Court for the Middle District of Pennsylvania**

| | |
|---|---|
| Michael A. Shaffer,<br>　　　　　Plaintiff, | } Civil Action No. 01-CV-1065<br>}<br>} |
| 　　v. | }<br>} |
| Susan Graybill, et al.,<br>　　　　　Defendants | }<br>} |

**Affidavit of Plaintiff Michael A. Shaffer**

1. My name is Michael A. Shaffer.  I am the Plaintiff in this law suit.  I have never been convicted of a felony or a crime involving moral turpitude.  I have personal knowledge of the facts stated in this Affidavit and they are true and correct.

2. I graduated from Dover High School in 1968 and enlisted in the Air Force for three and a half years and provided security for nuclear missile sites.

3. After the Air Force, I worked as a skip tracer and then as a licensed insurance salesman.  Then I spent a number of years as a business manager for various automobile sales companies in the area of customer financing and providing insurance for customers.

4. I obtained employment with Arthur Kusic, Esq., for eleven and a half years as a bill collector.

5. In June of 1998, I started a business, Shaffer, Frey and McIntire, and served as President of the collection agency, where my duties were collecting accounts, paying bills, and preparing or reviewing daily, weekly, and monthly reports.  I left the company in September of 1999 and started exploring the viability of purchasing a franchise.  I looked at a sign company and was first introduced to Minuteman Press at about that time.

6. I first talked to Defendant Emmett in November of 1999 about the possibility of opening a new store in Harrisburg.  I even gave Mr. Emmett a check for $5,500.00 to get started

but then decided not to purchase the franchise and Defendant Emmett returned my check to me.

5.  Defendant Emmett got back to me in July of 2000 to inquire if I were interested in purchasing an existing franchise in Lemoyne.  I asked for figures on the franchise and was advised by my attorney to check out the business checking account of the franchise.  I did so and got a written checking statement for three months of the franchise's operations from Mr. Emmett through the mail.  I declined to purchase the franchise since its income was only $5,000.00 per month as against expenses of over $11,000.00 per month per the check book figures.

6.  Then, Defendant Emmett lied to me.  He told me that Dennis Graybill was paying personal expenses from the business checking account and that the expenses for the business were in the $7,000.00 per month range.  I asked Dennis Graybill about this and he verified what Defendant Emmett told me.

7.  Defendant Emmett was informed by me that I only had $20,000.00 to work with after I paid the $17,500.00 for MMPI's training course in New York.  Defendant Emmett told me that I could turn the business around on that amount in three months.  I believed him, even though this statement later proved to be another lie. But for Defendant Emmett's lies, I would not have purchased the franchise.

8.  I decided to purchase the franchise because I thought I had enough money to turn it around, based on what Defendant Emmett was telling me.  With expenses represented to be $7,000.00 per month and the recommended marketing tactics from MMPI that would increase my income to at least that level in three months, I expected to be able to operate the business for a year or more on my remaining savings.  I wanted to be self-employed.

9.  I had no experience in the printing business.  I was told by Defendant Emmett that it would not be necessary and that I would be trained in the Minuteman program.  The only

entrepreneurial experience I had was with Shaffer Frey and McIntire in the debt collection business.

10.  At the time I entered into the Franchise Agreement, I only had less than $50,00.00 in assets to cover an approximately $125,000.00 investment.  I listed all my assets on a financial application that I submitted to MMPI.

11.  While I operated the franchise, I employed two people, a press operator and a graphic artist counter girl to take care of customers while I was out marketing.  They were on the payroll until nearly the end of February when I had to close the shop.  Mr. Emmett told me that I needed a press operator because I would be doing the marketing.  MMPI told me at the training school when it showed me press operations that I would probably never touch a press again

12.  I marketed from Monday through Thursday from 9:00 Am until 1:00 PM, calling on at least twenty potential customers a day. I usually got to talk to fifteen people a day.  Most of my business was from contacts that I made myself.  I got very little business from Mr. Graybill's prior customers.
When I got back to the business, I would help the employees and then do the quotes.

13.  I followed the marketing program recommended by MMPI but it did not produce the income necessary to meet expenses.

14.  My current income is zero dollars.   I am relying on my brother for help.  I am living in a house owned by my mother.

15.  I am attempting to find employment from classified ads in the newspaper.  I had hoped to find something in the $30,000.00 per year range but will take less now.  Jobs for people who have been in business for themselves are hard to find.

16.  The facts  stated in my Complaint and First Amended Complaint are within my

personal knowledge and true and correct. I renew each factual allegation therein.

17. Defendant Emmett was required by MMPI to keep and did keep a log of all contacts he had with me.

18. I suffered extreme emotional distress from what the Defendants did to me. Their actions destroyed my life. I could not and still cannot sleep at night. If I get any sleep at all, I wake up at 4:00 or 5:00 AM. I worry about the bills that keep coming in that need to be paid. I am ashamed when I frequently have to borrow money from my family to live on. I am frightened over what my creditors may try to do to me. I suffer mental depression. I am extremely worried about finding a job because I have been in business for myself and the possibility of finding a job is very remote. I suffer physical symptoms of an upset stomache to the extent that I have to take medicine to keep my food down.

18. **They set me up to fail.**

Further, affiant sayeth not.

*Michael A. Shaffe*
Michael A. Shaffer

Subscribed and sworn to before me this _11_ day of July, 2001.

*William C. Heiner*
Notary Public
Commonwealth of Pennsylvania
County of York

NOTARIAL SEAL
WILLIAM C. HEINER, NOTARY PUBLIC
YORK, YORK COUNTY
My Commission Expires Sept. 1, 2001



PRINTING "FOR THE JOB YOU NEEDED YESTERDAY"

# MINUTEMAN PRESS

## INTERNATIONAL, INC.

**489 Devon Park Drive**
**Suite 307**
**Wayne, PA 19087**
**phone: (610) 902-0203**
**fax: (610) 902-0206**

---

CONFIDENTIAL
APPLICATION FOR
MINUTEMAN PRESS
FRANCHISE

---

# THIS IS NOT A PURCHASE ORDER

The information you furnish in this form is not binding and in no way obligates you or Minuteman Press International, Incorporated. Its purpose is to provide our company with the pertinent information needed to evaluate you as an applicant. The answers supplied in this application will be held in strict confidence by the company and follow-up references or verificatons will not proceed until purchase negotiations have started.

# PERSONAL CONFIDENTIAL INFORMATION
### PLEASE PRINT CLEARLY

### PERSONAL PROFILE

## 1. PERSONAL DATA - PLEASE ATTACH RESUME

DATE _12-12-99_

NAME _SHAFFER  ANTHINY  SHAFFER_ (MICHAEL)  SPOUSE'S _____

     FIRST     MIDDLE     LAST     FIRST     MIDDLE     LAST

ADDRESS _4101  FAWN SQ.    HARRISBURG    PA        17112_

     STREET     CITY     STATE     ZIP

HOW LONG HAVE YOU LIVED AT THIS ADDRESS? _8 YEARS_     U.S. CITIZEN _YES_

**EDUCATION (CIRCLE ONE)**

HOME PHONE # _717-540-7036_    SELF   8   9   10   11   (12)   COLLEGE YRS. _2_   DEGREE _YES_

BUSINESS PHONE# _____    SPOUSE 8   9   10   11   12   COLLEGE YRS._____ DEGREE_____

DATE OF BIRTH _3-10-49_    NUMBER OF DEPENDENTS (INCLUDING SELF) _NONE_

     MO./DATE/YEAR

SOC. SEC. # _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_     NAME      RELATIONSHIP      AGE

SPOUSE'S SS# _____    _____

MARITAL STATUS:   SINGLE   ☐   _____

               MARRIED   ☐   _____

               DIVORCED   ☑   _____

                              _____

## 2. BUSINESS BACKGROUND

PRESENT EMPLOYER _SHAFFER, FRY & MACINTYRE_

BUSINESS ADDRESS _4400 LINGLESTOWN RD, HARRISBURG, PA. 17112_

TITLE RESPONSIBILITIES _PRESIDENT_

HOW LONG HAVE YOU BEEN EMPLOYED THERE? _1 YEAR 3 months_ (15 months)   ANNUAL SALARY _40,000_

SPOUSE'S OCCUPATION_____ ANNUAL SALARY _____

ANY OTHER SOURCE OF INCOME _NONE_    TOTAL ANNUAL INCOME _40,000_

HAVE YOU, AT ANY TIME, OWNED OR OPERATED YOUR OWN BUSINESS? (EXPLAIN BELOW)

_COLLECTION AGENCY    1 YEAR 3 months    FULL    40,000    SELLING TO PART_

TYPE OF BUSINESS    HOW LONG OPERATED    FULL/PART-TIME    ANNUAL INCOME    SOLD OR CLOSED

TYPE OF BUSINESS    HOW LONG OPERATED    FULL/PART-TIME    ANNUAL INCOME    SOLD OR CLOSED

CURRENT BUSINESS AFFILIATIONS OTHER THAN OCCUPATION (OWNER, PARTNER, OFFICER, ETC.) _N/A_

ORGANIZATIONAL AFFILIATIONS: (FRATERNAL, BUSINESS, PROFESSIONAL, CIVIC, ETC.) _N/A_

## 3. EMPLOYMENT HISTORY

LAST THREE JOBS:

_SHAFFER, FRY & MACINTYRE,    HARRISBURG    PA    15 months    PRESIDENT_

NAME OF EMPLOYER    ADDRESS    CITY    STATE   YEARS EMPLOYED    POSITION

_POWELL, ROGERS & SPEARS,    HALIFAX,  PA    7 months    ADJUSTER (COLLECTOR)_

NAME OF EMPLOYER    ADDRESS    CITY    STATE   YEARS EMPLOYED    POSITION

_ARTHUR A KUSIC    4261 CRUMS MILL RD, HARRISBURG, PA    12 YEARS    SUPERVISOR_

NAME OF EMPLOYER    ADDRESS    CITY    STATE   YEARS EMPLOYED    POSITION

## PERSONAL CONFIDENTIAL INFORMATION

### PLEASE PRINT CLEARLY

## 4. ABOUT YOU

How did you become interested in Minuteman Press International, Inc.? *BUSINESS OPPORTUNITIES IN NEWSPAPER- PATRIOT NEWS*

What are your reasons for going into your own business?

1) *SELF-EMPLOYMENT*   2) *HIGHER INCOME*   3) *RETIREMENT REASONS*

Do you intend to operate your Minuteman Press Center full or part-time? *FULL TIME*

Please Explain: _____

If part-time, how much time do you expect to spend at your franchise? *WHAT EVER TIME IS REQUIRED TO SUCCEED AND TO BE ABLE TO RETIRE FROM*

In which geographical area would you like to open your franchise?

1) *HARRISBURG, PA*   2) _____   3) _____

Do you plan on having a partner? *NO* _____ If so, will partner be active? _____

Partner's Name(s) _____ Phone # _____

## 5. FINANCIAL DATA (Bank References)

~~DIRECT DEPOSIT~~ *ALLFIRST BANK , DEVONSHIRE RD HARRISBURG, PA 17112*

| Name of Bank | Address | City | State | Zip Code |
|---|---|---|---|---|

*717-255-2233*      *76945723*   *$1500.²²*

Name of Bank Officer   Telephone Number   CHECKING ~~Savings~~ Account Number(s) and Balance

*NONE   OPENED CHECKING - MAY 1972*      *N/A*

Loans   Date of Loan   Original Amount   Payment Amount

---

*POSTMARK CREDIT UNION  2630 LINGLESTOWN RD, HARRISBURG, PA 17112*

| Name of Bank | Address | City | State | Zip Code |
|---|---|---|---|---|

*717-671-5119*      *7343*   *#5,000*

Name of Bank Officer   Telephone Number   Savings Account Number(s) and Balance

*NONE*

Loans   Date of Loan   Original Amount   Payment Amount

---

*BELCO COMMUNITY CREDIT UNION- 403 N 2ND ST, HARRISBURG, PA. 17101*

Name of Bank   Address   City   State   Zip Code

*207/08187019534   #9,000*
*717-232-3526*   *213/08187019880   #21,000*

Name of Bank Officer   Telephone Number   Savings Account Number(s) and Balance

*NONE*

Loans   Date of Loan   Original Amount   Payment Amount

---

If you rent, please indicate monthly rent and complete the following:

*$565.00   BEAUFORT PARK*      *8 YEARS*

Monthly Rent   Name of Landlord   How long have you lived there?

*717-540-9257   4112 BEECHWOOD LANE   HARRISBURG   PA   17112*

Landlord Telephone Number   Address   City   State   Zip

## PERSONAL CONFIDENTIAL INFORMATION

### PLEASE PRINT CLEARLY

**REAL ESTATE**

| Property Description | Value | Date Acquired | In Name of | Monthly Payment | Maturity Date |
|---|---|---|---|---|---|
| NONE | | | | | |

**STOCKS, BONDS, 401K, IRA, OTHER**

| No. of Shares | Description | In Name of | Market Value |
|---|---|---|---|
| 177 | IRA | MICHAEL SHAFFER | 9,033 |
| 1201 | IRA | MICHAEL SHAFFER | 21,165 |

**ASSETS PLEDGED**

| Description | Value | To Whom Pledged |
|---|---|---|
| NONE | | |

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| CASH #6500.00 | | NOTES PAYABLE TO BANKS  NONE | |
| STOCKS, BONDS SECURITIES  N/A | | NOTES PAYABLE TO OTHERS  NONE | |
| 401 K/IRA  30,000 | | | |
| AMT. OWED TO YOU BY OTHERS (DUE WITHIN 1 YR.)  9,000 | | OTHER PAYABLES (DUE WITHIN 1 YR.)  NONE | |
| HOME MARKET VALUE (PRESENT)  N/A | | HOME MORTGAGE  NONE | |
| OTHER REAL ESTATE VALUE (PRESENT) | | OTHER REAL ESTATE MORTGAGES  NONE | |
| INSURANCE (CASH VALUE)  N/A | | OTHER OBLIGATIONS  NONE | |
| OTHER ASSETS | | TOTAL LIABILITIES  NONE | |
| TOTAL ASSETS  45,500.00 | | TOTAL NET WORTH  45,500.00 | |

AMOUNT OF CAPITAL AVAILABLE TO INVEST IN A MINUTEMAN PRESS  20,000.00

SOURCE OF CAPITAL  IRA & SAVINGS

THIS IS NOT A CONTRACTUAL AGREEMENT, NOR IS THE SIGNING OF THIS APPLICATION BINDING ON YOU OR ON MINUTEMAN PRESS INTERNATIONAL, INC.  ANY INFORMATION ON THIS APPLICATION WILL NOT BE CHECKED UNLESS THE UNDERSIGNED GIVES WRITTEN OR ORAL AUTHORIZATION.

| _____ 12-12-99 | _____ |
|---|---|
| *APPLICANTS SIGNATURE        DATE | *APPLICANTS SIGNATURE        DATE |

*IF HUSBAND AND WIFE, BOTH SIGNATURES REQUIRED.

In the Court of Common Pleas of York County, Pennsylvania

John Schlaline,                              } No. 2001 SU 01710-08
                    Plaintiff,               }
                                             }
        v.                                   }
                                             }
CKN, Inc., a Pennsylvania corporation;       }
Minuteman Press International, Inc.,         }
A New York corporation;                      }
Nikhilesh Agarwal;                           }
Thomas L. Kwako; and                         }
Robert Emmett  *and May 23*                  }
                    Defendants.              } Jury Trial Demanded

### Second Amended Complaint in Law with Action for Declaratory Judgment

Comes now Plaintiff and amends his Original Complaint in accordance with Rule

before any responsive pleadings have been filed and brings the following causes of action against

each of the Defendants named above.

#### Parties, Jurisdiction and Venue

1.  Plaintiff is an individual who trades as Minuteman Press of York with its principal

office at 650 W. Market Street, York, PA 17404.

2.  Defendant CKN, Inc., is a Pennsylvania corporation with its principal place of

business in York County, PA.  It may be served with process by serving its registered agent,

Thomas L. Kwako at 5917 Anniston Road, Bethesda, MD 20817 by certified mail.

3.  Defendant Minuteman Press International, Inc. (hereafter MMPI) is a New York

corporation with its principal place of business in Farmingdale, NY.  It may be served with

process by servings its registered agent, Peter T. Bauer, General Counsel, Minuteman Press, Inc.,

1640 New Highway, Farmingdale, NY 11735 by certified mail.

3.  Defendant Nikhilesh Agerwal is an individual and President of CKN, Inc.  He may be

served with process at his place of business, Wyntre Brook Surgical, 15 Wyntre Brook Drive,

York, PA 17403 by personal service.

4.  Defendant Thomas L.Kwako is an individual and Vice President of CKN, Inc.  He

may be served with process at his residence at 5917 Anniston Road, Bethesda, MD 20817 by

certified mail.

4.1.  Defendant Robert Emmett is an individual and Pennsylvania regional representative

of Defendant MMPI and Vice President of MMPI.  He may be served with process at his place of

business at 489 Devon Park Drive, Suite 307, Wayne, PA 19087.

5.  The court has jurisdiction over these proceedings since one of the Defendants resides

in York County, PA, and another of the Defendants has its principal place of business in York

County, PA, and the amount in controversy exceeds the minimum jurisdictional amount of the

court.

6.  The court has venue over these proceedings because all or part of the cause of action

alleged herein arose in York County, PA, and at least one of the Defendants resides in York

County, PA, and another of the Defendants has its principal place of business in York County,

PA.

**Facts Common to All Counts**

7.  On or about the years of  1995 and 1996, Defendant Agarwal was the President of

CKN and Defendant Kwako was the Vice President of CKN.  Defendant CKN was operating a

Minuteman Press franchise under contract with MMPI.  Defendant CKN was desirous of selling

the franchise to Plaintiff and did so on or about April 3, 1996.  Plaintiff entered into various

contracts with Defendant CKN and with Defendant MMPI.

### Count I

8. This Count sounds in tort.

9. Throughout the relevant time frame alleged in Paragraph 7, all Defendants entered into a conspiracy with one another to unload a failing business on Plaintiff by agreeing to materially defraud Plaintiff by falsely inducing him to enter into a contract to purchase and a purchase agreement of the Minuteman Press franchise that already existed in York County, PA.

10. As aforesaid, Defendant Agarwal was the President of CKN and Defendant Kwako was the Vice President; Defendant CKN owned the Minuteman franchise in York. Defendant Kwako made material misrepresentations as to the financial viability of the franchise both as Vice President and as individual. He made these misrepresentations on behalf of himself and Defendant Agarwal. All misrepresentations were made on behalf of Defendant CKN and were designed to falsely induce Plaintiff to purchase the Minuteman Press franchise of York as an ongoing and viable enterprise with sufficient income to support the owner and three employees.

11. Defendants Agarwal and Kwako conspired with one another, CKN, Emmett and MMPI to represent the York franchise as a viable entity that would make a profit for Plaintiff and that Plaintiff would start seeing those profits within three months. Defendant Kwako materially misrepresented the financial viability of the York franchise. Defendants MMPI and Emmett materially assisted Defendant Kwako to do so. Defendant CKN by and through its Vice President, Defendant Kwako, also made the same material misrepresentations. Defendant MMPI and Defendant Emmett also made material misrepresentations to induce Plaintiff to purchase the franchise and materially assisted Defendants Agarwal, Kwako, and CKN in unloading an unprofitable franchise on Plaintiff; these misrepresentations were made by the individuals in the

home office of Defendant MMPI and its regional representative, Bob Emmett.

12. The following material misrepresentations were made by one or more of the Defendants:

a. Defendant Kwako materially misrepresented the financial viability of the York franchise. He represented the franchise as a viable entity that would make a profit for Plaintiff within a short period of time. He represented that the franchise had sufficient income to support a payroll for three employees, that the franchise had sufficient income to do all things necessary to the daily operations of the franchise, including the farming out of the necessary operations to outside providers, and that the franchise would still yield a profit to Plaintiff. These representations were false, knowingly made to induce Plaintiff to purchase a franchise that was losing money, and in fact falsely induced Plaintiff to purchase the franchise from Defendant CKN.    In particular, Defendants Kwako and CKN represented that the York franchise had sufficient income for daily operations when in fact it did not. The misrepresentations were made with the knowledge and consent of Defendant Agarwal and Defendant CKN and designed to benefit Defendants CKN, Agarwal and Kwako by allowing them to foist off an unviable enterprise onto Plaintiff. Defendant Kwako showed Plaintiff only the income side of the business ledger and deliberately concealed the expense side of the ledger.

b. Defendants Kwako and Emmett and MMPI represented to Plaintiff that the printing press business was established and had big clients. When Plaintiff inquired to Defendant Kwako as to expenses, said Defendant materially misrepresented that expenses were high because of internal politics in CKN and that all Plaintiff needed to do was get in the business and trim expenses, use his prior expertise in the printing business, and that Plaintiff would be able to make a go of the business because it had good will and a large customer list. Upon inquiry to

Defendant Emmett, Emmett falsely told Plaintiff that the franchise did not have to show him its expenses and that the expenses were high only because of the internal political situation at CKN. Defendant Emmett also related that the expenses of the franchise were not typical of the other franchises because the York franchise had a staff of five people and was paying up to $40.00 per hour for the services of just one of the staff members.   Had these misrepresentations not been made, Plaintiff would not have purchased the franchise.

   c.  Defendants Kwako, Agarwal and CKN conspired with Defendants MMPI and Emmett to make the misrepresentations contained in Paragraphs 12 a and b hereof.  Defendant MMPI represented to Plaintiff by and through its officers and agents, including its regional representative, Bob Emmett, who had the authority to speak on behalf of Defendant MMPI, that Plaintiff would realize profits immediately upon his purchase of the York franchise since the business was already established;; that all

he would have to do to make a profit was to manage and market the franchise; that all of the work not performed by in house  employees could be jobbed out, that the franchise had sufficient income to support the jobbing out and to pay three employees and to make a profit for Plaintiff; and that in house work would be efficiently provided by the employees.  In particular, for example and not by way of limitation,  Defendants MMPI and Emmett referred Plaintiff to other viable franchises, whose owners represented that they were making profits and satisfied with the deal they had made with MMPI.  Plaintiff visited at least six such franchises, which were each hand selected by Emmett.  Defendants MMPI and Emmett had previously conspired with these franchises to have them paint a rosy picture of the franchises and to intimidate them into stating only that which was positive about the operation of their franchises.  In particular, Defendants Emmett and unnamed co-conspirators in the MMPI home office, instructed each of

the franchise owners that they were not to tell Plaintiff anything negative about their particular franchises and the general operations of MMPI. This was another material misrepresentation induced by the fraudulent actions of Defendants MMPI and Emmett.

d. By way of further example, Plaintiff was referred by Defendant Emmett to the Chambersburg franchise in order to en..ce him to enter into the purchase of the York franchise; that store represented that it was making a good deal of profits. Defendant Emmett later took it upon himself to materially misrepresent the financial situation of the Chambersburg franchise and informed Plaintiff only that it had a circus as a major customer when in fact the circus was part owner of the franchise and gave most of the franchise's business to it. In fact when the Chambersburg store experienced strained, internal relations with the circus, it was unable to make a profit. In particular, Defendant MMPI and Defendant Emmett acknowledged that the loss of a big client could create problems for the Chambersburg franchise, especially since it was a small shop, but Plaintiff was then informed by Emmett that the franchise had other customers and its big customer was only icing on the cake. These misrepresentations were very material to Plaintiff because it was the operation of the Chambersburg franchise in particular that led him to purchase the York Franchise.

e. Defendant Emmett represented that there had been no previous franchise in the York area when in fact there had been a previous franchise that had to close its doors and go out of business. In particular, Defendant MMPI and Defendant Emmett represented that the York area would support a viable franchise and that a market survey had been performed to demonstrate that representation. Each of these representations was false, was knowingly made by MMPI and Emmett to falsely induce Plaintiff to purchase the franchise, and in fact led Plaintiff to purchase the franchise.

f. The common theme iterated by each of the six franchises was that all Plaintiff needed to do was marketing and keeping up with 20 daily quotes, that the franchises had good support from the home office and made many technical assistance visits to the franchises, that the franchises got good prices from MMPI's subsidiary supply company, and that Plaintiff could make 30% of gross sales in pre tax profits just by following the MMPI program. These franchises were directed and instructed to make these misrepresentations by Defendants Emmett and MMPI and the misrepresentations were made by the franchise owners of the Chambersburg, Lancaster, and Hanover, PA, franchises and three more franchises in New York as part of the expressly directed sales misrepresentations made by Defendants Emmett and unnamed co-conspirators in the MMPI home office.

g. In particular, Plaintiff was impressed by the Chambersburg operation and asked Defendant Emmett what made it unique. Defendant Emmett replied that it was not the big customer that made the franchise unique but that the franchise had to expand in order to market to new businesses and serve regular clients. Defendant Emmett materially omitted to inform Plaintiff that the circus was part owner of the franchise.

h. In particular, Defendant Kwako misrepresented to Plaintiff that he did not have to introduce a new business without a customer base and would therefore meet expenses and make a profit from the operation of the York franchise. Defendant Kwako then showed Plaintiff a customer list that was swelled into the hundreds of customers. Defendant Kwako failed to mention to Plaintiff that the customer list was so long because it listed any customer who ever stepped foot inside the doors of the franchise, even to make copies. The customer list was therefore not as represented to Plaintiff as a large customer base which would be given to Plaintiff and from which he could make significant profits.

13. Plaintiff was damaged by these material misrepresentations in the loss of the amounts that he paid to Defendant CKN to purchase the franchise, in the amounts he paid to Defendant MMPI for the transfer of the franchise, and in the loss of working capital. The amounts that he paid to two of the three employees are consequential damages since they contributed nothing to the work of the franchise and were laid off within nine and thirteen months, respectively. Further consequential damages flowed from the wasted money spent to job out much of the franchise work that the employees were unable to perform and the loss of substantial income from the job which he resigned in order to operate the franchise. These damages are in excess of the minimum jurisdictional amount of the court.

### Count II

14. This Count sounds in contract and in tort.

15. On or about April 3, 1996, Plaintiff entered into a written contract with Defendant MMPI which was labeled as the Franchise Agreement. After entering the Franchise Agreement, Plaintiff was sent by Defendant to New York for an explanation of what to do to make the franchise viable. He was promised in writing all needed technical assistance and advice. This assistance and advice was based on the express corporate formula that if the franchisee did what MMPI told him to do, he would meet expenses and make a profit. Plaintiff was expressly told by MMPI and Emmett that all he would have to do was to manage the franchise, make twenty cold calls a day, leave all work to the employees or job it out, and by doing so, he would realize significant profits. These promises were made to induce Plaintiff to enter into the franchise agreement, were made again at the training course in New York, and were again made many times when Plaintiff contacted the regional representative for assistance. In particular, Plaintiff was told by Bob Emmett, the regional representative of MMPI, on many

occasions that he did not need to know the technical details of the operation of the franchise but was to put an ad in the paper, job the work out, and make twenty cold calls a day. These promises were made in the Franchise Agreement or were made in supplementation of the written agreement or were made to induce Plaintiff to enter into the written agreement. In other words, follow our program and you will realize a pre tax profit of one third of your gross sales.

16. MMPI and Emmett affirmatively directed Plaintiff to manage the franchise, job out all work that could not be performed by in house employees, make twenty cold calls a day, and to forget about the details of the work. The income from a franchise operated in that fashion would be sufficient according to MMPI and Emmett to pay all the bills and still realize a pre tax profit amounting to approximately one third of gross sales. At no time was the income from the franchise sufficient to do so, not from the beginning nor to the end. These promises were breached by MMPI and Emmett..

17. Plaintiff asked for help for pre press operations and type setting on the computer. He was expressly told by Bob Emmett to job these processes out. However, the job outs could not be done on a timely basis and Plaintiff was rendered no assistance in learning these aspects of the operation, despite the promises of technical assistance. This denial of technical assistance amounted to another breach of contract.

18. MMPI promised further technical assistance when tech reps would visit to assist with any problems the franchise might have. However, these visits were not made on a timely basis and did not address the assistance that Plaintiff needed to mange the franchise. For example, when Plaintiff asked for technical assistance in camera work, he was told by MMPI and Emmett to hire someone to do it or job it out and that it was Plaintiff's job to do the marketing so he did not need to know anything about camera work. Furthermore, MMPI was to provide trouble

shooting and other help by telephone. But when Plaintiff asked for support with his computer, no computer support was ever provided. Similarly, Bob Emmet promised that there would be technical assistance if Plaintiff ever experienced a jam in the press operation area. But when Plaintiff's press operator was incapacitated by a blood clot, Emmett refused assistance and merely told Plaintiff to put an ad in the paper for another operator. This advice did not get the daily work done. Strangely enough, Bob Emmett was providing just such technical assistance to other franchisees. These inactions on the part of MMPI and Emmett amount to breach of contract.

19. Plaintiff further requested help on pre press and graphics matters. However, not only was this support not provided, but one of MMPI's tech reps actually came to York to have Plaintiff demonstrate his knowledge of those areas so that he would know what to do if someone else asked. This was another breach of contract.

20. In addition, MMPI and Emmett continually attempted to have Plaintiff utter constructive untruths about franchise operations when potential franchisees would contact him to determine the viability of purchasing a franchise from MMPI. MMPI told Plaintiff not to tell them anything negative and Bob Emmett attempted to induce Plaintiff to give false information to prospective franchisees. For example, an attorney who was interested in a franchise had many questions for Plaintiff and complained that none of the franchisees would talk to him about liabilities. When Plaintiff truthfully told the attorney that he had not seen the promised profits after three months of operation, he was thoroughly chastised by MMPI for doing so. This was intentional infliction of severe emotional distress.

21. Damages that flow from these breaches of contract include the loss of the money that was paid to MMPI to transfer the franchise to Plaintiff. Consequential damages include the loss

of what was paid by Plaintiff to the franchise owner to purchase the franchise, the loss of

operating capital, and the waste of assets of Plaintiff's franchise. Further direct damages result

from severe mental pain and anguish suffered by Plaintiff when he was told to not share anything

negative with potential franchisees and from the chastisement he received when he told the

potential attorney franchisee that he had not seen the promised profits within three months of

taking over Plaintiff's own franchise. Further consequential damages resulted from the loss

of substantial income from the job which he resigned in order to operate the franchise. These

damages are in an amount in excess of the minimum jurisdictional amounts of the court.

## Count III

22. This Count sounds in equity.

23. Plaintiff was presented with a written Franchise Agreement which affirmatively

requires him to refrain from opening another printing press operation within five miles of his

present location in the event that he terminated his contract with MMPI. This clause is a contract

of adhesion since Plaintiff simply had no bargaining power when he entered into the Agreement.

The contract was dictated by MMPI on a take it or leave it basis; no input from Plaintiff was

permitted; this clause is required of all who wish to purchase a franchise from MMPI. In

addition, under all of the circumstances of this case, it would be inequitable to enforce this

provision of the contract because it would deprive Plaintiff of his existing market.

24. Plaintiff was presented with a written Franchise Agreement which affirmatively

requires him to turn over all marketing lists in the event that he terminated his contract with

MMPI. This clause is a contract of adhesion for the reasons set forth in Paragraph 23 hereof. In

addition, under all of the circumstances of this case, it would be inequitable to enforce this

provision of the contract because it would deprive Plaintiff of his existing market.

25. The written Franchise Agreement further calls for the payment of franchise fees depending on the gross sales of the franchise. It would be inequitable to allow MMPI to enforce this provision of the contract since MMPI affirmatively breached the contract with Plaintiff as set forth in Count II and never has provided the agreed technical support that was needed by Plaintiff to orderly manage his franchise. MMPI did nothing to earn the franchise fees and it would be inequitable to allow MMPI to use the courts to attempt to collect them

26. Plaintiff will be damaged by the matters set forth in this Count by a total loss of a viable printing press operation and asks the Court for a declaratory judgment canceling these provisions of the contract and terminating the contract by rescission.

### Count IV

27. This Count sounds in tort.

28. Each Defendant herein intentionally or negligently inflicted emotional distress upon Plaintiff by their various actions, inactions, misrepresentations, demands, instructions and other similar actions as set forth in the previous Counts. Plaintiff suffered extreme emotional distress from the aforesaid actions of the Defendants. He has been damaged in amounts in excess of the minimum jurisdictional limits of the court, including the loss of his life savings, the amounts he expended to purchase the franchise, the loss of income from year to year in the operation of the franchise, lack of food for his family, temporary loss of his family, severe mental aggravation and distress, physical aggravation and distress, and shame from being required by the actions of the Defendant in having to file a Chapter 13 bankruptcy in order to save his home from foreclosure as a result of the debt incurred in purchasing and operating the franchise, and from the loss of substantial income from the employment he resigned in order to operate the franchise.

28.1  Further direct and consequential damages arose from the aforesaid actions and inactions of the Defendants from the loss of consortium with Plaintiff's wife that resulted when she was advised to see a doctor as a result of the emotional distress that she herself suffered as a result of the operation of a franchise that was losing money.  Plaintiff himself had to seek counseling from the pastor at his church over an extended period of time and also from a psychologist.  Far from having a job which was represented to be over at 5;00 PM, Plaintiff suffered further mental anguish, emotional distress, and physical symptoms from having to work 80 hours per week to keep the franchise going.  He further emotionally broke down and experienced frequent episodes of crying and entertained suicidal thoughts for years.  In addition, he suffered further distress from the loss of his credit reputation which resulted from the losses he experienced while operating the franchise and experienced further anguish when he received the inevitable and numerous phone calls from his creditors that resulted therefrom.

28.2.  Plaintiff suffered further physical symptoms such as many sleepless nights and desperation from the extreme sacrifices he had to make to keep the franchise going.

## Count V

29.  Each of the torts complained about were committed with such deliberateness and willfulness and in such reckless disregard of the rights of Plaintiff so as to entitle him to punitive damages in an amount in excess of the minimum jurisdictional amounts of the court.

### Incorporation by Reference

30.  Each Count herein is incorporated in each other Count by reference.  Each Paragraph herein is incorporated into each other Paragraph by reference.

### Jury Trial Demand

31.  Trial by jury is hereby demanded.

Wherefore, Plaintiff prays that after trial hereof, he be awarded actual and consequential damages and punitive damages, each in an amount in excess of the minimum jurisdictional amounts of this court against each Defendant and against the Defendants jointly and severally for their joint misconduct, that the specified provisions of the contract be declared unenforceable and null and void and that the contract be rescinded, and for such other and further relief in law and in equity to which Plaintiff may be justly entitled.

Respectfully Submitted,

Robert J. White
Counsel for Plaintiff
PO Box 3005
York, PA 17402
(717) 699-4534
FAX (717) 699-2895

## Certificate of Service

The undersigned certifies that he has mailed a copy of this First Amended Complaint with Action for Declaratory Judgment on each Defendant on May 15, 2001, by first class mail addressed as follows:
Defendant CKN by serving its registered agent, Thomas L. Kwako at 5917 Anniston Road, Bethesda, MD 20817;
Defendant MMPI by serving its registered agent, Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735;
Defendant Nikhilesh Agerwall at Wyntre Brook Surgical, 15 Wyntre Brook Drive, York, PA 17403;
Defendant Thomas L. Kwako at 5917 Anniston Road, Bethesda, MD 20817;
Defendant Robert Emmett at 489 Devon Park Drive, Suite 307, Wayne, Pa 19087.

Robert J. White

## Verification

I verify that the facts contained in this Second Amended Complaint with Action for Declaratory Judgment are true and correct to the best of my knowledge, information and belief. I

understand that any false statements are made subject to the penalties of 18 Pa.C.S.A. Sec. 4904 relating to unsworn falsification.

John Schlaline

**Notice to Plead**

**You are hereby notified to plead to this Second Amended Complaint and Action for Declaratory Judgment by June 15, 2001, or default judgment may be taken against you.**

**In the Court of Common Pleas of York County, Pennsylvania**
**Civil Division**

John Schlaline                          } No. 2001 SU 01710-08
        Plaintiff,                    }
                            }
        v.                              }
                            }
CKN, Inc.,                              }
et al.,                                 }
        Defendants                    } Jury Trial Demanded

**Plaintiff's Third Amended Complaint with Action for Declaratory Judgment**

Comes now Plaintiff and amends his Second Amended Complaint with Action for

Declaratory Judgment and states the following additional causes of action:

**Count VI**

32.  Plaintiff's Second Amended Complaint is incorporated herein by reference, the same

as if fully set forth herein.

33.  Defendant MMPI uttered the following material untruths in its Information for

Prospective Franchisees Required by Federal Trade Commission ("Information Statement").

These material untruths were presented to Plaintiff as part of the written disclosures made by

Defendant MMPI and the Information Statement is dated August 1995.  Among other things, the

Information Statement discloses material information as to litigation affecting MMPI.  The

Information Statement discloses the following in particular under the heading "Litigation, A.

HAS PENDING AN ADMINISTRATIVE, CRIMINAL OR MATERIAL CIVIL ACTION

PENDING AGAINST THAT PERSON ALLEGING VIOLATION OF A FRANCHISE,

ANTITRUST OR SECURITIES LAW, FRAUD, UNFAIR OR DECEPTIVE PRACTICES, OR

COMPARABLE ALLEGATIONS:"

> In the United States District Court, Eastern District of New York, CV #93-2496,
> Federal Trade Commission, Plaintiff, v. Minuteman Press International, Inc.,
> Speedy Sign-A-Rama, USA, Inc., Roy W. Titus and Jeffrey Haber, Defendants.
> The FTC filed a complaint against Defendants on June 4, 1993, alleging that the
> Defendants violated the FTC's Franchise Rule by failing to make proper disclosures
> concerning the existence of a transfer fee and concerning earnings claims that allegedly
> were given to franchisees, and violated Section 5 of the FTC Act by allegedly
> misrepresenting gross sales and profits that would be achieved. Plaintiff seeks monetary
> damages in an unspecified amount, as well as injunctive and other equitable relief.
> The Defendants intend to vigorously defend against the action. This action is currently at
> trial.

34. This statement is untrue because it fails to mention certain material facts about the

specified litigation, is a gross understatement of what the FTC was complaining about, was

designed to intentionally and negligently defraud purchasers of existing Minuteman franchises,

and is very material to the decision of any potential franchisee purchaser of an existing

Minuteman franchise because the FTC action actually called into question the entire marketing

program of Defendant MMPI.

35. In its most recent Disclosure Document of Minuteman Press International, Inc. which

is dated August, 1999, the following disclosure is made on page 12 about the same FTC action:

> Federal Trade Commission, Plaintiff, v. Minuteman Press International, Inc., Speedy
> Sign-A-Arama, USA, Inc., Roy W. Titus and Jeffrey Haber, Defendants (CV 93-2496)
> Filed on June 4, 1993, in the United States District Court, Eastern District of New York.
> On December 18, 1998, an injunction was filed prohibiting the Defendant's excluding
> Haber from doing the following: A. Making, or assisting in the making of, expressly or
> by implication, orally or in writing, to any prospective franchisee any statement of past,
> present or future sales, income, or gross or net profits of any existing or prospective
> franchisee or group of franchisees, unless at the time of making such representation the
> defendant possesses written material that provides a reasonable basis for the
> representation. B.Violating any provision of the Rule 16 C.F.R. Part 436 or the rule as it
> may later be amended and the disclosure requirements of the UFOC in effect at the time.
> C. Assessing or collecting a transfer/training fee from any franchisee who sells or assigns
> its franchise unless the selling franchisee received a copy of a disclosure statement
> indicating that such fee would be charged. D. Failing to monitor and investigate any
> complaints about compliance with the rule or the injunction. E. To cooperate with the

Commission in the enforcement of this injunction.

Section A of this disclosure relates to precisely the same marketing methods and misrepresentations that are set forth in Counts I through V of the Plaintiff's Second Amended Complaint, which are incorporated herein by reference.

36. Defendant MMPI's misrepresentations, omissions, false statements, actions and inactions therefore violate state blue sky laws, federal FTC rules, federal securities laws, the criminal law of the Commonwealth of Pennsylvania, and federal criminal law. Not only has MMPI violated civil law but also criminal law in the manner in which it falsely induced Plaintiff to purchase the existing Minuteman franchise in York.

37. Defendant Emmett materially assisted MMPI to do or fail to do those actions set forth in Paragraph 36.

38. Defendants Kwako and CKN may or may not have assisted MMPI and Emmett to do or fail to do those actions set forth in Paragraph 36. Defendants Kwako, Agarwal and CKN materially assisted Defendants MMPI and Emmett to market by unlawful methods as set forth in Counts I through V of the Plaintiff's Second Amended Complaint and has therefore assisted the latter Defendants to violate state blue sky laws, federal FTC rules, and federal securities laws and state and federal criminal laws..

39. In particular, the following written misrepresentations or omissions to state material facts need to make the misrepresentation true have been made or not made with respect to the Information Statement disclosure of then existing litigation as set forth in Paragraph 33:

a. MMPI and Emmett failed to disclose that the FTC was complaining about the precise marketing methods that MMPI and Emmett used in the marketing of existing franchises to particular franchisees, all as more fully set forth in Counts I and II, which are incorporated herein

by reference.

     b. MMPI failed to disclose the full nature and extent of the relief sought by the FTC by omitting all those disclosures set forth in Paragraph 35, in particular the fact that the FTC was attempting to prohibit it from marketing any existing franchise in the manner in which the York franchise was marketed to Plaintiff as more fully set forth in Counts I and II, which are incorporated herein by reference.

     c. Defendants Kwako, MMPI and Emmett failed to disclose to Plaintiff material financial information as required by the FTC request for injunctive relief when Kwako refused and Emmett falsely told Plaintiff that Kwako did not have to disclose the expense side of the ledger of the existing York franchise.

     d. MMPI failed to disclose to Plaintiff that the FTC was alleging that MMPI and others were liable for false and misleading claims about earnings, gross sales and profitability levels. Emmett and unnamed co-conspirators in the home office of MMPI were making those same false and misleading claims to Plaintiff.  Defendants Kwako and CKN were materially assisting Emmett to do so.  Defendant Agarwal stood by, approved the actions, and reaped the benefit from the other Defendants' actions.

     e. MMPI failed to disclose that the litigation involved FTC claims that it and its officers violated federal consumer protection and franchise disclosure laws

     f. MMPI failed to disclose that the FTC was complaining about sales pitches made by MMPI to prospective franchisees about gross earnings and profits they could expect to see by buying and operating MMPI's quick print and sign shops.

     g. MMPI failed to disclose that the FTC was seeking hefty monetary damages to those prospective franchisees who suffered monetary damage from the violation of the federal

consumer protection and franchise disclosure laws.

h. MMPI failed to disclose that the FTC accused MMPI and its sales force of an unlawful pattern of providing false and unsubstantiated information about earnings to people interested in buying one of MMPI's franchises.

i. MMPI failed to disclose that the FTC was attacking its written disclaimer statement that no earnings claims were made or authorized by MMPI as being unenforceable in the FTC action.

j. MMPI failed to disclose that the contradiction between its written disclaimers and a franchisor's actual practices was a violation of the FTC Act. The actual practices in this case were committed by Defendants CKN, Kwako, Emmett, Agarawal and certain unnamed co-conspirators in MMPI's home office.

k. MMPI failed to disclose that the FTC was complaining about the common-sense net impression from its actions in marketing its franchises that the purchaser was being furnished important specific earnings claims information to assist in the decision making process, notwithstanding the general disclaimers about earnings..

40. Defendants are therefore estopped from relying on their disclaimer clauses in their contracts with Plaintiff as a defense made to the claims of Plaintiff by collateral estoppel and their own misrepresentations made as part of a common scheme to defraud purchasers of MMPI franchises that the purchaser was being furnished important specific earnings claims information to assist in his decision making process and then forcing the purchaser to sign a bald faced lie that the precise information had not been provided. Defendant Kwako, for example, on behalf of CKN and individually expressly made such statements to Plaintiff in this particular case by furnishing such important specific earnings claims and then tried to disclaim those same

Drive, York, PA 17403;
MMPI by serving Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640
New Highway, Farmingdale, NY 11735
Nickelish Agarawal at Wyntre Brook Surgical, 15 Wyntre Brook Drive, York, PA 17403'
Kwako at 5917 Anniston Road, Bethesda, MD 20817;
Emmett at 489 Devon Park Drive, Suite 307, Wayne, PA 19087.

Robert J. White

### Verification

I verify that the facts contained in this Third Amended Complaint with Action for Declaratory
Judgment are true and correct to the best of my knowledge, information and belief. I understand
that any false statements are made subject to the penalties of 18 Pa.C.S.A. Sec. 4904 relating to
unsworn falsification.

John Schlaline

representations by a disclaimer clause in the sales agreement of the franchise to Plaintiff

designed to aid and abet Defendants MMPI and Emmett in foisting off a similar disclaimer

statement in its own disclosures to Plaintiff.  The conspiracy between Defendants CKN, Kwako

and Agarwal on the one hand and Defendants MMPI and Emmett on the other hand was so

specific that all Defendants are liable for all misrepresentations and the actions and inactions of

one another, the same as if they had performed the misrepresentations, actions and inactions as

an individual.

Wherefore, in addition to the relief requested in Plaintiff's Second Amended Complaint

with Action for Declaratory Judgment, Plaintiff requests such other and further relief at law and

in equity as arise from this additional Count together with a declaratory judgment that the

disclaimer clauses of the CKN and MMPI contracts with Plaintiff be rescinded.

### Notice to Plead

**Plead to the Third Amended Complaint within 20 days of service or default judgment may
be entered against you.**

Respectfully Submitted,

*Robt White*

Robert J. White
Counsel for Plaintiff
PO Box 3005
York, PA 17402
(717) 699-4534
FAX (717) 699-2895

### Certificate of Service

The undersigned certifies that he has mailed a copy of this Third Amended Complaint
with Action for Declaratory Judgment to each Defendant on May 19, 2001 by first class mail
addressed as follows:
CKN by serving its President, Nikhelish Agarawal at Wyntre Brook Surgical, 15 Wyntre Brook

Drive, York, PA 17403;
MMPI by serving Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640
New Highway, Farmingdale, NY 11735
Nickelish Agarawal at Wyntre Brook Surgical, 15 Wyntre Brook Drive, York, PA 17403'
Kwako at 5917 Anniston Road, Bethesda, MD 20817;
Emmett at 489 Devon Park Drive, Suite 307, Wayne, PA 19087.

Robert J. White

## Verification

 I verify that the facts contained in this Third Amended Complaint with Action for Declaratory
Judgment are true and correct to the best of my knowledge, information and belief.  I understand
that any false statements are made subject to the penalties of 18 Pa.C.S.A. Sec. 4904 relating to
unsworn falsification.

John Schlaline

**In the Court of Common Pleas of Lancaster County, Pennsylvania**
**Civil Division**

| | |
|---|---|
| George Steedle, | } No. _____ |
|       **Plaintiff,** | } |
| | } |
|   **v.** | } |
| | } Judge _____ |
| George Zimmerman, | } |
| Flo Zimmerman, | } |
| Minuteman Press International, Inc., | } |
| A New York corporation, and | } |
| Robert Emmett | } **Jury Trial Demanded** |

### Plaintiff's Draft Complaint with Action for Declaratory Judgment

Comes now Plaintiff and complains of each Defendant as follows.

### Parties, Jurisdiction and Venue

1. Plaintiff is George Steedle whose business address is 401 S. 7th Street, Akron, PA 17501.

2. Defendant George Zimmerman is an individual who resides in Lancaster County, PA.

3. Defendant Flo Zimmerman is an individual who resides in Lancaster County, PA.

4. Defendant Minuteman Press International, Inc. (MMPI) is a New York corporation with its home office in Farmingdale, New York. It may be served by certified mail addressed to its General Counsel, Peter T. Bauer, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735.

5. Defendant Robert Emmett is an individual and representative of MMPI and maintains an office in Wayne, PA. He may be served in person at 489 Devon Park Drive, Suite 307, Wayne, PA 19087.

6. The court has jurisdiction over these proceedings because the Minuteman Press franchise sold to Plaintiff by Defendants Graybill is located in Cumberland and the amount in

controversy exceeds the minimum jurisdictional limits of the court.

7.  The court has venue over these proceedings because all or part of the action arose in Lancaster County,  and Defendants Zimmerman reside in Lancaster County and operated a business in Lancaster County at all time relevant to this action.

### Facts Common to All Counts

8.  On or about January, 2000, Defendants Zimmerman were operating a Minuteman Press franchise in Akron under contract with Defendant MMPI.  Defendants Zimmerman were desirous of selling the franchise to Plaintiff and did so on January ___, 2001.  Plaintiff entered into various contracts with Defendants Zimmerman and MMPI in pursuance of the purchase of the franchise.

### Count I

9.  Throughout the relevant time frame to this action, all Defendants entered into a conspiracy with one another to unload an unprofitable business on Plaintiff by agreeing to materially defraud Plaintiff by falsely inducing him to enter into a contract to purchase and to purchase the Minuteman Press franchise in Akron, PA.  Defendant Emmett was the regional representative of MMPI and had authority to speak for and to bind the corporation.

10.  Defendants Zimmerman were the owners of the franchise.  Defendants Zimmerman made material written misrepresentations as to the financial viability of the franchise as an ongoing enterprise with sufficient income to pay expenses and support the store owner and two employees.

11.  The following misrepresentations were made by one or more of the Defendants:

a.  Defendants Zimmerman gave Plaintiff  false computer printouts of sales and expenses.  The printouts indicated that there were approximately $12,000 to $13,000.00 in monthly sales

and $8,000.00 in expenses, thus showing that the franchise was making a profit.  However, those kinds of sales were not obtainable from the business that Defendants Zimmerman sold to Plaintiff.  Income was obtainable only to the extent of approximately $5,000.00 per month and expenses run at $9,000.00 to $10,000.00 per month.

b. Defendants Emmett and MMPI gave Plaintiff false information as to the future potential of the franchise.  Emmett represented that the franchise would pick up a laser company, Laser Wireless, as a new customer and promised that Plaintiff would get all its business and at least $5,000.00 per year in sales income from that source.  The company never signed on as a customer.  It spent a grand total of $200.00 for its printing requirements from the Akron franchise.

c. Emmett and MMPI further represented that the store was making a profit when they knew that it was not.

d. Emmett and MMPI represented that the franchise had sufficient customers to generate sales in the $13,000.00 per month range when in fact it did not.

e. Defendant Emmett hand picked the Palmyra store and the Lancaster store to show to Plaintiff as representative franchises. Both stores relied on directions from MMPI and Emmett to misrepresent that they were doing well and needed more equipment to expand.  In fact, the stores were not doing well and the Lancaster franchise was doing so poorly that it had to file for bankruptcy liquidation in Mat of 2001.

f. Defendant Emmett represented that the Akron area would support a viable franchise and that there was so much business in the area that the area "could easily support a franchise." In fact, the Akron area was saturated with printers and the market is so competitive that Plaintiff could not charge the rates recommended by MMPI and Emmett and still obtain new business.

g. The common theme iterated by Defendants and the aforementioned franchises was that all Plaintiff needed to do was to market and make twenty daily quotes, that the franchises had good support from the home office and that the home office made many technical assistance visits to the franchises and that the franchises got good prices from MMPI's subsidiary supply company.

h. Defendants  Zimmerman took a promissory note for $15,000.00 payable in February of 2002 and Defendant Scott Zimmerman represented to Plaintiff that he would not have taken the note if he was not confident that Plaintiff could double the sales of the franchise over the next couple of years.

12. Plaintiff was damaged by these misrepresentations in the loss of the amounts that he paid to Defendants Zimmerman to purchase the franchise, in the amounts that he paid MMPI for the transfer of the franchise and to attend its school for new owners, and in the amounts that he invested or had to borrow as working capital to operate the franchise from month to month. Consequential damages include the amounts that Plaintiff had to forego by terminating his previous employment to devote his full time to the operation of the franchise as well as amounts he owes or paid to his landlord and other obligations on leasing contracts that were necessitated by the purchase of the franchise.

### Count II

13. On or about January ___, 2000, Plaintiff entered into a written contract with MMPI which was labeled as the Franchise Agreement.  Immediately upon entering into the Agreement, Plaintiff was sent to New York for an explanation of what to do to make the franchise viable.  He was promised in writing all needed technical assistance and advice.  These promises were made in order to induce Plaintiff to enter into the Agreement and were again made in the training

school in New York. MMPI and Emmett further promised to put together a marketing program for Plaintiff by which he could generate new business

14. These promises were breached. The marketing program, for example, included advice as from whom to purchase materials, what prices to quote, and assistance in the pricing area. In all three instances the advice rendered, which MMPI told Plaintiff to follow, was inadequate. The sources that MMPI recommended for the purchase of new material had prices so high that Plaintiff had to seek new sources after months of following MMPI's advice. The prices that MMPI told Plaintiff to charge his customers were so high in comparison to the competition in the area that Plaintiff lost business for months until he discovered that the reason he was losing business was that the recommended prices were not competitive in the area.

15. Plaintiff was promised in writing necessary tech rep visits to assist him to establish his franchise on a sound footing. However, the tech reps gave him false information as to pricing in the area. This was a big factor in Plaintiff's lack of success for the first six months of the operation of his franchise. His prices as recommended by MMPI were so high as to make his competitors look good. For example, Plaintiff was told to price his letterhead business at $180.00 per customer when at the same time his competitors were providing the same letterhead for $100.00.

16. MMPI's sales pitch was that it was looking for people who knew nothing about the printing business and that MMPI would teach the new owners the printing press business. MMPI breached this promise by, inter alia, selling to Plaintiff an unneeded perforation machine.

17. The trainer assigned to assist Plaintiff to learn his new business not only did not show up when he was supposed to but did not even return Plaintiff's phone calls. The tech rep visits were so infrequent as to be of no use. When the tech reps did show up, they spent most of

the day in driving up Plaintiff's long distance phone bill by calling other customers on Plaintiff's phone, all at the same time that they were supposed to be assisting Plaintiff.

18.  The suppliers recommended by MMPI were not cheaper than other suppliers but generally more expensive, so much so in fact that Plaintiff had to find new suppliers.

19.  Plaintiff requested assistance in other areas.  He requested the help promised by MMPI for his pressman, type setting, in keeping track of expenses, and for computer assistance. No help was provided.  He was offered spurious advice such as to hire a full time typesetter when MMPI knew that he did not have the money to pay one.  He was expressly told by MMPI and Emmett to manage the franchise, job out all work that he could not be performed by in house employees, and to forget about the details of the work.  The income from a franchise operated in that fashion would be sufficient according to MMPI to pay all bills and employees and still leave a profit for Plaintiff.  This was not the advice that Plaintiff needed to operate his franchise and was offered by MMPI only to get around its promises to provide technical support and other reasonable advice to the franchise.  For example, there was an occasion when Plaintiff needed immediate assistance because he was unable to open a customer's disc on his computer.  The needed advice was a long time in coming and was then only that MMPI had located someone in Philadelphia who might be able to assist.  The assistance was needed within twenty- four hours but the advice was not forthcoming for over a week.  And it was useless advice at that.  By the time that Plaintiff drove to Philadelphia to speak to whomever might be able to assist him, spend the time to get the assistance, and return to Akron, Plaintiff would have lost more time and incurred more expense than he could make from accomplishing this job.

### Count III

20.  MMPI would not sell the franchise to Plaintiff without first obtaining a financial

statement from him.  That financial statement showed limited savings and a job in which

Plaintiff was making over $70,000.00 per year plus benefits and a car.  MMPI knew or should

have known that Plaintiff could not make that kind of money from operating the Akron franchise,

especially after Plaintiff had turned down an offer of a new franchise from Emmett because he

did not have the financial wherewithal to start from scratch.  He needed an existing franchise that

would immediately generate that kind of income for him.  Nonetheless despite these disclosures,

MMPI caused the sale of the Akron franchise to Plaintiff and caused him to expend significant

amounts of money to purchase the franchise, attend the training school and otherwise invest in

the franchise.

21.  Having required Plaintiff to submit a financial statement listing all assets, liabilities

and the disclosure of his then current income to Emmett and despite the fact that MMPI and

Emmett knew that the Akron franchise would not produce profits anywhere near what Plaintiff

was making on his job, MMPI nonetheless sold the franchise to Plaintiff.  MMPI was under a

duty to disclose these matters to Plaintiff.  This willful and deliberate, grossly negligent, reckless,

and negligent behavior on the part of MMPI caused Plaintiff to suffer not only monetary

damages but severe emotional distress in amounts in excess of the minimum jurisdictional

amounts of the court

21.1.  All preceding and subsequent Paragraphs  are incorporated by reference.  The

actions, inactions, misrepresentations and breaches of contract and other wronful matters as set

forth therein were merely a prelude to more fanciful advice from Defendants Emmett and MMPI.

For example, when Plaintiff expressed the need for assistance to Emmett regarding the financial

plight of his franchise and the need for corrective action from MMPI, Emmett merely told him at

the very time when he needed the greatest assistance from the franchisor,  MMPI, that "other

people are able to do it," "the Lancaster store is able to do it and is doing very well" (this being the same store that is now in liquidation bankruptcy), and that "it is your fault, not MMPI's" because Plaintiff had not joined the two clubs that the franchisor recommended that he join.

21.2 As part of the come on, Emmett further advised Plaintiff, despite his financial difficulties and the money that he had spent to purchase the franchise, that he needed to purchase a new car, a pager, and a color copier. Plaintiff took his advice on the color copier and is now spending $400.00 per month on its lease without a concomitant increase in his business.

### Count IV

22. In the Disclosure Document of Minuteman Press International, Inc., which was required by FTC rules and is dated August, 1999, the following disclosure is made on page 12 about an FTC action against MMPI and others:

> Federal Trade Commission, Plaintiff, v. Minuteman Press International, Inc., Speedy Sign-A-Rama, USA, Inc., Roy W. Titus and Jeffrey Haber, Defendants (CV 93-2496) Filed on June 4, 1993, in the United States District Court, Eastern District of New York. On December 18, 1998, an injunction was filed prohibiting the Defendant's excluding Haber from doing the following: A. Making, or assisting in the making of, expressly or by implication, orally or in writing, to any prospective franchisee any statement of past, present or future sales, income, or gross or net profits of any existing or prospective franchisee or group of franchisees, unless at the time of making such representation the defendant possesses written material that provides a reasonable basis for the representation...

This disclosure relates to precisely the same marketing methods and misrepresentations that are set forth in Counts I through III which are incorporated herein by reference. The disclosure is not in proper English and omits material facts and is affirmatively misleading.

23. In particular, the following misrepresentations or omissions to state material facts needed to make the representation true have been made or not made with respect to the Disclosure Statement disclosure of then existing litigation:

a .MMPI and Emmett failed to disclose that the FTC was complaining about the precise marketing methods that MMPI and Emmett used in the marketing of existing franchises to particular franchises as more fully set forth in Counts I through III.

b. MMPI failed to disclose the full nature and extent of the relief obtained by the FTC by omitting the violations of state blue sky laws, federal FTC rules, federal securities laws, the criminal law of the Commonwealth of Pennsylvania and federal criminal law.

c. Defendants Zimmerman, MMPI and Emmett failed to disclose to Plaintiff material financial information as required by the injunctive relief when Emmett and the Zimmermans falsely disclosed financial figures to make it look as if the Akron franchise was making a profit and by falsely stating that a new customer was coming on board which would generate at least $5,000.00 worth of new business per year for the franchise when said Defendants had no written documentation to back up the claim,

d. MMPI failed to disclose to Plaintiff that the FTC proved that MMPI and others were liable for false and misleading claims about earnings, gross sales and profitability levels.

e. MMPI failed to disclose that the litigation involved FTC claims that it and its officers violated federal consumer protection and franchise disclosure laws.

f. MMPI failed to disclose that the FTC was complaining about sales pitches made by MMPI to prospective franchisees about gross earnings and profits they could expect to see by buying and operating MMPI's quick print and sign shops.

g. MMPI failed to disclose that the FTC was seeking hefty monetary damages to those prospective franchisees who suffered monetary damage from the violation of the federal consumer protection and franchise disclosure laws.

h. MMPI failed to disclose that the FTC proved that MMPI and its sales force were

engaged in an unlawful pattern of providing false and unsubstantiated information about earnings to people interested in buying one of MMPI's franchises.

i. MMPI failed to disclose that it was attacking its written disclaimer statement that no earnings, sales or profit claims were made or authorized by MMPI as being unenforceable in the FTC action.

j. MMPI failed to disclose that the contradiction between its written disclaimers and its actual practices was a violation of the FTC Act. The actual practices in this case were committed by Defendants Zimmerman, MMPI and Emmett and certain unnamed co-conspirators in MMPI's home office.

k. MMPI failed to disclose that the court had held unlawful the common net sense impression from its actions in marketing franchises that the purchaser was being furnished important specific earnings claims information to assist in the decision making process, notwithstanding the general disclaimers about earnings.

24, Defendants are therefore estopped from relying on their disclaimer clauses in their contracts with Plaintiff as a defense made to the claims of Plaintiff by collateral estoppel and their own misrepresentations made as part of a common scheme to defraud Plaintiff to believe that he was being furnished important specific earnings claims information in the decision making process and then forcing the purchaser to sign a bald faced lie that this precise information had not been furnished. The conspiracy between Defendants Zimmerman, Emmett and MMPI was so specific that all Defendants are liable for all misrepresentations and the actions and inactions of one another, the same as if they had performed the misrepresentations, actions and inactions as an individual.

24.1. Had these misrepresentations not been made, Plaintiff would not have purchased

the Akron franchise.

### Count V

25.  This Count sounds in equity.

26.  Plaintiff was presented with as written Franchise Agreement which affirmatively requires him to seek non-binding arbitration of his claims against MMPI, waives his right to jury trial, and vests jurisdiction in the United States District Court for the Eastern District of New York and further goes on to disclaim misrepresentations and somehow permits the losing party in the alleged non-binding arbitration to enter judgment on the arbitrators' decision. These clauses are contracts of adhesion, since Plaintiff simply had no bargaining power when he entered into the Agreement. The contract was dictated by MMPI on a take it or leave it basis; no input from Plaintiff was permitted; these clauses are required of all who wish to purchase a franchise from MMPI. In addition, under all the circumstances of this case, it would be inequitable to enforce these provisions because these clauses were designed by MMPI to further its unlawful schemes and actions as set forth in the other Counts to this action.

26.  Plaintiff asks the court for a declaratory judgment canceling these clauses of the contract and rescinding the contract and for an equitable decision to put Plaintiff back in the same financial situation he was in before he purchased the Akron franchise

### Count VI

27.  The torts alleged herein were committed with such deliberateness and willfulness and with such gross negligence and in reckless disregard of the rights of Plaintiff so as to entitle him to punitive damages.

### Count VII

28.  The various actions, inactions, and misrepresentations pleaded herein amounted to

intentional infliction or negligent infliction of emotional distress on Plaintiff.  In this respect,
Plaintiff's marriage is on the rocks as a result of the severe financial difficulties in which
Defendants placed him and his wife, Plaintiff suffers agony from the loss of his job in which he
was making $70,000.00 per year plus benefits plus a car.  Defendants have taken all his savings,
He has trouble sleeping as a result of extreme worry over the financial difficulties in which
Defendants placed him.  He suffers from extreme worry that he might lose everything and may
have to trade in his new model car on a junker in order to survive. His entire life has been made a
wreck as the result of the wrongful actions of the Defendants instead of moving towards the
financial independence and control of his own destiny that Defendants promised him.

## Incorporation by Reference

28.  Each Count hereof is incorporated by reference into each other Count.  Each
Paragraph hereof is incorporated by reference into each other Paragraph.

## Demand for Jury Trial

29.  Demand is hereby made for trial by jury.

Wherefore, Plaintiff requests that after trial hereof, he be awarded actual damages,
consequential damages, and punitive damages, each in an amount in excess of the jurisdictional
limits of the court, against each Defendant and against Defendants jointly and severally for their
joint misconduct, for a declaratory judgment voiding the specified clauses of the contracts, and
for such other and further relief in law and in equity as is just and proper in this case.

Respectfully Submitted,


Robert J. White

PBN 32487
PO Box 3005
York, PA 17402
(717) 699-4534
FAX (717) 699-2895

### Verification

I verify that the facts contained in this Complaint with Action for Declaratory Judgment are true and correct to the best of my knowledge, information and belief.  I understand that any false statements are made subject to the penalties of 18 Pa.C.S.A. Sec. 4904 relating to unsworn falsification.

_____

George Steedle

JUN  1 2001 23:06 FR BUCHANAN INGERSOLL  5 665 8760    17172330852          P.21



# AGREEMENT

# BETWEEN

# MINUTEMAN PRESS INTERNATIONAL, INC. and

Michael A. Shaffer

DATE: _9 / 1 / 00_

AGREEMENT made as of the 1st day of Sept 2000 by and between MINUTEMAN PRESS INTERNATIONAL, INC., a New York corporation having its principal place of business at 1640 New Highway, Farmingdale, New York 11735 (hereinafter called "Franchisor") and  Michael A. Shaffer

_____, (hereinafter called "Franchisee").

### WITNESSETH

WHEREAS, Franchisor is the owner of the service mark and logo, "MINUTEMAN PRESS" (the "Mark"), and other service marks and trade names (hereinafter collectively "Marks"), trade secrets, and know-how for use in connection with the unique system for full service quick offset printing, reproduction and copying, to meet the printing requirements for letterheads, bills, forms, cards, etc. (the "Minuteman Press System") and is the owner of the entire right, title and interest in and to U.S. Trademark, Principal Register, Registration No. 2,314,083, "Minuteman Press"; Registration No. 1,109,658, "Man With Clock Head; Registration No. 1,107,498 "For The Job You Needed Yesterday"; Registration No. 1,667,927 "International Minute Press"; Serial No. 153,653, "International MinuteFax & Design"; Registration No. 1312789 "Put a Little Color in Your Printing" and Registration No. 1,341,716 "Stripe Design" (Window Graphics); "Printing with Minute to Minute Results" Registration #1,755,929, "Color Combo Days" Registration No. 75/135,933, "Color Combo Days (Stylized) & Design", Registration No. 75/135,934 together with all of the good will symbolized by the Marks which Marks are used in identifying, advertising, promoting and marketing the Minuteman Press System; and

WHEREAS, Franchisee hereby acknowledges that by reason of Franchisor's high standards of quality and service in connection with the development of the Minuteman Press System, that the Minuteman Press System is unique and Franchisor has created over a period of time a clear identification and consumer demand therefor, which requires appropriate and adequate safeguards for the maintenance and future promotion of the Minuteman Press System; and

WHEREAS, Franchisee hereby acknowledges the exclusive right of Franchisor in and to the Minuteman Press System, as presently developed or as same may be improved and expanded during the term of this Agreement, including practices, know-how, trade secrets, designs, marks, logos, window

MMP00E3

1

graphics, signs and slogans presently in use and to be hereafter developed, all of which may be used thereunder; and

WHEREAS, Franchisee desires, upon the terms and conditions herein set forth, to obtain and enter into the business of owning and operating a Minuteman Press System at and from the location agreed upon, under the Marks, subject to the supervision of Franchisor and in accordance with the standards of Franchisor.

NOW THEREFORE, in consideration of the mutual promises and undertakings set forth below, the parties hereto agree as follows:

## 1. Grant of License

(a) Franchisor hereby grants to Franchisee a non-exclusive license to use and practice the Minuteman Press System in a location as hereinafter specified (the "Premises"), (the Minuteman Press System at the Premises being referred to as the "Minuteman Press Full Service Printing Center") solely in connection with the operation of a Minuteman Press Full Service Printing Center and to employ therein the Marks.

(b) Franchisee shall, under no circumstances, be authorized to use the Marks hereunder as part of any corporate name. If Franchisee is required to register under any statute for the registration of fictitious business name, Franchisee shall register in a form approved, in advance, by the attorneys for Franchisor.

(c) Franchisor agrees that so long as Franchisee faithfully performs and observes each and all of the obligations and conditions to be performed and observed by the Franchisee under or in connection with this Agreement, Franchisor, during the continuance of this Agreement, will not authorize any person or company, including itself, to operate a Minuteman Press Full Service Printing Center or any other store engaged in the quick offset printing business at _____ 855 Market ST _____

_____ Lemoyne, PA 17043 _____

_____

## 2. Trade Secrets and Confidential Relationship

MMP00E3

2

(a) Franchisor grants to Franchisee the right to use the Marks at the Premises, and will impart to Franchisee much of the know-how and trade secrets accumulated by Franchisor, in the operation of a Minuteman Press Full Service Printing Center.

(b) Franchisee acknowledges that Franchisor will disclose and impart to Franchisee, in confidence, some or all of its established trade secrets, production and sales methods and other techniques and know-how relating to the Minuteman Press Full Service Printing Center. Franchisee agrees that all such confidential information shall at all times be maintained in strictest confidence and used by Franchisee only in the regular operation of the duly authorized Minuteman Press Full Service Printing Center during the period of such authorization and not in any other business or other activity whatsoever. Franchisee further acknowledges that such trade secrets and confidential information are valuable, unique and special assets of Franchisor, and that it will not disclose any of same to any person, firm, corporation or other entity whatsoever, for any reason or purpose, without the prior written authorization or consent of Franchisor.

3.   **The Premises**

The Premises at which the facility is to be located will be mutually agreed upon and will be leased directly by Franchisee pursuant to a lease to be executed by Franchisee (the "Lease").

Prior to Franchisee's executing the Lease, Franchisor shall have the right to review same. Franchisee shall not execute the Lease without the prior written consent of the Franchisor. The Lease will contain a provision permitting the Franchisor to assume the obligations of Franchisee and/or its designee, upon any default of Franchisee and/or its designee, or upon any adjudication, whether voluntary or involuntary, that Franchisee is bankrupt, or upon the execution of a deed of trust to the benefit of creditors of Franchisee. The Franchisor shall have no liability with respect to the selection of a location for the Franchisee, nor liability with respect to any recommendation regarding the site's suitability.

Franchisee must deliver to Franchisor a fully executed copy of the lease to the Premises, prior to execution of the license agreement.

Franchisee cannot amend, renew or cancel lease or move the business without the express written consent of the Franchisor.

MMP00E3

3

4.    <u>Duties of Franchisor</u>

(a)  In order to assist Franchisee in the establishment and operation of the Minuteman Press Full Service Printing Center, Franchisor shall be obligated to perform the following duties on behalf of the Franchisee.

(i)  to provide Franchisee with a suggested bookkeeping system and invoice system;

(ii)  to provide Franchisee with periodic Minuteman Press system bulletins;

(iii)  to provide Franchisee with an Official Manual of Operations, which includes statements of policies and procedures, together with instruction and advice in the operation of a Minuteman Press Full Service Printing Center;

(iv)  to provide Franchisee with a starter supply of printed material consisting of letterhead, envelopes, flyers, invoices, business cards;

(v)  to provide Franchisee with sample copies of "Yellow Pages" advertising approved for Franchisee's use; and

(vi)  to provide Franchisee with reproduction proofs of newspaper advertising approved for Franchisee's use.

(vii)  to provide telephonic consultation and advisory assistance.

(viii)  assist Franchisee in planning the layout of the Minuteman Press Full Service Printing Center, which will essentially comply in appearance with all other Minuteman Press Full Service Printing Centers.  If the Franchisee purchases an existing Minuteman Press, License from an existing Franchisee, Franchisor shall have no obligation with respect to planning any layout as described herein above;

(ix)  aid in obtaining financing of the equipment selected for the Minuteman Press Full Service Printing Center;

(x)  a field representative to assist Franchisee for forty hours during the initial set up and operational phases of the Minuteman Press Full Service Printing Center.   Franchisor will make available, from time to time, "on location" assistance after the opening of the Minuteman Press Full Service Printing Center's operation, subject to Franchisee compliance with the Franchise Agreement.

(b)  The parties agree that the assistance to be rendered to Franchisee by Franchisor hereunder shall in no way impose any obligation upon Franchisor to make any payment or incur any expense or assume any obligation therefor.

MMP00E3

4

6. **Training Program**

Franchisor shall conduct a Minuteman Press System training program at a time designated and to be held at the Minuteman Press Training Center. Franchisee agrees that at least one (1) owner will attend such training session. Franchisor shall pay the cost of such training, including the transportation and the cost of lodging for one (1) owner during the training period. The training period is for 14 days over 2 1/2 weeks. Franchisor will pay no compensation for any service performed by the Franchisee during such training period. Franchisee may thereafter, at its request, receive, at its own expense, additional training or have an immediate family member receive training at a location as may be designated by Franchisor, provided a regularly scheduled training program is then scheduled or in session. Franchisor also agrees to provide training to a full time employee of Franchisee at Franchisee's cost and expense. Franchisor will have no obligation to pay for transportation and lodging expenses for the additional training period and will pay no compensation for any service performed by Franchisee or its representatives during such additional training period. .

6. **Payments by Franchisee**

In consideration of the grant of the license contained herein, Franchisee shall pay to Franchisor the following:

(a) Upon the execution hereof, a franchise fee of ~~Forty-Four Thousand Five Hundred ($44,500)~~ One Dollar ($1.00) ~~Dollars~~ is due and payable. Receipt of which Franchisor hereby acknowledges. An initial $5,500. deposit ("binder"), is payable after you submit your application, but before Minuteman Press commences investigation on potential site locations. The balance due and owing at the time of execution of this agreement.

(b) A royalty fee equal to six percent (6%) of Franchisee's total monthly gross billings as hereinafter defined. "Gross Billings" shall mean the total of all sales and/or fees charged for product and/or services furnished in, or upon orders placed at, or completed by delivery in, through or from the Minuteman Press Full Service Printing Center at the Premises, whether or not collected by Franchisee, less state and local sales taxes, if any. Within ten (10) days after the end of each month, Franchisee shall send to Franchisor, a statement in a form approved by Franchisor, signed by Franchisee showing all orders placed at the Minuteman Press Full Service Printing Center, all merchandise sold, and all billings therefor during the month, accompanied by a royalty check in the appropriate amount. All royalty fees are to be sent to the Franchisor's corporate headquarters in Farmingdale, New York or to such location as Franchisor may

MMP00E3

5

designate from time to time. In the event Licensee fails to deliver to Licensor, and/or deposit in the U.S. Postal System the royalty statement by the 10th day of the month for which the continuing royalty is due and payable, then such royalty statement shall be deemed late, and Franchisor, at its discretion, may charge a penalty of up to $10 per day, or not to exceed the maximum permitted by State law, for each day such royalty statement is late. In the event Licensee fails to deliver to Licensor, and/or deposit in the U.S. Postal System the Royalty Fee by the 10th day of the month following the close of the month for which the continuing royalty is due and payable, then such royalty fee shall be deemed late, and Franchisor, at its discretion, may charge a penalty of up to $10 per day, or not to exceed the maximum permitted by State law, for each day such royalty fee is late.

Royalty fees shall be waived for the first sixty (60) days after the opening of a new Minuteman Press Full Service Printing Center. If the Franchisee is the purchaser of an existing franchised center, the royalty is 6% commencing the first month of operation and continuing thereafter. It is expressly agreed that the payment of the royalty fee is not contingent upon Minuteman providing a level of service perceived by the Franchisee to be adequate.

Royalty Incentive Program:

Minuteman has instituted a royalty incentive program for qualified franchisees. Minuteman's current royalty incentive program is based on a set gross sales maximum. A qualified franchisee's royalty payments are currently capped at six percent of the maximum amount. Minuteman evaluates the gross sales maximum on a yearly basis, and at it's sole discretion may change the level or discontinue the program without prior notice to the franchisee at the end of the current program year.

In order for a franchisee to become eligible for participation under the program, the franchisee must be in full compliance with the terms, covenants and conditions of this Agreement. Specifically the franchisee must submit monthly royalty statements and monthly royalty payments by the 10th day of the following month.

## 7. Term

This Agreement shall be for an Initial Term of thirty five (35) years (the "Initial Term") commencing as of the date hereof, unless sooner terminated as hereinafter provided. Franchisee shall have the option to renew this Agreement on the prevailing terms and conditions then available to new Franchisees of Franchisor for an additional period of thirty five (35) years, provided that Franchisee is not in default under this Agreement at the date upon which Franchisor receives notice of the exercise of the option.

MMP00E3

6

and upon the expiration of the Initial Term of this Agreement. Such option to extend shall be exercisable by the sending of written notice to Franchisor not later than six (6) months prior to the expiration of the Initial Term hereof and provided Franchisee shall agree to the then prevailing terms and conditions available to new Franchisees of Franchisor.

Franchisee shall execute a general release, in a form prescribed by the Franchisor, of any and all claims against the Franchisor and its subsidiaries and affiliates, and their respective officers, directors, agents and employees, provided that all rights enjoyed by the Franchisee and any causes of action arising in its favor from the provisions of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of GBL 687.4 and 687.5 be satisfied.

## 8.  Duties of Franchisee

Franchisee understands and acknowledges that every detail of the system is important to Franchisee, the Franchisor and other Franchisees in order to develop and maintain high operating standards, system wide uniformity, and to increase the demand for services rendered by all of the licensed businesses under the System, and to protect the Franchisor's reputation and good will.

Franchisee agrees that it will:

(a) Use the subject matter of the license granted hereunder solely for the purposes of operating a Minuteman Press System at the Premises. Franchisee shall not use the Premises for any other purpose without the prior written consent of Franchisor.

(b) Maintain the Premises (exterior and interior), and all related equipment, furnishings, materials and supplies in first-class condition and operate the Minuteman Press Full Service Printing Center in a manner which will enhance, and not detract from, the value of the Franchisor's marks, trade names, reputation and good will.

(c) Prominently display on and in the Minuteman Press Full Service Printing Center advertising signs of such nature, form, color, number, location and size and containing such material as Franchisor shall direct, in writing, and shall not display therein or thereon any sign or advertisement to which Franchisor objects.

(d) Comply with all laws, ordinances, regulations and requirements of local, state and federal governmental authorities and pay any and all city, county, state and/or federal sales and/or use taxes.

MMP00E3

7

excise taxes, occupation taxes, license fees and other taxes, assessments and levies arising out of or in connection with all or any part of this Agreement

 (e) Obtain public liability, workmen's compensation and property damage insurance in amounts and through insurance carriers approved by Franchisor and shall name Franchisor as an additional insured as its interest may appear. Franchisee shall indemnify and save Franchisor harmless from and against any claims or expenses (including but not limited to reasonable attorney's fees) of whatever kind or character, on account of any actual or alleged loss, injury or damage to any person, firm or corporation, or to any property or claim arising out of or in connection with Franchisee's business, or the exercise or purported exercise by Franchisee of its license hereunder. This covenant shall survive the expiration or other termination of this Agreement.

 (f) Join and participate in a minimum of two local business and civic organizations.

 (g) Commence operation of the Minuteman Press System at the Premises not later than sixty (60) days following selection of the location and execution of the Lease thereof.

 (h) Furnish to the Franchisor at Franchisor's request, sampling of Franchisee's finished work product.

 (i) Franchisee is obligated and agrees to answer the telephone at the store premises with the name "Minuteman Press." Franchisee shall not answer the telephone under any other name without the written consent of Franchisor.

 (j) Franchisee shall conduct its business in accordance with Franchisor's Operations Manual, one copy of which Franchisee will have on loan from Franchisor for the term of the License Agreement. Franchisee agrees to comply with all the policies, procedures and standards set forth in the manual and as it may be modified from time to time by the Franchisor.

 (k) Franchisee acknowledges that Franchisor has explained the importance of the creation and maintenance of a full-time marketing program. Franchisee further acknowledges that a vital element of success of any Minuteman Press Full Service Printing Center lies in the creation and maintenance of a full-time marketing program. Franchisee agrees to initiate and maintain a regular, ongoing marketing program, spending a minimum of three hours per day, or a minimum of fifteen hours per week either personally or through an employee pursuing a marketing program. Franchisee further agrees to create a marketing file

MMP00E3

8

JU[] 21 2001 23:08 FR BUCH[]AN INGERSOLL [] 5 665 8760 [] 17172330852    P.30

and record all marketing activities therein. This file shall remain on the premises and be available to the Franchisor to review upon reasonable notice.

### 9. Equipment and Supplies

Franchisee acknowledges that the equipment, or equivalent equipment and supplies listed in Schedule A attached hereto and made a part hereof are required to open a Minuteman Press Full Service Printing Center. All furniture, fixtures, equipment and supplies listed in Schedule A are available from Franchisor. Franchisee has no express obligation to purchase or lease these items from Franchisor and Franchisor agrees to furnish specifications therefor upon request of Franchisee. Franchisee acknowledges that all items, or their equivalents, set forth in Schedule A must be purchased or leased prior to the date the Minuteman Press Full Service Printing Center opens for business and failure to purchase or lease the equipment within the time periods provided in Paragraph 8 (g) hereof shall be deemed a default hereunder.

### 10. Operation of Premises

(a) Franchisee agrees to continuously (during regular business hours and days) operate the Minuteman Press System in the Premises unless prohibited from so doing by an act of God, a religious holiday, a personal tragedy or conditions beyond Franchisee's control; and further agrees to exercise Franchisee's best efforts, skills and diligence in the conduct of such operations. In this connection, Franchisee agrees to so select and regulate its employees that they will be knowledgeable, presentable, courteous and helpful to customers, in compliance with the standards of Franchisor.

(b) During the term of this Agreement, Franchisee shall only sell products in the Premises approved by the Franchisor.

### 11. Regulation of Premises by Franchisor

(a) Throughout the term of this Agreement, Franchisor may regulate the services and performance rendered at the Premises in connection with the operation of the Minuteman Press System; Franchisor further may determine and regulate the standards of repair and maintenance of the Minuteman Press premises. Franchisee agrees to conform to the standards established by Franchisor as herein provided and maintain the Premises in the manner best calculated by the Franchisor to sustain the good will, consumer demand and prestige enjoyed by the Franchisor.

MMP00E3

9

(b) If Franchisor advises Franchisee that the premises are not neat or clean, Franchisee has fifteen (15) days after written notification to clean up the premises. If said cleaning is not performed, Franchisor has the right to have the premises cleaned at the expense of Franchisee.

(c) Franchisee hereby agrees to rent from Franchisor the logo type and name to be displayed on the exterior of the Premises and to pay Franchisor therefor a rental fee of Ten Dollars ($10.00) per annum, in advance. At the expiration or sooner termination of this Agreement, Franchisee agrees to return all such rented logo type, sign and name, if practicable.

(d) Franchisee agrees to permit Franchisor to take interior and exterior photographs of the Premises and use in any of Franchisor's publicity, advertising, or in such manner as Franchisor deems appropriate, all at Franchisor's expense.

## 12. Inspection of Books and Records

(a) Franchisee agrees that Franchisor's duly authorized representatives shall have the right at all times during regular business hours without notice to enter upon the Premises for the purpose of examining them to insure the proper exercise of quality control hereunder, testing the work product and conferring with Franchisee and Franchisee's employees, inspecting and checking merchandise, equipment and supplies and reviewing sales and operations procedures and obtaining samples of work produced by Franchisee.

(b) Franchisee will submit to Franchisor, annually during the term of this Agreement, a balance sheet and income statement and such other financial statements and schedules as Franchisor may reasonably require. In addition, Franchisee will submit to Franchisor, together with each payment made pursuant to Paragraph 6, a complete, itemized and detailed statement setting forth the total amount of gross billings of Franchisee during the preceding months. All statements submitted to Franchisor hereunder shall be sworn to by Franchisee and (if Franchisee is also a corporation) by its chief executive, directors and chief financial officers.

(c) Franchisee agrees to maintain at the Premises and available for inspection by Franchisor, at Franchisor's discretion during normal business hours, adequate records of its business operations. Franchisee agrees to permit Franchisor's duly authorized representatives to examine and/or audit and make copies thereof. Such records shall include, but not be limited to, invoices, W2's, 1099's, all tax returns and their supporting documents, profit and loss statements, cash register records, all bank statements and

MMP00E3



JUN 01 2001 23:09 FR BUCHANON INGERSOLL 215 665 8760 TO 17172330852    P.32

canceled checks as well as deposit slips, whether corporate or personal, and all other pertinent information deemed necessary in an examination or audit.

(d) Franchisor has the right to verify all of Franchisee's sales, directly with their customers, as well as all purchases and other expenses, directly with Franchisee's suppliers or employees.

(e) Franchisee will maintain true and correct books of account, in accordance with generally accepted accounting principals, consistently applied. Franchisor has the right under the agreement to have its authorized representatives examine and make copies of Franchisee's records of its business operations. Such records shall include, but not limited to cash register records, profit and loss statements, balance sheets, income tax work sheets and returns and any other records normally maintained by a business similar to that conducted at a Minuteman Press Full Service Printing Center. Franchisor may examine any such other reports or information pertaining to the business as Franchisor may reasonable request, from time to time.

(f) If the Franchisee fails to timely submit either the Franchisee's monthly gross sales report or financial statements, then Franchisor may conduct an audit and be reimbursed for all costs and expenses incurred without regard to the percentage of any discrepancy found. Franchisor estimates the audit charge to be between $150 and $300 per day, plus all expenses.

## 13. <u>The Marks</u>

Franchisor hereby acknowledges and warrants that the Marks are valid and subsisting, as hereinbefore recited. In this connection, Franchisee covenants and agrees never to object to or contest the validity or renewal rights of Franchisor thereof; and further agrees to refrain from any act seeking to infringe upon Franchisor's rights in and to the Marks. Franchisee agrees that its rights to use the Marks shall at all times be limited to the terms of this Agreement. At the expiration of the Agreement or sooner termination of the Agreement pursuant to its terms, Franchisee agrees to execute such documents and take such further actions as Franchisor shall reasonably deem necessary or advisable to the end that Franchisor shall be convinced that Franchisee has ceased the use of the Marks in every way and has no further interest or right therein whatsoever. Franchisee further covenants and agrees that it will not utilize the Marks, as shall be registered with the United States Patent Office, in any manner whatsoever either directly or indirectly, in any certificate or charter of incorporation. The Franchisor shall have the right to change the Marks and name at



MMP00E3

such time as the Franchisor shall deem appropriate.  Any such change shall be at the Franchisee's cost and expense.

Whereas, it may be in the best interest of the Franchisor to have the Franchisee conduct business in a name other than Minuteman Press it is, therefore, agreed between the parties that when or if Franchisor advises the Franchisee that the name Minuteman Press be discontinued and business conducted under a different trade name, the Franchisee will immediately remove the various signs from the Minuteman Press Full Service Printing Center and replace the same substituting in its place appropriate signs with the changed name.

In the event that Franchisee removes, defaces or improperly uses any Minuteman Press trademark, service mark, copyright or sign at the Licensed location, and fails to remedy default within twenty (20) days of written notice to correct same then in that event it is acknowledged that such action shall have caused severe damage to Franchisor.

## 14. Events of Default

Upon the occurrence of any of the following events, Franchisor, at its option, shall have the right, pursuant to applicable state law, to terminate this Agreement and all of the Franchisee's rights hereunder, provided Franchisee shall fail to remedy any of the following to Franchisor's satisfaction:

If Franchisee shall:

(a) become in default under any lease covering the Premises or equipment of its Minuteman Press Full Service Printing Center, and such default remains unremedied for ten (10) days after notice thereof; or

(b) closes the Minuteman Press Full Service Printing Center for a period of fifteen (15) successive days without Franchisor's prior written consent; or

(c) defaults in the performance of any of the covenants, terms or conditions of this Agreement, and such default remains unremedied for more than five (5) days after written notice thereof to Franchisee of such default; or

(d) becomes insolvent, be adjudicated bankrupt, have a voluntary or involuntary petition in bankruptcy or any other arrangement under the bankruptcy laws filed by or against it, make an assignment for the benefit of creditors, or if a receiver or trustee in bankruptcy appointed to take charge of Franchisee's affairs or property; or

MMP00E3

12

(e) commences dissolution proceedings or have such proceedings commenced against the Franchisee; or

(f) permits a judgment against the Franchisee to remain unsatisfied or unbonded of record for fifteen (15) days.

(g) removes, defaces, or improperly uses any Minuteman Press trademark, service mark, copyright or sign at the licensed location.

(h) state laws may exist which govern default, nonrenewal, termination and time to cure. If any of the terms of this agreement are inconsistent or determined void because of public policy of State Franchise Law, then any inconsistency shall be governed by State law to the extent it is void.

## 15. <u>Termination or Expiration of Agreement</u>

In the event of termination of this Agreement as provided herein:

(a) Franchisee agrees to immediately discontinue the employment or use of all marks (and to file notice of discontinuance or termination thereof), signs, structures and forms of advertising incorporating the Marks and further agrees to make, or cause to be made, such changes in signs, buildings and structures, equipment, supplies, furnishings and fixtures, and otherwise in order to distinguish the Premises from its former appearance and from other Minuteman Press System establishments. Thereafter, Franchisee shall not use in any manner any trademark, service mark, or trade name which is the same as Franchisor or its Franchisees. Upon termination of this Agreement for any reason, Franchisee may not refer to itself or any of its officers, directors, or employees as "formerly Minuteman Press", "formerly of Minuteman Press" or other words to that effect. Franchisee hereby authorizes the Franchisor to have the use and ownership of the telephone numbers used by the Franchisee in the Minuteman Press Full Service Printing Center and hereby authorizes the appropriate telephone company to change said ownership of said lines. Franchisee further agrees to execute those papers necessary to effect change in ownership. After said transfer, the cost of said number or numbers shall be borne by the Franchisor.

(b) All amounts due and owing from Franchisee to Franchisor shall immediately become due and payable.

(c) Franchisee shall pay to Franchisor all damages, costs and expenses, including reasonable attorney's fees, incurred by Franchisor in obtaining injunctive relief for the enforcement of any portion of the License Agreement.

MMP00E3

13

(d) Franchisee agrees that upon termination of the License, they will immediately return to the Franchisor all copies of the Confidential Operations Manual which have been loaned to them by the Franchisor and all updates, if any, which Franchisee may have thereafter.

(e) At the time of termination of the License Agreement, for any reason, Franchisee agrees to do the following:

1. Change any listed telephone numbers relating to the franchised business and;

2. Agrees not to provide a call forwarding telephone number referral with respect to any disconnected telephone number and;

3. Agrees not to indicate in any manner that it was previously affiliated with the Franchisor.

Franchisee further agrees to execute any and all necessary documentation to transfer any telephone numbers for the franchised business to the Franchisor.

(f) Franchisee shall immediately cease to use whatsoever the licensed software, and shall immediately return to Franchisor all originals, copies and updates thereto.

(g) Franchisor shall have the right, at its option, to purchase from Franchisee all of, or any part of any equipment, furnishings, supplies, or other material then in the possession of Franchisee that bears any of the Marks or trade names of Franchisor. Such right shall be exercisable by the giving of written notice to Franchisee, and all of the equipment, furnishings, supplies and materials designated or referred to in said notice shall immediately be delivered to Franchisor and Franchisor shall thereafter, after setting off against the amounts payable any monies owed by Franchisee to Franchisor under Paragraph 15 (b) above, promptly pay to Franchisee the amount due. Franchisor shall purchase the foregoing at the cost thereof to Franchisee less the depreciation therefore taken by Franchisee, if applicable, for such items for federal income tax purposes.

(h) THE LICENSE AGREEMENT MAY BE TERMINATED ONLY BY THE FRANCHISOR AND NO PROVISION IS MADE IN THIS AGREEMENT FOR THE UNILATERAL TERMINATION OF THIS AGREEMENT BY THE FRANCHISEE, EXCEPT FOR VIOLATION OF PROVISIONS SET FORTH IN PARAGRAPH FOUR (4) OF THE FRANCHISE AGREEMENT. IN THAT EVENT THE FRANCHISEE MUST PROVIDE FRANCHISOR WITH NOTICE OF DEFAULT AND OPPORTUNITY TO CURE.

MMP00E3

14

(i)   Franchisee's lease to the Premises heretofore referred to in Paragraph 3 of this Agreement shall be at the option of Franchisor deemed assigned to the Franchisor. The Franchisor shall advise the Franchisee of the exercise of said option at the time the termination notice is given.

(j)   Upon termination of Franchisee by Franchisor, Franchisee irrevocably grants to Franchisor all customer lists, customer business, including customer art work, presently in the possession of Franchisee.

### 16. Assignment

(a)   This Agreement shall not be assigned by Franchisee, whether voluntary, involuntary, by operation of law, or otherwise, without the prior written consent of Franchisor, which consent shall not be unreasonably withheld.

(b)   If Franchisee is an individual or two or more individuals or a partnership, Franchisee may upon the written consent of the Franchisor assign this Agreement to a corporation formed by Franchisee at its sole cost and expense for the sole purpose of operating a Minuteman Press Full Service Printing Center at the Premises, provided that Franchisee shall be and remain on the License Agreement jointly and severally liable for the performance of all the obligations of Franchisee under and in connection with this Agreement. Franchisee shall own not less than eighty percent (80%) of the issued and outstanding shares of such corporation; and provided, further that in the event of such assignment, the assignee corporation shall, in writing, assume all of the obligations of the Franchisee hereunder.  A change in the ownership (voluntary, involuntary, by operation of law or otherwise) of twenty percent (20%) or more of the capital stock of Franchisee corporation shall be deemed an assignment requiring Franchisor's consent.

(c)   In the event of a total assignment of all Franchisee's rights and interest in this agreement, the assignor will execute a general release in favor of Franchisor, in a form prescribed by Franchisor, provided, however, that all rights enjoyed by Franchisee and any causes of action arising in its favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of GBL 687.4 and 687.5 be satisfied.

(d)   In the event that Franchisee wishes to assign this Agreement to a party other than Franchisee corporation, Franchisee agrees to first offer to assign this Agreement to Franchisor or its

MMP00E3

15

nominee, on the same terms and conditions as offered to a bona fide prospective assignee, and Franchisor shall have a period of thirty (30) days in which to accept said offer.

(e) In the event of the death or incapacity of the Franchisee, and Franchisee is not a corporation, this Agreement will be transferable to the heirs of the deceased or incapacitated Franchisee, provided the active management of the Minuteman Press Full Service Printing Center continues satisfactorily to Franchisor. If Franchisee is a corporation then, upon the death or incapacity of the shareholder holding the greatest number of shares of stock of the Corporation this Agreement will continue in effect, provided the active management of the Minuteman Press Full Service Printing Center continues satisfactorily to Franchisor. If, in either of said events, the active management of the Minuteman Press Full Service Printing Center does not continue satisfactorily to Franchisor as reasonably determined by Franchisor within sixty (60) days after the death or incapacity of the Franchisee or Largest Shareholder or in the event the heirs of said deceased or incapacitated Franchisee or Largest Shareholder do not wish to continue the operation of the Minuteman Press Full Service Printing Center, then Franchisor or its nominee shall have the first right to acquire all of Franchisee's rights in and to this Agreement before the same be offered for assignment.

(f) Franchisor, as a condition of any Transfer, will require the payment to it of a training fee by the new Franchisee in order to reimburse Franchisor for any expenses which may be incurred, the actual technical and mechanical training as well as the backup and support provided to the incoming Franchisee. The training fee shall be Seventeen Thousand Five Hundred Dollars ($17,500), or the then current training fee charged by Minuteman Press International, Inc. The training fee will be payable by the new franchisee.

(g) Franchisor's consent to any proposed assignment hereunder shall not be deemed unreasonably withheld if the current Franchisee is in default of his obligation under the license agreement. Franchisor's consent to any proposed assignment hereunder shall not be deemed unreasonably withheld if the proposed assignee, in Franchisor's opinion, does not have the proper qualifications, capital, training and experience (or within a reasonable time cannot acquire such training and experience) and does not meet other standards that are reasonably required by Franchisor.

(h) Upon Franchisor's approval of a proposed assignment, the franchise agreement currently in force shall be surrendered to the Franchisor, and the Franchisee shall execute the then current form of License Agreement as Franchisor may reasonably require. The new Franchisee shall be required to attend the Minuteman Press Training Center Program.

MMP00E3

JUN 1 2001 23:10 FR BUCHANAN INGERSOLL 5 665 8760 TO 17172330852    P.38

## 17. Agency and indemnity

This Agreement does not create the relationship of principal and agent between Franchisee and Franchisor. Neither Franchisee nor Franchisor will under any circumstances, act or hold itself out as an agent or representative of the other nor incur any liability or create any obligation whatsoever in the name of the other. Franchisee will indemnify Franchisor and hold it harmless from any claims, demands, liabilities, actions, suits or proceedings asserted by third parties and arising out of the operation by Franchisee of the Premises. In the event any such claims, demands, actions, suits or proceedings relating to the Premises are commenced against Franchisor, Franchisee shall be solely responsible for the defense thereof, utilizing counsel reasonably satisfactory to Franchisor, and will promptly pay and discharge the expenses of such defense and all judgments and liens arising therefrom.

## 18. Actions Against Franchisee

In the event any claim, demand, action or proceeding is brought against Franchisee, or if Franchisee is notified of any violation of an applicable rule or statute, Franchisee will immediately notify Franchisor thereof, giving full particulars, and will diligently and expeditiously defend, compromise, cure or satisfy such claim, action, demand, proceeding or violation in Franchisee's sole discretion. Franchisee shall, in all respects, strive to uphold the standards and good will created in the Marks.

## 19. Restrictive Covenant

During the term of this Agreement, Franchisee will not directly or indirectly, as owner, employee, or otherwise, have any interest in or control over any type of business substantially similar to that of a Minuteman Press System establishment. Additionally, Franchisee will not divert or attempt to divert any business of or any customer of, the business licensed hereunder to any competitor, by direct or indirect means.

Unless specifically prohibited by state law Franchisee shall not for a period of two (2) years after termination of this Agreement, directly or indirectly, as owner, employee, or otherwise, have any interest in or control over any type of business substantially similar to that of a Minuteman Press System establishment within a radius of five (5) miles from the Minuteman Press Full Service Printing Center with which he had been formerly associated or within an area of five (5) miles from any existing Minuteman Press Full Service Printing Center. Franchisor acknowledges that Franchisee has previously made his living in other fields and

MMP00E3



17

that this paragraph in no way prevents him from earning his living in other fields of endeavor. The provisions of this paragraph will survive the termination of this Agreement, and will continue to be binding upon Franchisee individually and its individual shareholders, officers and directors notwithstanding any assignment pursuant to Paragraph 16.

## 20. Additional Remedies of Franchisor

Franchisee acknowledges that the restrictions contained in Paragraphs 2 and 19 of this Agreement are a reasonable and necessary protection of the legitimate interests of Franchisor, that any violation of them would cause substantial and irreparable injury to Franchisor, and that Franchisor would not have entered into this Agreement with Franchisee without receiving the additional consideration of Franchisee's binding itself to said restrictions. In the event of any violation of the said restrictions, Franchisor shall be entitled, in addition to any other remedy at law, to seek preliminary and permanent injunctive relief.

## 21. Notices

All notices which the Franchisor is required or may desire to give to the Franchisee under this Agreement may be delivered personally or may be sent by certified mail or registered mail, postage prepaid, addressed to Franchisee at either store address  855 Market ST, Lemoyne, PA 17043 , or home address,  4101 Fawn Square, Harrisburg, PA 17112 . All notices which Franchisee may be required or desires to give to Franchisor shall be sent by certified mail or registered mail, postage prepaid, addressed to: Minuteman Press International, Inc. 1640 New Highway, Farmingdale, NY 11735.

The addresses herein given for notices may be changed at any time by either party by written notice given to the other party as herein provided. Notices shall be deemed given upon personal delivery or two (2) business days after deposit in the U. S. Mails.

The Franchisee must give the Franchisor immediate written notice of any alleged breach or violation of this Agreement after the Franchisee has knowledge of, believes, determines or is of opinion that there has been an alleged breach of this Agreement by the Franchisor including any acts of misfeasance to nonfeasance. If the Franchisee fails to give written notice within one (1) year from the date that the Franchisee has knowledge of, believes, determines or is of the opinion that there has been an alleged breach by the Franchisor, then the alleged breach by the Franchisor will be deemed to be condoned, approved and waived by the Franchisee, the alleged breach by the Franchisor will not be deemed to be a breach of the

MMP00E3

18

agreement by the Franchisor, and the Franchisee will be permanently barred from commencing any action against the Franchisor for that alleged breach or violation.

## 22. Entire Agreement

THIS AGREEMENT AND SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF CONTAIN THE ENTIRE AGREEMENT OF THE PARTIES. NO OTHER AGREEMENTS, WRITTEN OR ORAL, SHALL BE DEEMED TO EXIST, AND ALL PRIOR AGREEMENTS AND UNDERSTANDINGS ARE SUPERSEDED HEREBY. NO OFFICER, EMPLOYEE OR AGENT OF FRANCHISOR HAS ANY AUTHORITY TO MAKE ANY REPRESENTATION OR PROMISE NOT CONTAINED IN THIS AGREEMENT, AND FRANCHISOR AGREES THAT IT HAS EXECUTED THIS AGREEMENT WITHOUT RELIANCE UPON ANY SUCH REPRESENTATION OR PROMISE. THIS AGREEMENT SHALL NOT BE BINDING UPON FRANCHISOR UNTIL EXECUTED BY AN AUTHORIZED OFFICER THEREOF. THIS AGREEMENT CANNOT BE MODIFIED OR CHANGED EXCEPT BY A WRITTEN INSTRUMENT SIGNED BY ALL OF THE PARTIES HERETO.

## 23. Arbitration and Litigation

The parties hereby agree that the Federal Arbitration Act shall apply to all claims arising out of or relating to this Agreement or the breach thereof and that the business, which is the subject of this Agreement, is engaged in Interstate Commerce. Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by arbitration in accordance with commercial arbitration rules of the Center for Dispute Resolution at a hearing to be held in the State of New York in the county where Minuteman maintains its home office. Any arbitration award shall be non-binding, but if the losing party consents, (such consent shall be in writing ) a judgment upon the arbitration award may be entered in any court having competent jurisdiction and then become binding and final. Minuteman and the franchisee (and their respective owners) waive to the fullest extent permitted by law, and right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

Each party will be responsible for its own costs, including attorneys fees, in conjunction with the arbitration proceeding. If the franchisee commences action in any court prior to the arbitrator's final decision on the controversy or claim, then the franchisee will be responsible for all expenses incurred by Minuteman and the franchisee in the arbitration proceeding. The Franchisee acknowledges and agrees that it is the

MMP00E3

intent of the parties that arbitration between Minuteman and the Franchisee shall be of Minuteman's and the Franchisee's individual claims only. No consolidated or multiple party claims may be brought by either Minuteman or the Franchisee.

The commencement of arbitration proceedings by an aggrieved party to settle disputes arising out of or relating to this Agreement is a condition precedent to the commencement of legal action by either party. If the parties cannot resolve their differences through the arbitration program or if the Arbitration clause in this agreement is found to be unenforceable, then either party may bring their individual action after thirty (30) days have expired from the final decision of the arbitrator or court. In either event, any litigation shall be brought in the Supreme Court, of the State of New York located in the county where Minuteman has its home office, or in the United States District Court for the Eastern District of New York. The parties waive their rights to trial by jury except where prohibited by Federal or State law.

This Arbitration Clause shall not be construed to limit the right of Minuteman to apply to any court of competent jurisdiction for injunctive relief for infringement on any of Minuteman's service marks, trademarks, or copyrighted items, unauthorized decimation of Minuteman's confidential information or trade secrets or violations of covenant not to compete. The Franchisee recognizes that violation of these provisions may cause irreparable harm to Minuteman, other franchisees and the franchise system as a whole.

## 24. Franchisee's Acknowledgment

Franchisor has made a strong effort to familiarize Franchisee with its franchise concepts, location criteria, and the duties and responsibilities of a Minuteman Press Franchisee. Minuteman Press Full Service Printing Centers differ depending on geographic location, length of time in business, the attitude and effort of Franchisee. Franchisee acknowledges the business and economic risks associated with the purchase of a franchise.

FRANCHISOR SPECIFICALLY STATES THAT THERE IS NO MINUTEMAN PRESS FULL SERVICE PRINTING CENTER THAT MAY BE CONSIDERED TO BE A "TYPICAL" OR "AVERAGE" CENTER. FRANCHISOR MAKES NO REPRESENTATIONS OR GUARANTEES AS TO GROSS SALES, NET PROFITS, GROSS PROFITS, REVENUES OR OTHER EARNINGS ANY FRANCHISEE CAN EXPECT. FRANCHISEE IS NOT ENTITLED TO ANY COMPENSATION OR REIMBURSEMENT FOR LOSS OF PROSPECTIVE PROFITS, ANTICIPATED SALES OR OTHER LOSSES.

MMP00E3

No person is authorized to give any representation other than those contained in or incorporated in this Franchise Agreement; and if given or made, such information or representation should not be relied upon as having been authorized.

### 25. Miscellaneous Provisions

(a) This Agreement shall be binding upon the parties hereto, their successors and assigns.

(b) As to any provision in this Agreement wherein approval is required, or modification desired, such approval or modification must be in writing and signed by the party to be charged.

(c) If any portion of this Agreement is declared to be invalid by any court, such determination shall not affect the balance of this Agreement and the same will remain in full force and effect.

(d) THIS AGREEMENT SHALL BE GOVERNED AS TO VALIDITY, CONSTRUCTION AND IN ALL OTHER RESPECTS, BY THE LAW OF THE STATE OF NEW YORK.

(e) The failure of Franchisor to enforce at any time or for any period of time any one or more of the terms or conditions of this Agreement shall not be a waiver of such terms or conditions or of Franchisor's right thereafter to enforce each and every term of this Agreement.

(f) Franchisor may sell or assign its interest in the license, in whole or in part, at any time.

(g) The captions herein are inserted for convenience only, and will not be deemed or construed to be a part of this Agreement or to define or limit the contents of the paragraph thereof.

(h) Franchisee acknowledges receipt from Franchisor of offering prospectus covering the terms of this Agreement.

(i) Franchisee acknowledges that State and Federal law may require the Franchisor to list the home address of the Franchisee in particular circumstances. Franchisee agrees and gives their consent to use the same.

MMP00E3

IN WITNESS WHEREOF the parties hereto have signed and sealed this instrument the day and year first above written.

Witness:

MINUTEMAN PRESS INTERNATIONAL, INC.

BY: _____
Franchisor    – Robert G. Emmett, V.P.

_____

BY: _____
Franchisee    – Michael A. Shaffer

_____

BY: _____
Franchisee

_____

_____

BY: _____
        Title
A corporation organized under the laws
        of the State of _____

_____

I have read the foregoing Agreement and understand and consent to the terms and provisions thereof, having affixed my initials to each respective page.

_____
Franchisee Signature – Michael A. Shaffer

_____
Franchisee Signature

MMP00E3

## FRANCHISEE'S CERTIFICATION

In consideration of the execution of the foregoing License Agreement with Minuteman Press International, Inc., the Franchisee hereby acknowledges that:

I have read and understand the foregoing License Agreement and understand that if I do not understand any terms of the License Agreement or if I do not understand any terms of this Acknowledgement of Receipt that I have the right to have my own attorney explain any terms of this Agreement to me; Minuteman encourages you to seek the advice of an attorney prior to signing the Franchise Agreement.

I understand that although Minuteman Press International, Inc., will provide assistance and advice, as outlined in the License Agreement, Minuteman Press cannot guarantee my success as a Minuteman Press Franchisee, and that my earnings as a Minuteman Press Franchisee will be primarily dependent upon my individual efforts in operating my Minuteman Press center.

I ACKNOWLEDGE THAT NEITHER MINUTEMAN PRESS INTERNATIONAL, INC., NOR ANY OF ITS DIRECTORS, OFFICERS, AGENTS OR EMPLOYEES HAS MADE ANY CLAIMS OR REPRESENTATIONS WHATSOEVER REGARDING POTENTIAL REVENUES, EARNINGS OR PROFITS, THAT A FRANCHISEE WILL ACHIEVE AS THE OWNER OF A MINUTEMAN PRESS FULL SERVICE PRINTING CENTER. I REPRESENT THAT I HAVE ENTERED INTO THE LICENSE AGREEMENT WITHOUT RELYING UPON ANY CLAIM OR REPRESENTATION NOT CONTAINED IN THE OFFERING CIRCULAR AND TO DO SO WOULD BE UNREASONABLE. I UNDERSTAND THAT THE FRANCHISOR IS RELYING UPON MY REPRESENTATION IN MAKING ITS DECISION TO GRANT THE FRANCHISE.

While Minuteman Press International, Inc., has offered assistance, I UNDERSTAND THAT I AM ASSUMING FULL RESPONSIBILITY FOR, AND HAVE HAD THE FINAL, ULTIMATE APPROVAL OF THE SITE SELECTED AND THE LEASE EXECUTED FOR THAT SITE, I further understand that I have the right to have my own attorney review the lease and explain to me any provisions of the lease.

Executed this _1st_ day of _Sept_ , 19 __ 2000

Witness

_____

BY:X _Michael A. Shaffer_

Franchisee – Michael A. Shaffer

_____

BY:X_____

Franchisee

_____

BY:X_____

Franchisee

_____

Corporate Name

_____

Name & Title

BY:X_____

A corporation organized under the laws of the State of _____

MMP00F3

JUN 21 2001 23:12 FR BUCHANAN INGERSOLL 215 665 8760 TO 17172330852    P.45



MICHAEL A. SHAFFER    05-72
4101 FAWN SQUARE    17-540-7036
HARRISBURG, PA 17112

Date 9-1-00

Pay to the Order of    $ 17,500.00



MICHAEL A. SHAFFER    05-72    4728
4101 FAWN SQUARE    PH 717-540-7036
HARRISBURG, PA 17112

Date 7-1-00

Pay to the Order of    $ 10.00



MICHAEL A. SHAFFER    05-72    4729
4101 FAWN SQUARE    PH 717-540-7036
HARRISBURG, PA 17112

Pay to the Order of    $



MICHAEL A. SHAFFER    05-72
4101 FAWN SQUARE    PH 717-540-7036
HARRISBURG, PA 17112

Date 9/1-00

Pay to the Order of    DRW    $ 100.00

SCHEDULE A

LEMOYNE, PENNSYLVANIA
DENNIS M. & SUSAN D. GRAYBILL
TO: MICHAEL A. SHAFFER

### EQUIPMENT DESCRIPTION LIST

COMPUTER WORKSTATION

COLOR COMPUTER MONITOR

LASERJET PRINTER

SOFTWARE

ONE MODEL 1650 XE-CD AM INTERNATIONAL OFFSET PRESS

ONE 1650 MODEL SWING-AWAY SECOND COLOR HEAD

MULTI-INSTALLED KOMPAC AUTOMATIC DAMPENER SYSTEM

ONE SP 990 PHOTO-DIRECT SILVER PLATEMAKER SYSTEM

METAL PLATEMAKER/MERCURY PRINTER

PLATE PUNCH

LIGHT TABLE

PRECISION PAPER CUTTER

AUTOMATIC AIR/SUCTION FEED FOLDER

PAPER DRILL

ELECTRIC SADDLE STAPLER

PADDER

THREE STEEL WORK TABLES

NEON SIGN PACKAGE

WINDOW GRAPHICS PACKAGE

FRONT LOBBY SERVICE COUNTER

FILE CABINET

TWO SIX FOOT FOLDING TABLES

LOBBY FURNITURE

DESK

SECRETARIAL CHAIR

STEEL SHELVING

IT IS UNDERSTOOD AND AGREED THAT THE ABOVE EQUIPMENT HAS BEEN PREVIOUSLY
USED.

_Dennis M. Graybill_          _Susan D. Graybill_          11/24/98

AGREED - DENNIS M. GRAYBILL & SUSAN D. GRAYBILL                    DATED

## CERTIFICATE OF SERVICE

I, Matthew C. Browndorf, Esquire, hereby certify that on this 22nd day of

June, 2001, I caused a copy of the foregoing Memorandum of Law to be served via

First Class U.S. Mail, postage prepaid, upon the following counsel of record:

Robert J. White, Esquire
P.O. Box 3005
York, PA 17402

and

Marvin Beshore, Esquire
Milspaw & Beshore
130 State Street
P.O. Box 946
Harrisburg, PA 17108-0946

Matthew C. Browndorf, Esquire

**Robert J. White**
**Attorney and Counselor at Law**
**PO Box 3005**
**York, PA 17402**
**(717) 699-4534**
**FAX (717) 699-2895**

**May 25, 2000**

Peter T. Bauer
General Counsel
Minuteman Press International, Inc.
1640 New Highway
Farmingdale, NY 11735

**URGENT TIME DATED MATERIAL**
**VIA FAX AND CERTIFIED MAIL**

**CONFIDENTIAL FOR PETER T.**
 **BAUER** only

Dear Peter,

I hope you enjoyed your overseas trip.  Matters have been developing relating to franchise owners who wish to sue MMPI.  There is a group of franchisees in Pennsylvania actively seeking out dissatisfied franchise owners who will do something about their dissatisfaction with MMPI. They referred George Steedle of your Akron, PA, franchise to me and I now represent him to pursue the matters included in the enclosed draft complaint to be filed in Lancaster County, PA.

I am attaching for your perusal a proposed Preliminary Agreement to work out some rules regarding the existing Pennsylvania litigation and future Pennsylvania litigation against MMPI and Emmett.

I now have three franchisees who have already filed or who or about to file actions in Pennsylvania against MMPI and Emmett arising from the common scheme to defraud that was set forth in Judge Hurley's Opinion and Memorandum of October 2, 1998, in the FTC action against MMPI.  All three of these franchisees fall within the narrowly defined protected class of franchisees as set forth in that Opinion.

I have also been contacted by a fourth franchisee who may or may not want to file suit against MMPI.  I am not pressuring him to do so.

In addition, I have been contacted by a fifth franchisee who does not wish to file suit at this time but who will testify that MMPI and Emmett made the same misrepresentations to him as they did to the three franchisees with actions pending or to become pending against MMPI.  A sixth franchisee who has been recently forced into liquidation bankruptcy has not contacted me yet, but the dissatisfied franchisees are in contact with him.

Things no longer appear to me as they did when I filed the initial two suits, although I will file the third suit in Lancaster County if I have to.  In this respect, when we discussed the second suit against MMPI, you expressed some concern over having another law suit filed and asked me to

contact you before filing any further suits, whereupon you would investigate the matters alleged in the potential law suits. I am taking you at your word and submitting a draft law suit on behalf of George Steedle to you for timely investigation by you.

As respects the existing litigation, it now appears to me that non-binding arbitration would be beneficial in both cases and I am willing to make substantial concessions to MMPI and Emmett to achieve that goal. There are strings attached to these concessions as outlined in the draft Preliminary Agreement attached hereto. Please respond by telephone no later than May 30, 2001, to see if we can reach an agreement regarding this arbitration.

The Shaffer case presents a particular problem in that he has been bled dry in his attempt to make a go of his franchise. He is living with his mother in an attempt to pare living expenses and is talking of taking a lawn mowing job to support himself until he finds something appropriate. He is in need of a loan as set forth in the draft Preliminary Agreement to tide him over while he awaits the outcome of the requested settlement conferences and the proposed arbitration.

Very Truly Yours,


Robert J. White
Counsel for the Lemoyne, York and Akron Franchises

cc: John Schlaline
    Michael Shaffer
    George Steedle

**Draft Preliminary Agreement**

John Schlaline of the York Minuteman franchise, Michael Shaffer of the Lemoyne Minuteman franchise, and George Steedle of the Akron Minuteman franchise (Plaintiffs) and Minuteman Press International, Inc. (MMPI) and Robert Emmett (Defendants) agree to submit all claims of the Plaintiffs against the Defendants and all claims and defenses of the Defendants and their associates and affiliates  to non-binding arbitration under the following terms and conditions.

1. Defendants agree not to raise the statute of limitations as a defense to the pleadings of the Plaintiffs or any other action arising out of the subject matter of their pleadings as it relates to future potential law suits brought regarding the same subject matter in any court of competent jurisdiction.

2. Defendants agree that courts of competent jurisdiction include the United States District Courts for the Eastern District of New York and the Middle District of Pennsylvania and the Courts of Common Pleas wherever situated in Pennsylvania.

3. Defendant MMPI agrees to make immediately available its entire files on the disclosed litigation in its Disclosure Statements as applicable to each Plaintiff.  Defendant MMPI agrees to immediately copy and send to Plaintiffs' counsel its entire file on each of the Plaintiffs and their franchises, excluding particular documents over ten pages in length.  MMPI shall make a listing of excluded documents and immediately send it to Plaintiffs' counsel.

4. Defendant Emmett agrees to immediately copy and send to Plaintiffs' counsel his entire file on each of the Plaintiffs and their franchises, excluding particular documents over ten pages in length.  Emmett shall make a listing of excluded documents and immediately send it to Plaintiffs' counsel.

5.  Defendant MMPI agrees to answer completely, truthfully, honestly and unequivocally or produce documents responsive to the following particular Paragraphs of the discovery Schlaline has served upon it: 7, 14, 22, 25, 32, 33, 39, 40, 41, 42, 43, and 44.  Defendant agree that any discovery made in the Schlaline case shall apply to all existing litigation and all potential  litigation involving other Plaintiffs but arising out of the subject matter of Plaintiffs' respective Complaints as amended.  No objections shall be made to the present discovery or to future written discovery, unless the future discovery is patently unreasonable as to a particular question.

6. Defendant Emmett agrees to answer or produce documents upon the same terms and conditions as specified in Paragraph 5  the following particular Paragraphs of the Schlaline discovery propounded on MMPI: 11,  16, 18.

7.  Plaintiff Shlaline remains free to propound additional discovery to Defendant and the provisions of Paragraph 5 shall apply thereto.

8.  Defendant shall reimburse Plaintiffs the sum of $500.00 actually expended in filing and serving their actions against the Defendants.

9.  Defendants agree that they have violated FTC rule and regulations and CFR provisions  as set forth in the Opinion and Memorandum of Judge Denis R. Hurley dated October 2, 1998, in Case No. 93-CV-2496 in the Eastern District of New York and have violated the injunction issued pursuant thereto with respect to Plaintiffs Shaffer and Steedle.

10.  Defendants agree that they will not contest venue in any of the courts specified in Paragraph 2 as to any litigation arising or refiled after the arbitration provided for herein.

11. The matters alleged in the pleadings of the Plaintiffs shall be submitted to non-

binding arbitration unless the matters raised in the pleadings are sooner resolved.

a. Any arbitration proceedings shall be handled by a bifurcated hearing, first as to the issue of liability and then as to the issue of damages. In the event that the arbitration panel finds against any Plaintiff on the liability issue, the panel shall nonetheless make findings of fact and conclusions of law on the amount of actual and consequential damages that the particular Plaintiff would have received on each Count in his pleadings as if he were entitled to recover thereon. At the option of Plaintiffs' counsel, the amounts of damages specified by the arbitration panel shall become agreed damages in any further action after the arbitration hearing. Plaintiffs reserve the right to pursue their actions for punitive damages in any further action after the arbitration proceedings.

b Any arbitration agreed to by the parties shall commence within one year from the date hereof or within such earlier time as can be arranged by the arbitrators.

c. Defendants MMPI and Emmett and the other parties defendant to the pleadings of Plaintiffs shall make arrangements to bear the complete cost of the arbitration.

d. The other parties defendant to the pleadings of the Plaintiffs shall be deemed necessary parties to the arbitration in the case of Plaintiff Schlaline but not in the case of Shaffer or Steedle or to any future litigation involving other Plaintiffs who may choose to take action against MMPI and/or Emmett and submit that action to non-binding arbitration.

e. The arbitration proceedings will be held in Harrisburg or York, PA.

f. The other parties defendant as specified in subparagraph d may opt to attend the arbitration proceedings and shall be bound thereby only to the extent set forth in this Paragraph 11.

12. This Agreement modifies the federal and Pennsylvania Rules of Civil Procedure and

the arbitration rules of the Federal Arbitration Act and shall be enforceable against the parties and their counsel.

13. Defendants MMPI and Emmett shall enter into meaningful settlement negotiations with Plaintiffs within the next ten days by having a settlement conference in which all parties shall be present and free to express any matter they desire to discuss as to whether Plaintiffs should or should not be compensated for damages alleged in their pleadings. The parties and their attorney shall spend at least eight hours in this settlement conference and will not sit idly by and remain silent on the compensation issues. The parties agree to make every good faith effort to resolve the issues raised in their pleadings at this settlement conference.

14. If these matters are not resolved as set forth in Paragraph 13, the parties agree that another settlement conference with only the attorneys present shall take place within ten days thereafter. All counsel at this conference will engage in meaningful discussion as to the merits or lack thereof of the issues raised in the Plaintiffs' pleadings. All counsel at this conference will engage in meaningful discussions as to the compensation issues. This settlement conference shall be scheduled for eight hours, but may be sooner terminated by agreement of all counsel.

15. In the case of Plaintiff Schlaline, one further settlement conference is required within twenty-five days with Plaintiff and all five Defendants present to discuss the matters set forth in Paragraphs 13 and 14.

16. Defendants MMPI and Emmett shall bear Plaintiffs' costs relating to these settlement conferences by reimbursing Plaintiffs the sum of $150.00 per hour expended by their counsel. Counsel's records shall be dispositive of the time spent on this agreement and the settlement conferences required hereunder and for preparation time.

17. This agreement shall be confidential, except to the extent necessary to disclose it in

any court of law or arbitration proceeding or to any governmental agency. This agreement shall be binding on the parties and their counsel. Should any dispute arise over this agreement, the dispute shall be resolved by any court of competent jurisdiction or by any arbitration panel of competent jurisdiction or by any governmental agency.

18. This agreement shall in no manner be construed so as to prevent Plaintiffs from continuing confidential settlement negotiations with any other party defendant specified in their pleadings.

18 Neither Plaintiffs nor Defendants have made any promises other than as set forth in this agreement.

19.The disclaimer clauses in the Franchise Agreement and in the Disclosure Statement and all other contracts between Plaintiffs and Defendant MMPI are waived for all purposes in a court of competent jurisdiction or in any arbitration proceedings.

20. All clauses in the contracts between Plaintiffs and MMPI or its subsidiaries and affiliates that are contrary to any matter agreed upon herein are hereby modified accordingly.

21 Defendants agree that their counsel shall respond to the factual matters alleged in their pleadings in the limited manner of having counsel prepare a draft response as to all factual allegations in the Plaintiffs' pleadings. Counsel for Defendant shall be required to admit or deny each factual allegation and mixed allegation of fact and law. All denials shall contain a clear and precise recitation of what the Defendants intend to prove to the contrary. This draft answer shall be submitted to Plaintiffs' counsel no later than the first settlement conference required hereunder, in order for him to make a realistic assessment of what facts he needs to prove at arbitration or trial. The facts contained in Paragraph 39 of Schlaline's pleadings are admitted by the Defendants as to all Plaintiffs or future Plaintiffs in an action arising from the same subject

matter as expressed in Plaintiffs' pleadings but with different Plaintiffs..

27.  All time limits, except as to the designated portions of discovery propounded or to be propounded by Plaintiffs, are hereby extended to the period ending twenty days after the last settlement conference required hereunder unless specified to the contrary herein.

28.  Defendants agree to lend Plaintiff Shaffer the sum of $10,000.00 at no interest to be repayable at the rate of $250.00 per month on the later to occur of the ending of his litigation or the time when he commences to make a salary at rates commensurate with his position before entering into the contract with MMPI.  If, at the end of six months, the matters raised in Shaffer's pleadings have not been resolved or he has not yet found employment at rates comparable to those he was making before entering into the contract, Defendants agree to make one additional loan to him of $10,000.00, repayable at the same monthly payment commencing on completed payments on the first loan.

29.  Defendant MMPI, its affiliates, subsidiaries and associates, including the lessors of equipment and suppliers, agree to a standstill arrangement whereby they will not attempt to enforce their contracts pending the outcome of this litigation.

30.  Time is of the essence of this Agreement.

This Agreement entered into this ___ day of May, 2001, in York, Pennsylvania, to which witness our hands and seals.


_____
John Schlaline, Plaintiff


_____
Michael Shaffer, Plaintiff


_____
MMPI, Defendant
By its President


_____
Robert Emmett, Defendant

_____                    _____
George Steedle, Plaintiff                   Counsel for Defendants


_____
Robert J. White
Counsel for Plaintiffs

**Robert J. White**
**Attorney and Counselor at Law**
**PO Box 3005**
**York, PA 17402**
**(717) 699-4534**
**FAX (717) 699-2895**

May 25, 2000                                          **URGENT TIME DATED MATERIAL**
                                                     **VIA FAX AND CERTIFIED MAIL**

Peter T. Bauer
General Counsel                                      **CONFIDENTIAL FOR PETER T.**
Minuteman Press International, Inc.                   **BAUER only**
1640 New Highway
Farmingdale, NY 11735

Dear Peter,

I hope you enjoyed your overseas trip. Matters have been developing relating to franchise
owners who wish to sue MMPI. There is a group of franchisees in Pennsylvania actively seeking
out dissatisfied franchise owners who will do something about their dissatisfaction with MMPI.
They referred George Steedle of your Akron, PA, franchise to me and I now represent him to
pursue the matters included in the enclosed draft complaint to be filed in Lancaster County, PA.

I am attaching for your perusal a proposed Preliminary Agreement to work out some rules
regarding the existing Pennsylvania litigation and future Pennsylvania litigation against MMPI
and Emmett.

I now have three franchisees who have already filed or who or about to file actions in
Pennsylvania against MMPI and Emmett arising from the common scheme to defraud that was
set forth in Judge Hurley's Opinion and Memorandum of October 2, 1998, in the FTC action
against MMPI. All three of these franchisees fall within the narrowly defined protected class of
franchisees as set forth in that Opinion.

I have also been contacted by a fourth franchisee who may or may not want to file suit against
MMPI. I am not pressuring him to do so.

In addition, I have been contacted by a fifth franchisee who does not wish to file suit at this time
but who will testify that MMPI and Emmett made the same misrepresentations to him as they did
to the three franchisees with actions pending or to become pending against MMPI. A sixth
franchisee who has been recently forced into liquidation bankruptcy has not contacted me yet,
but the dissatisfied franchisees are in contact with him.

Things no longer appear to me as they did when I filed the initial two suits, although I will file
the third suit in Lancaster County if I have to. In this respect, when we discussed the second suit
against MMPI, you expressed some concern over having another law suit filed and asked me to

contact you before filing any further suits, whereupon you would investigate the matters alleged in the potential law suits. I am taking you at your word and submitting a draft law suit on behalf of George Steedle to you for timely investigation by you.

As respects the existing litigation, it now appears to me that non-binding arbitration would be beneficial in both cases and I am willing to make substantial concessions to MMPI and Emmett to achieve that goal. There are strings attached to these concessions as outlined in the draft Preliminary Agreement attached hereto. Please respond by telephone no later than May 30, 2001, to see if we can reach an agreement regarding this arbitration.

The Shaffer case presents a particular problem in that he has been bled dry in his attempt to make a go of his franchise. He is living with his mother in an attempt to pare living expenses and is talking of taking a lawn mowing job to support himself until he finds something appropriate. He is in need of a loan as set forth in the draft Preliminary Agreement to tide him over while he awaits the outcome of the requested settlement conferences and the proposed arbitration.

Very Truly Yours,


Robert J. White
Counsel for the Lemoyne, York and Akron Franchises

cc: John Schlaline
    Michael Shaffer
    George Steedle

**Draft Preliminary Agreement**

John Schlaline of the York Minuteman franchise, Michael Shaffer of the Lemoyne Minuteman franchise, and George Steedle of the Akron Minuteman franchise (Plaintiffs) and Minuteman Press International, Inc. (MMPI) and Robert Emmett (Defendants) agree to submit all claims of the Plaintiffs against the Defendants and all claims and defenses of the Defendants and their associates and affiliates  to non-binding arbitration under the following terms and conditions.

1. Defendants agree not to raise the statute of limitations as a defense to the pleadings of the Plaintiffs or any other action arising out of the subject matter of their pleadings as it relates to future potential law suits brought regarding the same subject matter in any court of competent jurisdiction.

2. Defendants agree that courts of competent jurisdiction include the United States District Courts for the Eastern District of New York and the Middle District of Pennsylvania and the Courts of Common Pleas wherever situated in Pennsylvania.

3. Defendant MMPI agrees to make immediately available its entire files on the disclosed litigation in its Disclosure Statements as applicable to each Plaintiff.  Defendant MMPI agrees to immediately copy and send to Plaintiffs' counsel its entire file on each of the Plaintiffs and their franchises, excluding particular documents over ten pages in length.  MMPI shall make a listing of excluded documents and immediately send it to Plaintiffs' counsel.

4. Defendant Emmett agrees to immediately copy and send to Plaintiffs' counsel his entire file on each of the Plaintiffs and their franchises, excluding particular documents over ten pages in length.  Emmett shall make a listing of excluded documents and immediately send it to Plaintiffs' counsel.

5.  Defendant MMPI agrees to answer completely, truthfully, honestly and unequivocally or produce documents responsive to the following particular Paragraphs of the discovery Schlaline has served upon it: 7, 14, 22, 25, 32, 33, 39, 40, 41, 42, 43, and 44.  Defendant agree that any discovery made in the Schlaline case shall apply to all existing litigation and all potential  litigation involving other Plaintiffs but arising out of the subject matter of Plaintiffs' respective Complaints as amended.  No objections shall be made to the present discovery or to future written discovery, unless the future discovery is patently unreasonable as to a particular question.

6. Defendant Emmett agrees to answer or produce documents upon the same terms and conditions as specified in Paragraph 5  the following particular Paragraphs of the Schlaline discovery propounded on MMPI: 11,  16, 18.

7.  Plaintiff Shlaline remains free to propound additional discovery to Defendant and the provisions of Paragraph 5 shall apply thereto.

8.  Defendant shall reimburse Plaintiffs the sum of $500.00 actually expended in filing and serving their actions against the Defendants.

9.  Defendants agree that they have violated FTC rule and regulations and CFR provisions  as set forth in the Opinion and Memorandum of Judge Denis R. Hurley dated October 2, 1998, in Case No. 93-CV-2496 in the Eastern District of New York and have violated the injunction issued pursuant thereto with respect to Plaintiffs Shaffer and Steedle.

10.  Defendants agree that they will not contest venue in any of the courts specified in Paragraph 2 as to any litigation arising or refiled after the arbitration provided for herein.

11. The matters alleged in the pleadings of the Plaintiffs shall be submitted to non-

binding arbitration unless the matters raised in the pleadings are sooner resolved.

a. Any arbitration proceedings shall be handled by a bifurcated hearing, first as to the issue of liability and then as to the issue of damages.  In the event that the arbitration panel finds against any Plaintiff on the liability issue, the panel shall nonetheless make findings of fact and conclusions of law on the amount of actual and consequential damages that the particular Plaintiff would have received on each Count in his pleadings as if he were entitled to recover thereon.  At the option of Plaintiffs' counsel, the amounts of damages specified by the arbitration panel shall become agreed damages in any further action after the arbitration hearing.  Plaintiffs reserve the right to pursue their actions for punitive damages in any further action after the arbitration proceedings.

b Any arbitration agreed to by the parties shall commence within one year from the date hereof or within such earlier time as can be arranged by the arbitrators.

c. Defendants MMPI and Emmett and the other parties defendant to the pleadings of Plaintiffs shall make arrangements to bear the complete cost of the arbitration.

d. The other parties defendant to the pleadings of the Plaintiffs shall be deemed necessary parties to the arbitration in the case of Plaintiff Schlaline but not in the case of Shaffer or Steedle or to any future litigation involving other Plaintiffs who may choose to take action against MMPI and/or Emmett and submit that action to non-binding arbitration.

e. The arbitration proceedings will be held in Harrisburg or York, PA.

f. The other parties defendant as specified in subparagraph d may opt to attend the arbitration proceedings and shall be bound thereby only to the extent set forth in this Paragraph 11.

12. This Agreement modifies the federal and Pennsylvania Rules of Civil Procedure and

the arbitration rules of the Federal Arbitration Act and shall be enforceable against the parties and their counsel.

13. Defendants MMPI and Emmett shall enter into meaningful settlement negotiations with Plaintiffs within the next ten days by having a settlement conference in which all parties shall be present and free to express any matter they desire to discuss as to whether Plaintiffs should or should not be compensated for damages alleged in their pleadings. The parties and their attorney shall spend at least eight hours in this settlement conference and will not sit idly by and remain silent on the compensation issues. The parties agree to make every good faith effort to resolve the issues raised in their pleadings at this settlement conference.

14. If these matters are not resolved as set forth in Paragraph 13, the parties agree that another settlement conference with only the attorneys present shall take place within ten days thereafter. All counsel at this conference will engage in meaningful discussion as to the merits or lack thereof of the issues raised in the Plaintiffs' pleadings. All counsel at this conference will engage in meaningful discussions as to the compensation issues. This settlement conference shall be scheduled for eight hours, but may be sooner terminated by agreement of all counsel.

15. In the case of Plaintiff Schlaline, one further settlement conference is required within twenty-five days with Plaintiff and all five Defendants present to discuss the matters set forth in Paragraphs 13 and 14.

16. Defendants MMPI and Emmett shall bear Plaintiffs' costs relating to these settlement conferences by reimbursing Plaintiffs the sum of $150.00 per hour expended by their counsel. Counsel's records shall be dispositive of the time spent on this agreement and the settlement conferences required hereunder and for preparation time.

17. This agreement shall be confidential, except to the extent necessary to disclose it in

any court of law or arbitration proceeding or to any governmental agency.  This agreement shall be binding on the parties and their counsel.  Should any dispute arise over this agreement, the dispute shall be resolved by any court of competent jurisdiction or by any arbitration panel of competent jurisdiction or by any governmental agency.

18.  This agreement shall in no manner be construed so as to prevent Plaintiffs from continuing confidential settlement negotiations with any other party defendant specified in their pleadings.

18 Neither Plaintiffs nor Defendants have made any promises other than as set forth in this agreement.

19.The disclaimer clauses in the Franchise Agreement and in the Disclosure Statement and all other contracts between Plaintiffs and Defendant MMPI are waived for all purposes in a court of competent jurisdiction or in any arbitration proceedings.

20.  All clauses in the contracts between Plaintiffs and MMPI or its subsidiaries and affiliates that are contrary to any matter agreed upon herein are hereby modified accordingly.

21 Defendants agree that their counsel shall respond to the factual matters alleged in their pleadings in the limited manner of having counsel prepare a draft response as to all factual allegations in the Plaintiffs' pleadings.  Counsel for Defendant shall be required to admit or deny each factual allegation and mixed allegation of fact and law.  All denials shall contain a clear and precise recitation of what the Defendants intend to prove to the contrary.  This draft answer shall be submitted to Plaintiffs' counsel no later than the first settlement conference required hereunder, in order for him to make a realistic assessment of what facts he needs to prove at arbitration or trial.  The facts contained in Paragraph 39 of Schlaline's pleadings are admitted by the Defendants as to all Plaintiffs or future Plaintiffs in an action arising from the same subject

matter as expressed in Plaintiffs' pleadings but with different Plaintiffs..

27.  All time limits, except as to the designated portions of discovery propounded or to be propounded by Plaintiffs, are hereby extended to the period ending twenty days after the last settlement conference required hereunder unless specified to the contrary herein.

28.  Defendants agree to lend Plaintiff Shaffer the sum of $10,000.00 at no interest to be repayable at the rate of $250.00 per month on the later to occur of the ending of his litigation or the time when he commences to make a salary at rates commensurate with his position before entering into the contract with MMPI.  If, at the end of six months, the matters raised in Shaffer's pleadings have not been resolved or he has not yet found employment at rates comparable to those he was making before entering into the contract, Defendants agree to make one additional loan to him of $10,000.00, repayable at the same monthly payment commencing on completed payments on the first loan.

29. Defendant MMPI, its affiliates, subsidiaries and associates, including the lessors of equipment and suppliers, agree to a standstill arrangement whereby they will not attempt to enforce their contracts pending the outcome of this litigation.

30.  Time is of the essence of this Agreement.

This Agreement entered into this ___ day of May, 2001, in York, Pennsylvania, to which witness our hands and seals.

_____

John Schlaline, Plaintiff

_____

MMPI, Defendant
By its President


_____

Michael Shaffer, Plaintiff

_____

Robert Emmett, Defendant

_____          _____
George Steedle, Plaintiff              Counsel for Defendants


_____
Robert J. White
Counsel for Plaintiffs