

ORIGINAL

⑱
11-19-01
SC

In the United States District Court for the Middle District of Pennsylvania

Michael Shaffer,
        Plaintiff,

    v.

Susan Graybill, et al.,
        Defendants.

} No. 01-CV-1065
}
}
} Judge Rambo
}
}
}

FILED
HARRISBURG

NOV 1 6 2001

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

## Motion to File Second Amended Complaint

Comes now Plaintiff Michael Shaffer and moves the court for leave to file a Second Amended Complaint pursuant to F.R.Civ.P. No. 15.

1. This suit was commenced in state court on May 1, 2001, by the filing of Plaintiff's Complaint. The Complaint was amended by the First Amended Complaint before any party was required to respond. On June 15, 2001, the action was removed to federal court by the Defendants Minuteman and Emmett and a Motion to Dismiss was filed. The parties have fully briefed their positions on the Motion to Dismiss.

2. This Motion to Amend is filed in the interest of justice.

3. Among other matters raised by all Defendants in their respective Motions to Dismiss were technical deficiencies in the pleading of negligence and conspiracy. The proposed Second Amended Complaint dispenses with these objections.

4. In addition, the proposed amendment adds the missing Count V of the Complaint as

already amended which adds the request for declaratory judgment that the Franchise Agreement should be rescinded or modified and also requests rescission of the arbitration provision of the Franchise Agreement. Should the latter request be upheld, it will wholesale eliminate vast objections of the Defendant that Plaintiff's case should be abated or dismissed due to the arbitration provision of the Franchise Agreement.

5. Conference was held with opposing counsel over the merits of this Motion on November 14, 2001, and Defendants object to the filing of the Second Amended Complaint.

Wherefore, Plaintiff moves that he be granted leave to files his Second Amended Complaint.

Respectfully Submitted,

*Robert White*

Robert J. White
PBN 32487
PO Box 3005
York, PA 17402
(717) 699-4534

Counsel for Plaintiff

## Certificate of Conference

The undersigned certifies that he has conferred with Harris Chernow, Counsel for the Minuteman Defendants, on November 14, 2001, and that said Defendants are opposed to the requested relief.

*Robert White*

Robert J. White

## Certificate of Service

The undersigned certifies that he has served a copy of this Motion and the proposed Second Amended Complaint by first class mail, postage prepaid, on this 15th day of November,

2001, addressed to Harris J. Chernow, Counsel for the Minuteman Defendants, Buchanan Ingersoll, Eleven Penn Center, 14th Floor, 1835 Market Street, Philadelphia, PA 19103, and to

Charles Rees Brown, Nicholas & Foreman, 4409 N. Front Street, Harrisburg, PA 17110.

_Robert White_
Robert J. White

**In the United States District Court for the Middle District of Pennsylvania**
**Civil Division**

| | |
|---|---|
| Michael Shaffer,<br>    Plaintiff,<br><br>    v.<br><br>Susan Graybill as an individual<br>and as Administratrix of the<br>Estate of Dennis M. Graybill,<br>Minuteman Press International,<br>Inc., and Robert Emmett<br>    Defendants. | } No. 01-CV-1065<br>}<br>}<br>}<br>}<br>}<br>} Judge Rambo<br>}<br>}<br>}<br>}<br>}<br>} Jury Trial Demanded |

**Second Amended Complaint in Law with Action for Declaratory Judgment**

Comes now Plaintiff and complains of each Defendant as follows.

**Parties, Jurisdiction and Venue**

1. Plaintiff is Michael Shaffer who resides at 88 Bentz Mill Road, East Berlin, PA 17316.

2. Defendant Susan Graybill is an individual who operated a Minuteman Press franchise in Lemoyne, PA, and may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

3. Defendant Susan Graybill as Administratrix of the Estate of Dennis M. Graybill, deceased, may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

4. Defendant Minuteman Press International, Inc. (hereafter MMPI) is a New York corporation with its home office in Farmingdale, New York. It may be served by certified mail addressed to its registered agent, Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735.

1

5. Defendant Robert Emmett is an individual and representative of MMPI and maintains an office in Wayne, PA. He may be served in person at 489 Devon Park Drive, Suite 307, Wayne, PA 19087.

6. The court has jurisdiction over these proceedings because the Minuteman Press franchise sold to Plaintiff by Defendants Graybill is located in Cumberland County and the amount in controversy exceeds the minimum jurisdictional amounts of the court.

7. The court has venue over these proceedings because all or part of the cause of action arose in Cumberland County and Defendants Graybill maintained a place of business in Lemoyne, Cumberland County, PA, and reside in Cumberland County, PA.

### Facts Common to All Counts

8. On or about August, 2000, Defendants Graybill were operating a Minuteman Press franchise in Lemoyne under contract with Defendant MMPI. Defendants Graybill were desirous of selling the franchise to Plaintiff and did so on September 6, 2000. Plaintiff entered into various contracts with Defendants Graybill, Defendant MMPI in pursuance of the purchase of the franchise.

### Count I

9. This count sounds in tort.

10. Throughout the relevant time frame alleged in Paragraph 9, all Defendants entered into a conspiracy with one another to unload a failing business on Plaintiff by agreeing to materially defraud Plaintiff by falsely inducing him to enter into a contract to purchase and to purchase the Minuteman Press franchise located in Lemoyne, PA. Defendant Emmett was the

regional representative of Defendant MMPI and had authority speak for and to bind the corporation.

11.  Defendants Graybill were the owners of the franchise.  Defendants Graybill made material misrepresentations as to the financial viability of the franchise and these were made to falsely induce Plaintiff to purchase the Minuteman Press franchise of Lemoyne as an ongoing and viable enterprise with sufficient income to pay expenses and support the store owner and two employees.

12.  Defendants Graybill conspired with one another, MMPI and Emmett to represent the Lemoyne franchise as a viable entity that would make a profit and that Plaintiff would start seeing those profits within three months.  Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise.  Defendants MMPI and Emmett materially assisted Defendants Graybill to do so.  Defendants MMPI and Emmett also made material misrepresentations to induce Plaintiff to purchase the franchise and materially assisted Defendants Graybill in unloading an unprofitable franchise on Plaintiff; these misrepresentations were made by Defendant Emmett, MMPI's regional representative.

12.1.  In other words, two or more persons acted with a common purpose to defraud Plaintiff by unlawful means or for an unlawful purpose, to wit: obtaining money from Plaintiff under false pretenses.  The overt act done in pursuance of the conspiracy are set forth in Paragraph 12.  Actual legal damage has been suffered by Plaintiff as a result these overt acts as set forth more fully hereinafter.  All Defendants acted with malice.  All Defendants intended to injure Plaintiff by unloading an unviable franchise on him for the sole benefit of Defendants.  The Minuteman Defendants obtained a franchise fee and kept

3

an unviable operation in operation at the sole expense of Plaintiff. The Graybill Defendants obtained the purchase price of the franchise and caused significant losses to Plaintiff as he funneled money into a losing franchise.

13. The following misrepresentations were made by one or more of the Defendants:

a. Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise by representing that monthly operating expenses were in the range of $7,000.00 when in fact monthly operating expenses were in the range of $12,000.00. Plaintiff expressly obtained copies of the checks written for expenses by the franchise and refused to purchase the franchise because the operating expenses were too high at $12,000.00 per month. Defendant Emmett represented to Plaintiff in response that many of the checks were for personal expenditures and that the operating expenses for the franchise were only $7,000.00 per month. Defendants Graybill confirmed Emmett's misrepresentation. This was a very material factor to Plaintiff because the franchise's monthly income was only in the $5,000.00 range.

b. Defendant Emmett materially misrepresented the financial viability of the Lemoyne franchise by representing that Plaintiff need earn only $2,000.00 per month over and above what the franchise was bringing in in order to make a profit when in fact Plaintiff needed more than $7,000.00 more per month in gross sales just to break even.

c. Defendants MMPI and Emmett materially misrepresented to Plaintiff the financial viability of the Lemoyne franchise by making the same representations as set forth in Paragraphs 13a and 13b. Said Defendants conspired with Defendants Graybill to make these misrepresentations.

4

d. Defendants MMPI and Emmett materially misrepresented to Plaintiff that he would not only be able to meet expenses within a very short period of time but that he would also realize a gross profit of 30% of gross sales within that same time merely by following MMPI's marketing program, which was to make twenty new contacts per day. Plaintiff did so but was unable to make a profit on the franchise.

e. Defendants MMPI and Emmett materially misrepresented to Plaintiff that the only reason why the Lemoyne franchise was not already making a profit was because Defendant Dennis M. Graybill, now deceased, was not able due to his poor health to make enough marketing calls to generate additional sales.

14. Plaintiff was damaged by these misrepresentations in the loss of the amounts that he paid to Defendants Graybill to purchase the franchise, in the amounts that he paid Defendant MMPI for the transfer of the franchise and to attend its school for new owners, and in the loss of working capital and the amounts that had to be borrowed to operate the franchise from month to month. Consequential damages were suffered by Plaintiff in the amounts that he could not earn because he was devoting his full time to operation of the franchise instead of his former employment as well as amounts he owes to his landlord and Textron Financial Corporation from contracts that were necessitated by his purchase of the franchise. Further consequential damages stemmed from the inevitable loss of credit reputation when he was unable to repay the money he borrowed to keep the franchise operating from month to month.

**Count II**

15. On or about September 1, 2000, Plaintiff entered into a written contract with Defendant MMPI which was labeled as the Franchise Agreement. Immediately upon entering

5

the Agreement, Plaintiff was sent to New York for an explanation of what to do to make the franchise viable. He was promised in writing all needed technical assistance and advice. This assistance and advice was based on the express corporate formula that if the franchisee did what MMPI told him to do, he would meet expenses and make a profit. Plaintiff was expressly told by MMPI that all he would have to do was manage the franchise, make twenty cold calls a day, leave all work to the employees, and, by doing so, he would make significant profits. These promises were made in order to induce Plaintiff to enter into the franchise agreement and were again made in the training school in New York. These promises were made in the Franchise Agreement or were made in supplementation of the written agreement or were made in order to induce Plaintiff to enter into the written agreement. In other words, follow our program and you will realize a pretax profit of one third of your gross sales.

16. These promises were breached by MMPI. At no time was the income from the franchise sufficient to even meet expenses and within six months of purchasing the franchise, Plaintiff was forced to close his doors due to excessive expenses.

18. Damages that flow from these breaches of contract and false promises include the loss of the money that was paid to MMPI to transfer the franchise to Plaintiff and send him to training school in New York. Consequential damages include the loss of what was paid by Plaintiff to the franchise owners to purchase the franchise, the loss of operating capital, the waste of the assets of Plaintiff's franchise, and the various contractual payments needed to pay the landlord and the equipment lessor. Further direct damages resulted from the extreme mental anguish suffered by Plaintiff which were intentionally inflicted as the result of the torts alleged in this Complaint. These damages are in an amount in excess of the minimum jurisdictional limits

of the court.

### Count III

19.  Defendant MMPI would not transfer the franchise to Plaintiff without first receiving a financial application from the Plaintiff calling for a disclosure of all assets.. After reviewing Plaintiff's financial statements, MMPI caused the sale of the franchise in Lemoyne to Plaintiff and transferred the franchise to Plaintiff and caused him to expend significant amounts for training and for anticipated losses from operation of the franchise within the first three months.

20.  Having required Plaintiff to submit a financial application listing all assets of Plaintiff, Defendant MMPI at all times material to this Complaint, knew or should have known that Plaintiff had insufficient income and assets to operate the franchise for even the three months at the end of which Plaintiff was promised that he would be making profits. As the superior bargaining party, MMPI was under a duty to disclose to Plaintiff that he had insufficient income and assets with which to purchase the Lemoyne franchise.  This negligence on the part of MMPI caused Plaintiff to suffer not only monetary damages but also an entitlement to damages for extreme emotional distress in amounts in excess of the minimum jurisdictional limits of the court.

20.1 Defendants were under a duty requiring them to analyze the financial statements of Plaintiff in order to protect Plaintiff from entering into a contract that foisted off an unviable enterprise onto Plaintiff and to assure that Plaintiff has sufficient operating capital to operate the franchise for a time period long enough to increase business to levels that would sustain the franchise in operation and yield a profit for Plaintiff.  Defendants failed to do so.  Defendants breached their duty as the superior bargaining power to assure

that Plaintiff would have sufficient capital to stay in business. Indeed, the entire marketing program of Defendants is to sell franchises that will sustain themselves and yield a profit. Defendants knew or should have known that Plaintiff would be unable to operate his franchise on existing capital for a long enough time to turn the franchise into a profitable operation. Defendants actions directly resulted in the loss to Plaintiff over the period of six months that he was operating the franchise. Actual loss was suffered by Plaintiff as set forth in Counts I and II and the remaining Counts of this Complaint.

20.2.. Plaintiff has further been consequentially damaged by these defendants in an amount in excess of the minimum jurisdictional amount of the court for extreme mental anguish intentionally inflicted upon him as the result of the loss of his life savings.

### Count IV

22. Each of the torts complained about were committed with such deliberateness and willfulness and in such reckless disregard of the rights of Plaintiff so as to entitle him to punitive damages in an amount in excess of the minimum jurisdictional amounts of the court.

### Count V

22.1. Plaintiff is a small franchise owner who was enamored of Defendants' claims that he could control his own destiny and make a lot of money by operating a Minuteman Press franchise. However, he was presented with a Franchise Agreement that was a contract of adhesion and fraudulently deprived him of many rights.

22.2 Among other things, the Franchise Agreement waived Plaintiff's right to jury trial, the right to sue for punitive damages in arbitration, required expensive arbitration in Manhattan, New York, and contained onerous disclaimer provisions that nothing has been

represented other than in the Franchise Agreement while at the same time Defendants'

actual practices in marketing to small franchise purchasers are to make many and

significant representations.

22.3. The requirement in the Franchise Agreement for compulsory arbitration must

therefore be stricken from the contract. The arbitration requirement was simply part of

the parcel of fraud that Defendants perpetrated on Plaintiff. Defendants knew or should

have known at the time the Franchise Agreement was entered into that a small franchisee

such as Plaintiff would be unable to afford expensive arbitration in New York and would

therefore be unable to pursue his rights against Defendants. This arbitration provision was

therefore deliberately designed to cause Plaintiff to forego future rights under the

Franchise Agreement and defrauded him of those rights. In addition, the Franchise

Agreement is a contract of adhesion. All franchisees must sign it on a take it or leave it

basis. It is a standard form contract and not subject to negotiation. The Franchise

Agreement itself should therefore be rescinded, as well as the arbitration provision.

22.4. In addition, the arbitration provisions are onerous and not in keeping with the

rules of arbitration of the arbitrator that Defendant Minuteman itself named in the

arbitration provision. The arbitration clause requires that each party bear the costs of its

own arbitration whereas the  Center for Dispute Resolution's CPR Rules, attached hereto

as Exhibit A, require that the arbitrators take into account the financial situation of the

parties in assessing fees. Para. 16.3. In addition, the arbitration provision requires the

waiver of punitive damages in arbitration. A similar arbitration provision was stricken by

rescission by the 9th Circuit Court of Appeals. In addition, the Rules require that in the

9

event that the parties cannot agree on a single arbitrator, then a panel of three arbitrators will be appointed by the Center. Para. 5.1. This Rule unreasonably allows Defendants to drastically increase the cost of arbitration to Plaintiff threefold, merely on a decision by the Defendants that declines to agree to a single arbitrator. This is another element of the fraud perpetrated on Plaintiff in the inclusion of the arbitration provision in the Franchise Agreement since it bases costs of arbitration unreasonably on a unilateral decision of the Defendants to not agree to a single arbitrator. The selection of arbitrators itself, Para. 6.1 et seq., imposes an undue burden on Plaintiff to know the arbitrators in New York, a disadvantage not suffered by Defendants who are located in New York and represented by counsel that has a New York office. Finally, there is no time limit set for the arbitration by the Rules, thus allowing Defendants to unilaterally increase the costs of arbitration by calling many witness, as they have indicated they will do in the Joint Case Management Plan on file in this court.

22.5. For all these reasons, the arbitration clause in the Franchise Agreement should be rescinded.

22.6. In addition, the fraud perpetrated on Plaintiff by Defendants as more fully set forth in Counts I , II and II requires rescission of the entire Franchise Agreement.

22.7. The fact that the Franchise Agreement is a contract of adhesion is demonstrated by the fact that it is a standardized form contract to offer to a small consumer goods and services on a take it or leave it basis without affording Plaintiff consumer a realistic opportunity to bargain under such conditions that the Plaintiff could not obtain the desired product or service except by acquiescing to the contract. The

contract is in addition unconscionable for the reasons set forth in this Count. Plaintiff lacked any meaningful choice in accepting the contract and the challnged contract and the specified provisions therein, for the reasons stated in this Count, unreasonably favor the Defendants. These are yet additional grounds for rescission of the entire contract and the arbitration clause in particular.

## Incorporation by Reference

23. Each Count hereof is incorporated in each other Count by reference. Each Paragraph hereof is incorporated in each other Paragraph by reference.

## Count VI

32. Not used.

33. In the Disclosure Document of Minuteman Press International, Inc. which which was required by FTC rules and the New York Franchise Law, McKinney's General Business Law, Sec. 680 et seq, and is dated August, 1999, the following disclosure is made on page 12 about an FTC action against Defendant MMPI and others:

> Federal Trade Commission, Plaintiff, v. Minuteman Press International, Inc., Speedy Sign-A-Arama, USA, Inc., Roy W. Titus and Jeffrey Haber, Defendants (CV 93-2496) Filed on June 4, 1993, in the United States District Court, Eastern District of New York. On December 18, 1998, an injunction was filed prohibiting the Defendant's excluding Haber from doing the following: A. Making, or assisting in the making of, expressly or by implication, orally or in writing, to any prospective franchisee any statement of past, present or future sales, income, or gross or net profits of any existing or prospective franchisee or group of franchisees, unless at the time of making such representation the defendant possesses written material that provides a reasonable basis for the representation. B.Violating any provision of the Rule 16 C.F.R. Part 436 or the rule as it may later be amended and the disclosure requirements of the UFOC in effect at the time. C. Assessing or collecting a transfer/training fee from any franchisee who sells or assigns its franchise unless the selling franchisee received a copy of a disclosure statement

indicating that such fee would be charged. D. Failing to monitor and investigate any complaints about compliance with the rule or the injunction. E. To cooperate with the Commission in the enforcement of this injunction.

Section A of this disclosure relates to precisely the same marketing methods and misrepresentations that are set forth in Counts I through IV of the Plaintiff's Complaint, which are incorporated herein by reference. The disclosure omits material facts and is affirmatively misleading.

34.  Defendant MMPI's misrepresentations, omissions, false statements, actions and inactions  violate state blue sky laws, federal FTC rules, federal securities laws, the criminal law of the Commonwealth of Pennsylvania, and federal criminal law.  Not only has MMPI violated civil law but also criminal law in the manner in which it falsely induced Plaintiff to purchase the existing Minuteman franchise in Lemoyne.  Defendants have also violated the New York Franchise Law, McKinney's General Business Law, Sec. 687, by committing the same fraudulent and deceptive practices as itemized in this Complaint and this Count.  In particular,   Defendants, in connection with the offer and sale and purchase of a franchise, directly or indirectly:

a.  Employed the cited devices, schemes, or artificies to defraud Plaintiff;

b.  Made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and,

c.  Engaged in acts, practices and course of business as set forth in this Complaint and in this Count which operated as a fraud or deceit on Plaintiff.

35.  Defendant Emmett materially assisted MMPI to do or fail to do those actions set

12

forth in Paragraph 34.

36. Defendants Graybill may or may not have assisted MMPI and Emmett to do or fail to do those actions set forth in Paragraph 34. Defendants Graybill materially assisted Defendants MMPI and Emmett to market by unlawful methods as set forth in Counts I through IV of the Plaintiff's Complaint and has therefore assisted the latter Defendants to violate state blue sky laws, federal FTC rules, and federal securities laws and state and federal criminal laws..

37. In particular, the following written misrepresentations or omissions to state material facts needed to make the misrepresentation true have been made or not made with respect to the Disclosure Statement disclosure of then existing litigation as set forth in Paragraph 33:

a. MMPI and Emmett failed to disclose that the FTC was complaining about the precise marketing methods that MMPI and Emmett used in the marketing of existing franchises to particular franchisees, all as more fully set forth in Counts I through IV, which are incorporated herein by reference.

b. MMPI failed to disclose the full nature and extent of the relief sought by the FTC by omitting all those disclosures set forth in Paragraph 34, in particular the fact that the FTC was attempting to prohibit it from marketing any existing franchise in the manner in which the Lemoyne franchise was marketed to Plaintiff as more fully set forth in Counts I through IV, which are incorporated herein by reference.

c. Defendants Graybill, MMPI and Emmett failed to disclose to Plaintiff material financial information as required by the FTC request for injunctive relief when Emmettt falsely told Plaintiff that the Graybill expenses to operate the franchise were about $7,000.00 per month

13

and made the other misrepresentations set forth in Counts I through V.

d. MMPI failed to disclose to Plaintiff that the FTC was alleging that MMPI and others were liable for false and misleading claims about earnings, gross sales and profitability levels. Emmett and unnamed co-conspirators in the home office of MMPI were making those same false and misleading claims to Plaintiff.  Defendants Graybill were materially assisting Emmett to do so.

e.  MMPI failed to disclose that the litigation involved FTC claims that it and its officers violated federal consumer protection and franchise disclosure laws

f.  MMPI failed to disclose that the FTC was complaining about sales pitches made by MMPI to prospective franchisees about gross earnings and profits they could expect to see by buying and operating MMPI's quick print and sign shops.

g.  MMPI failed to disclose that the FTC was seeking hefty monetary damages to those prospective franchisees who suffered monetary damage from the violation of the federal consumer protection and franchise disclosure laws.

h.  MMPI failed to disclose that the FTC accused MMPI and its sales force of an unlawful pattern of providing false and unsubstantiated information about earnings to people interested in buying one of MMPI's franchises.

i.  MMPI failed to disclose that the FTC was attacking its written disclaimer statement that no earnings claims were made or authorized by MMPI as being unenforceable in the FTC action.

j.  MMPI failed to disclose that the contradiction between its written disclaimers and a franchisor's actual practices was a violation of the FTC Act.  The actual practices in this case

14

were committed by Defendants Graybill, MMPI and Emmett.and certain unnamed co-conspirators in MMPI's home office.

k. MMPI failed to disclose that the FTC was complaining about the common-sense net impression from its actions in marketing its franchises that the purchaser was being furnished important specific earnings claims information to assist in the decision making process, notwithstanding the general disclaimers about earnings..

38. Defendants are therefore estopped from relying on their disclaimer clauses in their contracts with Plaintiff as a defense made to the claims of Plaintiff by collateral estoppel and their own misrepresentations made as part of a common scheme to defraud purchasers of MMPI franchises that the purchaser was being furnished important specific earnings claims information to assist in his decision making process and then forcing the purchaser to sign a bald faced lie that the precise information had not been provided. Plaintiff. The conspiracy between Defendants Graybill, Emmett and MPI was so specific that all Defendants are liable for all misrepresentations and the actions and inactions of one another, the same as if they had performed the misrepresentations, actions and inactions as an individual.

### Count VII

39. This Count sounds in equity.

40. Plaintiff was presented with a written Franchise Agreement which affirmatively requires him to seek non-binding arbitration of his claims against MMPI. This clause is a contract of adhesion, since Plaintiff simply had no bargaining power when he entered into the Agreement. The contract was dictated by MMPI on a take it or leave it basis; no input from Plaintiff was permitted; this clause is required of all who wish to purchase a franchise from

15

MMPI.  In addition, under all the circumstances of this case, it would be inequitable to enforce

this provision of the contract because this clause was designed by MMPI to further its unlawful

schemes and activities as set forth in the other Counts of this action

41.  Plaintiff aks the court for a declaratory judgment canceling that clause of the contract

and for rescission of the contract.

Wherefore, Plaintiff prays that after trial hereof, he be awarded actual and

consequential damages and punitive damages, each in an amount in excess of the minimum

jurisdictional amounts of this court, against each Defendant jointly and severally, and for

such other relief at law or in equity to which Plaintiff is justly entitled, including a

declaratory judgment rescinding the contract and the arbitration clause in it and the

waiver of punitive damages before an arbitration panel.

Respectfully Submitted,

Robert J. White
PBN 32487
PO Box 3005
York, PA 17402
(717) 699-4534

Counsel for Plaintiff

### Certificate of Service

The undersigned certifies that he has mailed a copy of this **Second** Amended Complaint
with Action for Declaratory Judgment to each Defendant on **Nov 15**, 2001 by first class mail,
postage prepaid, to Harris J. Chernow, counsel for the Minuteman Defendants, at Buchanan
Ingersoll, Eleven Penn Center, 14th Floor, 1835 Market Street, Philadelphia, PA 19103 and to
Charles Rees Brown, counsel for the Graybill Defendants, at Nicholas & Foreman, 4409 N. Front

16

Street, Harrisburg, PA 17110.

_Robert White_
Robert J. White



**AIMAC** — *American International Mediation Arbitration and Conciliation*

Center for Alternative Dispute Resolution



# CPR RULES FOR NON-ADMINISTERED ARBITRATION

Revision History
CPR Advisory Committee
Introduction
Standard Contractual Provisions
**CPR Institute for Dispute Resolution Rules for Non-Administered Arbitration**
Commentary
Selected Bibliography

## CPR INSTITUTE FOR DISPUTE RESOLUTION
## RULES FOR NON-ADMINISTERED ARBITRATION
### (Revised and Effective September 15, 2000)

A. GENERAL AND INTRODUCTORY RULES
Rule 1: Scope Of Application
Rule 2: Notices
Rule 3: Commencement Of Arbitration
Rule 4: Representation

B. RULES WITH RESPECT TO THE TRIBUNAL
Rule 5: Selection Of Arbitrators By The Parties
Rule 6: Selection Of Arbitrator(s) By CPR
Rule 7: Qualifications, Challenges And Replacement Of Arbitrator(s)
Rule 8: Challenges To The Jurisdiction Of The Tribunal

C. RULES WITH RESPECT TO THE CONDUCT OF THE ARBITRAL PROCEEDINGS
Rule 9: General Provisions
Rule 10: Applicable Laws And Remedies
Rule 11: Discovery
Rule 12: Evidence And Hearings
Rule 13: Interim Measures Of Protection
Rule 14: The Award

D. MISCELLANEOUS RULES
Rule 15: Failure To Comply With Rules
Rule 16: Costs

## A. <u>GENERAL AND INTRODUCTORY RULES</u>

**Rule 1: Scope Of Application**
1.1 Where the parties to a contract have provided for arbitration under the CPR Institute for Dispute Resolution ("CPR") Rules for Non-Administered Arbitration (the "Rules"), or have provided for arbitration by the Center for Dispute Resolution, without further specification, they shall be deemed to have made these Rules a part of their arbitration agreement, except to the extent that they have agreed in writing, or on the record during the course of the arbitral proceeding, to modify these Rules. Unless the parties otherwise agree, these Rules, and any amendment thereof adopted by CPR, shall apply in the form in effect at the time the arbitration is commenced.

1.2 These Rules shall govern the arbitration except that where any of these Rules is in conflict with a mandatory provision of applicable arbitration law, that provision of law shall prevail.

**Rule 2: Notices**
2.1 Notices or other communications required under these Rules shall be in writing and delivered to the address specified in writing by the recipient or, if no address has been specified, to the last known business or residence address of the recipient. Notices and communications may be given by registered mail, courier, telex, facsimile transmission, or any other means of telecommunication that provides a record thereof. Notices and communications shall be deemed to be effective as of the date of receipt. Proof of transmission shall be deemed *prima facie* proof of receipt of any notice or communication given under these Rules.

2.2 Time periods specified by these Rules or established by the Arbitral Tribunal (the "Tribunal") shall start to run on the day following the day when a notice or communication is received, unless the Tribunal shall specifically provide otherwise. If the last day of such period is an official holiday or a non-business day at the place where the notice or communication is received, the period is extended until the first business day which follows. Official holidays and non-business days occurring during the running of the period of time are included in calculating the period.

**Rule 3: Commencement Of Arbitration**

3.1 The party commencing arbitration (the "Claimant") shall address to the other party (the "Respondent") a demand for arbitration.

3.2 The arbitration shall be deemed commenced as to any Respondent on the date on which the demand for arbitration is received by the Respondent.

3.3 The demand for arbitration shall include in the text or in attachments thereto:

   a. The full names, descriptions and addresses of the parties;

   b. A demand that the dispute be referred to arbitration pursuant to the Rules;

   c. The text of the arbitration clause or the separate arbitration agreement that is involved;

   d. A statement of the general nature of the Claimant's claim; and

   e. The relief or remedy sought.

3.4 Within 20 days after receipt of the demand for arbitration, the Respondent shall deliver to the Claimant a notice of defense. Failure to deliver a notice of defense shall not delay the arbitration; in the event of such failure, all claims set forth in the demand shall be deemed denied.

3.5 The notice of defense shall include:

   a. Any comment on items (a), (b), and (c) of the notice of arbitration that the Respondent may deem appropriate; and

   b. A statement of the general nature of the Respondent's defense.

3.6 The Respondent may include in its notice of defense any counterclaim within the scope of the arbitration clause. If it does so, the counterclaim in the notice of defense shall include items (a), (b), (c), (d) and (e) of Rule 3.3.

3.7 If a counterclaim is asserted, within 20 days after receipt of the notice of defense, the Claimant shall deliver to the Respondent a reply to counterclaim which shall have the same elements as provided in Rule 3.5 for the notice of defense. Failure to deliver a reply to counterclaim shall not delay the arbitration; in the event of such failure, all counterclaims set forth in the notice of defense shall be deemed denied.

3.8 Claims or counterclaims within the scope of the arbitration clause may be freely added or amended prior to the establishment of the Tribunal and thereafter

with the consent of the Tribunal. Notices of defense or replies to amended claims or counterclaims shall be delivered within 20 days after the addition or amendment.

3.9 If a dispute is submitted to arbitration pursuant to a submission agreement, this Rule 3 shall apply to the extent that it is not inconsistent with the submission agreement.

**Rule 4: Representation**
4.1 The parties may be represented or assisted by persons of their choice.

4.2 Each party shall communicate the name, address and function of such persons in writing to the other party and to the Tribunal.

## B. RULES WITH RESPECT TO THE TRIBUNAL

**Rule 5: Selection Of Arbitrators By The Parties**
5.1 If the parties cannot agree in writing on a Tribunal consisting of a sole arbitrator or of three arbitrators not appointed by parties or appointed as provided in Rule 5.4, the Tribunal shall consist of two arbitrators, one appointed by each of the parties and a third arbitrator who shall chair the Tribunal, selected as provided in Rule 5.2.

5.2 Within 30 days of the appointment of the second arbitrator, the two party-appointed arbitrators shall appoint a third arbitrator, who shall chair the Tribunal. In the event the party-appointed arbitrators are unable to agree on the third arbitrator, the third arbitrator shall be selected as provided in Rule 6.

5.3 If the parties have agreed on a Tribunal consisting of a sole arbitrator or of three arbitrators none of whom shall be appointed by either party, the parties shall attempt jointly to select such arbitrator(s) within 30 days after the notice of defense provided for in Rule 3.4 is due. The parties may extend their selection process until one or both of them have concluded that a deadlock has been reached. In this event, the arbitrator(s) shall be selected as provided in Rule 6.

5.4 If the parties have agreed on a Tribunal consisting of three arbitrators, two of whom are to be designated by the parties without knowing which party designated each of them, as provided in this Rule 5.4, either party, following the expiration of the time period for the notice of defense, may request CPR in writing, with a copy to the other party, to conduct a "screened" selection of party-designated arbitrators as follows:

   a. CPR will provide each party with a copy of its CPR Panels list. Within 15 days thereafter, each party shall designate three

candidates, in order of preference, from the CPR Panels as candidates for its party-designated arbitrator, and so notify CPR and the other party in writing.

b. CPR will ask the first candidate so designated by each party to confirm his or her availability to serve as arbitrator and to disclose in writing any circumstances that might give rise to justifiable doubt regarding the candidate's independence or impartiality, as provided in Rule 7. CPR will circulate to the parties each candidate's completed disclosure form. A party may object to the appointment of any candidate on independent and impartial grounds by written and reasoned notice to CPR, with copy to the other party, within 10 days after receipt of that candidate's disclosure form. CPR shall decide the objection after providing the non-objecting party with an opportunity to comment on the objection. If there is no objection to the candidate, or if the objection is overruled by CPR, CPR shall appoint the candidate as arbitrator, and any subsequent challenges of that arbitrator, based on circumstances subsequently learned, shall be made and decided in accordance with the procedures set forth in Rules 7.6 - 7.8.

c. If the first candidate designated by a party is unavailable, or if his or her independence or impartiality is successfully challenged, CPR will repeat the process provided in Rule 5.4(b) as to the subsequent candidates designated by that party, in order of the party's indicated preference. A party may designate additional candidates if the three candidates designated by that party are unavailable or do not meet the requirements of Rule 7.

d. Neither CPR nor the parties shall advise or otherwise provide any information or indication to any arbitrator candidate or arbitrator as to which party selected either of the party-designated arbitrators. No party or anyone acting on its behalf shall have any *ex parte* communications relating to the case with any arbitrator or arbitrator candidate designated or appointed pursuant to this Rule 5.4.

e. The chair of the Tribunal will be appointed by CPR in accordance with the procedure set forth in Rule 6.4, which shall proceed concurrently with the procedure for appointing the party-designated arbitrators provided in subsections (a) - (d) above.

f. The compensation of all members of the Tribunal appointed pursuant to Rule 5.4 shall be administered by the chair of the Tribunal in accordance with Rule 16.

5.5 Where the arbitration agreement entitles each party to appoint an arbitrator but there is more than one Claimant or Respondent to the dispute, and either the multiple Claimants or the multiple Respondents do not jointly appoint an arbitrator, CPR shall appoint all of the arbitrators as provided in Rule 6.4.

**Rule 6: Selection Of Arbitrator(s) By CPR**
6.1 Whenever (i) a party has failed to appoint the arbitrator to be appointed by it; (ii) the parties have failed to appoint the arbitrator(s) to be appointed by them acting jointly; (iii) the party-appointed arbitrators have failed to appoint the third arbitrator; (iv) the parties have provided that one or more arbitrators shall be appointed by CPR; or (v) the multi-party nature of the dispute calls for CPR to appoint all members of a three-member Tribunal pursuant to Rule 5.5, the arbitrator(s) required to complete the Tribunal shall be selected as provided in this Rule 6, and either party may request CPR in writing, with copy to the other party, to proceed pursuant to this Rule 6.

6.2 The written request may be made as follows:

> a. If the parties are unable to agree upon the appointment of a sole arbitrator, or the parties have failed to appoint the arbitrator(s) to be appointed by them through agreement, at any time after such failure has occurred.

> b. If the party-appointed arbitrators have failed to appoint the third arbitrator, as soon as the procedure contemplated by Rule 5.2 has been completed.

> c. If the arbitrator(s) are to be appointed by CPR, as soon as the notice of defense is due.

6.3 The written request shall include complete copies of the demand for arbitration and the notice of defense or, if the dispute is submitted under a submission agreement, a copy of the agreement supplemented by the demand for arbitration and notice of defense if they are not part of the agreement.

6.4 Except where a party has failed to appoint the arbitrator to be appointed by it, CPR shall proceed as follows:

> a. Promptly following receipt by it of the request provided for in Rule 6.3, CPR shall convene the parties in person or by telephone to attempt to select the arbitrator(s) by agreement of the parties.

> b. If the procedure provided for in (a) does not result in the selection of the required number of arbitrators, CPR shall submit to

the parties a list, from the CPR Panels, of not less than five candidates if one arbitrator remains to be selected, and of not less than seven candidates if two or three arbitrators are to be selected. Such list shall include a brief statement of each candidate's qualifications. Each party shall number the candidates in order of preference, shall note any objection it may have to any candidate, and shall deliver the list so marked to CPR and to the other party. Any party failing without good cause to return the candidate list so marked within 10 days after receipt shall be deemed to have assented to all candidates listed thereon. CPR shall designate as arbitrator(s) the nominee(s) willing to serve for whom the parties collectively have indicated the highest preference and who appear to meet the standards set forth in Rule 7. If a tie should result between two candidates, CPR may designate either candidate. If this procedure for any reason should fail to result in designation of the required number of arbitrators or if a party fails to participate in this procedure, CPR shall appoint a person or persons whom it deems qualified to fill any remaining vacancy.

6.5 Where a party has failed to appoint the arbitrator to be appointed by it, CPR shall appoint a person whom it deems qualified to serve as such arbitrator.

**Rule 7: Qualifications, Challenges And Replacement Of Arbitrator(s)**
7.1 Each arbitrator shall be independent and impartial.

7.2 By accepting appointment, each arbitrator shall be deemed to be bound by these Rules and any modification agreed to by the parties, and to have represented that he or she has the time available to devote to the expeditious process contemplated by these Rules.

7.3 Each arbitrator shall disclose in writing to the Tribunal and the parties at the time of his or her appointment and promptly upon their arising during the course of the arbitration any circumstances that might give rise to justifiable doubt regarding the arbitrator's independence or impartiality. Such circumstances include bias, interest in the result of the arbitration, and past or present relations with a party or its counsel.

7.4 No party or anyone acting on its behalf shall have any *ex parte* communications concerning any matter of substance relating to the proceeding with any arbitrator or arbitrator candidate, except that a party may advise a candidate for appointment as its party-appointed arbitrator of the general nature of the case and discuss the candidate's qualifications, availability, and independence and impartiality with respect to the parties, and a party may confer with its party-appointed arbitrator regarding the selection of the chair of the

Tribunal. As provided in Rule 5.4(d), no party or anyone acting on its behalf shall have any *ex parte* communications relating to the case with any arbitrator or arbitrator candidate designated or appointed pursuant to Rule 5.4.

7.5 Any arbitrator may be challenged if circumstances exist or arise that give rise to justifiable doubt regarding that arbitrator's independence or impartiality, provided that a party may challenge an arbitrator whom it has appointed only for reasons of which it becomes aware after the appointment has been made.

7.6 A party may challenge an arbitrator only by a notice in writing to CPR, with copy to the Tribunal and the other party, given no later than 15 days after the challenging party (i) receives notification of the appointment of that arbitrator, or (ii) becomes aware of the circumstances specified in Rule 7.5, whichever shall last occur. The notice shall state the reasons for the challenge with specificity. The notice shall not be sent to the Tribunal when the challenged arbitrator is a party-designated arbitrator selected as provided in Rule 5.4; in that event, CPR may provide each member of the Tribunal with an opportunity to comment on the substance of the challenge without disclosing the identity of the challenger.

7.7 When an arbitrator has been challenged by a party, the other party may agree to the challenge or the arbitrator may voluntarily withdraw. Neither of these actions implies acceptance of the validity of the challenge.

7.8 If neither agreed disqualification nor voluntary withdrawal occurs, the challenge shall be decided by CPR, after providing the non-challenging party and each member of the Tribunal with an opportunity to comment on the challenge.

7.9 In the event of death, resignation or successful challenge of an arbitrator not appointed by a party, a substitute arbitrator shall be selected pursuant to the procedure by which the arbitrator being replaced was selected. In the event of the death, resignation or successful challenge of an arbitrator appointed by a party, that party may appoint a substitute arbitrator; provided, however, that should that party fail to notify the Tribunal (or CPR, if the Tribunal has been constituted as provided in Rule 5.4) and the other party of the substitute appointment within 20 days from the date on which it becomes aware that the opening arose, that party's right of appointment shall lapse and the Tribunal shall promptly request CPR to appoint a substitute arbitrator forthwith.

7.10 In the event that an arbitrator fails to act or is *de jure* or *de facto* prevented from duly performing the functions of an arbitrator, the procedures provided in Rule 7.9 shall apply to the selection of a replacement. If the parties do not agree

on whether the arbitrator has failed to act or is prevented from performing the functions of an arbitrator, either party may request CPR to make that determination forthwith.

7.11 If the sole arbitrator or the chair of the Tribunal is replaced, the successor shall decide the extent to which any hearings held previously shall be repeated. If any other arbitrator is replaced, the Tribunal in its discretion may require that some or all prior hearings be repeated.

### Rule 8: Challenges To The Jurisdiction Of The Tribunal

8.1 The Tribunal shall have the power to hear and determine challenges to its jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

8.2 The Tribunal shall have the power to determine the existence, validity or scope of the contract of which an arbitration clause forms a part. For the purposes of challenges to the jurisdiction of the Tribunal, the arbitration clause shall be considered as separable from any contract of which it forms a part.

8.3 Any challenges to the jurisdiction of the Tribunal, except challenges based on the award itself, shall be made not later than the notice of defense or, with respect to a counterclaim, the reply to the counterclaim; provided, however, that if a claim or counterclaim is later added or amended such a challenge may be made not later than the response to such claim or counterclaim.


### C. RULES WITH RESPECT TO THE CONDUCT OF THE ARBITRAL PROCEEDINGS

### Rule 9: General Provisions

9.1 Subject to these Rules, the Tribunal may conduct the arbitration in such manner as it shall deem appropriate. The chair shall be responsible for the organization of arbitral conferences and hearings and arrangements with respect to the functioning of the Tribunal.

9.2 The proceedings shall be conducted in an expeditious manner. The Tribunal is empowered to impose time limits it considers reasonable on each phase of the proceeding, including without limitation the time allotted to each party for presentation of its case and for rebuttal. In setting time limits, the Tribunal should bear in mind its obligation to manage the proceeding firmly in order to complete proceedings as economically and expeditiously as possible.

9.3 The Tribunal shall hold an initial pre-hearing conference for the planning and scheduling of the proceeding. Such conference shall be held promptly after the constitution of the Tribunal, unless the Tribunal is of the view that further

submissions from the parties are appropriate prior to such conference. The objective of this conference shall be to discuss all elements of the arbitration with a view to planning for its future conduct. Matters to be considered in the initial pre-hearing conference may include, *inter alia*, the following:

> a. Procedural matters (such as setting specific time limits for, and manner of, any required discovery; the desirability of bifurcation or other separation of the issues in the arbitration; the desirability and practicability of consolidating the arbitration with any other proceeding; the scheduling of conferences and hearings; the scheduling of pre-hearing memoranda; the need for and type of record of conferences and hearings, including the need for transcripts; the amount of time allotted to each party for presentation of its case and for rebuttal; the mode, manner and order for presenting proof; the need for expert witnesses and how expert testimony should be presented; and the necessity for any on-site inspection by the Tribunal);

> b. The early identification and narrowing of the issues in the arbitration;

> c. The possibility of stipulations of fact and admissions by the parties solely for purposes of the arbitration, as well as simplification of document authentication;

> d. The possibility of appointment of a neutral expert by the Tribunal; and

> e. The possibility of the parties engaging in settlement negotiations, with or without the assistance of a mediator.

After the initial conference, further pre-hearing or other conferences may be held as the Tribunal deems appropriate.

9.4 In order to define the issues to be heard and determined, the Tribunal may, *inter alia*, make pre-hearing orders and instruct the parties to file more detailed statements of claim and of defense, and pre-hearing memoranda.

9.5 Unless the parties have agreed upon the place of arbitration, the Tribunal shall fix the place of arbitration based upon the contentions of the parties and the circumstances of the arbitration. The award shall be deemed made at such place. The Tribunal may schedule meetings and hold hearings wherever it deems appropriate.

## Rule 10: Applicable Law(s) And Remedies

10.1 The Tribunal shall apply the substantive law(s) or rules of law designated by the parties as applicable to the dispute. Failing such a designation by the parties, the Tribunal shall apply such law(s) or rules of law as it determines to be appropriate.

10.2 Subject to Rule 10.1, in arbitrations involving the application of contracts, the Tribunal shall decide in accordance with the terms of the contract and shall take into account usages of the trade applicable to the contract.

10.3 The Tribunal may grant any remedy or relief, including but not limited to specific performance of a contract, which is within the scope of the agreement of the parties and permissible under the law(s) or rules of law applicable to the dispute.

10.4 The Tribunal may award such pre-award and post-award interest, simple or compound, as it considers appropriate, taking into consideration the contract and applicable law.

## Rule 11: Discovery

The Tribunal may require and facilitate such discovery as it shall determine is appropriate in the circumstances, taking into account the needs of the parties and the desirability of making discovery expeditious and cost-effective. The Tribunal may issue orders to protect the confidentiality of proprietary information, trade secrets and other sensitive information disclosed in discovery.

## Rule 12: Evidence And Hearings

12.1 The Tribunal shall determine the manner in which the parties shall present their cases. Unless otherwise determined by the Tribunal or agreed by the parties, the presentation of a party's case shall include the submission of a pre-hearing memorandum including the following elements:

    a. A statement of facts;

    b. A statement of each claim being asserted;

    c. A statement of the applicable law and authorities upon which the party relies;

    d. A statement of the relief requested, including the basis for any damages claimed; and

    e. A statement of the nature and manner of presentation of the evidence, including the name, capacity and subject of testimony of

any witnesses to be called and an estimate of the amount of time required for each witness's direct testimony.

12.2 If either party so requests or the Tribunal so directs, a hearing shall be held for the presentation of evidence and oral argument. Testimony may be presented in written and/or oral form as the Tribunal may determine is appropriate. The Tribunal is not required to apply the rules of evidence used in judicial proceedings, provided, however, that the Tribunal shall apply the lawyer-client privilege and the work product immunity. The Tribunal shall determine the applicability of any privilege or immunity and the admissibility, relevance, materiality and weight of the evidence offered.

12.3 The Tribunal, in its discretion, may require the parties to produce evidence in addition to that initially offered. It may also appoint neutral experts whose testimony shall be subject to cross-examination and rebuttal.

12.4 The Tribunal shall determine the manner in which witnesses are to be examined. The Tribunal shall have the right to exclude witnesses from hearings during the testimony of other witnesses.

### Rule 13: Interim Measures Of Protection

13.1 At the request of a party, the Tribunal may take such interim measures as it deems necessary, including measures for the preservation of assets, the conservation of goods or the sale of perishable goods. The Tribunal may require appropriate security as a condition of ordering such measures.

13.2 A request for interim measures by a party to a court shall not be deemed incompatible with the agreement to arbitrate or as a waiver of that agreement.

### Rule 14: The Award

14.1 The Tribunal may make final, interim, interlocutory and partial awards. With respect to any interim, interlocutory or partial award, the Tribunal may state in its award whether or not it views the award as final for purposes of any judicial proceedings in connection therewith.

14.2 All awards shall be in writing and shall state the reasoning on which the award rests unless the parties agree otherwise. The award shall be deemed to be made at the seat of arbitration and shall contain the date on which the award was made. When there are three arbitrators, the award shall be made and signed by at least a majority of the arbitrators.

14.3 A member of the Tribunal who does not join in an award may file a dissenting opinion. Such opinion shall not constitute part of the award.

14.4 Executed copies of awards and of any dissenting opinion shall be delivered by the Tribunal to the parties.

14.5 Within 15 days after receipt of the award, either party, with notice to the other party, may request the Tribunal to interpret the award; to correct any clerical, typographical or computation errors, or any errors of a similar nature in the award; or to make an additional award as to claims or counterclaims presented in the arbitration but not determined in the award. The Tribunal shall make any interpretation, correction or additional award requested by either party that it deems justified within 30 days after receipt of such request. Within 15 days after delivery of the award to the parties or, if a party requests an interpretation, correction or additional award, within 30 days after receipt of such request, the Tribunal may make such corrections and additional awards on its own initiative as it deems appropriate. All interpretations, corrections, and additional awards shall be in writing, and the provisions of this Rule 14 shall apply to them.

14.6 The award shall be final and binding on the parties, and the parties will undertake to carry out the award without delay. If an interpretation, correction or additional award is requested by a party, or a correction or additional award is made by the Tribunal on its own initiative as provided in Rule 14.5, the award shall be final and binding on the parties when such interpretation, correction or additional award is made by the Tribunal or upon the expiration of the time periods provided in Rule 14.5 for such interpretation, correction or additional award to be made, whichever is earlier.

14.7 The dispute should in most circumstances be submitted to the Tribunal for decision within six months after the initial pre-hearing conference required by Rule 9.3. The final award should in most circumstances be rendered within one month thereafter. The parties and the Tribunal shall use their best efforts to comply with this schedule.


## D. MISCELLANEOUS RULES

### Rule 15: Failure To Comply With Rules

Whenever a party fails to comply with these Rules, or any order of the Tribunal pursuant to these Rules, in a manner deemed material by the Tribunal, the Tribunal shall fix a reasonable period of time for compliance and, if the party does not comply within said period, the Tribunal may impose a remedy it deems just, including an award on default. Prior to entering an award on default, the Tribunal shall require the non-defaulting party to produce evidence and legal argument in support of its contentions as the Tribunal may deem appropriate. The Tribunal may receive such evidence and argument without the defaulting party's presence or participation.

## Rule 16: Costs

16.1 Each arbitrator shall be compensated on a reasonable basis determined at the time of appointment for serving as an arbitrator and shall be reimbursed for any reasonable travel and other expenses.

16.2 The Tribunal shall fix the costs of arbitration in its award. The costs of arbitration include:

     a. The fees and expenses of members of the Tribunal;

     b. The costs of expert advice and other assistance engaged by the Tribunal;

     c. The travel and other expenses of witnesses to such extent as the Tribunal may deem appropriate;

     d. The costs for legal representation and assistance and experts incurred by a party to such extent as the Tribunal may deem appropriate;

     e. The charges and expenses of CPR with respect to the arbitration;

     f. The costs of a transcript; and

     g. The costs of meeting and hearing facilities.

16.3 Subject to any agreement between the parties to the contrary, the Tribunal may apportion the costs of arbitration between or among the parties in such manner as it deems reasonable, taking into account the circumstances of the case, the conduct of the parties during the proceeding, and the result of the arbitration.

16.4 The Tribunal may request each party to deposit an appropriate amount as an advance for the costs referred to in Rule 16.2, except those specified in subparagraph (d), and, during the course of the proceeding, it may request supplementary deposits from the parties. Any such funds shall be held and disbursed in such a manner as the Tribunal may deem appropriate.

16.5 If the requested deposits are not paid in full within 20 days after receipt of the request, the Tribunal shall so inform the parties in order that jointly or severally they may make the requested payment. If such payment is not made, the Tribunal may suspend or terminate the proceeding.

16.6 After the proceeding has been concluded, the Tribunal shall return any unexpended balance from deposits made to the parties as may be appropriate.

## Rule 17: Confidentiality

Unless the parties agree otherwise, the parties, the arbitrators and CPR shall treat the proceedings, any related discovery and the decisions of the Tribunal, as confidential, except in connection with judicial proceedings ancillary to the arbitration, such as a judicial challenge to, or enforcement of, an award, and unless otherwise required by law or to protect a legal right of a party. To the extent possible, any specific issues of confidentiality should be raised with and resolved by the Tribunal.

## Rule 18: Settlement And Mediation

18.1 Either party may propose settlement negotiations to the other party at any time. The Tribunal may suggest that the parties explore settlement at such times as the Tribunal may deem appropriate.

18.2 With the consent of the parties, the Tribunal at any stage of the proceeding may arrange for mediation of the claims asserted in the arbitration by a mediator acceptable to the parties. The mediator shall be a person other than a member of the Tribunal. Unless the parties agree otherwise, any such mediation shall be conducted under the CPR Mediation Procedure.

18.3 The Tribunal will not be informed of any settlement offers or other statements made during settlement negotiations or a mediation between the parties, unless both parties consent.

## Rule 19: Actions Against CPR Or Arbitrator(s)

Neither CPR nor any arbitrator shall be liable to any party for any act or omission in connection with any arbitration conducted under these Rules.

## Rule 20: Waiver

A party knowing of a failure to comply with any provision of these Rules, or any requirement of the arbitration agreement or any direction of the Tribunal, and neglecting to state its objections promptly, waives any objection thereto.

**In the United States District Court for the Middle District of Pennsylvania**
**Civil Division**

| | |
|---|---|
| Michael Shaffer, | } No. 01-CV-1065 |
|        Plaintiff, | } |
| | } |
|    v. | } |
| | } |
| Susan Graybill as an individual | } Judge Rambo |
| and as Administratrix of the | } |
| Estate of Dennis M. Graybill, | } |
| Minuteman Press International, | } |
| Inc., and Robert Emmett | } |
|      Defendants. | } Jury Trial Demanded |

**Proposed Second Amended Complaint in Law with Action for Declaratory Judgment**

Comes now Plaintiff and complains of each Defendant as follows.

**Parties, Jurisdiction and Venue**

1.  Plaintiff is Michael Shaffer who resides at 88 Bentz Mill Road, East Berlin, PA 17316.

2.  Defendant Susan Graybill is an individual who operated a Minuteman Press franchise in Lemoyne, PA, and may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

3.  Defendant Susan Graybill as Administratrix of the Estate of Dennis M. Graybill, deceased, may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

4.  Defendant Minuteman Press International, Inc. (hereafter MMPI) is a New York corporation with its home office in Farmingdale, New York.  It may be served by certified mail addressed to its registered agent, Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735.

5. Defendant Robert Emmett is an individual and representative of MMPI and maintains an office in Wayne, PA. He may be served in person at 489 Devon Park Drive, Suite 307, Wayne, PA 19087.

6. The court has jurisdiction over these proceedings because the Minuteman Press franchise sold to Plaintiff by Defendants Graybill is located in Cumberland County and the amount in controversy exceeds the minimum jurisdictional amounts of the court.

7. The court has venue over these proceedings because all or part of the cause of action arose in Cumberland County and Defendants Graybill maintained a place of business in Lemoyne, Cumberland County, PA, and reside in Cumberland County, PA.

### Facts Common to All Counts

8. On or about August, 2000, Defendants Graybill were operating a Minuteman Press franchise in Lemoyne under contract with Defendant MMPI. Defendants Graybill were desirous of selling the franchise to Plaintiff and did so on September 6, 2000. Plaintiff entered into various contracts with Defendants Graybill, Defendant MMPI in pursuance of the purchase of the franchise.

### Count I

9. This count sounds in tort.

10. Throughout the relevant time frame alleged in Paragraph 9, all Defendants entered into a conspiracy with one another to unload a failing business on Plaintiff by agreeing to materially defraud Plaintiff by falsely inducing him to enter into a contract to purchase and to purchase the Minuteman Press franchise located in Lemoyne, PA. Defendant Emmett was the

2

regional representative of Defendant MMPI and had authority speak for and to bind the corporation.

11.  Defendants Graybill were the owners of the franchise.  Defendants Graybill made material misrepresentations as to the financial viability of the franchise and these were made to falsely induce Plaintiff to purchase the Minuteman Press franchise of Lemoyne as an ongoing and viable enterprise with sufficient income to pay expenses and support the store owner and two employees.

12.  Defendants Graybill conspired with one another, MMPI and Emmett to represent the Lemoyne franchise as a viable entity that would make a profit and that Plaintiff would start seeing those profits within three months.  Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise.  Defendants MMPI and Emmett materially assisted Defendants Graybill to do so.  Defendants MMPI and Emmett also made material misrepresentations to induce Plaintiff to purchase the franchise and materially assisted Defendants Graybill in unloading an unprofitable franchise on Plaintiff; these misrepresentations were made by Defendant Emmett, MMPI's regional representative.

**12.1.  In other words, two or more persons acted with a common purpose to defraud Plaintiff by unlawful means or for an unlawful purpose, to wit: obtaining money from Plaintiff under false pretenses.  The overt act done in pursuance of the conspiracy are set forth in Paragraph 12.  Actual legal damage has been suffered by Plaintiff as a result these overt acts as set forth more fully hereinafter.  All Defendants acted with malice.  All Defendants intended to injure Plaintiff by unloading an unviable franchise on him for the sole benefit of Defendants.  The Minuteman Defendants obtained a franchise fee and kept**

3

**an unviable operation in operation at the sole expense of Plaintiff. The Graybill Defendants obtained the purchase price of the franchise and caused significant losses to Plaintiff as he funneled money into a losing franchise.**

13. The following misrepresentations were made by one or more of the Defendants:

a. Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise by representing that monthly operating expenses were in the range of $7,000.00 when in fact monthly operating expenses were in the range of $12,000.00. Plaintiff expressly obtained copies of the checks written for expenses by the franchise and refused to purchase the franchise because the operating expenses were too high at $12,000.00 per month. Defendant Emmett represented to Plaintiff in response that many of the checks were for personal expenditures and that the operating expenses for the franchise were only $7,000.00 per month. Defendants Graybill confirmed Emmett's misrepresentation. This was a very material factor to Plaintiff because the franchise's monthly income was only in the $5,000.00 range.

b. Defendant Emmett materially misrepresented the financial viability of the Lemoyne franchise by representing that Plaintiff need earn only $2,000.00 per month over and above what the franchise was bringing in in order to make a profit when in fact Plaintiff needed more than $7,000.00 more per month in gross sales just to break even.

c. Defendants MMPI and Emmett materially misrepresented to Plaintiff the financial viability of the Lemoyne franchise by making the same representations as set forth in Paragraphs 13a and 13b. Said Defendants conspired with Defendants Graybill to make these misrepresentations.

4

d. Defendants MMPI and Emmett materially misrepresented to Plaintiff that he would not only be able to meet expenses within a very short period of time but that he would also realize a gross profit of 30% of gross sales within that same time merely by following MMPI's marketing program, which was to make twenty new contacts per day. Plaintiff did so but was unable to make a profit on the franchise.

e. Defendants MMPI and Emmett materially misrepresented to Plaintiff that the only reason why the Lemoyne franchise was not already making a profit was because Defendant Dennis M. Graybill, now deceased, was not able due to his poor health to make enough marketing calls to generate additional sales.

14. Plaintiff was damaged by these misrepresentations in the loss of the amounts that he paid to Defendants Graybill to purchase the franchise, in the amounts that he paid Defendant MMPI for the transfer of the franchise and to attend its school for new owners, and in the loss of working capital and the amounts that had to be borrowed to operate the franchise from month to month. Consequential damages were suffered by Plaintiff in the amounts that he could not earn because he was devoting his full time to operation of the franchise instead of his former employment as well as amounts he owes to his landlord and Textron Financial Corporation from contracts that were necessitated by his purchase of the franchise. Further consequential damages stemmed from the inevitable loss of credit reputation when he was unable to repay the money he borrowed to keep the franchise operating from month to month.

### Count II

15. On or about September 1, 2000, Plaintiff entered into a written contract with Defendant MMPI which was labeled as the Franchise Agreement. Immediately upon entering

the Agreement, Plaintiff was sent to New York for an explanation of what to do to make the franchise viable. He was promised in writing all needed technical assistance and advice. This assistance and advice was based on the express corporate formula that if the franchisee did what MMPI told him to do, he would meet expenses and make a profit. Plaintiff was expressly told by MMPI that all he would have to do was manage the franchise, make twenty cold calls a day, leave all work to the employees, and, by doing so, he would make significant profits. These promises were made in order to induce Plaintiff to enter into the franchise agreement and were again made in the training school in New York. These promises were made in the Franchise Agreement or were made in supplementation of the written agreement or were made in order to induce Plaintiff to enter into the written agreement. In other words, follow our program and you will realize a pretax profit of one third of your gross sales.

16. These promises were breached by MMPI. At no time was the income from the franchise sufficient to even meet expenses and within six months of purchasing the franchise, Plaintiff was forced to close his doors due to excessive expenses.

18. Damages that flow from these breaches of contract and false promises include the loss of the money that was paid to MMPI to transfer the franchise to Plaintiff and send him to training school in New York. Consequential damages include the loss of what was paid by Plaintiff to the franchise owners to purchase the franchise, the loss of operating capital, the waste of the assets of Plaintiff's franchise, and the various contractual payments needed to pay the landlord and the equipment lessor. Further direct damages resulted from the extreme mental anguish suffered by Plaintiff which were intentionally inflicted as the result of the torts alleged in this Complaint. These damages are in an amount in excess of the minimum jurisdictional limits

6

of the court.

## Count III

19.  Defendant MMPI would not transfer the franchise to Plaintiff without first receiving a financial application from the Plaintiff calling for a disclosure of all assets.. After reviewing Plaintiff's financial statements, MMPI caused the sale of the franchise in Lemoyne to Plaintiff and transferred the franchise to Plaintiff and caused him to expend significant amounts for training and for anticipated losses from operation of the franchise within the first three months.

20.  Having required Plaintiff to submit a financial application listing all assets of Plaintiff, Defendant MMPI at all times material to this Complaint, knew or should have known that Plaintiff had insufficient income and assets to operate the franchise for even the three months at the end of which Plaintiff was promised that he would be making profits. As the superior bargaining party, MMPI was under a duty to disclose to Plaintiff that he had insufficient income and assets with which to purchase the Lemoyne franchise.  This negligence on the part of MMPI caused Plaintiff to suffer not only monetary damages but also an entitlement to damages for extreme emotional distress in amounts in excess of the minimum jurisdictional limits of the court.

**20.1 Defendants were under a duty requiring them to analyze the financial statements of Plaintiff in order to protect Plaintiff from entering into a contract that foisted off an unviable enterprise onto Plaintiff and to assure that Plaintiff has sufficient operating capital to operate the franchise for a time period long enough to increase business to levels that would sustain the franchise in operation and yield a profit for Plaintiff.  Defendants failed to do so.  Defendants breached their duty as the superior bargaining power to assure**

7

**that Plaintiff would have sufficient capital to stay in business. Indeed, the entire marketing program of Defendants is to sell franchises that will sustain themselves and yield a profit. Defendants knew or should have known that Plaintiff would be unable to operate his franchise on existing capital for a long enough time to turn the franchise into a profitable operation. Defendants actions directly resulted in the loss to Plaintiff over the period of six months that he was operating the franchise. Actual loss was suffered by Plaintiff as set forth in Counts I and II and the remaining Counts of this Complaint.**

20.2.. Plaintiff has further been consequentially damaged by these defendants in an amount in excess of the minimum jurisdictional amount of the court for extreme mental anguish intentionally inflicted upon him as the result of the loss of his life savings.

**Count IV**

22. Each of the torts complained about were committed with such deliberateness and willfulness and in such reckless disregard of the rights of Plaintiff so as to entitle him to punitive damages in an amount in excess of the minimum jurisdictional amounts of the court.

**Count V**

**22.1. Plaintiff is a small franchise owner who was enamored of Defendants' claims that he could control his own destiny and make a lot of money by operating a Minuteman Press franchise. However, he was presented with a Franchise Agreement that was a contract of adhesion and fraudulently deprived him of many rights.**

**22.2 Among other things, the Franchise Agreement waived Plaintiff's right to jury trial, the right to sue for punitive damages in arbitration, required expensive arbitration in Manhattan, New York, and contained onerous disclaimer provisions that nothing has been**

represented other than in the Franchise Agreement while at the same time Defendants'
actual practices in marketing to small franchise purchasers are to make many and
significant representations.

22.3.  The requirement in the Franchise Agreement for compulsory arbitration must
therefore be stricken from the contract.  The arbitration requirement was simply part of
the parcel of fraud that Defendants perpetrated on Plaintiff.  Defendants knew or should
have known at the time the Franchise Agreement was entered into that a small franchisee
such as Plaintiff would be unable to afford expensive arbitration in New York and would
therefore be unable to pursue his rights against Defendants.  This arbitration provision was
therefore deliberately designed to cause Plaintiff to forego future rights under the
Franchise Agreement and defrauded him of those rights.  In addition, the Franchise
Agreement is a contract of adhesion.  All franchisees must sign it on a take it or leave it
basis.  It is a standard form contract and not subject to negotiation.  The Franchise
Agreement itself should therefore be rescinded, as well as the arbitration provision.

22.4.  In addition, the arbitration provisions are onerous and not in keeping with the
rules of arbitration of the arbitrator that Defendant Minuteman itself named in the
arbitration provision.  The arbitration clause requires that each party bear the costs of its
own arbitration whereas the  Center for Dispute Resolution's CPR Rules, attached hereto
as Exhibit A, require that the arbitrators take into account the financial situation of the
parties in assessing fees. Para. 16.3.  In addition, the arbitration provision requires the
waiver of punitive damages in arbitration.  A similar arbitration provision was stricken by
rescission by the 9th Circuit Court of Appeals.  In addition, the Rules require that in the

9

event that the parties cannot agree on a single arbitrator, then a panel of three arbitrators will be appointed by the Center.  Para. 5.1.  This Rule unreasonably allows Defendants to drastically increase the cost of arbitration to Plaintiff threefold, merely on a decision by the Defendants that declines to agree to a single arbitrator.  This is another element of the fraud perpetrated on Plaintiff in the inclusion of the arbitration provision in the Franchise Agreement since it bases costs of arbitration unreasonably on a unilateral decision of the Defendants to not agree to a single arbitrator.  The selection of arbitrators itself, Para. 6.1 et seq., imposes an undue burden on Plaintiff to know the arbitrators in New York, a disadvantage not suffered by Defendants who are located in New York and represented by counsel that has a New York office.  Finally, there is no time limit set for the arbitration by the Rules, thus allowing Defendants to unilaterally increase the costs of arbitration by calling many witness, as they have indicated they will do in the Joint Case Management Plan on file in this court.

22.5.  For all these reasons, the arbitration clause in the Franchise Agreement should be rescinded.

22.6.  In addition, the fraud perpetrated on Plaintiff by Defendants as more fully set forth in Counts I , II and II requires rescission of the entire Franchise Agreement.

22.7.  The fact that the Franchise Agreement is a contract of adhesion is demonstrated by the fact that it is a standardized form contract to offer to a small consumer goods and services on a take it or leave it basis without affording Plaintiff consumer a realistic opportunity to bargain under such conditions that the Plaintiff could not obtain the desired product or service except by acquiescing to the contract.  The

contract is in addition unconscionable for the reasons set forth in this Count. Plaintiff lacked any meaningful choice in accepting the contract and the challnged contract and the specified provisions therein, for the reasons stated in this Count, unreasonably favor the Defendants. These are yet additional grounds for rescission of the entire contract and the arbitration clause in particular.

## Incorporation by Reference

23. Each Count hereof is incorporated in each other Count by reference. Each Paragraph hereof is incorporated in each other Paragraph by reference.

## Count VI

32. **Not used.**

33. In the Disclosure Document of Minuteman Press International, Inc. which which was required by FTC rules **and the New York Franchise Law, McKinney's General Business Law, Sec. 680 et seq,** and is dated August, 1999, the following disclosure is made on page 12 about an FTC action against Defendant MMPI and others:

> Federal Trade Commission, Plaintiff, v. Minuteman Press International, Inc., Speedy Sign-A-Arama, USA, Inc., Roy W. Titus and Jeffrey Haber, Defendants (CV 93-2496) Filed on June 4, 1993, in the United States District Court, Eastern District of New York. On December 18, 1998, an injunction was filed prohibiting the Defendant's excluding Haber from doing the following: A. Making, or assisting in the making of, expressly or by implication, orally or in writing, to any prospective franchisee any statement of past, present or future sales, income, or gross or net profits of any existing or prospective franchisee or group of franchisees, unless at the time of making such representation the defendant possesses written material that provides a reasonable basis for the representation. B.Violating any provision of the Rule 16 C.F.R. Part 436 or the rule as it may later be amended and the disclosure requirements of the UFOC in effect at the time. C. Assessing or collecting a transfer/training fee from any franchisee who sells or assigns its franchise unless the selling franchisee received a copy of a disclosure statement

indicating that such fee would be charged. D. Failing to monitor and investigate any complaints about compliance with the rule or the injunction. E. To cooperate with the Commission in the enforcement of this injunction.

Section A of this disclosure relates to precisely the same marketing methods and

misrepresentations that are set forth in Counts I through IV of the Plaintiff's

Complaint, which are incorporated herein by reference. The disclosure omits material facts and

is affirmatively misleading.

34. Defendant MMPI's misrepresentations, omissions, false statements, actions and

inactions violate state blue sky laws, federal FTC rules, federal securities laws, the

criminal law of the Commonwealth of Pennsylvania, and federal criminal law. Not only has

MMPI violated civil law but also criminal law in the manner in which it falsely induced Plaintiff

to purchase the existing Minuteman franchise in Lemoyne. **Defendants have also violated the**

**New York Franchise Law, McKinney's General Business Law, Sec. 687, by committing the**

**same fraudulent and deceptive practices as itemized in this Complaint and this Count. In**

**particular, Defendants, in connection with the offer and sale and purchase of a franchise,**

**directly or indirectly:**

**a. Employed the cited devices, schemes, or artificies to defraud Plaintiff;**

**b. Made untrue statements of material fact and omitted to state material facts**

**necessary in order to make the statements made, in the light of the circumstances under**

**which they were made, not misleading; and,**

**c. Engaged in acts, practices and course of business as set forth in this Complaint**

**and in this Count which operated as a fraud or deceit on Plaintiff.**

35. Defendant Emmett materially assisted MMPI to do or fail to do those actions set

forth in Paragraph 34.

36. Defendants Graybill may or may not have assisted MMPI and Emmett to do or fail to do those actions set forth in Paragraph 34. Defendants Graybill materially assisted Defendants MMPI and Emmett to  market by unlawful methods as set forth in Counts I through IV of the Plaintiff's  Complaint and has therefore assisted the latter Defendants to violate state blue sky laws, federal FTC rules, and federal securities laws and state and federal criminal laws..

37. In particular, the following written misrepresentations or omissions to state material facts needed  to make the misrepresentation true have been made or not made with respect to the Disclosure Statement disclosure of then existing litigation as set forth in Paragraph 33:

a.  MMPI and Emmett failed to disclose that the FTC was complaining about the precise marketing methods that MMPI and Emmett used in the marketing of existing franchises to particular franchisees, all as more fully set forth in Counts I through IV, which are incorporated herein by reference.

b. MMPI failed to disclose the full nature and extent of the relief sought by the FTC by omitting all those disclosures set forth in Paragraph 34, in particular the fact that the FTC was attempting to prohibit it from marketing any existing franchise in the manner in which the Lemoyne  franchise was marketed to Plaintiff as more fully set forth in Counts I through IV, which are incorporated herein by reference.

c.  Defendants Graybill, MMPI and Emmett failed to disclose to Plaintiff material financial information as required by the FTC request for injunctive relief when Emmettt falsely told Plaintiff that the Graybill expenses to operate the franchise were about $7,000.00 per month

13

and made the other misrepresentations set forth in Counts I through V.

d. MMPI failed to disclose to Plaintiff that the FTC was alleging that MMPI and others were liable for false and misleading claims about earnings, gross sales and profitability levels. Emmett and unnamed co-conspirators in the home office of MMPI were making those same false and misleading claims to Plaintiff. Defendants Graybill were materially assisting Emmett to do so.

e. MMPI failed to disclose that the litigation involved FTC claims that it and its officers violated federal consumer protection and franchise disclosure laws

f. MMPI failed to disclose that the FTC was complaining about sales pitches made by MMPI to prospective franchisees about gross earnings and profits they could expect to see by buying and operating MMPI's quick print and sign shops.

g. MMPI failed to disclose that the FTC was seeking hefty monetary damages to those prospective franchisees who suffered monetary damage from the violation of the federal consumer protection and franchise disclosure laws.

h. MMPI failed to disclose that the FTC accused MMPI and its sales force of an unlawful pattern of providing false and unsubstantiated information about earnings to people interested in buying one of MMPI's franchises.

i. MMPI failed to disclose that the FTC was attacking its written disclaimer statement that no earnings claims were made or authorized by MMPI as being unenforceable in the FTC action.

j. MMPI failed to disclose that the contradiction between its written disclaimers and a franchisor's actual practices was a violation of the FTC Act. The actual practices in this case

14

were committed by Defendants Graybill, MMPI and Emmett.and certain unnamed co-conspirators in MMPI's home office.

k. MMPI failed to disclose that the FTC was complaining about the common-sense net impression from its actions in marketing its franchises that the purchaser was being furnished important specific earnings claims information to assist in the decision making process, notwithstanding the general disclaimers about earnings..

38. Defendants are therefore estopped from relying on their disclaimer clauses in their contracts with Plaintiff as a defense made to the claims of Plaintiff by collateral estoppel and their own misrepresentations made as part of a common scheme to defraud purchasers of MMPI franchises that the purchaser was being furnished important specific earnings claims information to assist in his decision making process and then forcing the purchaser to sign a bald faced lie that the precise information had not been provided.  Plaintiff.  The conspiracy between Defendants Graybill, Emmett and MPI was so specific that all Defendants are liable for all misrepresentations and the actions and inactions of one another, the same as if they had performed the misrepresentations, actions and inactions as an individual.

### Count VII

39. This Count sounds in equity.

40. Plaintiff was presented with a written Franchise Agreement which affirmatively requires him to seek non-binding arbitration of his claims against MMPI.  This clause is a contract of adhesion, since Plaintiff simply had no bargaining power when he entered into the Agreement.  The contract was dictated by MMPI on a take it or leave it basis; no input from Plaintiff was permitted; this clause is required of all who wish to purchase a franchise from

15

MMPI. In addition, under all the circumstances of this case, it would be inequitable to enforce this provision of the contract because this clause was designed by MMPI to further its unlawful schemes and activities as set forth in the other Counts of this action

41. Plaintiff aks the court for a declaratory judgment canceling that clause of the contract and for rescission of the contract.

Wherefore, **Plaintiff prays that after trial hereof, he be awarded actual and consequential damages and punitive damages, each in an amount in excess of the minimum jurisdictional amounts of this court, against each Defendant jointly and severally, and for such other relief at law or in equity to which Plaintiff is justly entitled, including a declaratory judgment rescinding the contract and the arbitration clause in it and the waiver of punitive damages before an arbitration panel.**

Respectfully Submitted,


Robert J. White
PBN 32487
PO Box 3005
York, PA 17402
(717) 699-4534

Counsel for Plaintiff


### Certificate of Service

The undersigned certifies that he has mailed a copy of this **Second** Amended Complaint with Action for Declaratory Judgment to each Defendant on **Nov. ---**, 2001 by first class mail, postage prepaid, to Harris J. Chernow, counsel for the Minuteman Defendants, at Buchanan Ingersoll, Eleven Penn Center, 14th Floor, 1835 Market Street, Philadelphia, PA 19103 and to Charles Rees Brown, counsel for the Graybill Defendants, at Nicholas & Foreman, 4409 N. Front

Street, Harrisburg, PA 17110.

_____

Robert J. White

In the Court of Common Pleas of Cumberland County, Pennsylvania
Civil Division

Michael A. Shaffer,
      Plaintiff,

    v.

Susan Graybill as an individual —
and as Administratrix of the
Estate of Dennis M. Graybill;
Minuteman Press
International, a New York corpor-
ation; and Robert Emmett
      Defendants.

} No. 01- 2664 Civil Term
}
}
}
}
} Judge _____
}
}
}
}
}
}
} Jury Trial Demanded

NOTICE TO DEFEND

Notice

You have been sued in court. If you wish to defend against these claims, you must take action within twenty (20) days after this complaint and notice are served by entering an appearance personally or by an attorney and filing in writing with the Court your defenses or objections. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice. A judgment may also be entered against you for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Cumberland County Lawyer Referral Service
Cumberland County Bar Association
2 Liberty Avenue
Carlisle, PA 17013
(717) 249-3166
1-800-990-9108

**AVISO**

Usted ha sido domandado en corte. Si usted quiere defenderse en contra de estas demandas, usted debe tomar accion dentro de viente (20) dias despues que esta queja y aviso sean servidos, registrando una comparacencia personalmente o por su abogad y llenando en escrito en la corte su defensa u objectiones con la corte. Usted esta advertido que si fallah de hacerlo, el casa puede seguir sin usted y un desicion pued ser registrado en contra suya por la corte sin ningun otra aviso. Ademas, la corte pued decidir a favor del demandante y requiere que usted cumpia con todas las provisiones de esta demanda. Usted puede perder dinero o sus propriedades u otros derechos importante para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO NO PUEDE PAGAR UNO VAYA O LLAME POR TELEFONO A LA OFFICINA ESCRITA ABAJO PARA AVERIGULAR DONDE USTED PUED CONSEQUIRE ASSISTANCIA LEGAL.

Cumberland County Lawyer Referral Service
Cumberland County Bar Association
2 Liberty Avenue
Carlisle, PA 17013
(717) 249-3166
1-800-990-9108

In the Court of Common Pleas of Cumberland County, Pennsylvania
Civil Division

| | |
|---|---|
| Michael Shaffer,<br>    Plaintiff,<br><br>  v.<br><br>Susan Graybill as an individual<br>and as Administratrix of the<br>Estate of Dennis M. Graybill,<br>Minuteman Press International,<br>Inc., and Robert Emmett<br>    Defendants. | } No. _____<br>}<br>}<br>}<br>}<br>} Judge _____<br>}<br>}<br>}<br>}<br>} Jury Trial Demanded |

### Complaint in Law with Action for Declaratory Judgment

Comes now Plaintiff and complains of each Defendant as follows.

### Parties, Jurisdiction and Venue

1. Plaintiff is Michael Shaffer who resides at 88 Bentz Mill Road, East Berlin, PA 17316.

2. Defendant Susan Graybill is an individual who operated a Minuteman Press franchise in Lemoyne, PA, and may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

3. Defendant Susan Graybill as Administratrix of the Estate of Dennis M. Graybill, deceased, may be served in person at 1145 Highland Drive, Mechanicsburg, PA 17055.

4. Defendant Minuteman Press International, Inc. (hereafter MMPI) is a New York corporation with its home office in Farmingdale, New York. It may be served by certified mail addressed to its registered agent, Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735.

5. Defendant Robert Emmett is an individual and representative of MMPI and maintains

an office in Wayne, PA. He may be served in person at 489 Devon Park Drive, Suite 307, Wayne, PA 19087.

6. The court has jurisdiction over these proceedings because the Minuteman Press franchise sold to Plaintiff by Defendants Graybill is located in Cumberland County and the amount in controversy exceeds the minimum jurisdictional amounts of the court.

7. The court has venue over these proceedings because all or part of the cause of action arose in Cumberland County and Defendants Graybill maintained a place of business in Lemoyne, Cumberland County, PA, and reside in Cumberland County, PA.

## Facts Common to All Counts

8. On or about August, 2000, Defendants Graybill were operating a Minuteman Press franchise in Lemoyne under contract with Defendant MMPI. Defendants Graybill were desirous of selling the franchise to Plaintiff and did so on September 6, 2000. Plaintiff entered into various contracts with Defendants Graybill, Defendant MMPI in pursuance of the purchase of the franchise.

## Count I

9. This count sounds in tort.

10. Throughout the relevant time frame alleged in Paragraph 9, all Defendants entered into a conspiracy with one another to unload a failing business on Plaintiff by agreeing to materially defraud Plaintiff by falsely inducing him to enter into a contract to purchase and to purchase the Minuteman Press franchise located in Lemoyne, PA. Defendant Emmett was the regional representative of Defendant MMPI and had authority speak for and to bind the corporation.

11. Defendants Graybill were the owners of the franchise. Defendants Graybill made material misrepresentations as to the financial viability of the franchise and these were made to falsely induce Plaintiff to purchase the Minuteman Press franchise of Lemoyne as an ongoing and viable enterprise with sufficient income to pay expenses and support the store owner and two employees.

12. Defendants Graybill conspired with one another, MMPI and Emmett to represent the Lemoyne franchise as a viable entity that would make a profit and that Plaintiff would start seeing those profits within three months. Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise. Defendants MMPI and Emmett materially assisted Defendants Graybill to do so. Defendants MMPI and Emmett also made material misrepresentations to induce Plaintiff to purchase the franchise and materially assisted Defendants Graybill in unloading an unprofitable franchise on Plaintiff; these misrepresentations were made by Defendant Emmett, MMPI's regional representative.

13. The following misrepresentations were made by one or more of the Defendants:

a. Defendants Graybill materially misrepresented the financial viability of the Lemoyne franchise by representing that monthly operating expenses were in the range of $7,000.00 when in fact monthly operating expenses were in the range of $12,000.00. Plaintiff expressly obtained copies of the checks written for expenses by the franchise and refused to purchase the franchise because the operating expenses were too high at $12,000.00 per month. Defendant Emmett represented to Plaintiff in response that many of the checks were for personal expenditures and that the operating expenses for the franchise were only $7,000.00 per month. Defendants Graybill confirmed Emmett's misrepresentation. This was a very material factor to Plaintiff because the franchise's monthly income was only in the $5,000.00

range.

b. Defendant Emmett materially misrepresented the financial viability of the Lemoyne franchise by representing that Plaintiff need earn only $2,000.00 per month over and above what the franchise was bringing in in order to make a profit when in fact Plaintiff needed more than $7,000.00 more per month in gross sales just to break even.

c. Defendants MMPI and Emmett materially misrepresented to Plaintiff the financial viability of the Lemoyne franchise by making the same representations as set forth in Paragraphs 13a and 13b. Said Defendants conspired with Defendants Graybill to make these misrepresentations.

d. Defendants MMPI and Emmett materially misrepresented to Plaintiff that he would not only be able to meet expenses within a very short period of time but that he would also realize a gross profit of 30% of gross sales within that same time merely by following MMPI's marketing program, which was to make twenty new contacts per day. Plaintiff did so but was unable to make a profit on the franchise.

e. Defendants MMPI and Emmett materially misrepresented to Plaintiff that the only reason why the Lemoyne franchise was not already making a profit was because Defendant Dennis M. Graybill, now deceased, was not able due to his poor health to make enough marketing calls to generate additional sales.

14. Plaintiff was damaged by these misrepresentations in the loss of the amounts that he paid to Defendants Graybill to purchase the franchise, in the amounts that he paid Defendant MMPI for the transfer of the franchise and to attend its school for new owners, and in the loss of working capital and the amounts that had to be borrowed to operate the franchise from month to month. Consequential damages were suffered by Plaintiff in the amounts that he could not earn

because he was devoting his full time to operation of the franchise instead of his former

employment as well as amounts he owes to his landlord and Textron Financial Corporation from

contracts that were necessitated by his purchase of the franchise. Further consequential damages

stemmed from the inevitable loss of credit reputation when he was unable to repay the money he

borrowed to keep the franchise operating from month to month.

### Count II

15. On or about September 1, 2000, Plaintiff entered into a written contract with

Defendant MMPI which was labeled as the Franchise Agreement. Immediately upon entering

the Agreement, Plaintiff was sent to New York for an explanation of what to do to make the

franchise viable. He was promised in writing all needed technical assistance and advice. This

assistance and advice was based on the express corporate formula that if the franchisee did what

MMPI told him to do, he would meet expenses and make a profit. Plaintiff was expressly told by

MMPI that all he would have to do was manage the franchise, make twenty cold calls a day,

leave all work to the employees, and, by doing so, he would make significant profits. These

promises were made in order to induce Plaintiff to enter into the franchise agreement and were

again made in the training school in New York. These promises were made in the Franchise

Agreement or were made in supplementation of the written agreement or were made in order to

induce Plaintiff to enter into the written agreement. In other words, follow our program and you

will realize a pretax profit of one third of your gross sales.

16. These promises were breached by MMPI. At no time was the income from the

franchise sufficient to even meet expenses and within six months of purchasing the franchise,

Plaintiff was forced to close his doors due to excessive expenses.

18. Damages that flow from these breaches of contract and false promises include the

loss of the money that was paid to MMPI to transfer the franchise to Plaintiff and send him to training school in New York. Consequential damages include the loss of what was paid by Plaintiff to the franchise owners to purchase the franchise, the loss of operating capital, the waste of the assets of Plaintiff's franchise, and the various contractual payments needed to pay the landlord and the equipment lessor. Further direct damages resulted from the extreme mental anguish suffered by Plaintiff which were intentionally inflicted as the result of the torts alleged in this Complaint. These damages are in an amount in excess of the minimum jurisdictional limits of the court.

### Count III

19. Defendant MMPI would not transfer the franchise to Plaintiff without first receiving a financial application from the Plaintiff calling for a disclosure of all assets.. After reviewing Plaintiff's financial statements, MMPI caused the sale of the franchise in Lemoyne to Plaintiff and transferred the franchise to Plaintiff and caused him to expend significant amounts for training and for anticipated losses from operation of the franchise within the first three months.

20. Having required Plaintiff to submit a financial application listing all assets of Plaintiff, Defendant MMPI at all times material to this Complaint, knew or should have known that Plaintiff had insufficient income and assets to operate the franchise for even the three months at the end of which Plaintiff was promised that he would be making profits. As the superior bargaining party, MMPI was under a duty to disclose to Plaintiff that he had insufficient income and assets with which to purchase the Lemoyne franchise. This negligence on the part of MMPI caused Plaintiff to suffer not only monetary damages but also an entitlement to damages for extreme emotional distress in amounts in excess of the minimum jurisdictional limits of the court.

20.1.  Plaintiff has further been consequentially damaged by these defendants in an amount in excess of the minimum jurisdictional amount of the court for extreme mental anguish intentionally inflicted upon him as the result of the loss of his life savings.

### Count IV

22.  Each of the torts complained about were committed with such deliberateness and willfulness and in such reckless disregard of the rights of Plaintiff so as to entitle him to punitive damages in an amount in excess of the minimum jurisdictional amounts of the court.

### Incorporation by Reference

23.  Each Count hereof is incorporated in each other Count by reference.  Each Paragraph hereof is incorporated in each other Paragraph by reference.

Wherefore, Plaintiff prays that after trial hereof, he be awarded actual and consequential and punitive damages, each in an amount in excess of the minimum jurisdictional limits of the court against each defendant and against all defendants jointly and severally for their joint misconduct and for such other and further relief in law and in equity to which Plaintiff may be justly entitled.

Respectfully Submitted,

Robert J. White
Counsel for Plaintiff
PBN 32487
PO Box 3005
York, PA 17402
(717) 699-4534
FAX (717) 699-2895

### Verification

I verify that the facts contained in the Complaint are true and correct to the best of my knowledge, information and belief. I understand that any false statements are made subject to the penalties of 18 Pa.C.S.A. Sec. 4904 relating to unsworn falsification.

May 1, 2001.

Michael Shaffer

**In the Court of Common Pleas of Cumberland County, Pennsylvania**
**Civil Division**

Michael A. Shaffer                     } No. 2001-2664 Civil Term
            Plaintiff,                 }
                                       }
                                       }
        v.                             }
                                       }
Susan Graybill                         }
et al.,                                }
            Defendants                 } Jury Trial Demanded

**Plaintiff's First Amended Complaint with Action for Declaratory Judgment**

Comes now Plaintiff and amends his Complaint with Action for

Declaratory Judgment and states the following additional causes of action.

**Count VI**

32. ~~Plaintiff's Complaint is incorporated herein by reference, the same as if fully set forth~~ herein.

33. In the Disclosure Document of Minuteman Press International, Inc. which which was required by FTC rules and is dated August, 1999, the following disclosure is made on page 12 about an FTC action against Defendant MMPI and others:

> Federal Trade Commission, Plaintiff, v. Minuteman Press International, Inc., Speedy Sign-A-Arama, USA, Inc., Roy W. Titus and Jeffrey Haber, Defendants (CV 93-2496) Filed on June 4, 1993, in the United States District Court, Eastern District of New York. On December 18, 1998, an injunction was filed prohibiting the Defendant's excluding Haber from doing the following: A. Making, or assisting in the making of, expressly or by implication, orally or in writing, to any prospective franchisee any statement of past, present or future sales, income, or gross or net profits of any existing or prospective franchisee or group of franchisees, unless at the time of making such representation the defendant possesses written material that provides a reasonable basis for the representation. B.Violating any provision of the Rule 16 C.F.R. Part 436 or the rule as it may later be amended and the disclosure requirements of the UFOC in effect at the time.

C. Assessing or collecting a transfer/training fee from any franchisee who sells or assigns its franchise unless the selling franchisee received a copy of a disclosure statement indicating that such fee would be charged. D. Failing to monitor and investigate any complaints about compliance with the rule or the injunction. E. To cooperate with the Commission in the enforcement of this injunction.

Section A of this disclosure relates to precisely the same marketing methods and misrepresentations that are set forth in Counts I through IV of the Plaintiff's Complaint, which are incorporated herein by reference. The disclosure omits material facts and is affirmatively misleading.

34. Defendant MMPI's misrepresentations, omissions, false statements, actions and inactions  violate state blue sky laws, federal FTC rules, federal securities laws, the criminal law of the Commonwealth of Pennsylvania, and federal criminal law.  Not only has MMPI violated civil law but also criminal law in the manner in which it falsely induced Plaintiff to purchase the existing Minuteman franchise in Lemoyne.

35. Defendant Emmett materially assisted MMPI to do or fail to do those actions set forth in Paragraph 34.

36. Defendants Graybill may or may not have assisted MMPI and Emmett to do or fail to do those actions set forth in Paragraph 34.  Defendants Graybill materially assisted Defendants MMPI and Emmett to  market by unlawful methods as set forth in Counts I through IV of the Plaintiff's  Complaint and has therefore assisted the latter Defendants to violate state blue sky laws, federal FTC rules, and federal securities laws and state and federal criminal laws..

37. In particular, the following written misrepresentations or omissions to state material facts needed  to make the misrepresentation true have been made or not made with respect to the Disclosure Statement disclosure of then existing litigation as set forth in Paragraph 33:

a.  MMPI and Emmett failed to disclose that the FTC was complaining about the precise marketing methods that MMPI and Emmett used in the marketing of existing franchises to particular franchisees, all as more fully set forth in Counts I through IV, which are incorporated herein by reference.

b. MMPI failed to disclose the full nature and extent of the relief sought by the FTC by omitting all those disclosures set forth in Paragraph 34, in particular the fact that the FTC was attempting to prohibit it from marketing any existing franchise in the manner in which the Lemoyne  franchise was marketed to Plaintiff as more fully set forth in Counts I through IV, which are incorporated herein by reference.

c.  Defendants Graybill, MMPI and Emmett failed to disclose to Plaintiff material financial information as required by the FTC request for injunctive relief when Emmettt falsely told Plaintiff that the Graybill expenses to operate the franchise were about $7,000.00 per month and made the other misrepresentations set forth in Counts I through IV.

d. MMPI failed to disclose to Plaintiff that the FTC was alleging that MMPI and others were liable for false and misleading claims about earnings, gross sales and profitability levels. Emmett and unnamed co-conspirators in the home office of MMPI were making those same false and misleading claims to Plaintiff.  Defendants Graybill were materially assisting Emmett to do so.

e.  MMPI failed to disclose that the litigation involved FTC claims that it and its officers violated federal consumer protection and franchise disclosure laws

f.  MMPI failed to disclose that the FTC was complaining about sales pitches made by MMPI to prospective franchisees about gross earnings and profits they could expect to see by buying and operating MMPI's quick print and sign shops.

g. MMPI failed to disclose that the FTC was seeking hefty monetary damages to those prospective franchisees who suffered monetary damage from the violation of the federal consumer protection and franchise disclosure laws.

h. MMPI failed to disclose that the FTC accused MMPI and its sales force of an unlawful pattern of providing false and unsubstantiated information about earnings to people interested in buying one of MMPI's franchises.

i. MMPI failed to disclose that the FTC was attacking its written disclaimer statement that no earnings claims were made or authorized by MMPI as being unenforceable in the FTC action.

j. MMPI failed to disclose that the contradiction between its written disclaimers and a franchisor's actual practices was a violation of the FTC Act. The actual practices in this case were committed by Defendants Graybill, MMPI and Emmett.and certain unnamed co-conspiratorss in MMPI's home office.

k. MMPI failed to disclose that the FTC was complaining about the common-sense net impression from its actions in marketing its franchises that the purchaser was being furnished important specific earnings claims information to assist in the decision making process, notwithstanding the general disclaimers about earnings..

38. Defendants are therefore estopped from relying on their disclaimer clauses in their contracts with Plaintiff as a defense made to the claims of Plaintiff by collateral estoppel and their own misrepresentations made as part of a common scheme to defraud purchasers of MMPI franchises that the purchaser was being furnished important specific earnings claims information to assist in his decision making process and then forcing the purchaser to sign a bald faced lie that the precise information had not been provided. Plaintiff. The conspiracy between

Defendants Graybill, Emmett and MPI was so specific that all

Defendants are liable for all misrepresentations and the actions and inactions of one another, the

same as if they had performed the misrepresentations, actions and inactions as an individual.

## Count VII

39.  This Count sounds in equity.

40.  Plaintiff was presented with a written Franchise Agreement which affirmatively

requires him to seek non-binding arbitration of his claims against MMPI.  This clause is a

contract of adhesion, since Plaintiff simply had no bargaining power when he entered into the

Agreement.  The contract was dictated by MMPI on a take it or leave it basis; no input from

Plaintiff was permitted; this clause is required of all who wish to purchase a franchise from

MMPI.  In addition, under all the circumstances of this case, it would be inequitable to enforce

this provision of the contract because this clause was designed by MMPI to further its unlawful

schemes and activities as set forth in the other Counts of this action

41.  Plaintiff aks the court for a declaratory judgment canceling that clause of the contract

and for rescission of the contract.

Wherefore, in addition to the relief requested in Plaintiff's  Complaint

with Action for Declaratory Judgment, Plaintiff requests such other and further relief at law and

in equity as arise from these  additional Counts together with a declaratory judgment that the

arbitration clause of the  MMPI contract with Plaintiff be rescinded.

~~Notice to Plead~~

~~Plead to the First Amended Complaint within 20 days of service or default judgment may~~

~~be entered against you.~~

Respectfully Submitted,


Robert J. White
Counsel for Plaintiff
PO Box 3005
York, PA 17402
(717) 699-4534
FAX (717) 699-2895

## Certificate of Service


The undersigned certifies that he has mailed a copy of this First Amended Complaint with Action for Declaratory Judgment to each Defendant on May 19, 2001 by first class mail addressed as follows:
MMPI by serving Peter T. Bauer, General Counsel, Minuteman Press International, Inc., 1640 New Highway, Farmingdale, NY 11735
Defendant Robert Emmett at 489 Devon Park Drive, Suite 307, Wayne, PA 19087

_____
/s/
Robert J. White

## Verification

I verify that the facts contained in this First Amended Complaint with Action for Declaratory Judgment are true and correct to the best of my knowledge, information and belief. I understand that any false statements are made subject to the penalties of 18 Pa.C.S.A. Sec. 4904 relating to unsworn falsification.

_____
/s/
Michael Shaffer