**ORIGINAL**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL A. SHAFFER, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 01-CV-1065 |
| | : | Judge Sylvia H. Rambo |
| SUSAN GRAYBILL AS AN | : | |
| INDIVIDUAL AND AS | : | |
| ADMINISTRATRIX OF THE ESTATE | : | **FILED** |
| OF DENNIS M. GRAYBILL, | : | **HARRISBURG** |
| MINUTEMAN PRESS | : | |
| INTERNATIONAL, INC., | : | JAN 0 8 2002 |
| and ROBERT EMMETT, | | MARY E. D'ANDREA, CLERK |
| | | Per |
| Defendants. | | DEPUTY CLERK |

## DEFENDANTS MINUTEMAN PRESS INTERNATIONAL, INC.'S AND ROBERT EMMETT'S ANSWER TO PLAINTIFF'S COMPLAINT AND PLAINTIFF'S FIRST AMENDED COMPLAINT WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIM[1]

---

[1] This filing and any other activities undertaken by Answering Defendants and their counsel in this Court prior to the United States District Court for the Middle District of Pennsylvania's adjudication of Answering Defendants' pending Motion for Reconsideration to dismiss Plaintiff's Complaint and First Amended Complaint and/or to compel Plaintiff to arbitrate his claims pursuant to 9 U.S.C. §4 of the Federal Arbitration Act (or any appeal) are done involuntarily to protect Answering Defendants' interests and are without waiver of any Answering Defendants' right to compel arbitration of their claims and have this action stayed and/or dismissed pursuant to the terms of the Franchise Agreement and/or the Federal Arbitration Act. Given Answering Defendants' filing of the Motion for Reconsideration (and any appeal),

# ANSWER[1]

Defendants, Minuteman Press International, Inc. ("Minuteman Press") and Robert

Emmett ("Emmett"), by and through their undersigned counsel, file this Answer to Plaintiff's

Complaint and Plaintiff's First Amended Complaint with Affirmative Defenses and

Counterclaim as follows:

     1.     Admitted.

     2.     Admitted in part, denied in part.  It is admitted that Susan Graybill is an

individual who operated a Minuteman Press Franchise in Lemoyne, Pennsylvania.  The

remaining part of this allegation is denied as a conclusion of law to which no response is

required under the Federal Rules of Civil Procedure.

     3.     Denied.  Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph which is denied in its entirety.

     4.     Denied in part, admitted in part.  It is admitted that Defendant Minuteman Press

International, Inc. is a New York corporation with its home office in Farmingdale, New York.

The remaining allegations of this paragraph contain conclusions of law to which no response is

required under the Federal Rules of Civil Procedure.

     5.     Denied as stated.  Defendant Robert Emmett is an individual and an employee of

MMPI and maintains an office in Wayne, Pennsylvania.  The remaining allegations of this

---

any injuries or damages suffered by Plaintiff as a consequence of his continued prosecution of this action in contravention of his agreement to arbitrate are self-imposed.  Plaintiff is not free to and should not rely upon Answering Defendants' and their counsel's limited and involuntary activities in this Court as evidencing a waiver of Answering Defendants' right to compel arbitration.  Any purported reliance by Plaintiff upon Answering Defendants' and their counsel's limited and involuntary activities in this Court as evidencing a waiver of Answering Defendants' right to compel arbitration would be completely misplaced and unreasonable.

paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure.

6.    Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

7.    Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

8.    Denied as stated.  It is admitted that in or about August, 2000, Defendants Graybill were operating a Minuteman Press Franchise pursuant to a certain MMPI Franchise Agreement.  The remaining allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure.

9.    To the extent that this paragraph can be understood, its allegations contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

10.    Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

11.    Denied as stated.  It is admitted that Defendants Graybill were at one time franchisees of MMPI pursuant to a certain MMPI Franchise Agreement.  The remaining allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

12.    Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

13.    a.    Denied.  To the extent that the referenced alleged "representation" refers to a written statement set forth in documents provided to Plaintiff, it is denied as characterizing the contents of written documents to which no further response are required.  The written documents referenced are the best evidence of their contents and, therefore, speak for themselves.  To the extent that the referenced alleged "representation" refers to oral statements, the allegations set forth in this paragraph are denied.  To the extent that the "representations" refer to those being made by those other than an MMPI and/or Emmett, MMPI and Emmett are without knowledge or information sufficient to form belief as to the truth of the allegations contained in this paragraph which is denied in its entirety.

13.    b.    Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

13.    c.    Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

13.    d.    Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

13.    e.    Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

14.    Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

## COUNT II

15.    Denied as characterizing the contents of written documents to which no further response is required.  The written documents referenced are the best evidence of their contents and, therefore, speak for themselves.  Additionally, the allegations set forth in this paragraph are denied as conclusions of law to which no further response is required.  Furthermore, to the extent only that a further response is deemed required, the remaining allegations set forth in this paragraph are denied.

16.    Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

18.    [SIC]  Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and is therefore denied in its entirety.

## COUNT III

19 to and including 20.1[SIC].   No response is required as Count III has been dismissed by the Court pursuant to its Order dated December 21, 2001.

## COUNT IV

22.      [SIC] Denied.  The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

### Incorporation By Reference

23. [SIC]  The allegations contained in this paragraph are not allegations to which a response is required under the Federal Rules of Civil Procedure.  To the extent that any response is required, Defendants reassert and incorporate by reference all of their above-referenced answers pursuant to Fed. R.. Civ. P. 10(c).

### Plaintiff's First Amended Complaint

### COUNT VI [SIC]

32.      [SIC] The allegations contained in this paragraph are not allegations to which a response is required under the Federal Rules of Civil Procedure.  To the extent that any response is required, Defendants reassert and incorporate by reference all of their above-referenced answers pursuant to Fed.R.Civ.P. 10(c).

33.      [SIC]  Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure.  Furthermore, it is denied as characterizing the contents of written documents to which no further response is required.  The written documents referenced are the best evidence of the contents and, therefore, speak for themselves.

34.    [SIC]  Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

35.    [SIC]  Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

36.    [SIC]  Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

37.    [SIC]  Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

38.    [SIC]  Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

## COUNT VII [SIC]

39.    [SIC]  To extent to that this paragraph can be understood, its allegations contain conclusions of law to which no response is required under Federal Rules of Civil Procedure and it is therefore denied in its entirety.

40.    [SIC]  Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

41.    [SIC] Denied. The allegations in this paragraph contain conclusions of law to which no response is required under the Federal Rules of Civil Procedure and it is therefore denied in its entirety.

**WHEREFORE,** Defendants Minuteman Press International, Inc. and Robert Emmett demand that the judgement be entered in their favor and against Plaintiff Michael A. Shaffer, the cost of this suit and all attorneys' fees expended in defense of this action be assessed against Plaintiff and award to Defendants Minuteman Press International, Inc. and Robert Emmett, and such further belief, legal and equitable be granted as the Court deems appropriate.

### AFFIRMATIVE DEFENSES[1]

Defendants Minuteman Press International, Inc. and Robert Emmett assert all affirmative defenses available at law or equity to Plaintiff's Complaint and First Amended Complaint, but not limited to:

(a)    Plaintiff has failed to state a claim on which relief can be granted;

(b)    Plaintiff lacks standing in whole or in part to assert his claims;

(c)    Plaintiff breached the franchise contract at issue;

(d)    Plaintiff did not have good cause for termination of the franchise contract at issue;

(e)    By his own conduct and/or the terms of the franchise contract at issue, Plaintiff is estopped and/or barred from making his claims;

(f)    Plaintiff's claims are barred in whole or in part by his own negligent acts and omissions and/or wrongful conduct;

(g)    Plaintiff's unclean hands with respect to the transactions in question and matters at issue prevent him from obtaining the request at relief;

(h)    Plaintiff's claims are barred in whole or in part by the Parole Evidence Rule;

(i)    Plaintiff's claims are barred in whole or in part by the Applicable Statute of Frauds;

(j)    Plaintiff waived his claims in whole or in part;

(k)    Plaintiff's claims are barred in whole or in part because he consented to the complaint of conduct;

(l)    Plaintiff voluntarily assumed the risk of loss of which he now complains;

(m)    Plaintiff's claims are barred in whole or in part because he has not suffered any damages as a result of the complained of conduct;

(n)    Plaintiff's claims are barred in whole or in part because he failed to mitigate the damages he alleged to have suffered as a result of the complained of conduct;

(o)    Plaintiff's claims and prayers for relief are barred in whole or in part by the Election of Remedies Doctrine;

(p)    Defendants' alleged statements, which are denied, upon which Plaintiff claims to have relied, do not constitute actual misrepresentations, but rather non-actual opinions or predictions of future events;

(q)    Any reliance on the alleged statements at issue was unreasonable of law;

(r)    Plaintiff has no claim for punitive damages because Plaintiff waived any claim for and exemplary damages, and furthermore, Defendants' conduct was proper and commercially reasonably under all the circumstances, and such a claim for damages, punitive or otherwise, is not available under the facts and governing law in this case;

(s)    Plaintiff's claims are barred and/or premature, in whole or in part, under the terms of the Franchise Agreement at issue.  Plaintiff breached the Franchise Agreement at issue creating a setup claim in favor of Defendants;

(t)     The complained of conduct was privileged;

(u)     Plaintiff has defaulted under the Franchise Agreement by, *inter alia,* failing to continuously operate an MMPI Franchise pursuant to the terms of the Franchise Agreement, failing to provide written notice to MMPI of any breach of the Franchise Agreement by MMPI and giving MMPI the opportunity to cure.  As a result, Plaintiff is not entitled to any of the relief sought in the Complaint and First Amended Complaint;

(v)     the Franchise Agreement, together with its exhibits, attachments and addenda, is the entire agreement of the parties, and by its terms is an integrated document that supersedes all prior agreements or understandings between the parties;

(w)     there are no express or implied covenants or warranties oral or written, between the parties except as expressly stated in the Franchise Agreement;

(x)     the Franchise Agreement is governed by the laws of the State of New York.

(y)     the Court lacks jurisdiction over the claims contained in Plaintiff's Complaint and First Amended Complaint because Plaintiff they are subject to arbitration pursuant to the terms of the Franchise Agreement and the Federal Arbitration Act;

(z)     the Court lacks jurisdiction over the claims contained in Plaintiff's Complaint and First Amended Complaint due to improper venue because Plaintiff contracted to litigate all claims in the Supreme Court of the State of New York, in the county where Minuteman Press has its home office, or in the United States District Court for the Eastern District of New York;

(aa)    Plaintiff is not entitled to a jury trial because he contractually waived his right to a jury trial;

(bb)    Plaintiff's claims are time-barred because he contractually agreed to a one year statute of limitations for any alleged breach or violation of the Franchise Agreement; and

(cc)    Defendants reserve the right to assert such other defenses as they become known or available from the completion discovery.

**WHEREFORE,** Defendants Minuteman Press International, Inc. and Robert Emmett demand that the judgement be entered in their favor and against Plaintiff Michael A. Shaffer, the cost of this suit and any attorneys' fees and expenses in defense of this action be assessed against Plaintiff Michael A. Shaffer and awarded to Defendants Minuteman Press International, Inc. and Robert Emmett, and such further and other legal and equitable relief be granted as the Court deems just and appropriate.

## COUNTERCLAIM[1]
### (Minuteman Press International, Inc. v. Michael A. Shaffer)

### I.    THE PARTIES

1.    Defendant-Counterclaim Plaintiff Minuteman Press International, Inc. ("Minuteman Press" or "Defendant-Counterclaim Plaintiff") is a corporation organized and existing under the laws of the State of New York with its principal place of business at 1640 New Highway, Farmingdale, New York 11735.

2.    Plaintiff-Counterclaim Defendant Michael A. Shaffer ("Plaintiff-Counterclaim Defendant" or "Shaffer") d/b/a Minuteman Press is a citizen of the Commonwealth of Pennsylvania who resides at 88 Bentz Mill Road, East Berlin, Pennsylvania 17316 and maintained a principal place of business located at 855 Market Street, Lemoyne, Pennsylvania 17043.

3.    Plaintiff-Counterclaim Defendant Shaffer, the former franchised operator of a Minuteman Press franchise located in Lemoyne, Pennsylvania, owes certain duties and

contractual obligations to Minuteman Press and has done and is still doing business as "Minuteman Press".

4.     Despite termination of his franchise rights to conduct business as an authorized franchise of Minuteman Press, Plaintiff-Counterclaim Defendant continues to do business as, and/or hold himself out to the public as, an authorized Minuteman Press franchisee, when he is not so authorized.

## II.     THE MINUTEMAN PRESS FRANCHISE SYSTEM

5.     Minuteman Press is engaged in the business of developing, opening and operating full service quick offset printing, reproduction and copying centers which are identified to the public under the name and service marks "Minuteman Press" and "Minuteman Press Full Service Printing Centers." In particular, Minuteman Press is engaged in the business of offering and selling franchises to third-parties to develop, open and operate Minuteman Press Full Service Printing Centers.

6.     Minuteman Press franchisees are licensed to use Minuteman Press' trade names, service marks and trade marks and to operate under the Minuteman Press' proprietary business system, which includes plans, methods, systems and procedures for the opening and operation of Minuteman Press Full Service Printing Centers, whose features are distinctive décor, signs, floor plans, displays of specialized products and services, sales and marketing procedures and methods, and advertising and promotion (collectively, the "Minuteman Press System"). The relationship between Minuteman Press and each Minuteman Press franchisee is governed and defined by the terms and conditions of a franchise agreement (the "Minuteman Press Franchise Agreement") entered into between Minuteman Press and each Minuteman Press franchisee.

## III.     PLAINTIFF-COUNTERCLAIM DEFENDANT SHAFFER'S FRANCHISE AGREEMENT

7.    On or about September 1, 2000, Minuteman Press and Plaintiff-Counterclaim Defendant entered into a Franchise Agreement (the "Franchise Agreement") (a copy of the Franchise Agreement is attached hereto as Exhibit "A").  Subject to certain terms and conditions, the Franchise Agreement granted Plaintiff-Counterclaim Defendant the right to operate a franchised Minuteman Press Full Service Printing Center pursuant to the Minuteman Press System.  Following September 1, 2000 and until February 28, 2001, Plaintiff-Counterclaim Defendant operated an authorized franchised Minuteman Press Full Service Printing Center at 855 Market Street, Lemoyne, Pennsylvania.

8.    On or about February 28, 2001, Plaintiff-Counterclaim Defendant notified Minutemen Press that he was closing up and abandoning his Minuteman Press franchise location on February 28, 2001.

9.    By letter dated June 14, 2001 (the "June 14 letter"), Minuteman Press advised Plaintiff-Counterclaim Defendant in writing that he was in default of the Franchise Agreement and that the Franchise Agreement was terminated pursuant to ¶¶ 14(b) of the Franchise Agreement.

10.    Section 2(b) of the Franchise Agreement provides as follows:

> Franchisee acknowledges that Franchisor will disclose and impart to Franchisee, in confidence, some or all of its established trade secrets, production and sales methods and other techniques and know-how relating to the Minuteman Press Full Service Printing Center.  Franchisee agrees that all such confidential information shall at all times be maintained in strictest confidence and used by Franchisee only in the regular operation of the duly authorized Minuteman Press Full Service Printing Center during the period of such authorization and not in any other business or other activity whatsoever.  Franchisee further acknowledges that such trade secrets and confidential information are valuable, unique and special assets of Franchisor, and that it will not disclose any of same to any person, firm, corporation or other entity whatsoever,

for any reason or purpose, without the prior written authorization
or consent of Franchisor.

*See* Exhibit "A" at ¶ 2(b).

11.    Section 6(b) of the Franchise Agreement provides, in part, as follows:

A royalty fee equal to six percent (6%) of Franchisee's total
monthly gross billings as hereinafter defined. "Gross Billings"
shall mean the total of all sales and/or fees charged for product
and/or services furnished in, or upon orders placed at, or completed
by delivery in, through or from the Minuteman Press Full Service
Printing Center at the Premises, whether or not collected by
Franchisee, less state and local sales taxes, if any. Within ten (10)
days after the end of each month, Franchisee shall send to
Franchisor, a statement in a form approved by Franchisor, signed
by Franchisee showing all orders placed at the Minuteman Press
Full Service Printing Center, all merchandise sold, and all billings
therefor during the month, accompanied by a royalty check in the
appropriate amount. All royalty fees are to be sent to the
Franchisor's corporate headquarters in Farmingdale, New York or
to such location as Franchisor may designate from time to time. In
the event Licensee fails Licensor, and/or deposit in the U.S. Postal
System the royalty statement or royalty fee by the 10th day of the
month following the close of the month for which the continuing
royalty is due and payable [...]. **It is expressly agreed that the
payment of the royalty fee is not contingent upon Minuteman
providing a level of service perceived by the Franchisee to be
adequate**.

*See* Exhibit "A" at § 6(b) (emphasis added).

12.    Section 7 of the Franchise Agreement provides, in part, as follows:

This Agreement shall be for an initial Term of thirty five (35) years
(the "Initial Term") commencing as of the date hereof, unless
sooner terminated as hereinafter provided [...].

*See* Exhibit "A" at § 7.

13.    Section 14 of the Franchise Agreement provides, in part, as follows:

Upon the occurrence of any of the following events, Franchisor, at
its option, shall have the right, pursuant to applicable state law, to
terminate this Agreement and all of the Franchisee's rights

14

hereunder, provided Franchisee shall fail to remedy any of the
following to Franchisor's satisfaction:

If Franchisee shall:

(b)    closes the Minuteman Press Full Service Center for a
period of fifteen (15) successive days without Franchisor's prior
written consent; or

...

(c)    defaults in the performance of any of the covenants, terms
or conditions of this Agreement, and such default remains
unremedied for more than five (5) days after written notice thereof
to Franchisee of such default; or

...

(g)    removes, defaces, or improperly uses any Minuteman Press
trademark, service mark, copyright or sign at the licensed location.

*See* Exhibit "A" at § 14.

14.    Section 15 of the Franchise Agreement provides, in part, as follows:

In the event of termination of this Agreement as provided herein:

(a)    Franchisee agrees to immediately discontinue the
employment or use of all marks (and to file notice of
discontinuance or termination thereof), signs structures and forms
of advertising incorporating the Marks and further agrees to make,
or cause to be made, such changes in signs, buildings and
structures, equipment, supplies, furnishings and fixtures, and
otherwise in order to distinguish the Premises from its former
appearance and from other Minuteman Press System
establishments.  Thereafter, Franchisee shall not use in any manner
any trademark, service mark, or trade name which is the same as
Franchisor or its Franchisees.  Upon termination of this Agreement
for any reason, Franchisee may not refer to itself or any of its
officers, directors, or employees as "formerly Minuteman Press",
"formerly of Minuteman Press" or other words to that effect.
Franchisee hereby authorizes the Franchisor to have the use and
ownership of the telephone numbers used by the Franchisee in the
Minuteman Press Full Service Printing Center and hereby
authorizes the appropriate telephone company to change said
ownership of said lines.  Franchisee further agrees to execute those

papers necessary to effect change in ownership.  After said transfer, the cost of said number or numbers shall be borne by the Franchisor.

(b)    All amounts due and owing from Franchisee to Franchisor shall immediately become due and payable.

(c)    Franchisee shall pay to Franchisor all damages, costs and expenses, including reasonable attorney's fees, incurred by Franchisor in obtaining injunctive relief for the enforcement of any portion of the License Agreement.

(d)    Franchisee agrees that upon termination of the License, they will immediately return to the Franchisor all copies of the Confidential Operations Manual which have been loaned to them by the Franchisor and all updates, if any, which Franchisee may have thereafter.

(e)    At the time of termination of the License Agreement, for any reason, Franchisee agrees to do the following:

> 1.    Change any listed telephone numbers relating to the franchised business and;
>
> 2.    Agrees not to provide a call forwarding telephone number referral with respect to any disconnected telephone number and;
>
> 3.    Agrees not to indicate in any manner that it was previously affiliated with the Franchisor.

Franchisee further agrees to execute any and all necessary documentation to transfer any telephone numbers for the franchised business to the Franchisor.

(f)    Franchisee shall immediately cease to use whatsoever the licensed software, and shall immediately return to Franchisor all originals, copies and updates thereto.

...

(g)    Franchisor shall have the right, at its option, to purchase from Franchisee all of, or any part of any equipment, furnishings, supplies or other material then in the possession of Franchisee that bears any of the Marks or trade names of Franchisor.  Such right shall be exercisable by the giving of written notice to Franchisee,

and all of the equipment, furnishings, supplies and materials
designated or referred to in said notice shall immediately be
delivered to Franchisor and Franchisor shall thereafter, after setting
off against the amounts payable any monies owned by Franchisee
to Franchisor under Paragraph 15(b) above, promptly pay to
Franchisee the amount due.  Franchisor shall purchase the
foregoing at the cost thereof to Franchisee less the depreciation
therefore taken by Franchisee, if applicable, for such items for
federal income tax purposes.

...

(h)     THE LICENSE AGREEMENT MAY BE TERMINATED
ONLY BY THE FRANCHISOR AND NO PROVISION IS
MADE IN THIS AGREEMENT FOR THE UNILATERAL
TERMINATION OF THIS AGREEMENT BY THE
FRANCHISEE, EXCEPT FOR VIOLATION OF PROVISIONS
SET FORTH IN PARAGRAPH FOUR (4) OF THE FRANCHISE
AGREEMENT.  IN THAT EVENT THE FRANCHISEE MUST
PROVIDE FRANCHISOR WITH NOTICE OF DEFAULT AND
OPPORTUNITY TO CURE.

...

(l)     Upon termination of Franchisee by Franchisor, Franchisee
irrevocably grants to Franchisor all customer lists, customer
business, including customer art work, presently in the possession
of Franchisee.

*See* Exhibit "A" at § 15.

15.     Section 19 of the Franchise Agreement provides as follows:

### 19.     **Restrictive Covenant**

During the term of this Agreement, Franchisee will
not directly or indirectly, as owner, employee, or otherwise, have
any interest in or control over any type of business substantially
similar to that of a Minuteman Press System establishment.
Additionally, Franchisee will not divert or attempt to divert any
business of or any customer of, the business licensed hereunder to
any competitor, by direct or indirect means.

Unless specifically prohibited by state law
Franchisee shall not for a period of two (2) years after termination
of this Agreement, directly or indirectly, as owner, employee, or

17

otherwise, have any interest in or control over any type of business substantially similar to that of a Minuteman Press System establishment within a radius of five (5) miles from the Minuteman Press Full Service Printing Center with which he had been formerly associated or within an area of five (5) miles from any existing Minuteman Press Full Service Printing Center. Franchisor acknowledges that Franchisee has previously made his living in other fields and that this paragraph in no way prevents him from earning his leaving in other fields of endeavor. The provisions of this paragraph will survive the termination of this Agreement, and will continue to be binding upon Franchisee individually and its individual shareholders, officers and directors notwithstanding any assignment pursuant to Paragraph 16.

*See* Exhibit "A" at § 19.

16.    Section 20 of the Franchise Agreement provides as follows:

## 20.    **Additional Remedies of Franchisor**

Franchisee acknowledges that the restrictions contained in Paragraphs 2 and 19 of this Agreement are a reasonable and necessary protection of the legitimate interests of Franchisor, that any violation of them would cause substantial and irreparable injury to Franchisor, and that Franchisor would not have entered into this Agreement with Franchisee without receiving the additional consideration of Franchisee's binding itself to said restrictions. In the event of any violation of the said restrictions, Franchisor shall be entitled, in addition to any other remedy at law, to seek preliminary and permanent injunctive relief.

*See* Exhibit "A" at § 20.

17.    Section 22 of the Franchise Agreement provides as follows:

## 22.    **Entire Agreement**

THIS AGREEMENT AND SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF CONTAIN THE ENTIRE AGREEMENT OF THE PARTIES. NO OTHER AGREEMENTS, WRITTEN OR ORAL, SHALL BE DEEMED TO EXIST, AND ALL PRIOR AGREEMENTS AND UNDERSTANDINGS ARE SUPERSEDED HEREBY. NO OFFICER, EMPLOYEE OR AGENT OF FRANCHISOR HAS ANY AUTHORITY TO MAKE ANY REPRESENTATION OR

PROMISE NOT CONTAINED IN THIS AGREEMENT, AND
FRANCHISOR AGREES THAT IT HAS EXECUTED THIS
AGREEMENT WITHOUT RELIANCE UPON ANY SUCH
REPRESENTATION OR PROMISE.  THIS AGREEMENT
SHALL NOT BE BINDING UPON FRANCHISOR UNTIL
EXECUTED BY AN AUTHORIZED OFFICER THEREOF.
THIS AGREEMENT CANNOT BE MODIFIED OR CHANGED
EXCEPT BY A WRITTEN INSTRUMENT SIGNED BY ALL
OF THE PARTIES HERETO.

*See* Exhibit "A" at § 22.

18.    Section 23 of the Franchise Agreement provides as follows:

**23.    Arbitration and Litigation**

The parties hereby agree that the Federal Arbitration Act
shall apply to all claims arising out of or relating to this Agreement
or the breach thereof and that the business, which is the subject of
this Agreement, is engaged in Interstate Commerce.  **Any
controversy or claim arising out of or relating to this
Agreement or the breach thereof, shall be settled by
arbitration in accordance with commercial arbitration rules of
the Center for Dispute Resolution at a hearing to be held in the
State of New York in the county where Minuteman maintains
its home office.**  Any arbitration award shall be non-binding, but if
the losing party consents, (such consent shall be in writing) a
judgment upon the arbitration award may be entered in any court
having competent jurisdiction and then become binding and final.
Minuteman and the franchisee (and their respective owners) **waive**
to the fullest extent permitted by law, and right to or claim for any
**punitive or exemplary damages** against the other and agree that
in the event of a dispute between them each shall be limited to the
recovery of any actual damages sustained by it.

Each party will be responsible for its own costs, including
attorneys fees, in conjunction with the arbitration proceeding.  **If
the franchisee commences action in any court prior to the
arbitrator's final decision on the controversy or claim, then the
franchisee will be responsible for all expenses incurred by
Minuteman and the franchisee in the arbitration proceeding.**
The Franchisee acknowledges and agrees that it is the intent of the
parties that arbitration between Minuteman and the Franchisee
shall be of Minuteman's and the Franchisee's individual claims
only.  No consolidated or multiple party claims may be brought by
either Minuteman or the Franchisee.

19

**The commencement of arbitration proceedings by an aggrieved party to settle disputes arising out of or relating to this Agreement is a condition precedent to the commencement of legal action by either party.** If the parties cannot resolve their differences through the arbitration program or if the Arbitration clause in this agreement is found to be unenforceable, then either party may bring their individual action after thirty (30) days have expired from the final decision of the arbitrator or court. In either event, any litigation shall be brought in the Supreme Court, of the State of New York located in the county where Minuteman has its home office, or in the United States District Court for the Eastern District of New York. The parties waive their rights to trial by jury except where prohibited by Federal or State law.

This Arbitration Clause shall not be construed to limit the right of Minuteman to apply to any court of competent jurisdiction for injunctive relief for infringement on any of Minuteman's service marks, trademarks, or copyrighted items, unauthorized decimation of Minuteman's confidential information or trade secrets or violations of covenant not to compete. The Franchisee recognizes that violation of these provisions may cause irreparable harm to Minuteman, other franchisees and the franchise system as a whole.

*See* Exhibit "A" at § 23 (emphasis added).

19.   Section 24 of the Franchise Agreement provides as follows:

**24.   <u>Franchisee's Acknowledgment</u>**

Franchisor has made a strong effort to familiarize Franchisee with its franchise concepts, location criteria, and the duties and responsibilities of a Minuteman Press Franchisee. Minuteman Press Full Service Printing Centers differ depending on geographic location, length of time in business, the attitude and effort of Franchisee. Franchisee acknowledges the business and economic risks associated with the purchase of a franchise.

FRANCHISOR SPECIFICALLY STATES THAT THERE IS NO MINUTEMAN PRESS FULL SERVICE PRINTING CENTER THAT MAY BE CONSIDERED TO BE A "TYPICAL" OR "AVERAGE" CENTER. FRANCHISOR MAKES NO REPRESENTATIONS OR GUARANTEES AS TO GROSS SALES, NET PROFITS, GROSS PROFITS, REVENUES OR OTHER EARNINGS ANY FRANCHISEE CAN EXCEPT.

FRANCHISEE IS NOT ENTITLED TO ANY COMPENSATION OR REIMBURSEMENT FOR LOSS OF PROSPECTIVE PROFITS, ANTICIPATED SALES OR OTHER LOSSES.

No person is authorized to give any representation other than those contained in or incorporated in this Franchise Agreement, and if given or made, such information or representation should not be relied upon as having been authorized.

*See* Exhibit "A" at § 24.

### 21.    **Miscellaneous Provisions**

(a)    This Agreement shall be binding upon the parties hereto, their successors and assigns.

(b)    As to any provision in this Agreement wherein approval is required, or modification desired, such approval or modification must be in writing and signed by the party to be charged.

(c)    If any portion of this Agreement is declared to be invalid by any court, such determination shall not affect the balance of this Agreement and the same will remain in full force and effect.

(d)    THIS AGREEMENT SHALL BE GOVERNED AS TO VALIDITY, CONSTRUCTION AND IN ALL OTHER RESPECTS, BY THE LAW OF THE STATE OF NEW YORK.

(e)    The failure of Franchisor to enforce at any time or for any period of time any one or more of the terms or conditions of this Agreement shall not be a waiver of such terms or conditions or of Franchisor's right thereafter to enforce each and every term of this Agreement.

(f)    Franchisor may sell or assign its interest in the license, in whole or in part, at any time.

(g)    The captions herein are inserted for convenience only, and will not be deemed or construed to be a part of this Agreement or to define or limit the contents of the paragraph thereof.

> (h)    Franchisee acknowledges receipt from Franchisor of offering prospectus covering the terms of this Agreement.
>
> (i)    Franchisee acknowledges that State and Federal law may require the Franchisor to list the home address of the Franchisee in particular circumstances.  Franchisee agrees and gives their consent to use the same.

*See* Exhibit "A" at § 25.

## IV.    PLAINTIFF-COUNTERCLAIM DEFENDANT'S FAILURES

20.    In or around September 2000 Plaintiff-Counterclaim Defendant began operating a Minuteman Press Full Service Printing Center until on or about February 28, 2001 when Plaintiff-Counterclaim Defendant voluntarily closed his Minuteman Press Full Service Printing Center.

21.    Despite his contractual obligations under the Franchise Agreement, Plaintiff-Counterclaim Defendant has refused to continuously operate the Minuteman Press Full Service Printing Center.

22.    Despite his contractual obligations under the Franchise Agreement, Plaintiff-Counterclaim Defendant has refused to pay certain fees due and owing to Minuteman Press in Farmingdale, New York.

23.    Despite his contractual obligations under the Franchise Agreement, Plaintiff-Counterclaim Defendant has breached various provisions of the Franchise Agreement.

24.    Despite his contractual obligations under the Franchise Agreement, Plaintiff-Counterclaim Defendant has refused to cease using the Minuteman Press trademarks and/or trade names, in violation of § 15(a) of the Franchise Agreement.

25.    Plaintiff-Counterclaim Defendant owed Minuteman Press, pursuant to the Franchise Agreement and other obligations, the following royalty payments and supply fees, ongoing interest, attorneys' fees and costs:

| | |
|---|---|
| Royalties for Months of January and February, 2001** | $    521.92 |
| MMP Supply | $    186.51 |
| | |
| Total Owed By Plaintiff-Counterclaim | |
| Defendant to Minuteman Press as of February 28, 2001 | $    708.43*** |

***plus ongoing interest at the rate of 12%, attorneys' fees and costs.
**  average of royalties paid 10/00 to 12/01 due to failure to submit royalty reports

26.    With knowledge of the termination of the Franchise Agreement, Plaintiff-Counterclaim Defendant has intentionally traded on the Minuteman Press marks and trade dress and has deliberately misappropriated Minuteman Press' goodwill for his own benefit.  Plaintiff-Counterclaim Defendant's identification of himself as an authorized Minuteman Press franchisee and his lack of concern for the confusion of others negatively affects, and will continue to negatively affect, Minuteman Press' reputation and the reputation of other authorized Minuteman Press franchisees, and the goodwill of Minuteman Press' marks.

27.    Minuteman Press is informed and believes, and on that basis alleges that, among other things, Plaintiff-Counterclaim Defendant has published and continues to publish or contract with third parties to create, circulate and place advertisements, letters or notices displaying one or more of the Minuteman Press marks (including the name "Minuteman Press") incorrectly informing the consuming public, among others, that, among other things, he is an authorized Minuteman Press franchisee or affiliated with Minuteman Press when, in fact he is not an authorized Minuteman Press franchisee.

28.    Minuteman Press is informed and believes, and on that basis alleges that, among other things, Plaintiff-Counterclaim Defendant has used and continues to use customer and

mailing lists that remain the property of Minuteman Press (or otherwise should have been turned over to Minuteman Press) and has contacted and/or is contacting Minuteman Press franchisees and others for his own benefit.

29.     Minuteman Press is informed and believes, and on that basis alleges that, among other things, when one contacts directory assistance for Lemoyne, Pennsylvania and asks for "Minuteman Press," one is given the telephone number for Plaintiff-Counterclaim Defendant's formerly authorized Minuteman Press Full Service Printing Center (717-731-1733), thus inextricably linking Plaintiff-Counterclaim Defendant's unauthorized Minuteman Press center to Minuteman Press marks.

30.     For the protection of Minuteman Press' patrons, Minuteman Press and Minuteman Press' licensed operators, Minuteman Press now seeks to enforce the termination of the Franchise Agreement to ensure that Plaintiff-Counterclaim Defendant does not continue to use Minuteman Press' proprietary marks or otherwise identify himself as an authorized and licensed Minuteman Press franchisee, and otherwise to compel Plaintiff-Counterclaim Defendant to comply with his post-termination obligations under the Franchise Agreement.

## COUNT I
## FEDERAL TRADEMARK INFRINGEMENT, <u>UNFAIR COMPETITION AND DILUTION</u>

### (REQUEST FOR INJUNCTIVE RELIEF)

31.     Minuteman Press incorporates the averments contained in paragraphs 1 through 30.

32.     Plaintiff-Counterclaim Defendant has knowledge of the termination of the Franchise Agreement and is intentionally trading on Minuteman Press' proprietary marks, trade dress and business system and is deliberately misappropriating Minuteman Press' goodwill for

his own benefit. Plaintiff-Counterclaim Defendant's identification of himself as an unauthorized Minuteman Press franchisee and lack of concern for the confusion of others negatively affects Minuteman Press' reputation and the reputations of other authorized Minuteman Press franchisees, and the goodwill of Minuteman Press' proprietary marks.

33.    Plaintiff-Counterclaim Defendant's use of Minuteman Press' proprietary marks and/or the operation of any future Minuteman Press unauthorized center would constitute, trademark infringement pursuant to the Lanham Act (the federal trademark act), 15 U.S.C. § 1114; Plaintiff-Counterclaim Defendant's false representation of being affiliated with Minuteman Press constitutes, and any future representation of the unauthorized Minuteman Press franchise as being affiliated with Minuteman Press would constitute, a false designation of the origin of Plaintiff-Counterclaim Defendant's goods and services in violation of 15 U.S.C. §1125(a); Plaintiff-Counterclaim Defendant's post-termination use of Minuteman Press' proprietary marks causes (and any future use will cause will cause) dilution of the distinctive qualities of the marks in violation of 15 U.S.C. §1125(c); and Plaintiff-Counterclaim Defendant's conduct constitutes trademark infringement, unfair competition and an unfair trade practice under the common law. These violations are particularly egregious in that the public does not know that Plaintiff-Counterclaim Defendant's unauthorized use of the Minuteman Press trademark is not an authorized by Minuteman Press and creates the mistaken belief that he is affiliated with Minuteman Press.

34.    Plaintiff-Counterclaim Defendant's unauthorized use of the Minuteman Press trademark and/or trade name causes, and any continued use would cause, Minuteman Press irreparable injury in that Minuteman Press cannot control the manner in which Minuteman Press' registered proprietary marks are used; Minuteman Press may have difficulty re-franchising in

Lemoyne, Pennsylvania and the surrounding area; the reputations of both Minuteman Press and its authorized franchisees will be damaged; the goodwill related to Minuteman Press' proprietary marks, trade dress and business system will be diluted and taken from Minuteman Press' control; Minuteman Press' relationship with its authorized franchisees will be impaired; and Minuteman Press will lose profits and revenues which, because of Plaintiff-Counterclaim Defendant's conduct, cannot be readily calculated.

35.     Minuteman Press has no adequate remedy at law in that the damages as set forth above, including danger to the general public which relies on the reputation of Minuteman Press and its business system, the misappropriation and theft of Minuteman Press' proprietary marks and business system, the consequent injury to consumer recognition and goodwill, and the potential inability to re-franchise the Lemoyne, Pennsylvania market because of Plaintiff-Counterclaim Defendant's violation of his post-termination obligations, cannot be compensated in monetary damages. Under the Lanham Act and the Franchise Agreement, irreparable harm to Minuteman Press is presumed to result from Plaintiff-Counterclaim Defendant's unauthorized use of Minuteman Press' proprietary marks.

36.     Minuteman Press' immediate and irreparable harm will continue unless Plaintiff-Counterclaim Defendant is enjoined from committing these wrongful acts.

**WHEREFORE**, Defendant-Counterclaim Plaintiff Minuteman Press International, Inc. ("Minuteman Press") requests that the Court enter a judgment against Plaintiff-Counterclaim Defendant Michael A. Shaffer ("Plaintiff-Counterclaim Defendant") as follows:

a.     a preliminary and permanent injunction enjoining Plaintiff-Counterclaim Defendant, his agents, employees and any person acting in concert with them from using Minuteman Press' proprietary marks including the trade name "Minuteman Press," and all other

trade names, trademarks, service marks and trade dress associated with Minuteman Press or the Minuteman Press System, any and all telephone numbers, signs and printed goods bearing the "Minuteman Press" trade name and Minuteman Press' proprietary marks, or any similar designation, trade name or trade dress, otherwise suggesting a present or former affiliation with Minuteman Press, and enjoining Plaintiff-Counterclaim Defendant from otherwise unfairly competing with Minuteman Press (including using for competitive business purposes the telephone number(s) for Plaintiff-Counterclaim Defendant's unauthorized Minuteman Press center (including, without limitation, 717-731-1733);

        b.     Plaintiff-Counterclaim Defendant be ordered to immediately assign the business telephone number(s) for Plaintiff-Counterclaim Defendant's unauthorized Minuteman Press center (including, without limitation, 717-731-1733) and execute any documents which may be necessary or desirable to affect the transfer and appoint Minuteman Press as Plaintiff-Counterclaim Defendant's agent to affect such transfer with the applicable telephone service company;

        c.     a preliminary and permanent injunction requiring Plaintiff-Counterclaim Defendant to take such action as necessary to cancel any assumed name or equivalent registration previously established and/or filed by Plaintiff-Counterclaim Defendant which contains the name "Minuteman Press" or any other trade name, trademark or service mark of Minuteman Press;

        d.     an accounting by Plaintiff-Counterclaim Defendant of the profits to which Minuteman Press may be entitled in connection with the operation of the former Minuteman Press Full Service Printing Center after the termination of the Franchise Agreement;

e.    treble damages pursuant to 15 U.S.C. §1117 arising from the unauthorized use of the former Minuteman Press proprietary marks, or any similar designation, trade name or trade address, otherwise a present or former affiliation with Minuteman Press by Plaintiff-Counterclaim Defendant after termination of the Franchise Agreement;

f.    a preliminary and permanent injunction requiring Plaintiff-Counterclaim Defendant to return to Minuteman Press any materials received by virtue of the Franchise Agreement or otherwise touching or concerning the operation of the former Minuteman Press Full Service Printing Center including, without limitation, all manuals, software, marketing materials, plans and specifications, designs, records, data, samples, models, programs, handbooks and drawings;

g.    a preliminary and permanent injunction requiring Plaintiff-Counterclaim Defendant otherwise to comply with the post-termination obligations under the Franchise Agreement;

h.    Minuteman Press' attorney's fees;

i.    costs of this action;

j.    prejudgment and post-judgment interest; and

k.    such further relief as the Court deems appropriate.

## COUNT II
## MONEY DAMAGES FOR BREACH OF FRANCHISE AGREEMENT- FAILURE TO MAKE PAYMENTS DUE AND OWING

37.    Minuteman Press incorporates the averments contained in paragraphs 1 through 36.

38.    Plaintiff-Counterclaim Defendant's failures to pay royalties due and owing pursuant to the Franchise Agreement constitute material breaches of the Franchise Agreement and go to the very essence of the parties' business relationship and the Minuteman Press business system.

39.    Additionally, Plaintiff-Counterclaim Defendant has failed, among other things, to continuously operate the Minuteman Press Full Service Printing Center, pay for supplies and equipment and has refused to submit monthly Gross Billings, all of which constitute material breaches of the Franchise Agreement and go to the very essence of the parties business relationship and the Minuteman Press business system.

40.    As a direct, proximate and foreseeable consequence of Plaintiff-Counterclaim Defendant's material breaches of contract, Minuteman Press has suffered, and will continue to suffer, damages.

**WHEREFORE**, Defendant-Counterclaim Plaintiff Minuteman Press International, Inc. ("Minuteman Press") demands that the Court enter judgment in its favor and against Plaintiff-Counterclaim Defendant Michael A. Shaffer in the sum of $_____, plus all additional amounts found to be due at the time of judgment for fees, payments and interest due under the Franchise Agreement at the time of termination, together with costs, attorneys' fees, pre-judgment and post-judgment interest and such other relief as the Court deems appropriate.

## COUNT III
## DECLARATORY JUDGMENT-TERMINATION OF
## THE FRANCHISE AGREEMENT

41.    Minuteman Press incorporates the averments contained in paragraphs 1 through 40.

42.    Minuteman Press requests that the Court declare that the Franchise Agreement was properly terminated as of June 14, 2001, Plaintiff-Counterclaim Defendant had no further rights with respect to the Franchise Agreement. In effect, as a result of Plaintiff-Counterclaim Defendant's acts and/or omissions with respect to the Franchise Agreement, Plaintiff-Counterclaim Defendant chose to terminate his Franchise Agreement.

43.    Minuteman Press further requests that the Court order Plaintiff-Counterclaim Defendant to pay Minuteman Press its costs and reasonable attorneys' fees incurred in enforcing Plaintiff-Counterclaim Defendant's obligations under the Franchise Agreement.

**WHEREFORE**, Defendant-Counterclaim Plaintiff Minuteman Press International, Inc. ("Minuteman Press") requests that the Court enter a Declaratory Judgment against Defendant Michael A. Shaffer ("Plaintiff-Counterclaim Defendant") declaring as follows:

a.    Plaintiff-Counterclaim Defendant is in default of and has otherwise breached his obligations under the Franchise Agreement;

b.    the Franchise Agreement was properly terminated as of June 14, 2001, Plaintiff-Counterclaim Defendant had no further rights with respect to the Franchise Agreement;

c.    declaring that all sums due under the Franchise Agreement be immediately paid; and

d.    awarding Minuteman Press its reasonable attorneys' fees, costs and such other and further relief as the Court deems just and appropriate.

## COUNT IV
## BREACH OF FRANCHISE AGREEMENTS -
## FAILURE TO SUBMIT CLAIMS TO ARBITRATION

44.    Minuteman Press incorporates the averments contained in paragraphs 1 through 43.

45.    Pursuant to § 23 of the Franchise Agreement, Plaintiff-Counterclaim Defendant was required to submit his claims to arbitration before commencing this lawsuit, but has refused to do so.

46.    Plaintiff-Counterclaim Defendant's failure to submit his claims to arbitration constitutes a material breach of the Franchise Agreement and goes to the very essence of the parties' business relationship and the Minuteman Press business system.

47.    As a direct, proximate and foreseeable consequence of Plaintiff-Counterclaim Defendant's material breach of contract, Minuteman Press has suffered, and will continue to suffer, damages in that Minuteman Press has incurred and continues to incur the costs of litigating this lawsuit, including attorneys' fees.

**WHEREFORE**, Defendant-Counterclaim Plaintiff Minuteman Press International, Inc. demands that the Court enter judgment in its favor and against Plaintiff-Counterclaim Defendant Michael A. Shaffer in the amount of the costs Minuteman Press has incurred, including attorneys' fees, pre-judgment and post-judgment interest and such other relief as the Court deems appropriate.

## COUNT V
## UNLAWFUL POST-TERMINATION OPERATIONS

48.     Minuteman Press incorporates the averments contained in paragraphs 1 through 47.

49.     As set forth above, the Franchise Agreement between Minuteman Press and Plaintiff-Counterclaim Defendant gave rise to express contractual obligations.

50.     As a direct, proximate and foreseeable consequence of Plaintiff-Counterclaim Defendant's material breaches of contract and Plaintiff-Counterclaim Defendant's continued post-termination use of unauthorized Minuteman Press trade names and failure and refusal to schedule an orderly, complete de-identification, Minuteman Press has suffered damages.

**WHEREFORE**, Defendant-Counterclaim Plaintiff Minuteman Press International, Inc. ("Minuteman Press") requests that the Court enter a judgment against Plaintiff-Counterclaim Defendant Michael A. Shaffer ("Plaintiff-Counterclaim Defendant') as follows:

a.     awarding Minuteman Press all sums and amounts due and owing under the Franchise Agreement, together with damages for Plaintiff-Counterclaim Defendant's unlawful, post-termination infringement of Minuteman Press' proprietary marks;

b.     awarding Minuteman Press its reasonable attorneys' fees, costs; and

c.     such further and other relief as the Court deems appropriate.

## COUNT VI
## MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION
### (REQUEST FOR INJUNCTIVE RELIEF)

51.     Minuteman Press incorporates the averments contained in paragraphs 1 through 50.

52.     Minuteman Press has invested substantial amounts of time, effort and money into the development of the Minuteman Press' business system.  The Minuteman Press business

system, which includes Minuteman Press' confidential information and trade secrets and other confidential business information, is disclosed to Minuteman Press' licensed operators in confidence and gives the licensed operators a competitive advantage in the full service printing industry. Minuteman Press disclosed the Minuteman Press business system, including the confidential information and trade secrets, to Plaintiff-Counterclaim Defendant in confidence in his capacity as a licensed operator.

53.    Pursuant to § 15(a) of the Franchise Agreement, Plaintiff-Counterclaim Defendant is obligated upon termination of the Franchise Agreement to immediately cease to use Minuteman Press' trade secrets and confidential information. Pursuant to § 15(a) of the Franchise Agreement, Plaintiff-Counterclaim Defendant also covenanted and agreed that he would not use in any manner any trademark, service mark, or trade name which is the same as Minuteman Press or its franchisees.

54.    Plaintiff-Counterclaim Defendant's continuing use of unauthorized Minuteman Press proprietary marks and failure to return Minuteman Press' confidential information and trade secrets violates, and Plaintiff-Counterclaim Defendant's continuing use and any future use of unauthorized Minuteman Press proprietary marks and disclosure of Minuteman Press' confidential information and trade secrets would violate, the prohibition against misappropriation of Minuteman Press' confidential information and trade secrets and the confidentiality provisions contained in the Franchise Agreement. Moreover, Plaintiff-Counterclaim Defendant's continued use and disclosure constitutes misappropriation of Minuteman Press' confidential information and trade secrets under common law.

55.    Plaintiff-Counterclaim Defendant's continuing use of Minuteman Press' proprietary marks has irreparably damaged Minuteman Press, and Plaintiff-Counterclaim

Defendant's continuing use and any future use will continue to irreparably damage Minuteman Press, unless enjoined by the Court, and Minuteman Press has no adequate remedy at law.

**WHEREFORE**, Defendant-Counterclaim Plaintiff Minuteman Press International, Inc. ("Minuteman Press") requests that the Court enter a judgment against Plaintiff-Counterclaim Defendant Michael A. Shaffer as follows:

a.    a preliminary and permanent injunction enjoining Plaintiff-Counterclaim Defendant ("Plaintiff-Counterclaim Defendant"), his agents, employees and any person acting in concert with him from misappropriating, using, duplicating and disclosing any of Minuteman Press' confidential information or trade secrets;

b.    compensatory damages, including lost profits, arising from any use of the unauthorized use of Minuteman Press' proprietary marks by Plaintiff-Counterclaim Defendant after the termination of the Franchise Agreement;

c.    a preliminary and permanent injunction requiring Plaintiff-Counterclaim Defendant to return to Minuteman Press any materials received by virtue of the Franchise Agreement or otherwise touching or concerning the operation of the Minuteman Press center including, without limitation, all manuals, software, marketing materials, customer lists, mailing lists, plans and specifications, designs, records, data, samples, models, programs, handbooks and drawings and any other material containing information regarding or relating to Minuteman Press' confidential information, trade secrets, operating instructions or business practices;

d.    a preliminary and permanent injunction requiring Plaintiff-Counterclaim Defendant otherwise to comply with their respective post-termination obligations under the Franchise Agreement;

    e.        Minuteman Press' attorney's fees;

    f.        costs of this action;

    g.        prejudgment and post-judgment interest; and

    h.        such further relief as the Court deems appropriate.

**COUNT VII**
**MONEY DAMAGES FOR BREACH OF FRANCHISE AGREEMENT-**
**<u>LOST FUTURE PROFITS</u>**

56.     Minuteman Press incorporates the averments contained in paragraphs 1 through 55.

57.     Upon information and belief, it is believed and therefore alleged that as of at least February 2001, Plaintiff-Counterclaim Defendant did not intend to continue to perform or otherwise discharge any of his financial or other obligations under the Franchise Agreement.

58.     In effect, by failing to be and remain current with his financial or other obligations under the Franchise Agreement, Plaintiff-Counterclaim Defendant chose to terminate his own Franchise Agreement.

59.     Plaintiff-Counterclaim Defendant's failure to continuously operate the Minuteman Press Full Service Printing Center and pay and uphold his other obligations pursuant to the Franchise Agreement constitutes material breaches and anticipatory repudiation of the Franchise Agreement.

60.     Plaintiff-Counterclaim Defendant would have paid Minuteman Press $108,037.44 in royalties, based on an average of Plaintiff-Counterclaim Defendant's royalties for September, 2000 to December, 2000 of $260.96 per month, for the remainder of the thirty-five (35) year term from March 2001 (414 months), plus supply purchases and other payments to Minuteman.

61.    As a direct, proximate and foreseeable consequence of Plaintiff-Counterclaim Defendant's material breaches and anticipatory repudiations of contracts, Minuteman Press has suffered damages in the form of lost profits that it otherwise would have earned and enjoyed under the Franchise Agreement during the remaining term, which would have ended on August 31, 2035, of the Franchise Agreement.

**WHEREFORE,** Defendant-Counterclaim Plaintiff Minuteman Press International, Inc. ("Minuteman Press") requests that the Court enter judgment in its favor and against Plaintiff-Counterclaim Defendant Michael A. Shaffer for compensatory damages, including the lost profits that it otherwise would have earned and enjoyed under the Franchise Agreement during the remaining term of the Franchise Agreement which would have ended on August 31, 2035, plus all additional amounts found to be due at the time of judgment under the Franchise Agreement, together with costs, attorneys' fees, pre-judgment and post-judgment interest and such other relief as the Court deems appropriate.

Harris J. Chernow (PA I.D. No. 52577)
John J. Jacko, III (PA I.D. No. 67477)
Pearlette V. Toussant (PA I.D. No. 85756)
**BUCHANAN INGERSOLL**
**PROFESSIONAL CORPORATION**
Eleven Penn Center
1835 Market Street, 14th Floor
Philadelphia, PA 19103
(215) 665-3854 (telephone)
(215) 665-8760 (facsimile)

Attorneys for Plaintiff Minuteman Press
International, Inc. and Robert Emmett

Dated:  January 7, 2002

## CERTIFICATE OF SERVICE

I, Harris J. Chernow, hereby certify that on this 7th day of January 2002, I caused a copy of the foregoing Defendants Minuteman Press International, Inc.'s and Robert Emmett's Answer to Plaintiff's Complaint and First Amended Complaint Together With Affirmative Defenses and Counterclaim to be served via First-Class, U.S. Mail, postage prepaid, upon the following counsel of record:

Robert J. White, Esquire
P.O. Box 3005
York, PA 17402

and

Marvin Beshore, Esquire
**Milspaw & Beshore**
130 State Street
P.O. Box 946
Harrisburg, PA 17108-0946

and

Charles Rees Brown, Esquire
**Nicholas & Foreman, P.C.**
4409 North Front Street
Harrisburg, PA 17110

_____
Harris J. Chernow

474513 -1;PHL1

PRINTING "FOR THE JOB YOU NEEDED YESTERDAY"

# MINUTEMAN PRESS®

## INTERNATIONAL, INC.

# AGREEMENT

# BETWEEN

# MINUTEMAN PRESS INTERNATIONAL, INC. and

Michael A. Shaffer

**DATE:** 9/1/00

AGREEMENT made as of the __1st__ day of __Sept__, __2000__ by and between MINUTEMAN PRESS INTERNATIONAL, INC., a New York corporation having its principal place of business at 1640 New Highway, Farmingdale, New York 11735 (hereinafter called "Franchisor") and __Michael A. Shaffer__

_____, (hereinafter called "Franchisee").

### W I T N E S S E T H

WHEREAS, Franchisor is the owner of the service mark and logo, "MINUTEMAN PRESS" (the "Mark"), and other service marks and trade names (hereinafter collectively "Marks"), trade secrets, and know-how for use in connection with the unique system for full service quick offset printing, reproduction and copying, to meet the printing requirements for letterheads, bills, forms, cards, etc. (the "Minuteman Press System") and is the owner of the entire right, title and interest in and to U.S. Trademark, Principal Register, Registration No. 2,314,083, "Minuteman Press"; Registration No. 1,109,658, "Man With Clock Head; Registration No. 1,107,498 "For The Job You Needed Yesterday"; Registration No. 1,667,927 "International Minute Press"; Serial No. 153,653, "International MinuteFax & Design"; Registration No. 1312789 "Put a Little Color in Your Printing" and Registration No. 1,341,715 "Stripe Design" (Window Graphics); "Printing with Minute to Minute Results" Registration #1,755,929, "Color Combo Days" Registration No. 75/135,933, "Color Combo Days (Stylized) & Design", Registration No. 75/135,934 together with all of the good will symbolized by the Marks which Marks are used in identifying, advertising, promoting and marketing the Minuteman Press System; and

WHEREAS, Franchisee hereby acknowledges that by reason of Franchisor's high standards of quality and service in connection with the development of the Minuteman Press System, that the Minuteman Press System is unique and Franchisor has created over a period of time a clear identification and consumer demand therefor, which requires appropriate and adequate safeguards for the maintenance and future promotion of the Minuteman Press System; and

WHEREAS, Franchisee hereby acknowledges the exclusive right of Franchisor in and to the Minuteman Press System, as presently developed or as same may be improved and expanded during the term of this Agreement, including practices, know-how, trade secrets, designs, marks, logos, window

MMP00E3

1

graphics, signs and slogans presently in use and to be hereafter developed, all of which may be used thereunder; and

WHEREAS, Franchisee desires, upon the terms and conditions herein set forth, to obtain and enter into the business of owning and operating a Minuteman Press System at and from the location agreed upon, under the Marks, subject to the supervision of Franchisor and in accordance with the standards of Franchisor.

NOW THEREFORE, in consideration of the mutual promises and undertakings set forth below, the parties hereto agree as follows:

### 1.  Grant of License

(a) Franchisor hereby grants to Franchisee a non-exclusive license to use and practice the Minuteman Press System in a location as hereinafter specified (the "Premises"), (the Minuteman Press System at the Premises being referred to as the "Minuteman Press Full Service Printing Center") solely in connection with the operation of a Minuteman Press Full Service Printing Center and to employ therein the Marks.

(b) Franchisee shall, under no circumstances, be authorized to use the Marks hereunder as part of any corporate name.  If Franchisee is required to register under any statute for the registration of fictitious business name, Franchisee shall register in a form approved, in advance, by the attorneys for Franchisor.

(c) Franchisor agrees that so long as Franchisee faithfully performs and observes each and all of the obligations and conditions to be performed and observed by the Franchisee under or in connection with this Agreement, Franchisor, during the continuance of this Agreement, will not authorize any person or company, including itself, to operate a Minuteman Press Full Service Printing Center or any other store engaged in the quick offset printing business at _____ 855 Market ST _____

Lemoyne, PA 17043 _____

_____.


### 2.  Trade Secrets and Confidential Relationship

MMP00E3

2

(a) Franchisor grants to Franchisee the right to use the Marks at the Premises, and will impart to Franchisee much of the know-how and trade secrets accumulated by Franchisor, in the operation of a Minuteman Press Full Service Printing Center.

(b) Franchisee acknowledges that Franchisor will disclose and impart to Franchisee, in confidence, some or all of its established trade secrets, production and sales methods and other techniques and know-how relating to the Minuteman Press Full Service Printing Center. Franchisee agrees that all such confidential information shall at all times be maintained in strictest confidence and used by Franchisee only in the regular operation of the duly authorized Minuteman Press Full Service Printing Center during the period of such authorization and not in any other business or other activity whatsoever. Franchisee further acknowledges that such trade secrets and confidential information are valuable, unique and special assets of Franchisor, and that it will not disclose any of same to any person, firm, corporation or other entity whatsoever, for any reason or purpose, without the prior written authorization or consent of Franchisor.

## 3. **The Premises**

The Premises at which the facility is to be located will be mutually agreed upon and will be leased directly by Franchisee pursuant to a lease to be executed by Franchisee (the "Lease").

Prior to Franchisee's executing the Lease, Franchisor shall have the right to review same. Franchisee shall not execute the Lease without the prior written consent of the Franchisor. The Lease will contain a provision permitting the Franchisor to assume the obligations of Franchisee and/or its designee, upon any default of Franchisee and/or its designee, or upon any adjudication, whether voluntary or involuntary, that Franchisee is bankrupt, or upon the execution of a deed of trust to the benefit of creditors of Franchisee. The Franchisor shall have no liability with respect to the selection of a location for the Franchisee, nor liability with respect to any recommendation regarding the site's suitability.

Franchisee must deliver to Franchisor a fully executed copy of the lease to the Premises, prior to execution of the license agreement.

Franchisee cannot amend, renew or cancel lease or move the business without the express written consent of the Franchisor.

MMP00E3

3

## 4.    Duties of Franchisor

(a)  In order to assist Franchisee in the establishment and operation of the Minuteman Press Full Service Printing Center, Franchisor shall be obligated to perform the following duties on behalf of the Franchisee.

(i)    to provide Franchisee with a suggested bookkeeping system and invoice system;

(ii)    to provide Franchisee with periodic Minuteman Press system bulletins;

(iii)    to provide Franchisee with an Official Manual of Operations, which includes statements of policies and procedures, together with instruction and advice in the operation of a Minuteman Press Full Service Printing Center;

(iv)    to provide Franchisee with a starter supply of printed material consisting of letterhead, envelopes, flyers, invoices, business cards;

(v)    to provide Franchisee with sample copies of "Yellow Pages" advertising approved for Franchisee's use; and

(vi)    to provide Franchisee with reproduction proofs of newspaper advertising approved for Franchisee's use.

(vii)    to provide telephonic consultation and advisory assistance.

(Viii)    assist Franchisee in planning the layout of the Minuteman Press Full Service Printing Center, which will essentially comply in appearance with all other Minuteman Press Full Service Printing Centers.  If the Franchisee purchases an existing Minuteman Press, License from an existing Franchisee, Franchisor shall have no obligation with respect to planning any layout as described herein above;

(ix)    aid in obtaining financing of the equipment selected for the Minuteman Press Full Service Printing Center;

(x)    a field representative to assist Franchisee for forty hours during the initial set up and operational phases of the Minuteman Press Full Service Printing Center.    Franchisor will make available, from time to time, "on location" assistance after the opening of the Minuteman Press Full Service Printing Center's operation, subject to Franchisee compliance with the Franchise Agreement.

(b)  The parties agree that the assistance to be rendered to Franchisee by Franchisor hereunder shall in no way impose any obligation upon Franchisor to make any payment or incur any expense or assume any obligation therefor.

MMP00E3

4

## 5.  **Training Program**

Franchisor shall conduct a Minuteman Press System training program at a time designated and to be held at the Minuteman Press Training Center.  Franchisee agrees that at least one (1) owner will attend such training session. Franchisor shall pay the cost of such training, including the transportation and the cost of lodging for one (1) owner during the training period.  The training period is for 14 days over 2 1/2 weeks. Franchisor will pay no compensation for any service performed by the Franchisee during such training period. Franchisee may thereafter, at its request, receive, at its own expense, additional training or have an immediate family member receive training at a location as may be designated by Franchisor, provided a regularly scheduled training program is then scheduled or in session.  Franchisor also agrees to provide training to a full time employee of Franchisee at Franchisee's cost and expense.  Franchisor will have no obligation to pay for transportation and lodging expenses for the additional training period and will pay no compensation for any service performed by Franchisee or its representatives during such additional training period.

## 6.  **Payments by Franchisee**

In consideration of the grant of the license contained herein, Franchisee shall pay to Franchisor the following:

(a)  Upon the execution hereof, a franchise fee of One Dollar ($1.00) ~~Forty Four Thousand Five Hundred ($44,500)~~ ~~Dollars~~ is due and payable.  Receipt of which Franchisor hereby acknowledges.  An initial $5,500. deposit ("binder"), is payable after you submit your application, but before Minuteman Press commences investigation on potential site locations.  The balance due and owing at the time of execution of this agreement.

(b)  A royalty fee equal to six percent (6%) of Franchisee's total monthly gross billings as hereinafter defined.  "Gross Billings" shall mean the total of all sales and/or fees charged for product and/or services furnished in, or upon orders placed at, or completed by delivery in, through or from the Minuteman Press Full Service Printing Center at the Premises, whether or not collected by Franchisee, less state and local sales taxes, if any.  Within ten (10) days after the end of each month, Franchisee shall send to Franchisor, a statement in a form approved by Franchisor, signed by Franchisee showing all orders placed at the Minuteman Press Full Service Printing Center, all merchandise sold, and all billings therefor during the month, accompanied by a royalty check in the appropriate amount.  All royalty fees are to be sent to the Franchisor's corporate headquarters in Farmingdale, New York or to such location as Franchisor may

MMP00E3

5

designate from time to time. In the event Licensee fails to deliver to Licensor, and/or deposit in the U.S. Postal System the royalty statement by the 10th day of the month for which the continuing royalty is due and payable, then such royalty statement shall be deemed late, and Franchisor, at its discretion, may charge a penalty of up to $10 per day, or not to exceed the maximum permitted by State law, for each day such royalty statement is late. In the event Licensee fails to deliver to Licenser, and/or deposit in the U.S. Postal System the Royalty Fee by the 10th day of the month following the close of the month for which the continuing royalty is due and payable, then such royalty fee shall be deemed late, and Franchisor, at its discretion, may charge a penalty of up to $10 per day, or not to exceed the maximum permitted by State law, for each day such royalty fee is late.

Royalty fees shall be waived for the first sixty (60) days after the opening of a new Minuteman Press Full Service Printing Center. If the Franchisee is the purchaser of an existing franchised center, the royalty is 6% commencing the first month of operation and continuing thereafter. It is expressly agreed that the payment of the royalty fee is not contingent upon Minuteman providing a level of service perceived by the Franchisee to be adequate.

Royalty Incentive Program:

Minuteman has instituted a royalty incentive program for qualified franchisees. Minuteman's current royalty incentive program is based on a set gross sales maximum. A qualified franchisee's royalty payments are currently capped at six percent of the maximum amount. Minuteman evaluates the gross sales maximum on a yearly basis, and at it's sole discretion may change the level or discontinue the program without prior notice to the franchisee at the end of the current program year.

In order for a franchisee to become eligible for participation under the program, the franchisee must be in full compliance with the terms, covenants and conditions of this Agreement. Specifically the franchisee must submit monthly royalty statements and monthly royalty payments by the 10th day of the following month.

## 7. <u>Term</u>

This Agreement shall be for an Initial Term of thirty five (35) years (the "Initial Term") commencing as of the date hereof, unless sooner terminated as hereinafter provided. Franchisee shall have the option to renew this Agreement on the prevailing terms and conditions then available to new Franchisees of Franchisor for an additional period of thirty five (35) years, provided that Franchisee is not in default under this Agreement at the date upon which Franchisor receives notice of the exercise of the option

MMP00E3

6

and upon the expiration of the Initial Term of this Agreement. Such option to extend shall be exercisable by the sending of written notice to Franchisor not later than six (6) months prior to the expiration of the Initial Term hereof and provided Franchisee shall agree to the then prevailing terms and conditions available to new Franchisees of Franchisor.

Franchisee shall execute a general release, in a form prescribed by the Franchisor, of any and all claims against the Franchisor and its subsidiaries and affiliates, and their respective officers, directors, agents and employees, provided that all rights enjoyed by the Franchisee and any causes of action arising in its favor from the provisions of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of GBL 687.4 and 687.5 be satisfied.

### 8.  Duties of Franchisee

Franchisee understands and acknowledges that every detail of the system is important to Franchisee, the Franchisor and other Franchisees in order to develop and maintain high operating standards, system wide uniformity, and to increase the demand for services rendered by all of the licensed businesses under the System, and to protect the Franchisor's reputation and good will.

Franchisee agrees that it will:

(a)  Use the subject matter of the license granted hereunder solely for the purposes of operating a Minuteman Press System at the Premises. Franchisee shall not use the Premises for any other purpose without the prior written consent of Franchisor.

(b)  Maintain the Premises (exterior and interior), and all related equipment, furnishings, materials and supplies in first-class condition and operate the Minuteman Press Full Service Printing Center in a manner which will enhance, and not detract from, the value of the Franchisor's marks, trade names, reputation and good will.

(c)  Prominently display on and in the Minuteman Press Full Service Printing Center advertising signs of such nature, form, color, number, location and size and containing such material as Franchisor shall direct, in writing, and shall not display therein or thereon any sign or advertisement to which Franchisor objects.

(d)  Comply with all laws, ordinances, regulations and requirements of local, state and federal governmental authorities and pay any and all city, county, state and/or federal sales and/or use taxes

MMP00E3

7

excise taxes, occupation taxes, license fees and other taxes, assessments and levies arising out of or in connection with all or any part of this Agreement.

(e)  Obtain public liability, workmen's compensation and property damage insurance in amounts and through insurance carriers approved by Franchisor and shall name Franchisor as an additional insured as its interest may appear.  Franchisee shall indemnify and save Franchisor harmless from and against any claims or expenses (including but not limited to reasonable attorney's fees) of whatever kind or character, on account of any actual or alleged loss, injury or damage to any person, firm or corporation, or to any property or claim arising out of or in connection with Franchisee's business, or the exercise or purported exercise by Franchisee of its license hereunder.  This covenant shall survive the expiration or other termination of this Agreement.

(f)   Join and participate in a minimum of two local business and civic organizations.

(g)  Commence operation of the Minuteman Press System at the Premises not later than sixty (60) days following selection of the location and execution of the Lease thereof.

(h)  Furnish to the Franchisor at Franchisor's request, sampling of Franchisee's finished work product.

(i)   Franchisee is obligated and agrees to answer the telephone at the store premises with the name "Minuteman Press."  Franchisee shall not answer the telephone under any other name without the written consent of Franchisor.

(j)   Franchisee shall conduct its business in accordance with Franchisor's Operations Manual, one copy of which Franchisee will have on loan from Franchisor for the term of the License Agreement. Franchisee agrees to comply with all the policies , procedures and standards set forth in the manual and as it may be modified from time to time by the Franchisor.

(k)  Franchisee acknowledges that Franchisor has explained the importance of the creation and maintenance of a full-time marketing program.  Franchisee further acknowledges that a vital element of success of any Minuteman Press Full Service Printing Center lies in the creation and maintenance of a full-time marketing program. Franchisee agrees to initiate and maintain a regular, ongoing marketing program, spending a minimum of three hours per day, or a minimum of fifteen hours per week either personally or through an employee pursuing a marketing program.  Franchisee further agrees to create a marketing file

MMP00E3

8

and record all marketing activities therein.  This file shall remain on the premises and be available to the Franchisor to review upon reasonable notice.

## 9.  Equipment and Supplies

Franchisee acknowledges that the equipment, or equivalent equipment and supplies listed in Schedule A attached hereto and made a part hereof are required to open a Minuteman Press Full Service Printing Center. All furniture, fixtures, equipment and supplies listed in Schedule A are available from Franchisor.  Franchisee has no express obligation to purchase or lease these items from Franchisor and Franchisor agrees to furnish specifications therefor upon request of Franchisee.  Franchisee acknowledges that all items, or their equivalents, set forth in Schedule A must be purchased or leased prior to the date the Minuteman Press Full Service Printing Center opens for business and failure to purchase or lease the equipment within the time periods provided in Paragraph 8 (g) hereof shall be deemed a default hereunder.

## 10.  Operation of Premises

(a)  Franchisee agrees to continuously (during regular business hours and days) operate the Minuteman Press System in the Premises unless prohibited from so doing by an act of God, a religious holiday, a personal tragedy or conditions beyond Franchisee's control; and further agrees to exercise Franchisee's best efforts, skills and diligence in the conduct of such operations.   In this connection, Franchisee agrees to so select and regulate its employees that they will be knowledgeable, presentable, courteous and helpful to customers, in compliance with the standards of Franchisor.

(b)  During the term of this Agreement, Franchisee shall only sell products in the Premises approved by the Franchisor.

## 11.  Regulation of Premises by Franchisor

(a)  Throughout the term of this Agreement, Franchisor may regulate the services and performance rendered at the Premises in connection with the operation of the Minuteman Press System; Franchisor further may determine and regulate the standards of repair and maintenance of the Minuteman Press premises.  Franchisee agrees to conform to the standards established by Franchisor as herein provided and maintain the Premises in the manner best calculated by the Franchisor to sustain the good will, consumer demand and prestige enjoyed by the Franchisor.

MMP00E3

9

(b) If Franchisor advises Franchisee that the premises are not neat or clean, Franchisee has fifteen (15) days after written notification to clean up the premises. If said cleaning is not performed, Franchisor has the right to have the premises cleaned at the expense of Franchisee.

(c) Franchisee hereby agrees to rent from Franchisor the logo type and name to be displayed on the exterior of the Premises and to pay Franchisor therefor a rental fee of Ten Dollars ($10.00) per annum, in advance. At the expiration or sooner termination of this Agreement, Franchisee agrees to return all such rented logo type, sign and name, if practicable.

(d) Franchisee agrees to permit Franchisor to take interior and exterior photographs of the Premises and use in any of Franchisor's publicity, advertising, or in such manner as Franchisor deems appropriate, all at Franchisor's expense.

## 12. Inspection of Books and Records

(a) Franchisee agrees that Franchisor's duly authorized representatives shall have the right at all times during regular business hours without notice to enter upon the Premises for the purpose of examining them to insure the proper exercise of quality control hereunder, testing the work product and conferring with Franchisee and Franchisee's employees, inspecting and checking merchandise, equipment and supplies and reviewing sales and operations procedures and obtaining samples of work produced by Franchisee.

(b) Franchisee will submit to Franchisor, annually during the term of this Agreement, a balance sheet and income statement and such other financial statements and schedules as Franchisor may reasonably require. In addition, Franchisee will submit to Franchisor, together with each payment made pursuant to Paragraph 6, a complete, itemized and detailed statement setting forth the total amount of gross billings of Franchisee during the preceding months. All statements submitted to Franchisor hereunder shall be sworn to by Franchisee and (if Franchisee is also a corporation) by its chief executive, directors and chief financial officers.

(c) Franchisee agrees to maintain at the Premises and available for inspection by Franchisor, at Franchisor's discretion during normal business hours, adequate records of its business operations. Franchisee agrees to permit Franchisor's duly authorized representatives to examine and/or audit, and make copies thereof. Such records shall include, but not be limited to, invoices, W2's, 1099's, all tax returns and their supporting documents, profit and loss statements, cash register records, all bank statements and

MMP00E3

10

canceled checks as well as deposit slips, whether corporate or personal, and all other pertinent information deemed necessary in an examination or audit.

(d) Franchisor has the right to verify all of Franchisee's sales, directly with their customers, as well as all purchases and other expenses, directly with Franchisee's suppliers or employees.

(e) Franchisee will maintain true and correct books of account, in accordance with generally accepted accounting principals, consistently applied. Franchisor has the right under the agreement to have its authorized representatives examine and make copies of Franchisee's records of its business operations. Such records shall include, but not limited to cash register records, profit and loss statements, balance sheets, income tax work sheets and returns and any other records normally maintained by a business similar to that conducted at a Minuteman Press Full Service Printing Center. Franchisor may examine any such other reports or information pertaining to the business as Franchisor may reasonable request, from time to time.

(f) If the Franchisee fails to timely submit either the Franchisee's monthly gross sales report or financial statements, then Franchisor may conduct an audit and be reimbursed for all costs and expenses incurred without regard to the percentage of any discrepancy found. Franchisor estimates the audit charge to be between $150 and $300 per day, plus all expenses.

## 13. **The Marks**

Franchisor hereby acknowledges and warrants that the Marks are valid and subsisting, as hereinbefore recited. In this connection, Franchisee covenants and agrees never to object to or contest the validity or renewal rights of Franchisor thereof; and further agrees to refrain from any act seeking to infringe upon Franchisor's rights in and to the Marks. Franchisee agrees that its rights to use the Marks shall at all times be limited to the terms of this Agreement. At the expiration of the Agreement or sooner termination of the Agreement pursuant to its terms, Franchisee agrees to execute such documents and take such further actions as Franchisor shall reasonably deem necessary or advisable to the end that Franchisor shall be convinced that Franchisee has ceased the use of the Marks in every way and has no further interest or right therein whatsoever. Franchisee further covenants and agrees that it will not utilize the Marks, as shall be registered with the United States Patent Office, in any manner whatsoever either directly or indirectly, in any certificate or charter of incorporation. The Franchisor shall have the right to change the Marks and name at

MMP00E3

11

such time as the Franchisor shall deem appropriate. Any such change shall be at the Franchisee's cost and expense.

Whereas, it may be in the best interest of the Franchisor to have the Franchisee conduct business in a name other than Minuteman Press it is, therefore, agreed between the parties that when or if Franchisor advises the Franchisee that the name Minuteman Press be discontinued and business conducted under a different trade name, the Franchisee will immediately remove the various signs from the Minuteman Press Full Service Printing Center and replace the same substituting in its place appropriate signs with the changed name.

In the event that Franchisee removes, defaces or improperly uses any Minuteman Press trademark, service mark, copyright or sign at the Licensed location, and fails to remedy default within twenty (20) days of written notice to correct same then in that event it is acknowledged that such action shall have caused severe damage to Franchisor.

## 14. Events of Default

Upon the occurrence of any of the following events, Franchisor, at its option, shall have the right, pursuant to applicable state law, to terminate this Agreement and all of the Franchisee's rights hereunder, provided Franchisee shall fail to remedy any of the following to Franchisor's satisfaction:

If Franchisee shall:

(a) become in default under any lease covering the Premises or equipment of its Minuteman Press Full Service Printing Center, and such default remains unremedied for ten (10) days after notice thereof; or

(b) closes the Minuteman Press Full Service Printing Center for a period of fifteen (15) successive days without Franchisor's prior written consent; or

(c) defaults in the performance of any of the covenants, terms or conditions of this Agreement, and such default remains unremedied for more than five (5) days after written notice thereof to Franchisee of such default; or

(d) becomes insolvent, be adjudicated bankrupt, have a voluntary or involuntary petition in bankruptcy or any other arrangement under the bankruptcy laws filed by or against it, make an assignment for the benefit of creditors, or if a receiver or trustee in bankruptcy appointed to take charge of Franchisee's affairs or property; or

MMP00E3

12

(e) commences dissolution proceedings or have such proceedings commenced against the Franchisee; or

(f) permits a judgment against the Franchisee to remain unsatisfied or unbonded of record for fifteen (15) days.

(g) removes, defaces, or improperly uses any Minuteman Press trademark, service mark, copyright or sign at the licensed location.

(h) state laws may exist which govern default, nonrenewal, termination and time to cure. If any of the terms of this agreement are inconsistent or determined void because of public policy of State Franchise Law, then any inconsistency shall be governed by State law to the extent it is void.

## 15. Termination or Expiration of Agreement

In the event of termination of this Agreement as provided herein:

(a) Franchisee agrees to immediately discontinue the employment or use of all marks (and to file notice of discontinuance or termination thereof), signs, structures and forms of advertising incorporating the Marks and further agrees to make, or cause to be made, such changes in signs, buildings and structures, equipment, supplies, furnishings and fixtures, and otherwise in order to distinguish the Premises from its former appearance and from other Minuteman Press System establishments. Thereafter, Franchisee shall not use in any manner any trademark, service mark, or trade name which is the same as Franchisor or its Franchisees. Upon termination of this Agreement for any reason, Franchisee may not refer to itself or any of its officers, directors, or employees as "formerly Minuteman Press", "formerly of Minuteman Press" or other words to that effect. Franchisee hereby authorizes the Franchisor to have the use and ownership of the telephone numbers used by the Franchisee in the Minuteman Press Full Service Printing Center and hereby authorizes the appropriate telephone company to change said ownership of said lines. Franchisee further agrees to execute those papers necessary to effect change in ownership. After said transfer, the cost of said number or numbers shall be borne by the Franchisor.

(b) All amounts due and owing from Franchisee to Franchisor shall immediately become due and payable.

(c) Franchisee shall pay to Franchisor all damages, costs and expenses, including reasonable attorney's fees, incurred by Franchisor in obtaining injunctive relief for the enforcement of any portion of the License Agreement.

MMP00E3

(d) Franchisee agrees that upon termination of the License, they will immediately return to the Franchisor all copies of the Confidential Operations Manual which have been loaned to them by the Franchisor and all updates, if any, which Franchisee may have thereafter.

(e) At the time of termination of the License Agreement, for any reason, Franchisee agrees to do the following:

1. Change any listed telephone numbers relating to the franchised business and;

2. Agrees not to provide a call forwarding telephone number referral with respect to any disconnected telephone number and;

3. Agrees not to indicate in any manner that it was previously affiliated with the Franchisor.

Franchisee further agrees to execute any and all necessary documentation to transfer any telephone numbers for the franchised business to the Franchisor.

(f) Franchisee shall immediately cease to use whatsoever the licensed software, and shall immediately return to Franchisor all originals, copies and updates thereto.

(g) Franchisor shall have the right, at its option, to purchase from Franchisee all of, or any part of any equipment, furnishings, supplies, or other material then in the possession of Franchisee that bears any of the Marks or trade names of Franchisor. Such right shall be exercisable by the giving of written notice to Franchisee, and all of the equipment, furnishings, supplies and materials designated or referred to in said notice shall immediately be delivered to Franchisor and Franchisor shall thereafter, after setting off against the amounts payable any monies owed by Franchisee to Franchisor under Paragraph 15 (b) above, promptly pay to Franchisee the amount due. Franchisor shall purchase the foregoing at the cost thereof to Franchisee less the depreciation therefore taken by Franchisee, if applicable, for such items for federal income tax purposes.

(h) THE LICENSE AGREEMENT MAY BE TERMINATED ONLY BY THE FRANCHISOR AND NO PROVISION IS MADE IN THIS AGREEMENT FOR THE UNILATERAL TERMINATION OF THIS AGREEMENT BY THE FRANCHISEE, EXCEPT FOR VIOLATION OF PROVISIONS SET FORTH IN PARAGRAPH FOUR (4) OF THE FRANCHISE AGREEMENT. IN THAT EVENT THE FRANCHISEE MUST PROVIDE FRANCHISOR WITH NOTICE OF DEFAULT AND OPPORTUNITY TO CURE.

MMP00E3

(i) Franchisee's lease to the Premises heretofore referred to in Paragraph 3 of this Agreement shall be at the option of Franchisor deemed assigned to the Franchisor. The Franchisor shall advise the Franchisee of the exercise of said option at the time the termination notice is given.

(j) Upon termination of Franchisee by Franchisor, Franchisee irrevocably grants to Franchisor all customer lists, customer business, including customer art work, presently in the possession of Franchisee.

## 16. Assignment

(a) This Agreement shall not be assigned by Franchisee, whether voluntary, involuntary, by operation of law, or otherwise, without the prior written consent of Franchisor, which consent shall not be unreasonably withheld.

(b) If Franchisee is an individual or two or more individuals or a partnership, Franchisee may upon the written consent of the Franchisor assign this Agreement to a corporation formed by Franchisee at its sole cost and expense for the sole purpose of operating a Minuteman Press Full Service Printing Center at the Premises, provided that Franchisee shall be and remain on the License Agreement jointly and severally liable for the performance of all the obligations of Franchisee under and in connection with this Agreement. Franchisee shall own not less than eighty percent (80%) of the issued and outstanding shares of such corporation; and provided, further that in the event of such assignment, the assignee corporation shall, in writing, assume all of the obligations of the Franchisee hereunder. A change in the ownership (voluntary, involuntary, by operation of law or otherwise) of twenty percent (20%) or more of the capital stock of Franchisee corporation shall be deemed an assignment requiring Franchisor's consent.

(c) In the event of a total assignment of all Franchisee's rights and interest in this agreement, the assignor will execute a general release in favor of Franchisor, in a form prescribed by Franchisor, provided, however, that all rights enjoyed by Franchisee and any causes of action arising in its favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of GBL 687.4 and 687.5 be satisfied.

(d) In the event that Franchisee wishes to assign this Agreement to a party other than Franchisee corporation, Franchisee agrees to first offer to assign this Agreement to Franchisor or its

MMP00E3

15

nominee, on the same terms and conditions as offered to a bona fide prospective assignee, and Franchisor shall have a period of thirty (30) days in which to accept said offer.

(e) In the event of the death or incapacity of the Franchisee, and Franchisee is not a corporation, this Agreement will be transferable to the heirs of the deceased or incapacitated Franchisee, provided the active management of the Minuteman Press Full Service Printing Center continues satisfactorily to Franchisor. If Franchisee is a corporation then, upon the death or incapacity of the shareholder holding the greatest number of shares of stock of the Corporation this Agreement will continue in effect, provided the active management of the Minuteman Press Full Service Printing Center continues satisfactorily to Franchisor. If, in either of said events, the active management of the Minuteman Press Full Service Printing Center does not continue satisfactorily to Franchisor as reasonably determined by Franchisor within sixty (60) days after the death or incapacity of the Franchisee or Largest Shareholder or in the event the heirs of said deceased or incapacitated Franchisee or Largest Shareholder do not wish to continue the operation of the Minuteman Press Full Service Printing Center, then Franchisor or its nominee shall have the first right to acquire all of Franchisee's rights in and to this Agreement before the same be offered for assignment.

(f) Franchisor, as a condition of any Transfer, will require the payment to it of a training fee by the new Franchisee in order to reimburse Franchisor for any expenses which may be incurred, the actual technical and mechanical training as well as the backup and support provided to the incoming Franchisee. The training fee shall be Seventeen Thousand Five Hundred Dollars ($17,500), or the then current training fee charged by Minuteman Press International, Inc. The training fee will be payable by the new franchisee.

(g) Franchisor's consent to any proposed assignment hereunder shall not be deemed unreasonably withheld if the current Franchisee is in default of his obligation under the license agreement. Franchisor's consent to any proposed assignment hereunder shall not be deemed unreasonably withheld if the proposed assignee, in Franchisor's opinion, does not have the proper qualifications, capital, training and experience (or within a reasonable time cannot acquire such training and experience) and does not meet other standards that are reasonably required by Franchisor.

(h) Upon Franchisor's approval of a proposed assignment, the franchise agreement currently in force shall be surrendered to the Franchisor, and the Franchisee shall execute the then current form of License Agreement as Franchisor may reasonably require. The new Franchisee shall be required to attend the Minuteman Press Training Center Program

MMP00E3

16

### 17. **Agency and Indemnity**

This Agreement does not create the relationship of principal and agent between Franchisee and Franchisor. Neither Franchisee nor Franchisor will under any circumstances, act or hold itself out as an agent or representative of the other nor incur any liability or create any obligation whatsoever in the name of the other. Franchisee will indemnify Franchisor and hold it harmless from any claims, demands, liabilities, actions, suits or proceedings asserted by third parties and arising out of the operation by Franchisee of the Premises. In the event any such claims, demands, actions, suits or proceedings relating to the Premises are commenced against Franchisor, Franchisee shall be solely responsible for the defense thereof, utilizing counsel reasonably satisfactory to Franchisor, and will promptly pay and discharge the expenses of such defense and all judgments and liens arising therefrom.

### 18. **Actions Against Franchisee**

In the event any claim, demand, action or proceeding is brought against Franchisee, or if Franchisee is notified of any violation of an applicable rule or statute, Franchisee will immediately notify Franchisor thereof, giving full particulars, and will diligently and expeditiously defend, compromise, cure or satisfy such claim, action, demand, proceeding or violation in Franchisee's sole discretion. Franchisee shall, in all respects, strive to uphold the standards and good will created in the Marks.

### 19. **Restrictive Covenant**

During the term of this Agreement, Franchisee will not directly or indirectly, as owner, employee, or otherwise, have any interest in or control over any type of business substantially similar to that of a Minuteman Press System establishment. Additionally, Franchisee will not divert or attempt to divert any business of or any customer of, the business licensed hereunder to any competitor, by direct or indirect means.

Unless specifically prohibited by state law Franchisee shall not for a period of two (2) years after termination of this Agreement, directly or indirectly, as owner, employee, or otherwise, have any interest in or control over any type of business substantially similar to that of a Minuteman Press System establishment within a radius of five (5) miles from the Minuteman Press Full Service Printing Center with which he had been formerly associated or within an area of five (5) miles from any existing Minuteman Press Full Service Printing Center. Franchisor acknowledges that Franchisee has previously made his living in other fields and

MMP00E3

 

17

that this paragraph in no way prevents him from earning his living in other fields of endeavor.  The provisions of this paragraph will survive the termination of this Agreement, and will continue to be binding upon Franchisee individually and its individual shareholders, officers and directors notwithstanding any assignment pursuant to Paragraph 16.

### 20. Additional Remedies of Franchisor

Franchisee acknowledges that the restrictions contained in Paragraphs 2 and 19 of this Agreement are a reasonable and necessary protection of the legitimate interests of Franchisor, that any violation of them would cause substantial and irreparable injury to Franchisor, and that Franchisor would not have entered into this Agreement with Franchisee without receiving the additional consideration of Franchisee's binding itself to said restrictions.  In the event of any violation of the said restrictions, Franchisor shall be entitled, in addition to any other remedy at law, to seek preliminary and permanent injunctive relief.

### 21. Notices

All notices which the Franchisor is required or may desire to give to the Franchisee under this Agreement may be delivered personally or may be sent by certified mail or registered mail, postage prepaid, addressed to Franchisee at either store address ___855 Market ST, Lemoyne, PA 17043___ , or home address, ___4101 Fawn Square, Harrisburg, PA 17112___ .  All notices which Franchisee may be required or desires to give to Franchisor shall be sent by certified mail or registered mail, postage prepaid, addressed to: Minuteman Press International, Inc. 1640 New Highway, Farmingdale, NY 11735.

The addresses herein given for notices may be changed at any time by either party by written notice given to the other party as herein provided.  Notices shall be deemed given upon personal delivery or two (2) business days after deposit in the U. S. Mails.

The Franchisee must give the Franchisor immediate written notice of any alleged breach or violation of this Agreement after the Franchisee has knowledge of, believes, determines or is of opinion that there has been an alleged breach of this Agreement by the Franchisor including any acts of misfeasance to nonfeasance.  If the Franchisee fails to give written notice within one (1) year from the date that the Franchisee has knowledge of, believes, determines or is of the opinion that there has been an alleged breach by the Franchisor, then the alleged breach by the Franchisor will be deemed to be condoned, approved and waived by the Franchisee, the alleged breach by the Franchisor will not be deemed to be a breach of the

MMP00E3

18

agreement by the Franchisor, and the Franchisee will be permanently barred from commencing any action against the Franchisor for that alleged breach or violation.

## 22. Entire Agreement

THIS AGREEMENT AND SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF CONTAIN THE ENTIRE AGREEMENT OF THE PARTIES.  NO OTHER AGREEMENTS, WRITTEN OR ORAL, SHALL BE DEEMED TO EXIST, AND ALL PRIOR AGREEMENTS AND UNDERSTANDINGS ARE SUPERSEDED HEREBY.   NO OFFICER, EMPLOYEE OR AGENT OF FRANCHISOR HAS ANY AUTHORITY TO MAKE ANY REPRESENTATION OR PROMISE NOT CONTAINED IN THIS AGREEMENT, AND FRANCHISOR AGREES THAT IT HAS EXECUTED THIS AGREEMENT WITHOUT RELIANCE UPON ANY SUCH REPRESENTATION OR PROMISE. THIS AGREEMENT SHALL NOT BE BINDING UPON FRANCHISOR UNTIL EXECUTED BY AN AUTHORIZED OFFICER THEREOF.   THIS AGREEMENT CANNOT BE MODIFIED OR CHANGED EXCEPT BY A WRITTEN INSTRUMENT SIGNED BY ALL OF THE PARTIES HERETO.

## 23. Arbitration and Litigation

The parties hereby agree that the Federal Arbitration Act shall apply to all claims arising out of or relating to this Agreement or the breach thereof and that the business, which is the subject of this Agreement, is engaged in Interstate Commerce.  Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by arbitration in  accordance with commercial arbitration rules of the Center for Dispute Resolution at a hearing to be held in the State of New York in the county where Minuteman maintains its home office.  Any arbitration award shall be non-binding, but if the losing party consents, (such consent shall be in writing ) a judgment upon the arbitration award may be entered in any court having competent jurisdiction and then become binding and final.  Minuteman and the franchisee (and their respective owners) waive to the fullest extent permitted by law, and right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

Each party will be responsible for its own costs, including attorneys fees, in conjunction with the arbitration proceeding.  If the franchisee commences action in any court prior to the arbitrator's final decision on the controversy or claim, then the franchisee will be responsible for all expenses incurred by Minuteman and the franchisee in the arbitration proceeding.  The Franchisee acknowledges and agrees that it is the

MMP00E3

19

intent of the parties that arbitration between Minuteman and the Franchisee shall be of Minuteman's and the Franchisee's individual claims only. No consolidated or multiple party claims may be brought by either Minuteman or the Franchisee.

The commencement of arbitration proceedings by an aggrieved party to settle disputes arising out of or relating to this Agreement is a condition precedent to the commencement of legal action by either party. If the parties cannot resolve their differences through the arbitration program or if the Arbitration clause in this agreement is found to be unenforceable, then either party may bring their individual action after thirty (30) days have expired from the final decision of the arbitrator or court. In either event, any litigation shall be brought in the Supreme Court, of the State of New York located in the county where Minuteman has its home office, or in the United States District Court for the Eastern District of New York. The parties waive their rights to trial by jury except where prohibited by Federal or State law.

This Arbitration Clause shall not be construed to limit the right of Minuteman to apply to any court of competent jurisdiction for injunctive relief for infringement on any of Minuteman's service marks, trademarks, or copyrighted items, unauthorized decimation of Minuteman's confidential information or trade secrets or violations of covenant not to compete. The Franchisee recognizes that violation of these provisions may cause irreparable harm to Minuteman, other franchisees and the franchise system as a whole.

### 24. Franchisee's Acknowledgment

Franchisor has made a strong effort to familiarize Franchisee with its franchise concepts, location criteria, and the duties and responsibilities of a Minuteman Press Franchisee. Minuteman Press Full Service Printing Centers differ depending on geographic location, length of time in business, the attitude and effort of Franchisee. Franchisee acknowledges the business and economic risks associated with the purchase of a franchise.

FRANCHISOR SPECIFICALLY STATES THAT THERE IS NO MINUTEMAN PRESS FULL SERVICE PRINTING CENTER THAT MAY BE CONSIDERED TO BE A "TYPICAL" OR "AVERAGE" CENTER. FRANCHISOR MAKES NO REPRESENTATIONS OR GUARANTEES AS TO GROSS SALES, NET PROFITS, GROSS PROFITS, REVENUES OR OTHER EARNINGS ANY FRANCHISEE CAN EXPECT. FRANCHISEE IS NOT ENTITLED TO ANY COMPENSATION OR REIMBURSEMENT FOR LOSS OF PROSPECTIVE PROFITS, ANTICIPATED SALES OR OTHER LOSSES.

MMP00E3

No person is authorized to give any representation other than those contained in or incorporated in this Franchise Agreement; and if given or made, such information or representation should not be relied upon as having been authorized.

### 25. Miscellaneous Provisions

(a) This Agreement shall be binding upon the parties hereto, their successors and assigns.

(b) As to any provision in this Agreement wherein approval is required, or modification desired, such approval or modification must be in writing and signed by the party to be charged.

(c) If any portion of this Agreement is declared to be invalid by any court, such determination shall not affect the balance of this Agreement and the same will remain in full force and effect.

(d) THIS AGREEMENT SHALL BE GOVERNED AS TO VALIDITY, CONSTRUCTION AND IN ALL OTHER RESPECTS, BY THE LAW OF THE STATE OF NEW YORK.

(e) The failure of Franchisor to enforce at any time or for any period of time any one or more of the terms or conditions of this Agreement shall not be a waiver of such terms or conditions or of Franchisor's right thereafter to enforce each and every term of this Agreement.

(f) Franchisor may sell or assign its interest in the license, in whole or in part, at any time.

(g) The captions herein are inserted for convenience only, and will not be deemed or construed to be a part of this Agreement or to define or limit the contents of the paragraph thereof.

(h) Franchisee acknowledges receipt from Franchisor of offering prospectus covering the terms of this Agreement.

(i) Franchisee acknowledges that State and Federal law may require the Franchisor to list the home address of the Franchisee in particular circumstances. Franchisee agrees and gives their consent to use the same.

MMP00E3

21

IN WITNESS WHEREOF the parties hereto have signed and sealed this instrument the day and year first above written.

Witness:

MINUTEMAN PRESS INTERNATIONAL, INC.

BY: _____
Franchisor     — Robert G. Emmett, V.P.

_____

BY: _____
Franchisee     — Michael A. Shaffer

_____

BY:_____
Franchisee

_____

_____

BY:_____
        Title
A corporation organized under the laws
        of the State of _____

_____

I have read the foregoing Agreement and understand and consent to the terms and provisions thereof, having affixed my initials to each respective page.

_____
Franchisee Signature  — Michael A. Shaffer

_____
Franchisee Signature

MMP00E3

22

## FRANCHISEE'S RATIFICATION

In consideration of the execution of the foregoing License Agreement with Minuteman Press International, Inc., the Franchisee hereby acknowledges that:

I have read and understand the foregoing License Agreement and understand that if I do not understand any terms of the License Agreement or if I do not understand any terms of this Acknowledgement of Receipt that I have the right to have my own attorney explain any terms of this Agreement to me; <u>Minuteman encourages you to seek the advice of an attorney prior to signing the Franchise Agreement.</u>

I understand that although Minuteman Press International, Inc., will provide assistance and advice, as outlined in the License Agreement, Minuteman Press cannot guarantee my success as a Minuteman Press Franchisee, and that my earnings as a Minuteman Press Franchisee will be primarily dependent upon my individual efforts in operating my Minuteman Press center.

I ACKNOWLEDGE THAT NEITHER MINUTEMAN PRESS INTERNATIONAL, INC., NOR ANY OF ITS DIRECTORS, OFFICERS, AGENTS OR EMPLOYEES HAS MADE ANY CLAIMS OR REPRESENTATIONS WHATSOEVER REGARDING POTENTIAL REVENUES, EARNINGS OR PROFITS, THAT A FRANCHISEE WILL ACHIEVE AS THE OWNER OF A MINUTEMAN PRESS FULL SERVICE PRINTING CENTER. I REPRESENT THAT I HAVE ENTERED INTO THE LICENSE AGREEMENT WITHOUT RELYING UPON ANY CLAIM OR REPRESENTATION NOT CONTAINED IN THE OFFERING CIRCULAR AND TO DO SO WOULD BE UNREASONABLE. I UNDERSTAND THAT THE FRANCHISOR IS RELYING UPON MY REPRESENTATION IN MAKING ITS DECISION TO GRANT THE FRANCHISE.

While Minuteman Press International, Inc., has offered assistance, I UNDERSTAND THAT I AM ASSUMING FULL RESPONSIBILITY FOR, AND HAVE HAD THE FINAL, ULTIMATE APPROVAL OF THE SITE SELECTED AND THE LEASE EXECUTED FOR THAT SITE, I further understand that I have the right to have my own attorney review the lease and explain to me any provisions of the lease.

Executed this _1st_ day of _Sept_ ,~~19~~ 2000

Witness

_____

BY:X _Michael A. Shaffer_

Franchisee - Michael A. Shaffer

_____

BY:X _____

Franchisee

_____

BY:X _____

Franchisee

_____

Corporate Name

_____

BY:X _____

Name & Title

A corporation organized under the laws of the State of _____

MMP00E3



SCHEDULE A

LEMOYNE, PENNSYLVANIA
DENNIS M. & SUSAN D. GRAYBILL
TO: MICHAEL A. SHAFFER

## EQUIPMENT DESCRIPTION LIST

COMPUTER WORKSTATION

COLOR COMPUTER MONITOR

LASERJET PRINTER

SOFTWARE

ONE MODEL 1650 XE-CD AM INTERNATIONAL OFFSET PRESS

ONE 1650 MODEL SWING-AWAY SECOND COLOR HEAD

MULTI-INSTALLED KOMPAC AUTOMATIC DAMPENER SYSTEM

ONE SP 990 PHOTO-DIRECT SILVER PLATEMAKER SYSTEM

METAL PLATEMAKER/MERCURY PRINTER

PLATE PUNCH

LIGHT TABLE

PRECISION PAPER CUTTER

AUTOMATIC AIR/SUCTION FEED FOLDER

PAPER DRILL

ELECTRIC SADDLE STAPLER

PADDER

THREE STEEL WORK TABLES

NEON SIGN PACKAGE

WINDOW GRAPHICS PACKAGE

FRONT LOBBY SERVICE COUNTER

FILE CABINET

TWO SIX FOOT FOLDING TABLES

LOBBY FURNITURE

DESK

SECRETARIAL CHAIR

STEEL SHELVING

IT IS UNDERSTOOD AND AGREED THAT THE ABOVE EQUIPMENT HAS BEEN PREVIOUSLY
USED.

11/24/98

AGREED - DENNIS M. GRAYBILL & SUSAN D. GRAYBILL                         DATED